No. 04-1255C
(Judge Robert H. Hodges, Jr.)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LUMBERMENS MUTUAL CASUALTY COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# PLAINTIFF'S CORRECTED OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

---

Mark G. Jackson
PRESTON GATES & ELLIS LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580
(206) 623-7022

Counsel of Record for Plaintiff
LUMBERMENS MUTUAL
CASUALTY COMPANY

Derek D. Crick
Kevin A. Rosenfield
PRESTON GATES & ELLIS LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580
(206) 370-6586

May 4, 2005

## TABLE OF CONTENTS


1. INTRODUCTION .......... 1
II. STATEMENT OF THE ISSUES .......... 2
III. STATEMENT OF THE CASE .......... 2
  A. Contract Award .......... 2
  B. Relevant Contract Requirements .......... 3
  C. Performance by and Payment to Landmark .......... 5
  D. Modification No. A00010 .......... 8
  E. Termination, Takeover, and Completion. .......... 9
  F. Assessment of Liquidated Damages .......... 11
  G. Lumbermens' Claims .......... 12
IV. ARGUMENT .......... 13
  A. Standard of Review .......... 13
  B. This Court Has Jurisdiction Over Lumbermens' Claims Based Upon Pro Tanto Discharge/Impairment of Suretyship. .......... 15
  C. This Court Possesses Jurisdiction to Consider Lumbermens' Claims under the Doctrine of Equitable Subrogation. .......... 18
  D. This Court Has Jurisdiction Over Lumbermens' Claims for Breach of the Takeover Agreement. .......... 20
    *1. The CDA does not apply to the Takeover Agreement.* .......... 21
    *2. Lumbermens is Not a "Contractor" Under the CDA.* .......... 23
V. CONCLUSION .......... 27

# TABLE OF AUTHORITIES

## Cases

Admiralty Construction, Inc. v. Dalton, 156 F.3d 1217 (Fed. Cir. 1998) ........................ 25

American Insurance Co. v. United States, 62 Fed. Cl. 151 (2004) .................................. 16

Brubaker Amusement Co. v. United States, 304 F.3d 1349 (Fed. Cir. 2002) ........................................................................................................ 13

Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573 (Fed. Cir. 1993) ................................ 14

Coastal Corp. v. United States, 713 F.2d 728 (Fed. Cir. 1983) ....................................... 22

Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 119 S. Ct. 1661 (1999) ........................................................................................................ 13

Fireman's Fund Ins. Co. v. United States, 313 F.3d 1344 (Fed. Cir. 2002) ..................... 23

First Annapolis Bancorp, Inc. v. United States, 54 Fed. Cl. 529 (2002) .......................... 14

G.E. Boggs & Assocs., Inc. v. Roskens, 969 F.2d 1023 (Fed. Cir. 1992) ........................ 21

Gutz v. United States, 45 Fed. Cl. 291 (1999) ................................................................ 22

Ins. Co. of the West v. United States, 55 Fed. Cl. 529 (2003) .......................................... 18

International Fidelity Insur. Co. v. United States, 41 Fed. Cl. 706 (1998) ................. 15, 18

Moyer v. United States, 190 F.3d 1314 (Fed. Cir. 1999) ................................................. 14

National Surety v. United States, 118 F.3d 1542 (Fed Cir. 1997) ............................. 16, 17

National Union Indem. Co. v. G. E. Bass & Co., 369 F.2d 75 (5th Cir. 1966) ........................................................................................................ 16

Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746 (Fed. Cir. 1988) ........................................................................................................ 13

Sharman Co., Inc. v. United States, 2 F.3d 1564 (Fed. Cir. 1993) .................................. 25

St. Paul Fire and Marine Insur. Co. v. United States, 1994 U.S. Claims LEXIS 189, 39 Cont. Cas. Fed. (CCH) P76,706 (1994) ........................................... 23

Travelers Indemnity Co. v. United States, 16 Cl. Ct. 142 (1988) ............................... 23, 26

U.S. Fidelity & Guar. Co. v. United States, 475 F.2d 1377 (Ct. Cl. 1973) ....................... 17

United Pacific Ins. Co. v. United States, 16 Cl. Ct. 555 (1989) ................................. 15, 16

United Pacific Insur. Co. v. Roche, No. 04-1334, 2005 U.S. App. LEXIS 4494, at *3 (Fed. Cir. March 18, 2005) ......................................................... 23

United States Fire Insur. Co. v. United States, 61 Fed. Cl. 494 (2004) ...................... 18, 19

United States v. Mitchell, 463 U.S. 206, 103 S. Ct. 2961 (1983) .................................... 15

United States v. Reliance Ins. Co., 799 F.2d 1382 (9th Cir. 1986) .................................. 16

United States. v. Seaboard Surety Co., 817 F.2d 956 (2nd Cir. 1987) ............................. 25

W.R. Cooper Gen. Contractor, Inc. v. United States, 843 F.2d 1362 (Fed. Cir. 1988) ................................................................................................. 13

Westech Corp. v. United States, 20 Cl. Ct. 745 (1990) ...................................... 20, 21, 26

White Mountain Apache Tribe v. United States, 249 F.3d 1364 (Fed. Cir. 2001) .......... 14

**Statutes**

28 U.S.C. § 1491 .......... 14
28 U.S.C. § 1491(a)(1) (2001) .......... 14
41 U.S.C § 602(a) (1978) .......... 21
41 U.S.C. § 601(4) .......... 26
41 U.S.C. § 609(a)(1) .......... 26

**Other Authorities**

RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY §§ 37-44 (1996) .......... 17
Robert G. Watt, et. al., The Surety's Procedures for Preserving and Defending Its Rights Following Default Termination, 22 Constr. Lawyer 10 (2002) .......... 16
S. Rep. No. 95-1118, 95th Cong., 2d Sess. 16, *reprinted in* 1978 U.S.C.C.A.N. 5235 .......... 25, 26

## 1. INTRODUCTION

This Court has jurisdiction over all of Lumbermens' claims. The Complaint contains detailed allegations and assertions of fact which establish the jurisdiction of this Court. The Government ignores these facts or asks the Court to ignore them. For example, Counts 1 through 10 of the Complaint state causes of action for "discharge/impairment of suretyship." The Government's motion simply ignores those allegations by addressing them as if they were equitable subrogation claims. They are not. Lumbermens properly pleaded causes of action for discharge/impairment of suretyship over which this Court has jurisdiction.

Counts 11 through 20 are equitable subrogation causes of action, each based upon conduct by the Navy prior to notice of default. As a result, the Government claims this Court is without jurisdiction over these counts. However, a recent decision from this Court establishes jurisdiction over pre-notice equitable subrogation claims where—as here—the claims are based upon material deviations from the contract by the Government.

In Counts 21, 22 and 23, Lumbermens asserts causes of action for breach of the Takeover Agreement. The Government assumes, and asks this Court to assume, that all contracts, including the Takeover Agreement, are subject to the Contract Disputes Act ("CDA"). There is no basis for such an assumption. Lumbermens' claims based upon a breach of the Takeover Agreement are not subject to the CDA for two reasons. First, the Takeover Agreement is not a procurement contract and, therefore, is outside the scope of the CDA. Second, even if the Takeover Agreement were a procurement contract (which it is not), Lumbermens is not a "contractor" under the Takeover Agreement. Instead,

Atherton Construction, Inc., the Completing Contractor (who along with the Government and Lumbermens executed the Takeover Agreement), is the "contractor."

Accordingly, this Court has jurisdiction over all of Lumbermens' claims. The Government's motion to dismiss should be denied in its entirety.

## II. STATEMENT OF THE ISSUES

1. Whether this Court has jurisdiction over Counts 1 through 10 of the Complaint which assert *discharge/ impairment of suretyship claims*, which claims are based upon payments made by the Navy (a) in violation of the Contract and (b) prior to receipt by the Navy of notice of default.

2. Whether this Court has jurisdiction over Counts 11 through 20 of the Complaint which assert *equitable subrogation claims*, which claims are based upon payments made by the Navy (a) in violation of the Contract and (b) prior to receipt by the Navy of notice of default.

3. Whether Counts 21, 22 and 23 of the Complaint, which assert claims for breach of the Takeover Agreement, are subject to the Contract Disputes Act.

4. Whether this Court has jurisdiction over Counts 21, 22 and 23, which claims are based upon conduct by the Navy after notice of default resulting in costs incurred by the Completion Contractor when such costs were paid by Lumbermens, pursuant to the doctrine of equitable subrogation.

## III. STATEMENT OF THE CASE

### A. Contract Award

On or about April 11, 2000, the United States, through the United States Navy, Engineering Field Activity, Northwest, in Poulsbo, Washington ("Navy"), awarded Contract Number N44255-97-C-5515 ("Contract") to Landmark Construction Company

("Landmark"). Complaint, ¶5. Pursuant to the Contract, Landmark was to perform the repair and renovation of 160 military family housing ("MFH") units at the Naval Air Station, Whidbey Island, in Oak Harbor, Washington ("Project"). Id., ¶6. As awarded, the Contract price was $9,878,026.00, and the Contract completion date was October 23, 2002. Id., ¶¶6, 11. Lumbermens provided both the performance and payment bonds for the Contract. Id., ¶8.

**B. Relevant Contract Requirements**

The Contract incorporated by reference or in full text a variety of clauses relevant to the issues raised in Lumbermens' Complaint. Pursuant to FAR 52.232-5, Payments Under Fixed-Price Construction Contracts (May 1997) ("the Payments Clause"), the Navy was to make progress payments monthly as the work on the Project proceeded, or at more frequent intervals as determined by the Navy, based upon estimates of work accomplished. Id., ¶¶10, 12.[1] The Payments Clause also provides that all material for which payment was made as part of a progress payment shall, at the time of payment, become the sole property of the Government. Id., ¶14.

The Contract placed specific limitations on the Navy's authority to include in progress payments amounts for the purchase of materials. Id., ¶100. Those limitations included the requirement that Landmark provide the Navy satisfactory evidence that the material for which payment was requested had been delivered to the Project site or that Landmark has acquired title to the property. Id., ¶111. In addition, the Contract also expressly provided that certain materials, i.e., those susceptible to deterioration or physical damage in storage or transit, could not be considered for progress payments if

[1] Relevant terms of the Contract are included as Exhibit 4 to the Declaration of Matthew Muretta ("Muretta Decl.").

stored off of the Project site. Id., ¶112. The Contract also required the Navy to maintain the official property records for Government property (which by definition included material for which payment was made as part of a progress payment) under the Contract. Id., ¶113.

The Contract described payment procedures in further detail in § 01200, Price and Payment Procedures. Pursuant to § 01200, Landmark—in order to receive progress payments—was to submit an invoice, a Contract Performance Statement (showing, among other things, the percentage of completion), an updated network analysis schedule ("NAS"), a release, and a certification. Id., ¶¶15, 16. The NAS submitted by Landmark with each invoice was to comply with § 01321 of the Contract and FAR 52.236-15, Schedules for Construction Contracts (Apr 1984). Id., ¶¶20, 21.

The NAS was a key document in the administration of this Contract. For scheduling and payment purposes, the Contract required the Project be broken down into discrete activities and that each activity assigned a monetary value. Id., ¶¶22, 24. The NAS was the vehicle established by the Contract to fulfill these requirements. By identifying all completed and partially completed activities at any given point, the Navy would have the ability to determine the extent of the Contractor's progress. Id. In addition, because each activity was assigned a monetary value, the Navy would have the ability to determine the amount of the progress payment earned by the Contractor. Id. The initial NAS was to be submitted to the Navy for review and approval and thereafter updated and submitted with each progress payment request. Id.

**C. Performance by and Payment to Landmark**

The NAS submitted by Landmark and approved by the Navy contained line items for more than $2.6 million in material, including $500,000 for "windows and doors," $500,000 for "cabinets," $300,000 for "paint," $485,940 for "flooring," and $287,040 for "siding." Id., ¶28. The NAS contained no definition of the scope of work contained in these material line items. Id. As a result, the NAS approved by the Navy contemplates that Landmark, upon billing the Navy for $500,000 for "windows and doors," for example, would be credited with the corresponding progress on Project completion. Id. Thus, according to the NAS submitted by Landmark, upon the mere "billing" for the material separately identified on its NAS, Landmark would be credited by the Navy for completing 26.3% of the Project. Id. The NAS submitted by Landmark did not comply with the requirements established by FAR 31.102(e)(2), the Payments Clause, or §§ 01200 and 01321 of the Contract. Nonetheless, the Navy approved Landmark's NAS. Id., ¶29.

Between its September 18, 2000 invoice and its November 20, 2000 invoice—a total of three invoices—Landmark invoiced the Navy for more than $3,105,031, or almost one-third of the Contract value of $9.878 million. Id., ¶40. When combined with two earlier invoices, the total invoiced by Landmark by November 20, 2000 was more than $3.598 million, or 36.4% of Contract value. Id. However, by November 20, 2000, the Navy had not even approved Landmark's construction drawings. As a result, Landmark had not even begun construction work on the interior of the MFH units, much less completed a single MFH unit. Id.

As of June 1, 2001, the Navy had paid, or approved for payment, a total of $4,793,633 to Landmark. Id., ¶53. Included in that amount were substantial payments for material, including $375,000 for "doors and windows," $260,000 for "cabinets," $156,000 for "paint," $485,940 for "flooring," and $257,040 for "siding." Id. When Landmark submitted progress payment requests for these materials, it did not submit invoices or other documentation identifying the quantities and types of material for which it sought payment. Id., ¶¶55, 57. Nor did Landmark submit documentation identifying the purchase price of these materials. Id. Nor did Landmark state whether the material for which it requested payment was in transit or stored and, if stored, where. Id. Indeed, Landmark did not even submit documentation establishing that the material had been ordered, much less delivered. Id., ¶¶55, 57. Moreover, the Navy did not ask Landmark to provide any such information regarding the material for which payment was sought. As a result, when it received progress payment requests for this material, the Navy did not have any evidence of title, quantity, quality, size and/or style for the material it was purchasing and to which it was obtaining title. Id., ¶¶55-58. Nonetheless, the Navy paid Landmark each time Landmark requested such payment for material. The Navy did not ask or demand that Landmark provide any further information which would substantiate quantity, type, size, or location of the material. Id. In short, the Navy paid more than $1.5 million for material without even asking—much less receiving—any information about the material the Navy owned by virtue of such payment.

By June 1, 2001, the Navy had also paid, or authorized payments in the amount of, $458,640 for "asbestos and lead abatement," $378,936 for "personnel," and $590,000 for "sitework." Id., ¶59. The $458,640 paid to Landmark for "asbestos and lead

abatement" accounted for 52% of the amount budgeted in the Navy-approved NAS for that "activity." Id., ¶60. However, pursuant to the Navy's own records, Landmark had completed only 54 of the 160 units for which it had budgeted, or 34%. Thus, pursuant to the Navy's own records, the Navy paid Landmark for abating 83 units when Landmark had abated only 54. Id. Accordingly, Landmark was paid $158,760 for work it had not performed. Payment by the Navy for 83 units when Landmark had abated only 54 units violated the Payments Clause, §§ 01200 and 01321 of the Contract and FAR 31.102(e)(2). Id.

It would have been a relatively simple matter for the Navy to divide the cost allocated to this activity by the number of MFH units at which the activity would occur. Id., ¶62. Indeed, such an analysis was required by the Contract. Id. Instead, the Navy based its payment to Landmark upon the mere passage of time. That is, rather than determine how much work Landmark had done, the Navy determined what percentage of Contract time had elapsed and paid Landmark accordingly. Id. That determination and payment also violated the terms of the Contract.

Similarly, the Navy's payments for "personnel" amounted to 52% of the amount budgeted by Landmark for this line item on the NAS. Id., ¶63. Payment of this amount also violated the terms of the Contract. Id., ¶64. The Contract required the Navy to make progress payments based upon work completed, but the Navy based its payment for the "personnel" activity on the mere passage of time. Id. According to the Navy's own records, Landmark was approximately 12% complete with the Project. Nonetheless, the Navy did not question any of the amount requested by Landmark for "personnel." As a result, the Navy paid Landmark more than $291,500 for work that Landmark did not

perform. Id., ¶65. That determination and payment by the Navy violated the terms of the Contract.

In regards to the "sitework" payments, Landmark entered into a subcontract with Lloyd Enterprises, Inc. ("Lloyd") in the amount of $590,000 to perform the "sitework." Id., ¶33. The Contract required that Landmark prepare and provide to the Navy daily Contractor Production Reports ("CPR"). Id., ¶34. The CPRs prepared by Landmark and submitted to the Navy disclose that all of Lloyd's employees worked a grand total of approximately 305 hours performing the entire scope of work subcontracted for by Lloyd. Id., ¶37. In its September 18, 2000 invoice, Landmark invoiced the Navy for the entire amount invoiced to Landmark by Lloyd, and noted on the Navy-approved NAS for "sitework" -- $590,000. Id., ¶38. The Navy authorized payment for that invoice in the full amount requested by Landmark. Id. As a result, the Navy paid Landmark for work performed by Lloyd at the rate of almost $2,000 per hour. Id. The Navy had all of the information necessary to determine that Landmark intended to pay Lloyd almost $2,000 per hour for the "sitework." Nonetheless, the Navy still approved Landmark's invoice. Id., ¶39. That determination and payment by the Navy violated the terms of the Contract.

**D. Modification No. A00010**

By bilateral Modification No. A00010, effective February 28, 2001, Landmark and the Navy added to the Contract the requirement to renovate 21 additional MFH units (for a total of 181) and increased the Contract price by $1,884,176. Id., ¶49. The modification, however, did not extend the Contract completion date, which remained as October 23, 2002. Id. Modification No. A00010 thereby significantly increased the scope of the Contract. Nevertheless, the Navy—in violation of the Contract and federal

regulations—failed to obtain the consent of the surety, Lumbermens, for this modification. Id., ¶39.

**E. Termination, Takeover, and Completion.**

By letter dated July 20, 2001, Landmark informed the Navy that Landmark was unable to complete the Project due to financial problems and was therefore in default. Id., ¶68. The Navy terminated Landmark for default on August 2, 2001. Id., ¶69. At termination, there remained $7,392,381.24 in unpaid Contract balance. Id., ¶70. The Navy had paid Landmark almost 40% of the Contract price, $4,793,633.76. However, only 22 of the 181 MFH units on Contract had been completed by Landmark. Id. The Navy estimated that the Contract was only 12% complete (based upon units completed and returned to the Navy) or 15% complete (if partially completed units were included). Id. Thus, by the Navy's own reckoning, it had overpaid Landmark between 25 and 28 percent, or between $3.040 and $3.404 million. Id.

According to the Navy, the Project was approximately 16 weeks behind schedule on August 16, 2001, two weeks after termination of Landmark. Id. The Project continued to fall behind schedule while the Navy and Lumbermens negotiated the terms of a takeover agreement. Id.

Effective November 20, 2001, Lumbermens, the Navy and Atherton Construction, Inc. ("Atherton") executed a Takeover Agreement. Id., ¶72. Atherton was identified in the Takeover Agreement as the "Completing Contractor." Id. Pursuant to ¶ 1 of the Takeover Agreement, the Completing Contractor stepped into the shoes of Landmark, the defaulted contractor:

> The Completing Contractor will perform or procure the performance of all work and other obligations of the defaulted contract not presently completed or fulfilled, including the correction and repair of all defective work and all work under the warranty provision. … The Government will deal directly with the Completing Contractor on day-to-day operations and decisions regarding contract performance. The provisions and clauses of the defaulted contract, and the plans and specifications, are incorporated into this Agreement and will be binding on the Completing Contractor.

Muretta Decl., Exhibit 1, ¶ 1. The status of the Completing Contractor as "contractor" was further emphasized in ¶¶ 3, 4, and 5, which provide, in pertinent part:

> The executed Takeover Agreement shall be incorporated by unilateral modification into Contract N44255-00-C-2529 *in the name of the Completing Contractor*.

Id., ¶ 3 (emphasis added)

> The Government shall review all requests for payment and, upon approval, shall forward payments *to the Completing Contractor as the sole payee*. ...

Id., ¶ 4 (emphasis added)

> After the date of this Takeover Agreement, the *Government shall deal solely and exclusively with the Completing Contractor* with respect to change orders under the defaulted contract, and all funds due for performance of such change order shall be paid to the Completing Contractor as sole payee.

Id., ¶ 5 (emphasis added). In contrast, Lumbermens was identified in the Takeover Agreement as the "Surety." Id., ¶ 1. Moreover, the Takeover Agreement expressly states that Lumbermens entered into that agreement in its capacity as a performance bond surety and was "not acting as a contractor."

Finally, the Takeover Agreement also provided that "the Surety or the Completing Contractor will have the right to use, without charge, any of the materials, supplies, equipment or personal property furnished or supplied to or by the Defaulted Contractor." Muretta Decl., Exhibit 1, ¶5.

### F. Assessment of Liquidated Damages

According to the Contract, if Atherton, as the Completing Contractor, failed to complete the Project by October 23, 2002 (through no fault of the Navy), the Navy could assess liquidated damages in the amount of $75 per unit per day for each day of delay. Id., ¶27. The Takeover Agreement did not modify the original completion date of the Project, which remained as October 23, 2002. Id., ¶74. Atherton completed work on the Project on June 6, 2003, and the Navy withheld liquidated damages against Lumbermens in the amount of $1,015,125. Id., ¶¶88, 89.

During performance of its Contract, Atherton notified the Navy on January 31, 2002 that the existing electrical wiring system in the MFH units did not meet the requirements of the National Electrical Code. Id., ¶76. The Navy, which had known of this problem for several months prior to the termination of Landmark, initially denied the problem's existence. Id., ¶77. Finally, on March 15, 2002, the Navy acknowledged existence of the changed condition and provided Atherton with a request for proposal to obtain the price for the added scope of work necessary to correct the deficient wiring. Id., ¶78. As a result of this changed work, Atherton incurred a 46-day delay to its critical path. Atherton requested that the Navy provide a schedule extension to accommodate this 46-day delay. Id., ¶80. The Navy refused and ultimately assessed liquidated damages against Lumbermens for the period of time encompassed by the 46-day schedule extension requested by Atherton. Id., ¶¶80, 81.

The Navy also assessed liquidated damages against Lumbermens during the period in which Atherton was completing the additional 21 MFH units placed on the Contract by Modification No. A00010. Id., ¶82. The Navy did not obtain the surety's

consent for Modification No. A00010. Id., ¶83. Accordingly, the 21 additional MFH units were not within the scope of work bonded by Lumbermens. The 21 MFH units added by Modification No. A00010 would have reasonably required an additional 74 days to complete. Id., ¶¶84, 85. Thus, Lumbermens is entitled to a 74-day schedule extension to complete the 21 additional MFH units that were not part of its bonded scope of work. Id. The assessment of liquidated damages by the Navy for that period violated the terms of the Contract and the Takeover Agreement.

**G. Lumbermens' Claims**

Lumbermens filed suit pursuant to the Tucker Act, 28 U.S.C. § 1491. Lumbermens asserts the following claims:

- Counts 1 through 10: Impairment of suretyship claims (also known as "pro tanto discharge") based upon the Navy's numerous breaches of the Contract through its improper approval of Landmark's NAS, the Navy's failure to withhold progress payments, and the Navy's improper payments to Landmark for doors, windows, cabinets, paint, flooring, siding, asbestos abatement, personnel, and sitework. Id., ¶¶90-179.
- Counts 11 through 20: Equitable subrogation claims, likewise based upon the Navy's numerous breaches of the Contract through its improper approval of Landmark's NAS, the Navy's failure to withhold progress payments, and the Navy's improper payments to Landmark for doors, windows, cabinets, paint, flooring, siding, asbestos abatement, personnel, sitework. Id., ¶¶180-270.
- Counts 21, 22, and 23: Breach of the Takeover Agreement claims, based upon (a) the Navy's failure to provide Lumbermens with all material purchased by the Navy for the Project using Contract funds; (b) the Navy's refusal to extend the Contract

completion date by 46 days due to differing site conditions encountered by Atherton, resulting in the assessment of liquidated damages in violation of the Takeover Agreement; and (c) the Navy's refusal to extend the Contract completion date by 74 days for Atherton to complete the unbonded scope of work contained in Modification No. A00010 to the Contract, resulting in the assessment of liquidated damages in violation of the Takeover Agreement. Id., ¶¶270-86. As discussed below, these counts also state claims under the doctrine of equitable subrogation claims.

## IV. ARGUMENT

### A. Standard of Review

A plaintiff must establish jurisdiction by a preponderance of the evidence. Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion only if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of [the] claim which would entitle [the plaintiff] to relief." Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 654, 119 S. Ct. 1661 (1999); Brubaker Amusement Co. v. United States, 304 F.3d 1349, 1355 (Fed. Cir. 2002). See also W.R. Cooper Gen. Contractor, Inc. v. United States, 843 F.2d 1362, 1364 (Fed. Cir. 1988) ("When the facts alleged in the complaint reveal 'any possible basis on which the non-movant might prevail, the motion must be denied.'")

Where, as here, a Rule 12(b)(1) motion "simply challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations—that is, the movant presents a "facial" attack on the pleading[2]—then those allegations are taken as

[2] "For the purposes of this motion only, we accept as true the factual allegations set forth in the complaint." Government's Motion to Dismiss, p. 2, n.1.

true and construed in a light most favorable to the complainant." Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citation omitted). In considering a motion to dismiss for lack of subject matter jurisdiction, the Court may examine relevant evidence in order to resolve any factual disputes. See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999). See also Cedars-Sinai Med., 11 F.3d at 1584 (Fed. Cir. 1993) ("In establishing predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings … .")

Lumbermens asserts jurisdiction for its claims under the Tucker Act, 28 U.S.C. § 1491. In relevant part, the Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded … upon an express or implied contract with the United States ... ." 28 U.S.C. § 1491(a)(1) (2001). The Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. Id. See First Annapolis Bancorp, Inc. v. United States, 54 Fed. Cl. 529, 538 (2002). Individual claimants must "demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained'." White Mountain Apache Tribe v. United States, 249 F.3d 1364, 1372 (Fed. Cir. 2001) (quoting U.S. v. Mitchell, 463 U.S. 206 at 217, 103 S.Ct. 2961 (1983).

Here, the Tucker Act provides the Court with subject matter jurisdiction for Lumbermens' claims against the Government for impairment of suretyship (also known as "pro tanto discharge"), equitable subrogation, and breach of the Takeover Agreement. First, it is settled law that the Tucker Act confers jurisdiction to this Court for claims of impairment of suretyship against the Government. United Pacific Ins. Co. v. United

States, 16 Cl. Ct. 555 (1989). Second, the Tucker Act also provides jurisdiction for claims asserted against the Government under the doctrine of equitable subrogation. International Fidelity Insur. Co. v. United States, 41 Fed. Cl. 706, 711 (1998). Finally, Lumbermens' claim for breach of the Takeover Agreement is based upon an express contract with the United States and thus fits within the scope of the Tucker Act. See 28 U.S.C. § 1491(a)(1). See also United States v. Mitchell, 463 U.S. 206, 215, 103 S. Ct. 2961 (1983) ("The Court of Claims' jurisdiction over contract claims against the Government has long been recognized, and Government liability in contract is viewed as perhaps the 'widest and most unequivocal waiver of federal immunity from suit'.")

**B. This Court Has Jurisdiction Over Lumbermens' Claims Based Upon Pro Tanto Discharge/Impairment of Suretyship.**

Counts 1-10 of the Complaint are based upon the doctrine of pro tanto discharge or impairment of suretyship. The Government's motion does not directly address these counts of the Complaint. Instead, the Government appears to argue that discharge and equitable subrogation claims are one and the same, that both require notice to the Government before any surety claim can accrue. If that is indeed the Government's argument, it is wrong as a matter of law. The Court clearly has jurisdiction over Lumbermens' claims based upon the doctrine of discharge/impairment of suretyship.

Courts have generally stated the doctrine of "pro tanto discharge" or "impairment of suretyship" as follows:

> Where there has been a material departure from contractual provisions relating to payments and the security of retained funds, a compensated surety is discharged from its obligations on the performance bond to the extent that such unauthorized payments result in prejudice or injury.

National Union Indem. Co. v. G. E. Bass & Co., 369 F.2d 75, 77 (5th Cir. 1966); United States v. Reliance Ins. Co., 799 F.2d 1382, 1385 (9th Cir. 1986).[3] By showing that the Navy materially departed from its contractual obligations, Lumbermens may recover losses suffered as the result of the impairment of its rights under the bonded contract. This Court has jurisdiction over such causes of action.

Unlike a subrogation claim, courts consistently acknowledge that a surety may recover under a claim for pro tanto discharge *irrespective of notice*. National Surety v. United States, 118 F.3d 1542 (Fed Cir. 1997) (recovery permitted where government disbursed improper payments prior to notice); American Insurance Co. v. United States, 62 Fed. Cl. 151, 156 (2004) (acknowledging that "a surety may, *without providing the requisite notice*, recover against an obligee that impairs its suretyship status," but finding no impairment in that case) (emphasis added); United Pac. Ins. Co. v. United States, 16 Cl. Ct. 555 (1989) (despite absence of notice, surety permitted to recover progress payment made by government in violation of the contract's payment provisions).

In National Surety, the Federal Circuit held that the surety was entitled to recover damages, finding that the government was liable for its improper release of the retainages *even though the government had not received formal notice of the default*. National Surety, 118 F.3d at 1544-46. According to the court, this liability arose from the government's obligations to the surety "to administer the contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded." Id. at 1546 (quoting U.S. Fidelity & Guar. Co. v.

[3] For a secondary discussion of the doctrine of discharge/impairment, see Robert G. Watt, et. al., The Surety's Procedures for Preserving and Defending Its Rights Following Default Termination, 22 Constr. Lawyer 10 (2002) ("An act that increases a surety's risk of loss by increasing its cost of performance constitutes an impairment of suretyship status.")

United States, 475 F.2d 1377, 1384 (Ct. Cl. 1973)). Consequently, "[c]ontract terms that provide security for the bonded performance can not be ignored, waived, or modified without consideration of the surety's interests." Id. at 1547. The Government's failure to comply with the terms of the contract was a change in the terms from those on which the surety provided its bonds, and the Government was therefore liable. Id. The fact that the Government had already released this security—and had not received prior notice of impropriety from the surety—simply did not permit the Government to avoid liability for losses sustained by the surety. Id.[4]

As pleaded by Lumbermens in its Complaint, the Navy breached contractual obligations that provided security for the bonded performance. The Contract contained express limitations on when, how, and to what extent the Government could make payment to Landmark. Such provisions included (1) the Payments Clause, (2) FAR 52.236-15, (3) § 01200 of the Contract, and (4) § 01321 of the Contract. See, e.g., Complaint, ¶ 20-26, 29. The Government was also contractually required to adhere to a procedure of approving progress payments that "ensure[d] that payments are commensurate with work accomplished." Id., ¶ 93. The Government, however, administered the Contract improperly and violated these contract provisions.

---

[4] In so holding, the Federal Circuit in National Surety adhered to the position of the Restatement (Third) of Suretyship and Guaranty, under which a surety has a claim against an obligee that increases its costs of performance even if the latter is unaware that the obligor has defaulted. See RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY §§ 37-44 (1996). Notably, neither National Surety nor the Restatement require (or even indicate) that the contractual provisions in question must be—as the Government asserts in its motion—"intended for the benefit of the parties to the contract." See Def. Mot, p. 7, n. 7. The *intent* of the parties in this context is irrelevant and is not an element in a discharge claim. Instead, all that matters is the *effect* of the contractual provision: i.e., whether the Government's failure to adhere to the provision materially increased the surety's risk. See National Surety, 118 F.3d at 1545-47; RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY §§ 37-44. As discussed supra, the Government impaired Lumbermens' rights by derogating from multiple contractual provisions which provided security for the surety's interest.

Because the Government materially departed from contractual provisions relating to payments and the security of retained funds, Lumbermens is entitled to recover damages that resulted thereof. The Government's duty to protect the rights of the surety extends even before the Government has received noticed of the contractor's default. Lumbermens is permitted to pursue its claims against the Government under the doctrine of pro tanto discharge/impairment of suretyship. The Government's motion to dismiss these claims should be denied.

**C. This Court Possesses Jurisdiction to Consider Lumbermens' Claims under the Doctrine of Equitable Subrogation.**

Counts 11 through 20 of the Complaint are equitable subrogation claims. These claims are presented as alternate theories of recovery to Counts 1 through 10. Under the doctrine of equitable subrogation, Lumbermens is entitled recover contract funds that were improperly disbursed by the Navy to Landmark. "It is settled law that the Tucker Act, coupled with the doctrine of equitable subrogation, provides subject matter jurisdiction to the court to determine a surety's claim against the government." International Fidelity Insur. Co. v. United States, 41 Fed. Cl. 706, 711 (1998). See also Ins. Co. of the West v. United States, 55 Fed. Cl. 529, 533 (2003) ("sovereign immunity presents no barrier to a claim by a subrogee surety against the United States").

The Government now asserts that Lumbermens' failure to notify the Navy of the Navy's violation of the Contract during performance bars Lumbermens' equitable subrogation claims. See Motion, p. 5. The Government's assertion is wrong.

The Court of Federal Claims recently indicated that a surety may recover any and all depleted contract funds under an equitable subrogation claim. See United States Fire Insur. Co. v. United States, 61 Fed. Cl. 494 (2004). Mirroring the facts of the instant

case, the government in United States Fire improperly paid the contractor for work that was not performed and for work that was not properly performed. After the contractor defaulted, the surety sought to recover all improper payments made to the contractor before the default or notice thereof. The government sought dismissal of the surety's claim, arguing that the doctrine of equitable subrogation did not permit such a claim. The Court, however, ruled that equitable subrogation sufficiently provided the court with jurisdiction to decide the claim:

> To bring a claim against the government, the surety must first settle the amounts due to the subcontractors and then, under the doctrine of equitable subrogation, step into the shoes of the contractors and bring suit directly against the Government. Once this occurs, however, no act here limits the right of subrogees to bring suit against the government, and thus sovereign immunity presents no barrier to such an action.

Id. at 501. (citations omitted) Here, the surety's claim is no different. Just as in United States Fire, Lumbermens seeks to recover improper payments made to the contractor prior to notice of the default. And, just as in United States Fire—and differentiating the instant case from those cases cited by the Government in its motion—Lumbermens' equitable subrogation claim is based upon contractual obligations to which the Government failed to adhere. Such obligations, as discussed supra, include the Payments Clause, FAR 52.236-15, FAR 31.102(e)(2), § 01200 of the Contract, and (4) § 01321 of the Contract. See Discussion, supra, Part III.B, p. 17. Lumbermens is therefore entitled to pursue the equitable subrogation claims of Counts 11-20 under the Tucker Act.

Moreover, even if the notice requirements were imposed, the Government's motion on this point is limited in its application to only Counts 11-20, the specific equitable subrogation claim based upon pre-notice condition.[5]

**D. This Court Has Jurisdiction Over Lumbermens' Claims for Breach of the Takeover Agreement.**

Lumbermens' complaint includes three claims for breach of the Takeover Agreement. In Count 21, Lumbermens claims that, in violation of paragraph 10 of the Takeover Agreement, the Navy failed to provide to Lumbermens all of the materials that the Navy purchased for the Project. Complaint, ¶¶270-77. In Counts 22 and 23, Lumbermens asserts that the Navy improperly assessed liquidated damages for delays caused by (1) a differing site condition relating to electrical wiring and (2) performing work outside the bonded contract, specifically the scope of work called for by Modification No. A00010, a modification to which Lumbermens never consented. Id., ¶¶278-86.

The Government argues that the Contract Disputes Act ("CDA") requires Lumbermens to first submit these claims to the contracting officer for a final decision and, because Lumbermens did not, this Court is without jurisdiction over these claims.

[5] The Government assumes that all of Lumbermens subrogation claims involve the disbursement of funds prior to notice. That assumption is inaccurate. Although couched in different terms, Counts 21, 22 and 23 adequately pleaded causes of action for equitable subrogation. These claims, alternatively pursued by Lumbermens as breach of the Takeover Agreement, are based upon the Navy's failure to provide the Completion Contractor, Atherton, with materials and schedule extensions. Lumbermens paid Atherton for that material and reimbursed Atherton for the liquidated damages withheld by the Navy. Muretta Decl., ¶¶6-8. A surety, under the doctrine of equitable subrogation, may recover the amount of the contract balance improperly retained by the government. See Westech Corp. v. United States, 20 Cl. Ct. 745, 749 (1990). Notably, these damages occurred *well after the Navy had received notice of Landmark's default*—and thus after the Navy's equitable duties had been triggered.

See Def. Mot., pp. 10-12. However, the CDA does not apply to the Takeover Agreement. Moreover, even if the CDA applied to the Takeover Agreement, Lumbermens is not a "contractor" for the purposes of the CDA.[6]

***1. The CDA does not apply to the Takeover Agreement.***

Contrary to the government's assumption, "not all government contracts … fall within the Contract Disputes Act." G.E. Boggs & Assocs., Inc. v. Roskens, 969 F.2d 1023, 1026 (Fed. Cir. 1992). Instead, the CDA applies only to contracts entered into by an executive agency for the "procurement" of property, services or construction and the "disposal" of personal property. 41 U.S.C § 602(a) (1978). The Takeover Agreement is not a "procurement" contract.

Initially, it is clear that the Takeover Agreement does not alter the services or obligations required of Lumbermens:

> It is understood and agreed that the Surety, by entering into this Agreement, *is not acting as a contractor, but is instead acting in its capacity as a performance bond surety*. The Surety, who will have no employees on the project site, shall have no obligation to furnish any insurance under the contract, and any insurance required under the contract shall be provided by the Completing Contractor.

Muretta Decl., Exhibit 1, ¶ 9 (emphasis added). Lumbermens remained a surety and its services as a surety did not change. The "services contracted for and/or performed by … [a surety], do not fit within those agreements deemed 'contracts' with the government." Westech Corp., 20 Cl. Ct. at 749 (rejecting application of the CDA to an implied contract with a surety). Here, because (1) the services provided by Lumbermens under the

[6] Even if the CDA were applied to the Takeover Agreement and/or Lumbermens were viewed as a "contractor", Counts 21, 22 and 23 would, nonetheless, be within this Court's jurisdiction under the doctrine of equitable subrogation. See infra, note 5.

Takeover Agreement were those normally provided by a surety and (2) surety services are not subject to the CDA, the CDA does not apply to the Takeover Agreement.

Unlike the Contract, the Takeover Agreement does not itself procure construction services. Instead, the Takeover Agreement arranges for and leads to a contract for the procurement of construction. Accordingly, at best, the Takeover Agreement is ancillary to a contract for the procurement of construction and is not within the coverage of the CDA. See, e.g., Coastal Corp. v. United States, 713 F.2d 728, 730 (Fed. Cir. 1983) (holding that an implied contract to consider bids fairly was merely ancillary to a contract for goods and services, not itself a contract for goods or services, and, as a result, not within the CDA).

Indeed, as between the Navy and Lumbermens, the Takeover Agreement is nothing more than a settlement agreement. The "whereas" clauses describe the situation in which the parties found themselves—the existence of the Contract, guarantee by Lumbermens of the principal, default by the principal, the Navy's demand and Lumbermens agreement to perform its duties under the performance bond. Paragraphs 1–11 of the Takeover Agreement describe the terms of that settlement agreement. Pursuant to these terms, the Parties agreed to resolve how Lumbermens would perform its duties under the performance bond. Lumbermens is merely asserting the Navy breached that settlement agreement. A claim alleging a breach by the government of a settlement agreement is not covered by the CDA. Gutz v. United States, 45 Fed. Cl. 291, 298-99 (1999) (suit for breach of a settlement agreement arising from a farm deficiency payment dispute is not covered by the CDA). For these reasons, the Takeover Agreement is not a

procurement contact covered by the CDA. The Government's motion to dismiss Counts 21-23 should be denied.

***2. Lumbermens is Not a "Contractor" Under the CDA.***

Indeed, even if the CDA applied to the Takeover Agreement, Lumbermens would, nonetheless, not qualify as a "contractor" under the CDA for two reasons. First, Lumbermens remained a "surety" under the Takeover Agreement. Second, designation of Lumbermens as a CDA "contractor" in this context would violate the "single point of contract" rule in government contracts.

A takeover agreement—under certain circumstances—may turn the surety into a "contractor" under the CDA. See Fireman's Fund Ins. Co. v. United States, 313 F.3d 1344 (Fed. Cir. 2002) (indicating that the CDA might be applicable to surety's post-takeover claims).[7] In many takeover agreements, for example, the agreement is solely between the surety and the government, and the surety agrees to complete the work remaining under the contract, stepping into the shoes of the defaulting prime contractor. See Fireman's Fund Insur. Co., 313 F.3d at 1346 (involving takeover agreement in which surety "agreed to complete the contract"); United Pacific Insur. Co. v. Roche, No. 04-1334, 2005 U.S. App. LEXIS 4494, at *3 (Fed. Cir. March 18, 2005) (involving takeover agreement in which surety "agreed to complete the work remaining under the contract"); St. Paul Fire and Marine Insur. Co. v. United States, 1994 U.S. Claims LEXIS 189, 39 Cont. Cas. Fed. (CCH) P76,706 (1994) (noting that "the takeover agreement explicitly

[7] Under such circumstances, Courts hold that it would be "extremely harsh and inconsistent" to bar a surety from suing under the CDA. Travelers Indemnity Co. v. United States, 16 Cl. Ct. 142, 153 (1988). Notably, there are no published decisions in which a surety was obligated to pursue its claims under the CDA. Instead, the cases cited by the Government involve situations where the surety was *denied* the right to pursue its claims under the CDA.

recognize[d] the government's substitution of the original contractor, USR, with St. Paul [the surety] under the prime construction"). The Government asks this Court to infer that the Takeover Agreement transfers Lumbermens into a CDA contractor. The Government is not entitled to that inference. Moreover, all takeover agreements are not alike.

Here, the Takeover Agreement is distinctly different than the takeover agreements referenced in the decisions on which the Government relies. Indeed, the Takeover Agreement expressly states that Lumbermens is *not* a "contractor":

> It is understood and agreed that the Surety, by entering into this Agreement, *is not acting as a contractor* but is instead acting in its capacity as a performance bond surety. The Surety, who will have no employees on the project site, shall have no obligation to furnish any insurance under the contract, and any insurance required under the contract *shall be provided by the Completing Contractor*.

Muretta Decl., Exhibit 1, ¶ 9 (emphasis added). Thus, unlike many takeover agreements (and distinguishing the instant case from the cases cited by the Government), the Takeover Agreement merely memorialized and reaffirmed Lumbermens' pre-existing obligations as performance bond surety under the original Contract, and the original tri-partite relationship remained unchanged. Lumbermens' role remained that of surety; it did not become a contractor.

This point is further reinforced by the designation of Atherton as the "contractor" under the Modification No. A00013, which states that "[t]he contractor organization performing the contract work has changed from Landmark Construction Corporation… to Atherton Construction, Inc." Muretta Decl., Exhibit 3. The Takeover Agreement in question thus never altered the tri-partite relationship of contractor (Landmark/Atherton), surety (Lumbermens), and the Government.

The CDA is limited to "claims by a contractor against the government relating to a contract." 41 U.S.C. § 605(a) (emphasis added). Since Atherton—and not Lumbermens—is clearly and expressly considered the "contractor" under the Takeover Agreement, the CDA is not applicable to Lumbermens or its claims. Where such a relationship exists, courts have uniformly held that a surety is not considered a "contractor" under the CDA. As stated by the Second Circuit—and echoed by the Federal Circuit—a surety simply lies outside of the intended scope of the CDA:

> Nowhere are sureties or the Miller Act mentioned [within the CDA], and the goals of encouraging bids on contracts and lowering the cost of resolving disputes surrounding government contracts bear little relation to the type of performance bonds that are issued for all large scale government construction projects. Congress simply had an entirely different set of problems in mind when it passed the CDA, and *we see no reason to judicially transform sureties into 'contractors' where Congress has not done so*.

United States. v. Seaboard Surety Co., 817 F.2d 956, 961-62 (2nd Cir. 1987) (emphasis added). See also Admiralty Construction, Inc. v. Dalton, 156 F.3d 1217, 1221 (Fed. Cir. 1998) (quoting Seaboard).

In addition, designation of Lumbermens as a contractor in these circumstances is inconsistent with the "single point of contact" required by the CDA. Congress passed the CDA in 1978 to provide a comprehensive, uniform system for adjudicating contract claims against the government. See Seaboard Surety, 817 F.2d at 961-62 (citing S. Rep. No. 95-1118, 95th Cong., 2d Sess. 16, *reprinted in* 1978 U.S.C.C.A.N. 5235, 5235-36 (hereinafter Legislative History)). In order to streamline the adjudicative resolution of contract claims, the CDA placed strict and specific parameters limits on the process. See id.; Sharman Co., Inc. v. United States, 2 F.3d 1564, 1568-69 n.6 (Fed. Cir. 1993). Jurisdiction under the CDA is limited to claims of a "contractor," defined as being "a

party to a Government contract other than the Government." 41 U.S.C. § 609(a)(1); 41 U.S.C. § 601(4). According to the legislative history of the CDA, the requirement that one must be a contractor was to achieve a "single point of contact" between the contractor and the government so that the government would not be faced with multiple, duplicative claims by numerous parties involved with the same project. See Admiralty Construction, 156 F.3d at 1220 (citing Legislative History at 5250). A "contractor" for jurisdictional purposes is thereby limited to the prime contractor. Westech Corp., 20 Cl. Ct. at 749 (1990). See also Admiralty Construction, 156 F.3d at 1220. ("Thus, the CDA makes only a single 'contractor' eligible to appeal a contracting officer's final decision."); Travelers Indemnity Co. v. United States, 16 Cl. Ct. at 153 ("Therefore, the right to sue the government over the construction contract was … limited to the contractor."). Here, the Government's attempt to designate Lumbermens as a CDA contractor for claims arising under the Takeover Agreement violates that rule.

The Takeover Agreement is not subject to the CDA. Further, because Atherton, not Lumbermens, replaced Landmark as the contractor under the original Contract, Lumbermens is not a "contractor" for purposes of the CDA. Lumbermens is therefore not subject to the jurisdictional requirements of the CDA and may pursue its Takeover Agreement-related claims without first submitting them to the contracting officer for a final decision. The Government's motion to dismiss should be denied.

## V. CONCLUSION

For the reasons stated above, Lumbermens respectfully requests that the Court deny Defendant's motion to dismiss.

Respectfully submitted,

PRESTON GATES & ELLIS LLP

By_/s/ Derek D. Crick_______________
Derek D. Crick, WSBA #28759
Mark G. Jackson

Counsel of Record for Plaintiff
LUMBERMENS MUTUAL
CASUALTY COMPANY

Kevin A. Rosenfield
PRESTON GATES & ELLIS LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580
(206) 623-7022

May 4, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2005, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to all parties of record.

/s/____________________
Judy Goldfarb