# In the United States Court of Federal Claims

No. 04-1255C
(Filed: August 17, 2005)

* * * * * * *

LUMBERMENS MUTUAL CASUALTY COMPANY,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

* * * * * * *

Miller Act Surety Case; Motion to Dismiss; Equitable Subrogation; Notice of Default; Impairment of Suretyship; 48 C.F.R. §§ 52.232-5, 52.236.15; Modification of Bonded Contract; Alleged Mismanagement of Bonded Contract.

Mark G. Jackson, Preston Gates & Ellis, LLP, Seattle, Washington, for plaintiff.

Leslie C. Ohta, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington D.C., for defendant.

## ORDER AND OPINION

**HODGES**, Judge.

Plaintiff served as surety on a construction project that was abandoned by the original contractor, Landmark. Plaintiff Lumbermens Mutual took over the contract after default and hired a contractor, Atherton Construction, to complete the job. Lumbermens incurred costs in completing the project that it alleges were caused by defendant's contract mismanagement. Lumbermens seeks damages under theories of equitable subrogation, impairment of suretyship, and breach of the Takeover Agreement.

The Government moved to dismiss plaintiff's subrogation claims because Lumbermens did not notify the Navy that it should withhold or divert progress payments, or that the contractor

was approaching default. We agree that plaintiff's failure to notify the Government of the contractor's impending default disposes of plaintiff's equitable subrogation claims.

BACKGROUND

The Navy awarded a contract to Landmark Construction Company in April 2000, for the repair and renovation of 160 military family housing units. The initial contract price was approximately $9.9 million. The Miller Act requires contractors to post performance and payment bonds for construction contracts of value greater than $100,000. See 40 U.S.C. § 3131. Landmark obtained the required performance bond from Lumbermens Mutual Casualty. Landmark was to complete the work by October 23, 2002.

The contract contained various payment clauses. As with many construction contracts, the Government made periodic progress payments corresponding to the work completed. The contract required Landmark to submit certified Contract Performance Statements and updated Network Analysis Schedules to show progress on the project. The contract also required the contractor to show that it had obtained title to materials before billing the Navy for them. Materials subject to deterioration or damage during transit were to be delivered to the project site before payment.

Lumbermens alleges that the Government did not hold the contractor to these provisions. For example, plaintiff claims that the Navy's payments to Landmark exceeded progress on the project because defendant based its payments to Landmark upon the passage of time and not to completion of the units.

Landmark's initial Network Analysis Schedule did not conform to contract requirements because it did not differentiate between the delivery of materials and the incorporation of the materials into the renovated housing. The Navy approved the Schedule nevertheless, and it paid Landmark over one-third of the contract price before having approved the construction drawings, according to Lumbermens. Plaintiff alleges that the Navy paid Landmark more than $1,276,000 for materials without documenting the "quantity, type, size, or [the whereabouts] of the material[s]." (Complaint ¶¶ 55-58.)

The Navy and Landmark agreed to an increase in the contract's scope in February 2001, adding the renovation of twenty-one housing units for a price of $1,884,176. Lumbermens did not consent to this bilateral agreement between the Government and the original contractor, Landmark. The modification did not extend the completion date of the contract.

Landmark informed the Navy in July 2001 that it would be unable to complete the project. The Navy terminated the contract for default in August 2001. The Navy had paid Landmark nearly forty percent of the total contract price at termination, though Landmark had completed only twenty-two of the 181 housing units.[1] The Navy estimated that the project was

[1] This completion rate does not necessarily show how much progress had been made. The record does not yet make clear the standards used by the Navy for declaring a unit "complete."

fourteen weeks behind schedule when it terminated the contract, and the project continued to fall behind as Lumbermens negotiated a takeover agreement with the Government.

Lumbermens and a completion contractor, Atherton Construction, entered into a Takeover Agreement with the Navy in late November 2001. The project completion date under the Takeover Agreement was the same as required by the original contract, October 2002. Atherton completed the project in June 2003. When Atherton did not complete the project on the original schedule, the Navy withheld approximately $1 million liquidated damages. Plaintiff argues that this delay was due in large part to differing site conditions and to the bilateral modification between the Navy and Landmark for additional housing units.

DISCUSSION

Lumbermens' Complaint alleges that certain costs of performing the defaulting contractor's work were the Government's fault. For example, plaintiff claims that the Navy paid Landmark for services that it had not performed and paid for goods that the contractor did not deliver. Lumbermens argues that the Navy should not have withheld liquidated damages because delays in completion of the project were the Government's fault. It also contends that the Navy purchased materials from the defaulting contractor but did not deliver the materials to Lumbermens or to Atherton.

I. Equitable Subrogation

The Miller Act requires prime contractors to post performance bonds on all federal construction contracts. <u>See</u> 40 U.S.C. § 270a. The surety guarantees that a contract will be completed in the event of the principal's default and that the Government will not have to pay more than the contract price. <u>See</u> <u>United States v. Munsey Trust Co.</u>, 332 U.S. 234, 244 (1947). This court has recognized Tucker Act jurisdiction over contract-based claims brought by a Miller Act surety based upon equitable subrogation. <u>See</u> <u>Ins. Co. of the West v. United States</u>, 243 F.3d 1367, 1375 (Fed. Cir. 2001). The doctrine of equitable subrogation entitles a surety taking over contract performance or financing completion of the contract to rights that the defaulting contractor would have had against the Government. <u>Fireman's Fund Ins. Company v. United States</u>, 909 F.2d 495, 499 (Fed. Cir. 1990). If a surety expects the Government to withhold or to divert funds prior to default, however, the surety must notify the Government that the contractor cannot complete the contract. <u>Ransom v. United States</u>, 17 Cl. Ct. 263, 272 (1989), <u>aff'd</u>, 900 F.2d 242 (Fed. Cir. 1990). The Government's equitable duty to retain contract funds for the surety is triggered upon notice from the surety that the contractor is in default or that payment should be made to the surety. <u>See</u> <u>Fireman's Fund Ins. Company</u>, 909 F.2d at 499 (holding that "only notice by the surety triggers the government's equitable duty").

Plaintiff did not notify the Government that Landmark was approaching default or that the Navy should withhold or divert progress payments. As such notice is required for a surety to retain its equitable rights against the Government, we must dismiss Counts 1 through 10 of plaintiff's Complaint.

II. Impairment of Suretyship

The Government owes a surety the duty "to administer the contract . . . in a way that does not materially increase the risk that was assumed." Nat'l Surety v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997) (quoting U.S. Fidelity & Guar. Co. v. United States, 201 Ct. Cl. 1, 475 F2d 1377, 1384 (1973)). "[A]ny change or modification of the construction contract which materially increases a compensated surety's risk discharges the obligation [to the extent of the modification]." Id. at 1547. This principle raises factual issues regarding the bilateral contract modification between the Navy and Landmark, and also the manner in which the Navy exercised its discretion in administering the contract. For example, the contract modification added the renovation of additional units with no extension of the completion date. Such additional work might have materially increased the risk of default assumed by the surety when it bonded the contract. The surety claims that it did not consent to this enlargement of the scope of work; the Government argues that plaintiff's consent is not necessary. Whether the burden of completing twenty-one additional units added to the contractor's financial difficulties is an issue of fact that the parties may develop through discovery.

The Federal Circuit stated in National Surety that "contract terms that provide security for the bonded performance cannot be ignored, waived, or modified without consideration of the surety's interests . . . ." Id. Such consideration may not necessarily include consent, but the extent to which defendant considered the surety's interests is an issue of fact.

Lumbermens must show that the Government departed from the terms of its contract with Landmark. See id at 1546. The contracting officer in National Surety had no discretion regarding contract variance for special needs of the contractor. The retainage provision was mandatory. The court of appeals held that this term was one on which the surety relied when it bonded the contract. Id.

The retainage terms of this contract are not mandatory. If the contract's terms are permissive or if they provide the contracting officer more discretion, the Government's duty to the surety may be less. See Amer. Ins. Co. v. United States, 62 Fed. Cl. 151, 157 (holding that permissive terms of contract authorized the contracting officer to make payments in full despite the contractor's lack of progress). In such cases, the Government must "exercise its discretion responsibly and . . . consider the surety's interest in conjunction with other problems encountered in the administration of the contract." Argonaut Ins. Co. v. United States, 193 Ct. Cl. 483, 434 F.2d 1362, 1368 (1970); U.S. Fid. & Guar. Co. v. United States, 201 Ct. Cl. 1, 475 F.2d 1377, 1384 (1973) (examining whether contracting officer acted responsibly in making payments to a contractor that did not pay its bills).

"Other problems" referred to in Argonaut might include the need for a contracting officer to stray from rigid schedules that tie payment to progress. For example, this may serve the Government's interest in completing the project by avoiding default resulting from a contractor's cash flow difficulties.

The terms of this contract are permissive, but plaintiff has alleged that the Navy substantially departed from the contract to the surety's detriment. For example, plaintiff alleges that the Navy paid the defaulting contractor Landmark nearly forty percent of the project funds for completion of no more than fifteen percent of the work. The contracting officer allegedly accepted a Network Analysis Schedule that fell far short of the contract requirements. This facilitated such overpayment, according to Lumbermens. Plaintiff also argues that the contracting officer made large payments for materials without substantiating their quantity or their location.

The contracting officer has a duty to weigh the Government's interests against those of the surety, as shown. See Amer. Ins. Co., 62 Fed. Cl. at 158 (2004) (citing Nat'l Surety, 118 F.3d at 1546; Fireman's Fund Ins. Co. v. United States, 909 F.2d 495, 499 (Fed. Cir. 1990); Argonaut Ins. Co., 434 F.2d at 1367-68; United Pac. Ins. Co. v. United States 16 Cl. Ct. 555, 557 (1989)). The contracting officer in this case might have been exercising proper discretion, balancing the Government's interests in the efficient and successful completion of the project against plaintiff's financial concerns. However, the Complaint alleges that the contracting officer abused his discretion. Counts 11 through 20 of plaintiff's Complaint depend on further development of the facts.

III. Post-Takeover Claims

Counts 21 and 22 of plaintiff's Complaint allege that the Navy breached the Takeover Agreement with Lumbermens and Atherton, the completing contractor. Count 21 seeks the value of materials that plaintiff alleges the Government spent contract funds but did not deliver to Atherton for completion of the project. The Takeover Agreement states, "the Government agrees that the Surety or the Completing Contractor will have the right to use, without charge, any of the materials, supplies, equipment or personal property furnished or supplied to or by the Defaulted Contractor."

Count 22 alleges that the delay for which Atherton was charged liquidated damages resulted from the Government's refusal to grant schedule extensions to the completing contractor. Plaintiff contends that such extensions were necessary because the bilateral modification added housing units to the project. Atherton also had to remediate non-compliant electrical work installed by the defaulting contractor, according to Lumbermens.

The Government urges us to dismiss Counts 21 and 22 because plaintiff did not comply with procedural requirements of the Contract Disputes Act. See 41 U.S.C. §§ 601-613. Government contractors must submit claims to the contracting officer and obtain a final decision before filing suit in this court. See 41 U.S.C. §§ 605(a), 609(a)(1); Witherington Constr. Corp. v. United States, 45 Fed. Cl. 208, 211 (1999). Plaintiff's Complaint does not allege that Lumbermens or Atherton submitted a claim to the Contracting Officer. It is unclear whether the Takeover Agreement is subject to the CDA in these circumstances and whether Counts 21 and 22 arise under the Takeover Agreement or the original contract. The Government modified the original contract to incorporate the Takeover Agreement.

Plaintiff argues that the Government withheld liquidated damages "against Lumbermens," the surety. (Compl. ¶¶ 83-84, 90.) The Government charged liquidated damages to Atherton, however. Plaintiff seeks treatment as a "completing surety," as opposed to a "paying surety," arguing that it has stepped into the defaulted contractor's shoes. Nevertheless, it rejects the need to comply with procedural requirements of the Contract Disputes Act by claiming that the Takeover Agreement is not subject to the Act.[2] Plaintiff's status as a "completing surety" or a "paying surety" is unclear. See Westech Corp. v. United States, 20 Cl. Ct. 745 (1990), and Travelers Indemnity Co. v. United States, 16 Cl. Ct. 142 (1988).

Lumbermens' claim for cost of materials arises from the Navy's alleged breach of the Takeover Agreement, a contract to which Lumbermens is a party. Defendant contends that surety takeover agreements are subject to the Contract Disputes Act, citing Westech Corp. v. United States, 20 Cl. Ct. 745, and Transamerica Insurance Co. v. United States, 6 Cl. Ct. 367 (1984). Factual and legal issues, such as Atherton's efforts to seek reimbursement under the Takeover Agreement and Lumbermens' legal position as a party to the Takeover Agreement prevent rulings that depend on the Takeover Agreement at this stage of proceedings.

## CONCLUSION

Defendant's Motion to Dismiss Counts 1 through 10 of the Complaint is GRANTED. The Government's obligation to protect project funds on behalf of a surety is triggered by notice. Absent notice, the Government owes plaintiff no duty to protect the project funds under a theory of equitable subrogation.

Defendant's motions to dismiss Counts 11 through 20 and Counts 21 and 22 of the Complaint are DENIED. The parties have not presented sufficient facts for us to rule on the post-takeover claims or the applicability of the Contract Disputes Act to the Takeover Agreement. Plaintiff's impairment of suretyship allegations raise questions of fact such as whether the contracting officer abused his discretion in administering the original contract and whether modification of the original contract materially increased the risk assumed by Lumbermens.

Counsel will contact the court no later than August 24 to propose a discovery schedule or other pretrial proceedings, if necessary.

s/Robert H. Hodges, Jr.
Robert H. Hodges, Jr.
Judge

[2] The Takeover Agreement states, "[i]t is understood that the Surety, by entering into this Agreement, is not acting as a contractor, but is instead acting in its capacity as a performance bond surety."