90. Finally, on or about March 15, 2002, the Navy acknowledged the existence of the changed condition and provided Atherton with a request for proposal to obtain Atherton's price for the added scope of work necessary to correct the deficient wiring.

91. On March 18, 2002, Atherton was able to re-start work, implementing the changes directed by the Navy.

92. As a result of this changed work, Atherton incurred at least a 46-day delay to its critical path. Atherton requested that the Navy provide a schedule extension to accommodate this 46-day delay. The Navy refused.

93. The Navy assessed liquidated damages against Lumbermens for the period of time encompassed by the 46-day schedule extension requested by Atherton.

94. The Navy also assessed liquidated damages against Lumbermens during the period in which Atherton was completing the additional 21 MFH units placed on the Contract by Modification No. A00010.

95. The Navy did not obtain the surety's consent for Modification No. A00010. Thus, the 21 additional MFH units were not within the scope of work bonded by Lumbermens.

96. The 21 MFH units added by Modification Number A00010 would have reasonably required at least 74 days to complete.

97. Lumbermens is entitled to at least a 74-day schedule extension to complete the 21 additional MFH units that were not part of its bonded scope of work.

98. Together, the electrical delay and the completion of the Modification No. A00010 MFH units added at least 120 days to the schedule.

99. Pursuant to the Completion Contract, Atherton completed work on the Project on June 6, 2003.

100. The Navy withheld liquidated damages against Lumbermens in the amount of $1,015,125.

101. If the Navy had extended the Contract completion date by 120 days, Lumbermens would be entitled to the return of at least $744,000 in liquidated damages retained by the Navy.

102. Lumbermens incurred damages in excess of $4.160 million under its performance bond to complete the project. In addition, Lumbermens incurred damages of more than $550,000 under its payment bond to compensate suppliers and subcontractors that had not been paid by Landmark.

## VII. Causes of Action

### A. Discharge/Impairment of Suretyship

#### Count 1 – Failure to Require Progress Payments Certifications

103. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

104. With each invoice submitted by Landmark, the Contract mandated that Landmark submit a progress payment certification. Among other things, the Landmark was required to certify that all payments due to suppliers and subcontractors from previous government progress payments had been made. The Payments Clause further provided that if Landmark failed to provide the mandatory progress payment certification than "payment [to Landmark] shall not be made."

105. Landmark provided the required certification for only three invoices, numbers 1, 10 and 11.

106. Landmark failed to provide the required certification for the remaining invoices it submitted to the Navy, which invoices totaled $4,099,708.16. Nevertheless, the Navy authorized payment to Landmark and Landmark was paid from Contract funds.

106. The Contract funds provide the security for the performance bonded by Lumbermens.

107. The Contract terms and conditions, including the mandatory progress payment certification of the Payments Clause, provided security for the performance bonded by Lumbermens.

108. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

109. Invoices 2 though 9 submitted by Landmark violated the Payments Clause of the Contract, FAR 52.235-5, because they did not include the mandatory certification.

110. The Navy's approval and subsequent payment of Invoices 2 through 9 also violated the Payments Clause of Contract, FAR 52.235, because the Contracting Officer does not have authority to pay invoices that lack the mandatory certifications.

111. The Navy's failure to comply with the terms of the Contract by demanding from Landmark the certifications required by the Payments Clause was a change to the Contract terms which Lumbermens relied upon to provide the performance and payment bonds and which failure materially increased the risk that was assumed by Lumbermens when it issued the bonds.

112. As a result of the Navy's failure to comply with the terms of the Contract, Lumbermens was damaged in the amount of $4,099,708.16.

**Count 2 – Failure to Require a Schedule of Prices**

107. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

108. Pursuant to § 01200, ¶ 1.2 of the Contract, Landmark was not to be paid for any construction work until (1) it submitted a Schedule of Prices, on forms provided by the Government, and (2) said Schedule of Prices was approved by the Contracting Officer.

109. Landmark never submitted such a Schedule of Prices, nor did the Contracting Officer demand that Lumbermens comply with § 01200, ¶ 1.2 of the Contract.

110. Nevertheless, Landmark invoiced the Navy and the Contracting Officer approved invoices for construction work, including advance payment for materials, totaling in excess of $4.5 million.

113. The Contract funds provide the security for the performance bonded by Lumbermens.

114. The Contract terms and conditions, including § 01200, ¶ 1.2 of the Contract, provided security for the performance bonded by Lumbermens.

115. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

116. The Navy's failure to require Landmark to comply with § 01200, ¶ 1.2 of the Contract and subsequent payments Lumbermens, violated the terms of the Contract.

117. The Navy's failure to so comply with the terms of the Contract was a change to the Contract terms which Lumbermens relied upon to provide the performance and payment bonds and which failure materially increased the risk that was assumed by Lumbermens when it issued the bonds.

118. As a result of the Navy's failure to comply with the terms of the Contract, Lumbermens was damaged in the amount of at least $4.5 million.

**Count 3 – Failure to Require Proper Network Analysis Schedule**

119. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

120. The Contract required that Landmark submit to the Navy a Network Analysis Schedule that complied with FAR 52.236-15, Schedules for Construction Contracts (Apr 1984) and § 01321 of the Contract.

121. In addition, the Contract required that the NAS provide a foundation for progress payment requests from Landmark that complied with the requirement of the Payments clause and § 01200 of the Contract.

122. Further, FAR 31.102(e)(2) required that the procedure used by the Navy for approving progress payments, which depended upon the NAS submitted by Landmark, "ensure that [progress] payments are commensurate with work accomplished."

123. The Contract funds provide the security for the performance bonded by Lumbermens.

124. The Contract terms and conditions, including the requirement for a Network Analysis System that "ensure[d] that [progress] payments are commensurate with work accomplished" provided security for the performance bonded by Lumbermens.

125. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

126. The NAS approved by the Navy failed to conform to the Contract requirements for several reasons, including, but not limited to: (1) the NAS did not contain the required minimum number of activities for the Project; (b) the NAS did not contain the minimum number of activities for each MFH; (3) the NAS did not allocate costs to each activity; and (4) the NAS did not provide a basis for determining the value of the work actually performed by Landmark and on which progress payments could be based.

127. The Navy's failure to comply with the terms of the Contract by demanding from Landmark a proper Network Analysis Schedule was a change to the Contract terms which Lumbermens relied upon to provide the performance and payment bonds and which failure materially increased the risk that was assumed by Lumbermens when it issued the bonds.

128. As a result of the Navy's failure to demand from Landmark a Network Analysis Schedule that complied with Contract requirements, Lumbermens has been damaged by at least $2,000,000, the exact amount to be proven at trial.

**Count 4 – Improper Payment for Doors and Windows**

129. Paragraphs 1 through 91 are incorporated by reference as if fully set forth herein.

130. The Contract placed specific limitations on the Navy's authority to include in progress payments amounts for materials prior to the incorporation of said materials into the Project.

131. Those limitations include, but are not limited to, the requirement that Landmark provide to the Navy satisfactory evidence that the material for which payment has been requested have been delivered to the Project site or that Landmark has acquired title to the property.

132. The Contract also expressly provided that certain materials, i.e., those susceptible to deterioration or physical damage in storage or transit, may not be considered for progress payments if stored off of the Project site.

133. The Contract required the Navy to maintain the official property records for Government property under the Contract.

134. The Navy paid Landmark $375,000 for doors and windows as a material cost. Immediately upon said payment, title to said doors and windows passed to the Navy. However, the Navy failed to obtain any evidence of title, quantity, quality, size and/or style for the doors and windows to which it was to obtain title.

135. The Contract requirement establishing the documentation under which the Navy may consider for progress payments material prior to said material's incorporation into the Project, as well as the transfer of title and obligation of the Navy to maintain property records, are Contract terms that provide security for the bonded performance.

136. The Navy is not permitted to ignore, waive, or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

137. The Navy materially increased the surety's risk by, among other things, the Navy's failure to (1) obtain information necessary to create and maintain accurate property records for the material it paid for in making progress payments to Landmark, and (2) determine whether said material had been purchased and, if so, where it was located. These failures by the Navy were changes to the Contract terms on which Lumbermens relied in providing the performance and payment bonds.

138. As a result of the Navy's failures related to the Navy's payment to Landmark of $375,000 for doors and windows, Lumbermens was damaged in the amount of at least $131,775.00.

**Count 5 – Improper Payment for Cabinets**

139. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

140. The Contract placed specific limitations on the Navy's authority to include in progress payments amounts for materials prior to the incorporation of said materials into the Project.

141. Those limitations include, but are not limited to, the requirement that Landmark provide to the Navy satisfactory evidence that the material for which payment has been requested have been delivered to the Project site or that Landmark has acquired title to the property.

142. The Contract also expressly provided that certain materials, i.e., those susceptible to deterioration or physical damage in storage or transit, may not be considered for progress payments if stored off of the Project site.

143. The Contract required the Navy to maintain the official property records for Government property under the Contract.

144. The Navy paid Landmark $260,000 for cabinets as a material cost. Immediately upon said payment, title to said cabinets passed to the Navy. However, the Navy failed to obtain any evidence of title, quantity, quality, size and/or style for the cabinets to which it was to obtain title.

145. The Contract requirement establishing the documentation under which the Navy may consider for progress payments material prior to said material's incorporation into the Project, as well as the transfer of title and obligation of the Navy to maintain property records, are Contract terms that provide security for the bonded performance.

146. The Navy is not permitted to ignore, waive, or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

147. The Navy materially increased the surety's risk by, among other things, the Navy's failure to (1) obtain information necessary to create and maintain accurate property records for the material it paid for in making progress payments to Landmark, and (2) failing to determine whether said material had been purchased and, if so, where it was located. These failures by the Navy were changes to the Contract terms on which Lumbermens relied in providing the performance and payment bonds.

148. As a result of the Navy's failures involved in the Navy's payment to Landmark of $260,000 for cabinets, Lumbermens was damaged in the amount of at least $232,607.

**Count 6 – Improper Payment for Paint**

149. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

150. The Contract placed specific limitations on the Navy's authority to include in progress payments amounts for materials prior to the incorporation of said materials into the Project.

151. Those limitations include, but are not limited to, the requirement that Landmark provide to the Navy satisfactory evidence that the material for which payment has

been requested have been delivered to the Project site or that Landmark has acquired title to the property.

152. The Contract also expressly provided that certain materials, i.e., those susceptible to deterioration or physical damage in storage or transit, may not be considered for progress payments if stored off of the Project site.

153. The Contract required the Navy to maintain the official property records for Government property under the Contract.

154. The Navy paid Landmark $156,000 for paint as a material cost. Immediately upon said payment, title to said paint passed to the Navy. However, the Navy failed to obtain any evidence of title, quantity, quality, size and/or style for the paint to which it was to obtain title.

155. The Contract requirement establishing the documentation under which the Navy may consider for progress payments material prior to said material's incorporation into the Project, as well as the transfer of title and obligation of the Navy to maintain property records, are Contract terms that provide security for the bonded performance.

156. The Navy is not permitted to ignore, waive, or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

157. The Navy materially increased the surety's risk by, among other things, the Navy's failure to (1) obtain information necessary to create and maintain accurate property records for the material it paid for in making progress payments to Landmark, and (2) failing to determine whether said material had been purchased and, if so, where it was located. These failures by the Navy were changes to the Contract terms on which Lumbermens relied in providing the performance and payment bonds.

158. As a result of the Navy's failures involved in the Navy's payment to Landmark of $156,000 for paint, Lumbermens was damaged in the amount of at least $136,479.

**Count 7 – Improper Payment for Flooring**

159. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

160. The Contract placed specific limitations on the Navy's authority to include in progress payments amounts for materials prior to the incorporation of said materials into the Project.

161. Those limitations include, but are not limited to, the requirement that Landmark provide to the Navy satisfactory evidence that the material for which payment has been requested have been delivered to the Project site or that Landmark has acquired title to the property.

162. The Contract also expressly provided that certain materials, i.e., those susceptible to deterioration or physical damage in storage or transit, may not be considered for progress payments if stored off of the Project site.

163. The Contract required the Navy to maintain the official property records for Government property under the Contract.

164. The Navy paid Landmark $485,940 for flooring as a material cost. Immediately upon said payment, title to said flooring passed to the Navy. However, the Navy failed to obtain any evidence of title, quantity, quality, size and/or style for the flooring to which it was to obtain title.

165. The Contract requirement establishing the documentation under which the Navy may consider for progress payments material prior to said material's incorporation into the Project, as well as the transfer of title and obligation of the Navy to maintain property records, are Contract terms that provide security for the bonded performance.

166. The Navy is not permitted to ignore, waive, or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

167. The Navy materially increased the surety's risk by, among other things, the Navy's failure to (1) obtain information necessary to create and maintain accurate property

records for the material it paid for in making progress payments to Landmark, and (2) failing to determine whether said material had been purchased and, if so, where it was located. These failures by the Navy were changes to the Contract terms on which Lumbermens relied in providing the performance and payment bonds.

168. As a result of the Navy's failures involved in the Navy's payment to Landmark of $485,940 for flooring, Lumbermens was damaged in the amount of at least $333,940.

**Count 8 – Improper Payment for Siding**

169. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

170. The Contract placed specific limitations on the Navy's authority to include in progress payments amounts for materials prior to the incorporation of said materials into the Project.

171. Those limitations include, but are not limited to, the requirement that Landmark provide to the Navy satisfactory evidence that the material for which payment has been requested have been delivered to the Project site or that Landmark has acquired title to the property.

172. The Contract also expressly provided that certain materials, i.e., those susceptible to deterioration or physical damage in storage or transit, may not be considered for progress payments if stored off of the Project site.

173. The Contract required the Navy to maintain the official property records for Government property under the Contract.

174. The Navy paid Landmark $257,040 for siding as a material cost. Immediately upon said payment, title to said siding passed to the Navy. However, the Navy failed to obtain any evidence of title, quantity, quality, size and/or style for the siding to which it was to obtain title.

175. The Contract requirement establishing the documentation under which the Navy may consider for progress payments material prior to said material's incorporation into the Project, as well as the transfer of title and obligation of the Navy to maintain property records, are Contract terms that provide security for the bonded performance.

176. The Navy is not permitted to ignore, waive, or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

177. The Navy materially increased the surety's risk by, among other things, the Navy's failure to (1) obtain information necessary to create and maintain accurate property records for the material it paid for in making progress payments to Landmark, and (2) failing to determine whether said material had been purchased and, if so, where it was located. These failures by the Navy were changes to the Contract terms on which Lumbermens relied in providing the performance and payment bonds.

178. As a result of the Navy's failures involved in the Navy's payment to Landmark of $257,040 for siding, Lumbermens was damaged in the amount of at least $172,128.

**Count 9 – Improper Payment for Asbestos Abatement**

179. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

180. The Payments Clause required the Navy to make payment to Landmark as work progressed. Further, FAR 31.102(e)(2) requires that the procedures used by the Navy for approving progress payments ensure that the progress payments made to Landmark were commensurate with the work accomplished by Landmark.

181. The obligation to ensure that progress payments made to Landmark were made as work progressed and were commensurate with work accomplished by Landmark were terms of the Contract that provided security for the bonded performance.

182. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

183. Here, the Navy paid Landmark $458,640 for asbestos and lead abatement. Such payment constituted 52% of the budgeted amount for that scope of work. However, at termination, Landmark had completed only 34% of the scope of work. As a result, the Navy paid Landmark $158,760 more than it should have. Such payment by the Navy was not based upon the work performed. Instead, the payment was based upon the mere passage of time. Further, the Navy failed to ensure that said payment was commensurate with the work performed by Landmark.

184. The Navy's failure to ensure that progress payments to Landmark for asbestos and lead abatement were based upon work performed and commensurate with the progress made was a material change to the Contract terms and an abuse of discretion which materially increased the risk that was assumed by Lumbermens when it issued the bonds.

185. As a result of the Navy's material change to the Contract terms and/or abuse of discretion, Lumbermens was damaged in the amount of at least $158,760.

**Count 10 – Improper Payment for Personnel**

186. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

187. The Payments Clause required the Navy to make payment to Landmark as work progressed. Further, FAR 31.102(e)(2) requires that the procedures used by the Navy for approving progress payments ensure that the progress payments made to Landmark were commensurate with the work accomplished by Landmark.

188. The obligation to ensure that progress payments made to Landmark were made as work progressed and were commensurate with work accomplished by Landmark were terms of the Contract that provided security for the bonded performance.

189. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

190. Here, the Navy paid Landmark $378,936 for personnel. Such payment constituted 52% of the budgeted amount for that scope of work. However, at termination, Landmark had completed only 12% of the Contract's scope of work. As a result, the Navy paid Landmark $291,533 more than it should have. Such payment by the Navy was not based upon the work performed. Instead, the payment was based upon the mere passage of time. Further, the Navy failed to ensure that said payment was commensurate with the work performed by Landmark.

191. The Navy's failure to ensure that progress payments to Landmark for personnel were based upon work performed and commensurate with the progress made was a material change to the Contract terms and an abuse of discretion which materially increased the risk that was assumed by Lumbermens when it issued the bonds.

192. As a result of the Navy's material change to the Contract terms and/or abuse of discretion, Lumbermens was damaged in the amount of at least $291,533.

**Count 11 – Improper Payment for Sitework**

193. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

194. The Payments Clause required the Navy to make payment to Landmark as work progressed. Further, FAR 31.102(e)(2) requires that the procedures used by the Navy for approving progress payments ensure that the progress payments made to Landmark were commensurate with the work accomplished by Landmark.

195. The obligation to ensure that progress payments made to Landmark were made as work progressed and were commensurate with work accomplished by Landmark were terms of the Contract that provided security for the bonded performance.

196. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

197. Here, the Navy paid Landmark $590,000 for sitework, resulting in a payment of almost $2,000 per equipment hour for sitework. Such payment by the Navy did not reflect the value of the work performed and was not commensurate with the work performed.

198. The Navy's failure to ensure that progress payments to Landmark for sitework were reasonable and based upon work performed and commensurate with the progress made was a material change to the Contract terms and an abuse of discretion which materially increased the risk that was assumed by Lumbermens when it issued the bonds.

199. As a result of the Navy's material change to the Contract terms and/or abuse of discretion, Lumbermens was damaged in the amount of at least $300,000, the exact amount to be proven at trial.

**Count 12 – Failure to Withhold Progress Payments**

200. Paragraphs 1 through 102 are incorporated by this reference as if fully set forth herein.

201. Pursuant to the Payments Clause and § 01200 of the Contract, the Navy was obligated to make proper payment to Landmark as work progressed on the Project.

202. Further, FAR 31.102(e)(2) required that the procedures used by the Navy for approving progress payments ensured that the progress payments made to Landmark were commensurate with the work accomplished.

203. The Contract gave the Navy both the right and the obligation to withhold progress payments in the event that the Navy had made earlier payments erroneously or in advance or in excess of work actually performed by Landmark.

204. As of January 1, 2001, the Navy had paid Landmark $3,829,602, or 37% of the Contract price. However, at that time, Landmark had yet to complete and return to the Navy a single MFH unit.

205. The Navy had a duty under the Contract to ensure that progress payments were commensurate with the work performed.

206. The terms and conditions of the Contract establishing the Navy's right and obligation to withhold progress payments to recover erroneous payments or advance or excess progress payments previously made are terms and conditions that provide security for the bonded performance.

207. Here the Navy failed to withhold progress payments after January 15, 2001. Such failure by the Navy was contrary to the terms and conditions of the Contract and an abuse of discretion.

208. The Navy is not permitted to ignore, waive, or modify Contract terms and conditions that provide security for the bonded performance without consideration of Lumbermens' interests.

209. The Navy failed to consider Lumbermens' interests and failed and refused to withhold progress payments and such failures materially increased the risk assumed by Landmark when it issued the bonds and caused Lumbermens damage in the amount of $964,032.48, the total payments made to Landmark by the Navy after January 1, 2001.

**Count 13 – Failure to Default Terminate Landmark's Contract**

210. Paragraphs 1 though 102 are incorporated by reference as if fully set forth herein.

211. By mid-January 2001, the Navy had received numerous complaints from Landmark's suppliers and subcontracts regarding lack of payment from Landmark.

212. As a result of the numerous complaints received by the Navy from Landmark's suppliers and subcontractors, the Navy initially rejected Landmark's January 2001 invoice. Further, the Navy at that time demanded that Landmark provide to the Navy an accounting of all funds received by Landmark from the Navy and all amounts owed to and paid by Landmark to Landmark's suppliers and subcontractors.

213. Landmark provided an accounting of funds to the Navy by letter dated February 7, 2001.

214. Landmark's February 7, 2001 submission proved that Landmark had not paid its suppliers and subcontractors. That submission also proved that, to the extent Landmark had provided progress payment certifications required by the Payments Clause, such certifications were false.

215. FAR 32.112-1(c) provides that the Contracting Officer "shall initiate administrative or other remedial action" if he or she determines that the progress payment certification required by the Payments Clause is "inaccurate in any material respect."

216. Further, FAR 32.006-3(b) provides that government personnel "shall report suspected fraud related to advance, partial, or progress payments."

217. The Navy did not analyze Landmark's February 7, 2001 submission. As a result, the Contracting Officer did not take the required administrative or remedial action as required by FAR 32.112-1. Further the Contracting Officer did not report suspected fraud as required by FAR 32.006-3.

218. These FAR provisions are terms of the Contract and required the Contracting Officer to take administrative or remedial action and, on the facts presented to the Contracting Officer, required the Navy to terminate Landmark's contract for default.

219. The Contract terms and conditions provided security for the performance bonded by Lumbermens.

220. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

221. The Navy's failure to require Landmark to comply with FAR 32.006-3 and FAR 32.112-1violated the terms of the Contract.

222. The Navy's failure to so comply with the terms of the Contract was a change to the Contract terms upon which Lumbermens had relied in providing the performance and

payment bonds. That Navy's failure materially increased the risk beyond that assumed by Lumbermens when it issued the bonds.

223. As a result of the Navy's failure to comply with the terms of the Contract, Lumbermens was damaged in the amount of at least $2.0 million, the exact amount to be proven at trial.

**B. Breach of Takeover Agreement**

**County 14 – Failure to Provide Government Property**

224. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

225. Pursuant to the November 20, 2001 Takeover Agreement executed by Lumbermens, the Navy and Atherton, the Navy agreed that, to the extent the Navy had any right, title or interest therein, Lumbermens would have the right to use, without charge, all the materials, supplies, and equipment furnished to or by Landmark.

226. Lumbermens has complied fully with the terms and conditions of the Takeover Agreement.

227. During the course of Landmark's performance, the Navy paid Landmark in excess of $2.4 million for materials that, at the time of payment, had not been incorporated into the Project.

228. At the time the Navy paid for such material, such material became the sole property of the Navy. That is, upon payment for the material, the Navy obtained sole right, title and interest in and to said property.

229. Pursuant to the Takeover Agreement, the Navy was contractually obligated to provide all of said materials to Lumbermens for use by Lumbermens in the Project.

230. The Navy failed and refused to provide to Lumbermens, or Lumbermens' designee, all of said materials.

231. The breach by the Navy of its obligation to provide to Lumbermens all material purchased by the Navy for the Project damaged Lumbermens in excess of $1,000,000, the exact amount to be proven at trial

**Count 15 – Improper Assessment of Liquidated Damages**

232. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

233. Pursuant to the Takeover Agreement, the Navy was obligated to pay to the Completing Contractor the balance of the Contract price that remained unpaid at the time of default, subject to approved withholdings. Any payment in excess of the Contract balance remaining unpaid that was necessary to complete the Project would be paid by Lumbermens.

234. The Takeover Agreement provided that the Navy could retain from the unpaid Contract balance liquidated damages.

235. Lumbermens and the Completing Contractor fully complied with the terms and conditions of the Takeover Agreement.

236. During performance by the Completing Contractor, the Navy refused to extend the Contract completion date by 46 days, as requested by the Completing Contractor, to accommodate the schedule delay caused by unforeseen and changed conditions relating to electrical wiring.

237. In addition, Lumbermens is entitled to a 74 day schedule extension to complete the 21 additional MPH units placed on the Contract pursuant to Modification No. A00010.

238. Lumbermens did not consent to Modification No. A00010. Accordingly, that scope of work was not within the scope of work bonded by Lumbermens. Accordingly, the Navy had no right under the Takeover Agreement to assess liquidated damages against Lumbermens for completing that scope of work.

239. The Navy's failure and refusal to extend the Contract Completion date by a total of 120 days and the assessment of liquidated damages for that 120-day period constitutes a breach of the Takeover Agreement.

240. As a result of the Navy's breach, Lumbermens has been damaged in the amount of at least $744,0000.

## VII. Prayer for Relief

WHEREFORE, Lumbermens prays for relief as follows:

1. Judgment against the United States in an amount not less than $3,600,000, the exact amount to be proven at trial; and

2. Such other and further relief as the Court deems just, necessary and proper.

///

DATED this 21st day of February, 2006.

LUMBERMENS MUTUAL CASUALTY COMPANY

By: ____________________
Mark G. Jackson, WSBA #18325

PRESTON GATES ELLIS LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580
(206) 623-7022

Counsel of Record for
LUMBERMENS MUTUAL CASUALTY COMPANY

OF COUNSEL:

Derek C. Crick
Kevin A. Rosenfield
PRESTON GATES & ELLIS LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580
(206) 623-7022

Richard L. Hanson
G. Matthew Koehl
PRESTON GATES ELLIS & ROUVELAS MEEDS LLP
1735 New York Avenue NW, Suite 500
Washington DC 20006-5221
(202) 628-1700

K:\50395\00003\MGJ\MGJ_P208H