**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LUMBERMENS MUTUAL CASUALTY COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 04-1225C<br><br>Honorable Robert H. Hodges, Jr. |

**FIRST AMENDED COMPLAINT**

Plaintiff Lumbermens Mutual Casualty Company ("Lumbermens) complains of defendant the United States of America and for its claims of relief against defendant states as follows:

**I. Nature of the Action**

1. This is a suit by a Miller Act surety (Lumbermens), who took over and completed a construction project after the principal defaulted, to recover from the obligee (the United States): (1) improper payments made by the obligee, resulting from the obligee's failure to comply with the Contract requirements, thereby impairing the collateral of the surety and materially increasing the surety's risk and (2) damages arising from the obligee's breach of the takeover agreement pursuant to which the surety completed the project.

**II. Parties**

2. Plaintiff is Lumbermens, an Illinois industrial property and casualty insurance company with its principal place of business in Long Grove, Illinois.

3. Defendant is the United States, acting by and through its authorized agents.

## III. Jurisdiction

4. The Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491.

## IV. Venue

5. Venue is proper in this Court pursuant to the Tucker Act, 29 U.S.C. § 1491.

## V. Background

### A. Contract Award

6. On or about April 11, 2000, the United States, through the United States Navy, Engineering Field Activity, Northwest, in Poulsbo, Washington ("Navy"), awarded Contract Number N44255-97-C-5515 ("Contract") to Landmark Construction Company ("Landmark").

7. Pursuant to the Contract, Landmark was to perform the Whole Site Repair/ Revitalization of the Maylor Capehart Housing Area on Naval Air Station, Whidbey Island, in Oak Harbor, Washington ("Project"). The Project, as originally awarded, entailed the design/ build remodeling of 160 military family housing ("MFH") units on Whidbey Island. The initial Contract price was $9,878,026.00.

8. The Contract required that Landmark provide to the Navy performance and payment bonds. The performance bond, naming the United States as obligee, was to be in the penal sum of the Contract price, *i.e.*, $9,878,026. The Contract required a payment bond in the amount of $2,500,000.

9. Lumbermens provided both the performance and payment bonds in the amounts and in the format required.

10. The Navy approved the performance and payment bonds provided by Lumbermens.

### B. Relevant Contract Requirements

11. The Contract included in full text or incorporated by reference or a variety of clauses relevant to the issues raised in this Complaint, including: (1) FAR 52.232-5, Payments

Under Fixed-Price Construction Contracts (May 1997) ("the Payments Clause"); (2) FAR 52.236-15, Schedules for Construction Contracts (Apr 1984); (3) FAR 52.245-1, Property Records (Apr 1984); (4) FAR 52.245-2, Government Property (Fixed-Price Contracts (Dec 1989)); (5) FAR 52.228-15, Performance and Payment Bonds – Construction (Sept 1996); (6) FAR 52.211-10, Commencement, Prosecuting, and Completion of Work (Apr 1984); and (7) FAR 52.211-12, Liquidated Damages – Construction (Apr 1984).[1]

12. Landmark was to begin work on the Project within 15 days after receipt of Notice to Proceed and was given 910 calendar days to complete the Project. In this case, the Contract completion date was established by the Navy as October 23, 2002.

13. Pursuant to the Payments Clause, the Navy was to make progress payments monthly as the work on the Project proceeded, or at more frequent intervals as determined by the Navy, on estimates of work accomplished.

14. The Payments Clause provides that a contractor's request for progress payments shall include, among other things, an itemization of the amounts requested, a listing of the amounts included for work performed by each subcontractor and a listing of the amounts previously paid to each subcontractor under the Contract.

15. The Payments Clause also required, among other things, that Landmark certify all payments due to suppliers and subcontractors from previous government progress payments had been made. The Payments Clause further mandated that if Landmark failed to provide the requisite progress payment certification, then "payment [to Landmark] shall not be made."

16. The Payments Clause further authorized the Navy to include in progress payments, amounts for material delivered to the site as well as for material delivered elsewhere (i.e., offsite) if: (1) the Contract otherwise authorized such consideration; and (2) the Contractor furnished satisfactory evidence of title and that the material would be used to

[1] The FAR is codified at Title 48 of the Code of Federal Regulations.

perform the Contract. The Payments Clause also provided that all material covered by a progress payment shall, at the time of payment, become the sole property of the Government.

17. In addition to the Payments Clause requirements, the Contract described payment procedures in greater detail in Section 01200, Price and Payment Procedures.

18. Section 01200, ¶ 1.2 required Landmark to prepare a Schedule of Prices on forms provided by the Government and to submit the Schedule of Prices to the Government for approval by the Contracting Officer. Further, according to § 01200, ¶ 1.2, "payments [to Landmark] for construction work will not be made until the Schedule of Prices has been approved by the Contracting Officer."

19. Further, pursuant to § 01200 of the Contract, to receive progress payments, Landmark was to submit an invoice, a Contract Performance Statement (showing, among other things, the percentage of completion), an updated network analysis, a release, and a certification.

20. According to § 01200 of the Contract, payments to Landmark were subject to the Navy's right to reduce payments in the event that Landmark had been overpaid on any previous progress payment(s).

21. Section 01200 of the Contract authorized the Navy to consider for progress payments, materials delivered off-site (thereby fulfilling the condition established by the Payments Clause). However, that authority was expressly limited. For example, § 01200, ¶ 1.4.2(b) provided that payments may be made for material stored off the construction site if (1) the conditions in the Payments Clause are satisfied, (2) the material was stored within a distance of 50 miles by streets and roads to the construction site, (3) the materials were insured and protected from theft, and (4) the materials were not susceptible to deterioration while in storage. Further, materials in transit to either the job site or storage site were not eligible for payment.

22. Pursuant to the Property Records clause, the Navy was obligated to maintain official Government property records in connection with Government property under the Contract. The Property Records clause expressly relieved the Contractor (i.e., Landmark) of that responsibility.

23. As described above, the Contract required Landmark to submit an updated network analysis with each invoice. Section 01321, Network Analysis Schedule, in conjunction with FAR 52.236-15, Schedule for Construction Contract (Apr 1984), described the requirements for the Network Analysis Schedule ("NAS") to be prepared and submitted by Landmark and approved by the Contracting Officer.

24. The NAS consisted of "time network scaled design diagrams and accompanying mathematical analyses." Contract, § 01321, ¶ 1.4. The NAS was to be used to determine Landmark's progress on the Project and formed the basis for Landmark's progress payment requests and the Navy's approval of said progress payment requests. Thus, the NAS used scheduled activities to which were allocated costs for performing the activities.

25. For scheduling purposes, the basic concept of the network analysis diagram is to show how the start of one activity on the Project was dependent on the completion of earlier activities and how its completion affects future activities. As a result, the Contract required the Project be broken down into discrete activities.

26. According to § 01321, ¶ 1.4.2, the "minimum number of activities in the final network diagram shall be 30 per building and 1000 for the total project." Accordingly, the network diagram for a single MFH unit was to reflect at least thirty separate activities, each of which could be allocated specific costs and duration.

27. The Contract expressly required that each activity depicted in the network diagram have an assigned monetary value.

28. The Contract required that the program or means used to create the mathematical compilation required by the NAS be capable of "compiling the total value of the

completed and partially completed activities." Contract, § 01321, ¶ 1.4.3. Thus, by identifying all completed and partially completed activities at any given point, the Navy could determine the extent of the Contractor's progress. In addition, because each activity was assigned a monetary value, the Navy could determine the amount of the progress payment earned by the Contractor.

29. The Contract required Landmark to submit the completed NAS to the Navy for review and approval by the Contracting Officer.

30. The Contract also contained provisions regarding liquidated damages. According to the Contract, if Landmark failed to complete the Project by October 23, 2002, the Navy could assess liquidated damages against Landmark in the amount of $75 per unit per day for each day of delay.

**C. <u>Performance by and Payment to Landmark</u>**

31. Landmark submitted a NAS as required by the Contract. The Navy's Project Engineer received the submitted NAS and simply returned it to Landmark "approved as noted." The Project Engineer did not perform any analysis or review of the prices listed on the NAS for any activity. Further, the Contracting Officer never reviewed or approved the NAS. Nevertheless, the Navy used Landmark's NAS, which included line items for more than $2.6 million in material. Over three-fourths of that number consisted of only five categories: $500,000 for "windows and doors"; $500,000 for "cabinets"; $300,000 for "paint"; $485,940 for "flooring"; and $287,040 for "siding." Because no analysis was performed, the Navy chose to be ignorant as to whether, for example, the number of gallons of paint that could be purchased with $300,000 had a reasonable relationship to what it took to do the job.

32. Further, the NAS contained no definition of the scope of work contained in these material line items. As a result, the NAS provided by Landmark contemplated that Landmark, upon billing the Navy for $500,000 for "windows and doors" would be credited

with the corresponding progress on Project completion. Thus, according to the NAS submitted by Landmark, upon the mere "billing" for the material separately identified on its NAS, Landmark would be credited by the Navy for completing 26.3% of the Project.

33. The NAS also included line items and prices for various field office overhead and labor items, outside of constructing the individual MFH units, including "personnel" for $728,834, "sitework" for $590,000, and "asbestos and lead abatement" for $882,000.

34. The NAS used by the Navy allocated only $4,363,518 to the construction of individual MFH units, or a mere 44% of the contract price, to the activity representing the principal purpose of the Contract.

35. The NAS submitted by Landmark, used by the Navy and on which the Navy relied for making progress payments to Landmark did not identify 1000 separate activities as required by the Contract. Instead, Landmark's NAS contained less than 600 activities. Moreover, the NAS also failed to identify 30 separate activities for each MFH Unit. Further, the NAS did not identify the cost of any individual activity for each MFH. As a result, the NAS did not and could not provide a basis on which the Navy could reasonably rely to estimate progress payments. The NAS used by the Navy to make progress payments to Landmark was never reviewed, analyzed or approved by the Contracting Officer, whose approval was required by the Contract.

36. The NAS submitted by Landmark was not approved by the Contracting Officer and, further, did not comply with the requirements established by FAR 32.102(e)(2), the Payments Clause or §§ 01200 or 01321 of the Contract. Nonetheless, the Navy used Landmark's NAS.

37. On August 8, 2000, the Navy issued Modification A0001 to the Contract. This unilateral, no-cost modification provided Landmark a limited notice to proceed ("NTP") for specific items of work, including installation of off-street parking, asbestos abatement, lead abatement, interior demolition, removal of existing appliances and coordination with the

piping installation contractor. The modification provided that no other work was to be performed until final design had been approved.

38. Landmark entered into a subcontract with Lloyd Enterprises, Inc. ("Lloyd") in the amount of $590,000 to perform the "sitework." The NAS approved by the Navy included $590,000 for the line item described as "sitework." The NAS also identified Lloyd as the subcontractor performing that line item.

39. However, in its proposal, Landmark proposed to perform the sitework for less than $362,000. The Navy did not question the $230,000 increase in this item, notwithstanding that this was a separate bid item.

40. The Contract required that Landmark prepare and provide to the Navy daily Contractor Production Reports ("CPR"). Among other items of information, the CPRs prepared by Landmark identified the personnel working on the Project, the tasks performed and the hours worked on a daily basis.

41. As discussed previously, the Contract required Landmark to remodel existing MFH units. Accordingly, Landmark was not developing an undeveloped site, building new roads or placing utilities. The sitework in this Project essentially consisted of extending the asphalt off-street parking space in front of each MFH unit to accommodate an additional car. Lloyd's scope of work was limited to providing a flat, compacted and asphalt-paved space adjacent to an existing asphalt slab.

42. The CPRs prepared by Landmark and submitted to the Navy identify the dates and times Lloyd worked in fulfillment of its Subcontract. According to the CPRs, Lloyd began working on the sitework August 9, 2000, the day after Landmark received notice to proceed for the sitework. According to these CPRs, Lloyd finished the sitework on September 13, 2000. Lloyd submitted two invoices to Landmark. The first invoice was dated August 25, 2000, in the amount of $159,496.60. The second invoice was dated September 15,

2000, for the amount of $430,502.40. The two invoices total $590,000, the subcontract price and the value of the sitework line item in the Navy-approved NAS.

43. The CPRs prepared by Landmark and submitted to the Navy disclose that the equipment used by Lloyds to perform the sitework was employed for only approximately 305 hours.

44. In addition, the Navy received certified payrolls from Lloyds. These certified payrolls established that Lloyd's labor costs for the site work were less than $30,000.

45. In its September 18, 2000 invoice, Landmark invoiced the Navy for the entire amount invoiced to Landmark by Lloyd, and noted on the Navy-approved NAS for sitework -- $590,000. The Navy authorized payment for that invoice in the full amount requested by Landmark. As a result, the Navy paid Landmark for work performed by Lloyd at the rate of almost $2,000 per equipment hour.

46. The Navy had all of the information necessary to determine that Landmark intended to pay Lloyd almost $2,000 per equipment hour for the sitework. Nonetheless, the Navy still approved Landmark's invoice.

47. Between its September 18, 2000 invoice and its November 20, 2000 invoice, a total of three invoices, Landmark invoiced the Navy for more than $3,105,031, or almost one-third of the original contract value of $9.878 million. When combined with its two earlier invoices, the total invoiced by Landmark by November 20, 2000 was more than $3.598 million, or 36.4% of contract value. However, by November 20, 2000, the Navy had not even approved Landmark's construction drawings. Nor had Landmark submitted (or the Contracting Officer approved) the Schedule of Prices required by § 01200, ¶ 1.2 of the Contract. As a result, Landmark had not even begun construction work on the interior of the MFH units, much less completed a single MFH unit.

48. Within its September, October and November 2000 invoices, Landmark requested payment for at least $1,346,980 in material cost for such items as doors and

windows, cabinets, paint, flooring and siding. The Navy paid the entire amounts requested by Landmark in each invoice. Indeed, the Navy approved the invoices almost immediately, without requesting from Landmark any supporting documentation.

49. Included within the amount referenced in the previous paragraph was $140,000 for cabinets. That is, by November 20, 2000, Landmark requested, and the Navy subsequently approved and paid Landmark, $140,000 for cabinets. However, by November 20, 2000, Landmark had not even ordered cabinets valued at $140,000, much less paid for them. Nor were cabinets valued at $140,000 delivered to the Project site by November 20, 2000.

50. Landmark entered into a purchase order subcontract with Tacoma Fixture Co. to provide all the cabinets required on the Project. Tacoma Fixture Co. delivered its first cabinets to Landmark on October 27, 2000. Tacoma Fixture submitted its first invoice to Landmark on November 7, 2000 in the amount of $10,405.29.

51. Landmark did not submit with its invoice to the Navy requesting payment for cabinets any documentation describing the quantity, type or size of the cabinets for which it requested payment. Nor did it inform the Navy when – if at all – it had purchased or was purchasing the cabinets or where the cabinets would be stored. Landmark did not inform the Navy whether the cabinets were in transit. Further, the Navy did not request any information from Landmark that would provide any of this information. Instead, the Navy simply approved Landmark's request in its entirety. Landmark was then paid for cabinets that were not even ordered, much less delivered to Landmark or the Project site.

52. Immediately upon payment by the Navy for the amount requested by Landmark for cabinets, the cabinets became the sole property of the Navy. However, because of the Navy's failure to demand from Landmark any information necessary to establish its title to said material or to create and/or maintain property records for said materials, the Navy

did not have the ability to identify that to which it had obtained title. Simply put, the Navy did not know what it bought when it paid $140,000 to Landmark.

53. On December 20, 2000, the Navy issued unilateral Modification A00008. This modification incorporated into the Contract the approved construction design.

54. On that same date, December 20, 2000, Landmark submitted its sixth invoice. In its sixth invoice, Landmark requested $230,647.36, for a cumulative total of $3,829,601.28. As with each of the five previous invoices, the Navy approved invoice number six in its entirety. Landmark was subsequently paid.

55. As a result, through the December 20, 2000 invoice, the Navy had authorized payment to Landmark of $3,829,601.28, yet Landmark had still yet to complete a single MFH unit. Moreover, by mid-January 2001, the Navy had received numerous complaints from Landmark's suppliers and subcontractors regarding Landmark's failure to pay its suppliers and subcontractors.

56. As a result of the numerous complaints received by the Navy from Landmark's suppliers and subcontractors, the Navy initially rejected Landmark's January 2001 invoice. Further, the Navy at that time demanded that Landmark provide to the Navy an accounting of all funds received by Landmark from the Navy and all amounts owed to and paid by Landmark to Landmark's suppliers and subcontractors.

57. By letter dated February 7, 2001, Landmark provided accounting information to the Navy. Landmark's February 7, 2001 submission proved that Landmark had not paid its suppliers and subcontractors. That submission also proved that, to the extent Landmark had provided progress payment certifications required by the Payments Clause, such certifications were false.

58. FAR 32.112-1(c) provides that the Contracting Officer "shall initiate administrative or other remedial action" if he or she determines that the progress payment certification required by the Payments Clause is "inaccurate in any material respect."

59. Further, FAR 32.006-3(b) provides that government personnel "shall report suspected fraud related to advance, partial, or progress payments."

60. The Navy did not analyze Landmark's February 7, 2001 submission. As a result, the Contracting Officer did not take administrative or remedial action as required by FAR 32.112-1. Further the Contracting Officer did not report suspected fraud as required by FAR 32.006-3. Instead, the Contracting Officer accelerated payments to Landmark such that within the six week period after receipt of Landmark's February 7, 2001 submission, the Contracting Officer authorized the payment of three separate invoices totaling $503,362.88.

61. By bilateral Modification A00010, effective February 28, 2001, Landmark and the Navy added to the Contract the requirement to renovate 21 additional MFH units (for a total of 181) and increased the Contract price by $1,884,176. The modification did not extend the Contract completion date, which remained October 23, 2002.

62. The Navy did not obtain the consent of the surety for Modification No. A00010.

63. Between February 20, 2001 and May 1, 2001, the Navy paid, or authorized payment of, an additional $680,438.20. Thus, by May 1, 2001, the Navy had paid or authorized payment of 36.7% of the Contract price. However, by May 1, 2001, the Navy had accepted only three of the 181 MFH units on Contract.

64. Landmark submitted its invoice No. 5575-12 on May 30, 2001, requesting payment of $283,594.28, for a total payment of $4,793,633. The Navy approved the payment request in its entirety.

65. As of June 1, 2001, the Navy had paid, or approved for payment, a total of $4,793,633 to Landmark. Included with that amount were amounts for materials, including $375,000 for "doors and windows," $260,000 for "cabinets," $156,000 for "paint," $485,940 for "flooring," and $257,040 for "siding."

66. By June 1, 2001, the Navy had also paid or approved for payment $458,640 for "asbestos and lead abatement," $378,936 for "personnel," and $590,000 for "sitework."

67. When Landmark submitted progress payment requests for "doors and windows," it did not submit invoices or other documentation identifying the quantities and types of windows and doors for which it sought payment. Nor did Landmark submit documentation identifying the purchase price of the doors and windows. Nor did Landmark identify the location at which this material was stored or whether the material had been purchased or was in transit. As a result, when it approved payment for this material, the Navy did not know how many doors and windows it was paying for, what types and sizes of doors and windows it was paying for, where the doors and windows were stored, or even if the material was actually purchased. The Navy failed to obtain any information that would establish it obtained title to any door or window.

68. Immediately upon payment by the Navy for the amount requested by Landmark for "doors and windows," said doors and windows became the sole property of the Navy. Pursuant to FAR 52.241-1, Government Property (Fixed-Price Contracts) (Dec. 1989), the Navy was obligated to maintain official property records for the material it paid for. However, because the Navy failed to demand from Landmark any information to establish the Navy's title to said material or necessary to create and/or maintain property records for said material, the Navy did not have the ability to identify that to which it had obtained title. The Navy did not know what it bought when it paid Landmark $375,000 for "doors and windows."

69. Similarly, when Landmark submitted additional progress payment requests for "paint," "flooring," and "siding," it failed to provide to the Navy any information which would, could or did identify type, size, quantity, cost and location of any of the material. Indeed, Landmark did not even submit documentation establishing the material that had been ordered or delivered. Landmark submitted no information from which the Navy could even

infer, much less establish, that Landmark had purchased, or that the Navy was paying for, material that would be used in the Project. Nonetheless, the Navy paid Landmark each time Landmark requested such payment for material. The Navy did not ask or demand that Landmark provide any further information which would substantiate quantity, type, size, or location of the material. In short, the Navy neither demanded nor obtained any documentation that would establish title to any material for which it paid Landmark.

70. Immediately upon payment by the Navy for the amounts requested by Landmark for "paint," "flooring," and "siding," said material became the sole property of the Navy. However, because the Navy failed to demand from Landmark any information to establish its title to said material or necessary to create and/or maintain property records for said material, the Navy did not have the ability to identify that to which it had obtained title. The Navy did not know what it had purchased when it paid Landmark for "paint," "flooring," and "siding."

71. By June 1, 2001, the Navy had paid Landmark, or authorized payments totaling $458,640 for "asbestos and lead abatement," $378,936 for "personnel," and $590,000 for "sitework."

72. The $458,640 paid to Landmark for "asbestos and lead abatement" accounted for 52% of the amount budgeted by the NAS for that "activity." However, pursuant to the Navy's own records, Landmark had completed abatement in only 54 of the 160 units for which it had budgeted, or 34%.[2] Thus, the Navy paid Landmark for abating 83 units when Landmark had only abated 54. Accordingly, Landmark was paid $158,760 for work it had not performed.

73. Payment by the Navy for 83 units when Landmark had abated only 54 units was inconsistent with the Payments Clause, § 01200 of the Contract and FAR 32.102(e)(2).

[2] Landmark did not re-forecast budgets for activities after the Contract was modified to add the additional 21 MFH units. Instead, Landmark simply created a single activity to which it attributed the entire price of that modification.

74. The Navy failed to divide the cost allocated to this activity (abatement) by the number of MFH units in which the activity would occur. Such an analysis was required by the Contract. Instead, the Navy based its payment to Landmark upon the passage of time. That is, rather than determining how much work Landmark had performed, the Navy determined what percentage of Contract time had elapsed and paid Landmark accordingly. Progress payments based upon such a calculation violated the terms of the Contract.

75. The NAS included an activity identified as "personnel" for which Landmark had budgeted $728,834 for the entire Project. Separately, Landmark budgeted an amount for labor for each of the MFH units under Contract. Thus, the "personnel" activity was in addition to labor for building the MFH units. However, by June 1, 2001, the Navy had paid Landmark, or authorized payment, in the amount of $378,936 for "personnel," 52% of the amount budgeted by Landmark for this line item.

76. Payment by the Navy for 52% of the amount budgeted by Landmark for the "personnel" activity was inconsistent with the Contract requirements. The Contract required the Navy to make progress payments based upon work completed. However, the Navy based its payment for the "personnel" activity on the mere passage of time, which violated the terms of the Contract.

77. At that time, Landmark was approximately 12% complete with the Project. Nonetheless, the Navy did not question any of the amount requested by Landmark for "personnel." As a result, the Navy paid Landmark more than $291,500 for work that Landmark did not perform.

**D. <u>Termination, Takeover and Completion</u>.**

78. By letter dated June 21, 2001, Landmark notified the Navy that Landmark had furloughed its field staff and that no further work was being done pending the resolution of financial difficulties.

79. On July 11, 2001, the Navy issued Landmark a cure notice.

80. By letter dated July 20, 2001, Landmark informed the Navy that Landmark was unable to complete the Project due to financial problems and was therefore in default.

81. The Navy default terminated Landmark's contract on August 2, 2001.

82. At termination, there remained $7,392,381.24 in unpaid Contract balance. The Navy had paid Landmark almost 40% of the modified Contract price, or $4,793,633.76. However, only 22 of the 181 MFH units on Contract had been completed by Landmark. Indeed, the Navy estimated that the Contract was only 12% complete (based upon units completed and returned to the Navy) or only 15% complete (if partially completed units were included). Thus, by the Navy's own reckoning, it had overpaid Landmark between 25 and 28 percent, or between $3.040 and $3.404 million. Moreover, between July 2000 and May 2001, the Navy authorized payment of eleven separate invoices to Landmark, totaling $4,793,633.76. However, Landmark provided the progress payment certifications required by the Payments Clause only for invoices 1, 10 and 11, which invoices totaled $693,925.60.

83. When the Navy issued its June 11, 2001 Cure Notice, it believed the Project was approximately three weeks behind schedule. According to the Navy, the Project was approximately 16 weeks behind schedule on August 16, 2001, two weeks after default termination. The Project continued to fall behind schedule while the Navy and Lumbermens negotiated the terms of a Takeover Agreement.

84. Effective November 20, 2001, Lumbermens, the Navy and Atherton Construction, Inc. ("Atherton") executed a Takeover Agreement, pursuant to which Lumbermens agreed to be responsible for completing the Project. Atherton was identified in the Takeover Agreement as the "Completing Contractor." Effective that same date, Lumbermens and Atherton executed a Completion Contract, pursuant to which, on behalf of Lumbermens, Atherton would perform the work necessary to complete the Project.

85. The Takeover Agreement provided, with respect to material previously paid for by the Navy for use on the Project, that:

> Insofar as the Government as any right, title or interest therein, the Government agrees that the Surety or the Completing Contractor will have the right to use, without charge, any of the materials, supplies, equipment or personal property furnished or supplied to or by the Defaulted Contractor which may be stored on the premises of the project or elsewhere, or which may have been fabricated for use in connection with the project. The Government makes no warranty as to the quantity or condition of any such materials, supplies, equipment or personal property.

86. The Takeover Agreement did not modify the original completion date of the Project, which remained as October 23, 2001.

87. The Takeover Agreement also included a reservation of rights for Lumbermens, which provided:

> This Agreement shall not be construed to waive, limit, alter or amend any of the Surety's rights or defenses under the performance bond or otherwise. Except as to the Government's mitigation of damages in accepting completion of the defaulted contract by the Surety, it is expressly understood that by entering into this Agreement the Surety does not waive, prejudice, or in any way adversely affect or limit any claim that it, as Surety, or the Defaulted Contractor might have against the Government, including any claim arising out of payments made by the Government to the Defaulted Contractor; and the Surety hereby expressly reserves, any and all rights and defenses it may have against the Government under the contract and the performance bond. Nothing in this Agreement shall prejudice the rights of the Surety to seek a judicial or other appropriate determination of its rights.

88. During performance of its Completion Contract, Atherton notified the Navy on January 31, 2002, that the existing electrical wiring system in the MFH units did not meet the requirements of the National Electrical Code. Atherton found the absence of the necessary ground, among other deficiencies, and notified the Navy that these circumstances constituted a changed condition.

89. The Navy, which had known of this problem for several months prior to the default termination of Landmark's contract, initially denied the problem's existence. During this period, Atherton was unable to proceed with scheduled work on its critical path.

90. Finally, on or about March 15, 2002, the Navy acknowledged the existence of the changed condition and provided Atherton with a request for proposal to obtain Atherton's price for the added scope of work necessary to correct the deficient wiring.

91. On March 18, 2002, Atherton was able to re-start work, implementing the changes directed by the Navy.

92. As a result of this changed work, Atherton incurred at least a 46-day delay to its critical path. Atherton requested that the Navy provide a schedule extension to accommodate this 46-day delay. The Navy refused.

93. The Navy assessed liquidated damages against Lumbermens for the period of time encompassed by the 46-day schedule extension requested by Atherton.

94. The Navy also assessed liquidated damages against Lumbermens during the period in which Atherton was completing the additional 21 MFH units placed on the Contract by Modification No. A00010.

95. The Navy did not obtain the surety's consent for Modification No. A00010. Thus, the 21 additional MFH units were not within the scope of work bonded by Lumbermens.

96. The 21 MFH units added by Modification Number A00010 would have reasonably required at least 74 days to complete.

97. Lumbermens is entitled to at least a 74-day schedule extension to complete the 21 additional MFH units that were not part of its bonded scope of work.

98. Together, the electrical delay and the completion of the Modification No. A00010 MFH units added at least 120 days to the schedule.

99. Pursuant to the Completion Contract, Atherton completed work on the Project on June 6, 2003.

100. The Navy withheld liquidated damages against Lumbermens in the amount of $1,015,125.

101. If the Navy had extended the Contract completion date by 120 days, Lumbermens would be entitled to the return of at least $744,000 in liquidated damages retained by the Navy.

102. Lumbermens incurred damages in excess of $4.160 million under its performance bond to complete the project. In addition, Lumbermens incurred damages of more than $550,000 under its payment bond to compensate suppliers and subcontractors that had not been paid by Landmark.

## VII. Causes of Action

### A. Discharge/Impairment of Suretyship

#### Count 1 – Failure to Require Progress Payments Certifications

103. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

104. With each invoice submitted by Landmark, the Contract mandated that Landmark submit a progress payment certification. Among other things, the Landmark was required to certify that all payments due to suppliers and subcontractors from previous government progress payments had been made. The Payments Clause further provided that if Landmark failed to provide the mandatory progress payment certification than "payment [to Landmark] shall not be made."

105. Landmark provided the required certification for only three invoices, numbers 1, 10 and 11.

106. Landmark failed to provide the required certification for the remaining invoices it submitted to the Navy, which invoices totaled $4,099,708.16. Nevertheless, the Navy authorized payment to Landmark and Landmark was paid from Contract funds.

106. The Contract funds provide the security for the performance bonded by Lumbermens.

107. The Contract terms and conditions, including the mandatory progress payment certification of the Payments Clause, provided security for the performance bonded by Lumbermens.

108. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

109. Invoices 2 though 9 submitted by Landmark violated the Payments Clause of the Contract, FAR 52.235-5, because they did not include the mandatory certification.

110. The Navy's approval and subsequent payment of Invoices 2 through 9 also violated the Payments Clause of Contract, FAR 52.235, because the Contracting Officer does not have authority to pay invoices that lack the mandatory certifications.

111. The Navy's failure to comply with the terms of the Contract by demanding from Landmark the certifications required by the Payments Clause was a change to the Contract terms which Lumbermens relied upon to provide the performance and payment bonds and which failure materially increased the risk that was assumed by Lumbermens when it issued the bonds.

112. As a result of the Navy's failure to comply with the terms of the Contract, Lumbermens was damaged in the amount of $4,099,708.16.

**Count 2 – Failure to Require a Schedule of Prices**

107. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

108. Pursuant to § 01200, ¶ 1.2 of the Contract, Landmark was not to be paid for any construction work until (1) it submitted a Schedule of Prices, on forms provided by the Government, and (2) said Schedule of Prices was approved by the Contracting Officer.

109. Landmark never submitted such a Schedule of Prices, nor did the Contracting Officer demand that Lumbermens comply with § 01200, ¶ 1.2 of the Contract.

110. Nevertheless, Landmark invoiced the Navy and the Contracting Officer approved invoices for construction work, including advance payment for materials, totaling in excess of $4.5 million.

113. The Contract funds provide the security for the performance bonded by Lumbermens.

114. The Contract terms and conditions, including § 01200, ¶ 1.2 of the Contract, provided security for the performance bonded by Lumbermens.

115. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

116. The Navy's failure to require Landmark to comply with § 01200, ¶ 1.2 of the Contract and subsequent payments Lumbermens, violated the terms of the Contract.

117. The Navy's failure to so comply with the terms of the Contract was a change to the Contract terms which Lumbermens relied upon to provide the performance and payment bonds and which failure materially increased the risk that was assumed by Lumbermens when it issued the bonds.

118. As a result of the Navy's failure to comply with the terms of the Contract, Lumbermens was damaged in the amount of at least $4.5 million.

**Count 3 – Failure to Require Proper Network Analysis Schedule**

119. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

120. The Contract required that Landmark submit to the Navy a Network Analysis Schedule that complied with FAR 52.236-15, Schedules for Construction Contracts (Apr 1984) and § 01321 of the Contract.

121. In addition, the Contract required that the NAS provide a foundation for progress payment requests from Landmark that complied with the requirement of the Payments clause and § 01200 of the Contract.

122. Further, FAR 31.102(e)(2) required that the procedure used by the Navy for approving progress payments, which depended upon the NAS submitted by Landmark, "ensure that [progress] payments are commensurate with work accomplished."

123. The Contract funds provide the security for the performance bonded by Lumbermens.

124. The Contract terms and conditions, including the requirement for a Network Analysis System that "ensure[d] that [progress] payments are commensurate with work accomplished" provided security for the performance bonded by Lumbermens.

125. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

126. The NAS approved by the Navy failed to conform to the Contract requirements for several reasons, including, but not limited to: (1) the NAS did not contain the required minimum number of activities for the Project; (b) the NAS did not contain the minimum number of activities for each MFH; (3) the NAS did not allocate costs to each activity; and (4) the NAS did not provide a basis for determining the value of the work actually performed by Landmark and on which progress payments could be based.

127. The Navy's failure to comply with the terms of the Contract by demanding from Landmark a proper Network Analysis Schedule was a change to the Contract terms which Lumbermens relied upon to provide the performance and payment bonds and which failure materially increased the risk that was assumed by Lumbermens when it issued the bonds.

128. As a result of the Navy's failure to demand from Landmark a Network Analysis Schedule that complied with Contract requirements, Lumbermens has been damaged by at least $2,000,000, the exact amount to be proven at trial.

**Count 4 – Improper Payment for Doors and Windows**

129. Paragraphs 1 through 91 are incorporated by reference as if fully set forth herein.

130. The Contract placed specific limitations on the Navy's authority to include in progress payments amounts for materials prior to the incorporation of said materials into the Project.

131. Those limitations include, but are not limited to, the requirement that Landmark provide to the Navy satisfactory evidence that the material for which payment has been requested have been delivered to the Project site or that Landmark has acquired title to the property.

132. The Contract also expressly provided that certain materials, i.e., those susceptible to deterioration or physical damage in storage or transit, may not be considered for progress payments if stored off of the Project site.

133. The Contract required the Navy to maintain the official property records for Government property under the Contract.

134. The Navy paid Landmark $375,000 for doors and windows as a material cost. Immediately upon said payment, title to said doors and windows passed to the Navy. However, the Navy failed to obtain any evidence of title, quantity, quality, size and/or style for the doors and windows to which it was to obtain title.

135. The Contract requirement establishing the documentation under which the Navy may consider for progress payments material prior to said material's incorporation into the Project, as well as the transfer of title and obligation of the Navy to maintain property records, are Contract terms that provide security for the bonded performance.

136. The Navy is not permitted to ignore, waive, or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

137. The Navy materially increased the surety's risk by, among other things, the Navy's failure to (1) obtain information necessary to create and maintain accurate property records for the material it paid for in making progress payments to Landmark, and (2) determine whether said material had been purchased and, if so, where it was located. These failures by the Navy were changes to the Contract terms on which Lumbermens relied in providing the performance and payment bonds.

138. As a result of the Navy's failures related to the Navy's payment to Landmark of $375,000 for doors and windows, Lumbermens was damaged in the amount of at least $131,775.00.

**Count 5 – Improper Payment for Cabinets**

139. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

140. The Contract placed specific limitations on the Navy's authority to include in progress payments amounts for materials prior to the incorporation of said materials into the Project.

141. Those limitations include, but are not limited to, the requirement that Landmark provide to the Navy satisfactory evidence that the material for which payment has been requested have been delivered to the Project site or that Landmark has acquired title to the property.

142. The Contract also expressly provided that certain materials, i.e., those susceptible to deterioration or physical damage in storage or transit, may not be considered for progress payments if stored off of the Project site.

143. The Contract required the Navy to maintain the official property records for Government property under the Contract.

144. The Navy paid Landmark $260,000 for cabinets as a material cost. Immediately upon said payment, title to said cabinets passed to the Navy. However, the Navy

failed to obtain any evidence of title, quantity, quality, size and/or style for the cabinets to which it was to obtain title.

145. The Contract requirement establishing the documentation under which the Navy may consider for progress payments material prior to said material's incorporation into the Project, as well as the transfer of title and obligation of the Navy to maintain property records, are Contract terms that provide security for the bonded performance.

146. The Navy is not permitted to ignore, waive, or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

147. The Navy materially increased the surety's risk by, among other things, the Navy's failure to (1) obtain information necessary to create and maintain accurate property records for the material it paid for in making progress payments to Landmark, and (2) failing to determine whether said material had been purchased and, if so, where it was located. These failures by the Navy were changes to the Contract terms on which Lumbermens relied in providing the performance and payment bonds.

148. As a result of the Navy's failures involved in the Navy's payment to Landmark of $260,000 for cabinets, Lumbermens was damaged in the amount of at least $232,607.

**Count 6 – Improper Payment for Paint**

149. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

150. The Contract placed specific limitations on the Navy's authority to include in progress payments amounts for materials prior to the incorporation of said materials into the Project.

151. Those limitations include, but are not limited to, the requirement that Landmark provide to the Navy satisfactory evidence that the material for which payment has been requested have been delivered to the Project site or that Landmark has acquired title to the property.

152. The Contract also expressly provided that certain materials, i.e., those susceptible to deterioration or physical damage in storage or transit, may not be considered for progress payments if stored off of the Project site.

153. The Contract required the Navy to maintain the official property records for Government property under the Contract.

154. The Navy paid Landmark $156,000 for paint as a material cost. Immediately upon said payment, title to said paint passed to the Navy. However, the Navy failed to obtain any evidence of title, quantity, quality, size and/or style for the paint to which it was to obtain title.

155. The Contract requirement establishing the documentation under which the Navy may consider for progress payments material prior to said material's incorporation into the Project, as well as the transfer of title and obligation of the Navy to maintain property records, are Contract terms that provide security for the bonded performance.

156. The Navy is not permitted to ignore, waive, or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

157. The Navy materially increased the surety's risk by, among other things, the Navy's failure to (1) obtain information necessary to create and maintain accurate property records for the material it paid for in making progress payments to Landmark, and (2) failing to determine whether said material had been purchased and, if so, where it was located. These failures by the Navy were changes to the Contract terms on which Lumbermens relied in providing the performance and payment bonds.

158. As a result of the Navy's failures involved in the Navy's payment to Landmark of $156,000 for paint, Lumbermens was damaged in the amount of at least $136,479.

**Count 7 – Improper Payment for Flooring**

159. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

160. The Contract placed specific limitations on the Navy's authority to include in progress payments amounts for materials prior to the incorporation of said materials into the Project.

161. Those limitations include, but are not limited to, the requirement that Landmark provide to the Navy satisfactory evidence that the material for which payment has been requested have been delivered to the Project site or that Landmark has acquired title to the property.

162. The Contract also expressly provided that certain materials, i.e., those susceptible to deterioration or physical damage in storage or transit, may not be considered for progress payments if stored off of the Project site.

163. The Contract required the Navy to maintain the official property records for Government property under the Contract.

164. The Navy paid Landmark $485,940 for flooring as a material cost. Immediately upon said payment, title to said flooring passed to the Navy. However, the Navy failed to obtain any evidence of title, quantity, quality, size and/or style for the flooring to which it was to obtain title.

165. The Contract requirement establishing the documentation under which the Navy may consider for progress payments material prior to said material's incorporation into the Project, as well as the transfer of title and obligation of the Navy to maintain property records, are Contract terms that provide security for the bonded performance.

166. The Navy is not permitted to ignore, waive, or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

167. The Navy materially increased the surety's risk by, among other things, the Navy's failure to (1) obtain information necessary to create and maintain accurate property records for the material it paid for in making progress payments to Landmark, and (2) failing to determine whether said material had been purchased and, if so, where it was located. These

failures by the Navy were changes to the Contract terms on which Lumbermens relied in providing the performance and payment bonds.

168. As a result of the Navy's failures involved in the Navy's payment to Landmark of $485,940 for flooring, Lumbermens was damaged in the amount of at least $333,940.

**Count 8 – Improper Payment for Siding**

169. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

170. The Contract placed specific limitations on the Navy's authority to include in progress payments amounts for materials prior to the incorporation of said materials into the Project.

171. Those limitations include, but are not limited to, the requirement that Landmark provide to the Navy satisfactory evidence that the material for which payment has been requested have been delivered to the Project site or that Landmark has acquired title to the property.

172. The Contract also expressly provided that certain materials, i.e., those susceptible to deterioration or physical damage in storage or transit, may not be considered for progress payments if stored off of the Project site.

173. The Contract required the Navy to maintain the official property records for Government property under the Contract.

174. The Navy paid Landmark $257,040 for siding as a material cost. Immediately upon said payment, title to said siding passed to the Navy. However, the Navy failed to obtain any evidence of title, quantity, quality, size and/or style for the siding to which it was to obtain title.

175. The Contract requirement establishing the documentation under which the Navy may consider for progress payments material prior to said material's incorporation into

the Project, as well as the transfer of title and obligation of the Navy to maintain property records, are Contract terms that provide security for the bonded performance.

176. The Navy is not permitted to ignore, waive, or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

177. The Navy materially increased the surety's risk by, among other things, the Navy's failure to (1) obtain information necessary to create and maintain accurate property records for the material it paid for in making progress payments to Landmark, and (2) failing to determine whether said material had been purchased and, if so, where it was located. These failures by the Navy were changes to the Contract terms on which Lumbermens relied in providing the performance and payment bonds.

178. As a result of the Navy's failures involved in the Navy's payment to Landmark of $257,040 for siding, Lumbermens was damaged in the amount of at least $172,128.

**Count 9 – Improper Payment for Asbestos Abatement**

179. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

180. The Payments Clause required the Navy to make payment to Landmark as work progressed. Further, FAR 31.102(e)(2) requires that the procedures used by the Navy for approving progress payments ensure that the progress payments made to Landmark were commensurate with the work accomplished by Landmark.

181. The obligation to ensure that progress payments made to Landmark were made as work progressed and were commensurate with work accomplished by Landmark were terms of the Contract that provided security for the bonded performance.

182. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

183. Here, the Navy paid Landmark $458,640 for asbestos and lead abatement. Such payment constituted 52% of the budgeted amount for that scope of work. However, at

termination, Landmark had completed only 34% of the scope of work. As a result, the Navy paid Landmark $158,760 more than it should have. Such payment by the Navy was not based upon the work performed. Instead, the payment was based upon the mere passage of time. Further, the Navy failed to ensure that said payment was commensurate with the work performed by Landmark.

184. The Navy's failure to ensure that progress payments to Landmark for asbestos and lead abatement were based upon work performed and commensurate with the progress made was a material change to the Contract terms and an abuse of discretion which materially increased the risk that was assumed by Lumbermens when it issued the bonds.

185. As a result of the Navy's material change to the Contract terms and/or abuse of discretion, Lumbermens was damaged in the amount of at least $158,760.

**Count 10 – Improper Payment for Personnel**

186. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

187. The Payments Clause required the Navy to make payment to Landmark as work progressed. Further, FAR 31.102(e)(2) requires that the procedures used by the Navy for approving progress payments ensure that the progress payments made to Landmark were commensurate with the work accomplished by Landmark.

188. The obligation to ensure that progress payments made to Landmark were made as work progressed and were commensurate with work accomplished by Landmark were terms of the Contract that provided security for the bonded performance.

189. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

190. Here, the Navy paid Landmark $378,936 for personnel. Such payment constituted 52% of the budgeted amount for that scope of work. However, at termination, Landmark had completed only 12% of the Contract's scope of work. As a result, the Navy

paid Landmark $291,533 more than it should have. Such payment by the Navy was not based upon the work performed. Instead, the payment was based upon the mere passage of time. Further, the Navy failed to ensure that said payment was commensurate with the work performed by Landmark.

191. The Navy's failure to ensure that progress payments to Landmark for personnel were based upon work performed and commensurate with the progress made was a material change to the Contract terms and an abuse of discretion which materially increased the risk that was assumed by Lumbermens when it issued the bonds.

192. As a result of the Navy's material change to the Contract terms and/or abuse of discretion, Lumbermens was damaged in the amount of at least $291,533.

**Count 11 – Improper Payment for Sitework**

193. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

194. The Payments Clause required the Navy to make payment to Landmark as work progressed. Further, FAR 31.102(e)(2) requires that the procedures used by the Navy for approving progress payments ensure that the progress payments made to Landmark were commensurate with the work accomplished by Landmark.

195. The obligation to ensure that progress payments made to Landmark were made as work progressed and were commensurate with work accomplished by Landmark were terms of the Contract that provided security for the bonded performance.

196. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

197. Here, the Navy paid Landmark $590,000 for sitework, resulting in a payment of almost $2,000 per equipment hour for sitework. Such payment by the Navy did not reflect the value of the work performed and was not commensurate with the work performed.

198. The Navy's failure to ensure that progress payments to Landmark for sitework were reasonable and based upon work performed and commensurate with the progress made was a material change to the Contract terms and an abuse of discretion which materially increased the risk that was assumed by Lumbermens when it issued the bonds.

199. As a result of the Navy's material change to the Contract terms and/or abuse of discretion, Lumbermens was damaged in the amount of at least $300,000, the exact amount to be proven at trial.

**Count 12 – Failure to Withhold Progress Payments**

200. Paragraphs 1 through 102 are incorporated by this reference as if fully set forth herein.

201. Pursuant to the Payments Clause and § 01200 of the Contract, the Navy was obligated to make proper payment to Landmark as work progressed on the Project.

202. Further, FAR 31.102(e)(2) required that the procedures used by the Navy for approving progress payments ensured that the progress payments made to Landmark were commensurate with the work accomplished.

203. The Contract gave the Navy both the right and the obligation to withhold progress payments in the event that the Navy had made earlier payments erroneously or in advance or in excess of work actually performed by Landmark.

204. As of January 1, 2001, the Navy had paid Landmark $3,829,602, or 37% of the Contract price. However, at that time, Landmark had yet to complete and return to the Navy a single MFH unit.

205. The Navy had a duty under the Contract to ensure that progress payments were commensurate with the work performed.

206. The terms and conditions of the Contract establishing the Navy's right and obligation to withhold progress payments to recover erroneous payments or advance or excess

progress payments previously made are terms and conditions that provide security for the bonded performance.

207. Here the Navy failed to withhold progress payments after January 15, 2001. Such failure by the Navy was contrary to the terms and conditions of the Contract and an abuse of discretion.

208. The Navy is not permitted to ignore, waive, or modify Contract terms and conditions that provide security for the bonded performance without consideration of Lumbermens' interests.

209. The Navy failed to consider Lumbermens' interests and failed and refused to withhold progress payments and such failures materially increased the risk assumed by Landmark when it issued the bonds and caused Lumbermens damage in the amount of $964,032.48, the total payments made to Landmark by the Navy after January 1, 2001.

**Count 13 – Failure to Default Terminate Landmark's Contract**

210. Paragraphs 1 though 102 are incorporated by reference as if fully set forth herein.

211. By mid-January 2001, the Navy had received numerous complaints from Landmark's suppliers and subcontracts regarding lack of payment from Landmark.

212. As a result of the numerous complaints received by the Navy from Landmark's suppliers and subcontractors, the Navy initially rejected Landmark's January 2001 invoice. Further, the Navy at that time demanded that Landmark provide to the Navy an accounting of all funds received by Landmark from the Navy and all amounts owed to and paid by Landmark to Landmark's suppliers and subcontractors.

213. Landmark provided an accounting of funds to the Navy by letter dated February 7, 2001.

214. Landmark's February 7, 2001 submission proved that Landmark had not paid its suppliers and subcontractors. That submission also proved that, to the extent Landmark

had provided progress payment certifications required by the Payments Clause, such certifications were false.

215. FAR 32.112-1(c) provides that the Contracting Officer "shall initiate administrative or other remedial action" if he or she determines that the progress payment certification required by the Payments Clause is "inaccurate in any material respect."

216. Further, FAR 32.006-3(b) provides that government personnel "shall report suspected fraud related to advance, partial, or progress payments."

217. The Navy did not analyze Landmark's February 7, 2001 submission. As a result, the Contracting Officer did not take the required administrative or remedial action as required by FAR 32.112-1. Further the Contracting Officer did not report suspected fraud as required by FAR 32.006-3.

218. These FAR provisions are terms of the Contract and required the Contracting Officer to take administrative or remedial action and, on the facts presented to the Contracting Officer, required the Navy to terminate Landmark's contract for default.

219. The Contract terms and conditions provided security for the performance bonded by Lumbermens.

220. The Navy is not permitted to ignore, waive or modify Contract terms that provide security for the bonded performance without consideration of Lumbermens' interests.

221. The Navy's failure to require Landmark to comply with FAR 32.006-3 and FAR 32.112-1violated the terms of the Contract.

222. The Navy's failure to so comply with the terms of the Contract was a change to the Contract terms upon which Lumbermens had relied in providing the performance and payment bonds. That Navy's failure materially increased the risk beyond that assumed by Lumbermens when it issued the bonds.

223. As a result of the Navy's failure to comply with the terms of the Contract, Lumbermens was damaged in the amount of at least $2.0 million, the exact amount to be proven at trial.

**B. Breach of Takeover Agreement**

**Count 14 – Failure to Provide Government Property**

224. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

225. Pursuant to the November 20, 2001 Takeover Agreement executed by Lumbermens, the Navy and Atherton, the Navy agreed that, to the extent the Navy had any right, title or interest therein, Lumbermens would have the right to use, without charge, all the materials, supplies, and equipment furnished to or by Landmark.

226. Lumbermens has complied fully with the terms and conditions of the Takeover Agreement.

227. During the course of Landmark's performance, the Navy paid Landmark in excess of $2.4 million for materials that, at the time of payment, had not been incorporated into the Project.

228. At the time the Navy paid for such material, such material became the sole property of the Navy. That is, upon payment for the material, the Navy obtained sole right, title and interest in and to said property.

229. Pursuant to the Takeover Agreement, the Navy was contractually obligated to provide all of said materials to Lumbermens for use by Lumbermens in the Project.

230. The Navy failed and refused to provide to Lumbermens, or Lumbermens' designee, all of said materials.

231. The breach by the Navy of its obligation to provide to Lumbermens all material purchased by the Navy for the Project damaged Lumbermens in excess of $1,000,000, the exact amount to be proven at trial

**Count 15 – Improper Assessment of Liquidated Damages**

232. Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

233. Pursuant to the Takeover Agreement, the Navy was obligated to pay to the Completing Contractor the balance of the Contract price that remained unpaid at the time of default, subject to approved withholdings. Any payment in excess of the Contract balance remaining unpaid that was necessary to complete the Project would be paid by Lumbermens.

234. The Takeover Agreement provided that the Navy could retain from the unpaid Contract balance liquidated damages.

235. Lumbermens and the Completing Contractor fully complied with the terms and conditions of the Takeover Agreement.

236. During performance by the Completing Contractor, the Navy refused to extend the Contract completion date by 46 days, as requested by the Completing Contractor, to accommodate the schedule delay caused by unforeseen and changed conditions relating to electrical wiring.

237. In addition, Lumbermens is entitled to a 74 day schedule extension to complete the 21 additional MPH units placed on the Contract pursuant to Modification No. A00010.

238. Lumbermens did not consent to Modification No. A00010. Accordingly, that scope of work was not within the scope of work bonded by Lumbermens. Accordingly, the Navy had no right under the Takeover Agreement to assess liquidated damages against Lumbermens for completing that scope of work.

239. The Navy's failure and refusal to extend the Contract Completion date by a total of 120 days and the assessment of liquidated damages for that 120-day period constitutes a breach of the Takeover Agreement.

240. As a result of the Navy's breach, Lumbermens has been damaged in the amount of at least $744,0000.

## VII. Prayer for Relief

WHEREFORE, Lumbermens prays for relief as follows:

1. Judgment against the United States in an amount not less than $3,600,000, the exact amount to be proven at trial; and

2. Such other and further relief as the Court deems just, necessary and proper.

///

DATED this 13th day of March, 2006.

LUMBERMENS MUTUAL CASUALTY COMPANY

By: /s/ Mark G. Jackson __________
Mark G. Jackson, WSBA #18325

PRESTON GATES ELLIS LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580
(206) 623-7022

Counsel of Record for
LUMBERMENS MUTUAL CASUALTY COMPANY

OF COUNSEL:

Derek C. Crick
Kevin A. Rosenfield
PRESTON GATES & ELLIS LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580
(206) 623-7022

Richard L. Hanson
G. Matthew Koehl
PRESTON GATES ELLIS & ROUVELAS MEEDS LLP
1735 New York Avenue NW, Suite 500
Washington DC 20006-5221
(202) 628-1700

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2006, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to all parties of record.

/s/____________________
Judy Goldfarb