No. 04-1255C
(Judge Robert H. Hodges, Jr.)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

LUMBERMENS MUTUAL CASUALTY COMPANY,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

---

# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Mark G. Jackson, WSBA #18325
GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101-2939
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for
LUMBERMENS MUTUAL
CASUALTY COMPANY

July 20, 2007

TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. STATEMENT OF THE ISSUES .......... 2

III. STATEMENT OF THE CASE .......... 3

IV. ARGUMENT .......... 6

A. Standards of Review .......... 6

1. Summary Judgment under RCFC 56(c). .......... 6

2. Discharge of a Surety .......... 7

B. Plaintiff is entitled to summary judgment as to entitlement on Count 2 because the Contracting Officer made payments for construction work in violation of § 01200, ¶ 1.2 of the Contract. .......... 9

C. Plaintiff is entitled to summary judgment as to entitlement on Count 3 because the Contracting Officer made payments in violation of § 01200, ¶ 1.3 of the Contract. .......... 10

V. CONCLUSION .......... 10

# TABLE OF AUTHORITIES

Page

## Cases

Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986) ........ 7

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) ........ 6

Curtis v. United States, 168 F. Supp. 213, 216 (Ct. Cl. 1958), cert. denied, 361 U.S. 843 (1959) ........ 7

Mergentime Corp. v. Washington Metro. Area Transit Auth., 775 F. Supp. 14, 21 (D.D.C. 1991) ........ 9

National Surety at 1548 ........ 9

National Surety Corp. v. United States, 118 F.3d 1542 (Fed. Cir. 1997) ........ 7, 8, 9, 10

National Surety, 118 F.3d at 1545-47 ........ 8

National Surety, 118 F.3d at 1546 ........ 8

National Union Indem. Co. v. G. E. Bass & Co., 369 F.2d 75, 77 (5th Cir. 1966) ........ 7

Nova Casualty Co. v. United States, 72 Fed. Cl. 755 (2006) ........ 8

Reliance Ins. Co. v. Colbert, 124 U.S. App. D.C. 339, 365 F.2d 530, 535 (D.C. Cir. 1966) ........ 9

Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 89 (1989) ........ 6

Sweats Fashions, Inc. v. Pannill Knitting, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) ........ 7

United States v. Reliance Ins. Co., 799 F.2d 1382, 1385 (9th Cir. 1986) ........ 8

# I. INTRODUCTION

Plaintiff Lumbermens Mutual Casualty Company ("Plaintiff" or "Lumbermens") is the surety for a federal construction project on the Whidbey Island Naval Air Station on behalf of the United States Navy ("Navy"). The original contractor, Landmark Construction Corporation ("Landmark") defaulted and the Navy called upon Lumbermens to perform under the performance bond it provided for the project. Lumbermens, the Navy and Atherton Construction, Inc. ("Atherton") executed a Takeover Agreement pursuant to which Atherton would complete the project. However, the Navy had insufficient funds remaining to pay Atherton to complete the project and Lumbermens, pursuant to its obligations under the performance bond, paid the difference. Further, the Navy withheld payment of more than $1 million from Atherton as liquidated damages because Atherton did not finish the project within the original contractually established schedule. Lumbermens paid this difference to Atherton as well. In addition, Lumbermens made payments in excess of $550,000 to subcontractors and suppliers who had not been paid by Landmark. In this case, Lumbermens alleges the Navy violated certain mandatory payment provisions in the contract when paying Landmark. It also seeks to recover costs it incurred because of the liquidated damages withheld by the Navy. Two of the counts of the complaint in which Lumbermens seeks to recover its damages are presented in this motion.

Specifically, pursuant to Rule 56(c) of the Rules of the Court of Federal Claims (RCFC"), Plaintiff moves for partial summary judgment as to counts 2 and 3 of the First Amended Complaint ("Comp."). There do exist material issues of disputed facts regarding the amount of damages Plaintiff suffered. However, there are no disputed issues of material fact regarding Defendant's liability. As a result, Plaintiff seeks partial summary judgment on

these two counts only on the issue of entitlement, reserving for trial the resolution of damages.

Count 2 alleges that the Navy violated the terms of the contract by making payments to Landmark for construction work because (a) contract provided that no payments for construction work would be made by the Navy until Landmark submitted, and the Contracting Officer approved, a schedule of prices. Here, it is undisputed that Landmark submitted no schedule of prices and the Contracting Officer did not approve a schedule of prices. However, notwithstanding those failures, the Navy made payments of more than $4 million to Landmark for construction work.

Count 3 alleges that the Navy further violated payment provisions because the Contracting Officer failed to approve Landmark's Network Analysis Schedule ("NAS"), a Contracting Officer-approved and updated version of which was to be included in each progress payment request made by Landmark. However, the Contracting Officer never reviewed, much less approved Landmark's NAS. Notwithstanding that failure, the Navy paid Landmark more than $4 million.

## II. STATEMENT OF THE ISSUES

1. Did the Navy violate the payment terms of the Contract by making payments for construction work to Landmark when: (a) the Contract, at § 01200, ¶ 1.2, states that no payments for construction work would be made to Landmark until Landmark submitted and the Contracting Officer approved a schedule of prices; (b) Landmark did not submit a schedule of prices; and, (c) the Navy nonetheless paid Landmark more that $4 million for construction work.

2. Did the Navy violate the payment terms of the Contract by paying Landmark when: (a) the Contract required Landmark to submit a NAS that complied with the requirements of § 01321 of the Contract; (b) the Contract required the contracting officer to approve the NAS; (c) the contracting officer-approved NAS was the foundation for progress payments; (d) the Contracting Officer never reviewed or approved the NAS; and (e) the Navy nonetheless paid Landmark more than $4 million.

## III. STATEMENT OF THE CASE[1]

1. On or about April 11, 2000, the United States, through the Navy, awarded Contract Number N44255-97-C-5515 ("Contract") to Landmark. Deposition Testimony of John Santiago ("Santiago"), 44:24-45:9; Santiago, Exhibit A.

2. Pursuant to the Contract, Landmark was to perform the Whole Site Repair/Revitalization of the Maylor Capehart Housing Area on Naval Air Station, Whidbey Island, in Oak Harbor, Washington ("Project"). *Id.* The Project, as originally awarded, entailed the design/build remodeling of 160 military family housing ("MFH") units on Whidbey Island. *Id.* The initial Contract price was $9,878,026.00. Santiago, Exhibit A.

3. The Contract required that Landmark provide to the Navy performance and payment bonds. The performance bond, naming the United States as obligee, was to be in the penal sum of the Contract price, *i.e.*, $9,878,026. The Contract required a payment bond in the amount of $2,500,000. First Amended Complaint ("Comp."), Answer to First Amended Complaint ("Ans."), ¶8.

4. Lumbermens provided both the performance and payment bonds in the amounts and in the format required and the Navy approved the performance and payment bonds provided by

[1] Plaintiff refers to each of the following facts as Plaintiff's Proposed Findings of Fact ("PPFF").

Lumbermens. (Comp., Ans., ¶¶8, 9)

5. In addition to the standard Federal Acquisition Regulation payments clause requirements, the Contract described payment procedures in greater detail in § 01200, Price and Payment Procedures. Santiago, 85:15-86:2; Santiago, Exhibit B.

6. The Contract, at § 01200, ¶ 1.2 required Landmark to prepare a Schedule of Prices for approval by the contracting officer and, further, stated that "Payments for construction work will not be made until the Schedule of Prices has been approved by the Contracting Officer." Santiago, Exhibit B.

7. The mandatory nature of this condition precedent for payment to Landmark for construction work was further emphasized at the pre-construction conference attended by representatives for Landmark and the Navy, including the contracting officer. Specifically, the minutes state that: "**SCHEDULE OF PRICES**: It is emphasized that no payment will be made until the Schedule of Prices is approved." Santiago, 109:3-11; 113:11-24; Santiago, Exhibit C, p. 6.

8. The Navy did not receive from Landmark the Schedule of Prices required by § 01200, ¶ 1.2 of the Contract. Nor did the Contracting Officer approve the Schedule of Prices required by § 01200, ¶ 1.2. Santiago, 242:22-243:2. Nonetheless, the Navy paid Landmark more than $4 million for construction work. Comp., Ans. ¶82[2]

9. Section 01200 also established mandatory requirements relating to the contractor's invoice for progress payments. Specifically, the Contract stated that

> Requests for payment will be processed in accordance with "FAR 52.252-5 [sic], Payments Under Fixed-Price Construction Contract" and shall consist of the following:
> * * *

---

[2] "At termination, there remained $7,392,381.24 in unpaid Contract balance. The Navy had paid Landmark almost 40% of the modified Contract price, or $4,293,633.76."

(3) The Contractor shall provide an updated network analysis.

* * *

*Id.*

10. The Contract enforced this requirement by providing that invoices that did not contain an updated NAS (which had to be approved by the contracting officer) would be returned to the contractor. Santiago, Exhibit B, ¶ 1.3(d).

11. The network analysis referenced in the payment provisions at § 01200 is more fully described in the Contract at § 01321, Network Analysis Schedule, which describes the requirements for the NAS to be prepared and submitted by Landmark (Santiago, 119:8-120:1; Santiago, Exhibit D) and approved by the contracting officer. Santiago, 127:22-128:16; Santiago, Exhibit E.

12. The NAS consisted of time network scaled design diagrams and accompanying mathematical analyses. Santiago, Exhibit E. The NAS was to be used to determine Landmark's progress on the Project and formed the basis for Landmark's progress payment requests and the Navy's approval of said progress payment requests. Santiago, 123:3-17; Santiago, Exhibit D. Thus, the NAS used scheduled activities to which costs were allocated for performing the activities. *Id.*

13. The Contracting Officer did not either review or approve the NAS prepared and used by Landmark to obtain progress payments. Santiago, 120:2-7.

14. The Navy default terminated Landmark's contract on August 2, 2001. Comp., Ans. ¶81.

15. At termination, there remained $7,392,381.24 in unpaid Contract balance. Comp., Ans. ¶82. The Navy had paid Landmark almost 40% of the modified Contract price, or $4,793,633.76. *Id.* However, only 22 of the 181 MFH units on Contract had been completed by Landmark. *Id.*

16. Effective November 20, 2001, Lumbermens, the Navy and Atherton executed a Takeover Agreement, pursuant to which Lumbermens agreed to be responsible for completing the Project. Declaration of Matthew Muretta ("Muretta Decl."),[3] ¶2 and Exhibit 1 thereto. Atherton was identified in the Takeover Agreement as the Completing Contractor. *Id.* Effective that same date, Lumbermens and Atherton executed a Completion Contract, pursuant to which, on behalf of Lumbermens, Atherton would perform the work necessary to complete the Project. Muretta Decl., ¶3 and Exhibit 2 thereto.

17. Pursuant to the Completion Contract, Atherton completed work on the Project on June 6, 2003. Comp, Ans., ¶99.

18. Under its performance bond obligations, Lumbermens paid Atherton to complete the project in excess of $4 million above the Contract balance of $7,392,381.24 remaining when Landmark was terminated. Muretta Decl., ¶8.

## IV. ARGUMENT

### A. Standards of Review

#### 1. Summary Judgment under RCFC 56(c).

Under RCFC 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c). Summary judgment is properly regarded not as a disfavored shortcut, but rather as an integral part of the Court rules as a whole, designed to secure a just, speedy and inexpensive determination of every action. Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 89 (1989)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986));

[3] The Muretta Declaration was previously filed by Plaintiff in its Opposition to Defendant's Motion to Dismiss and is Document 17-1 in the docket of the case.

*accord* Sweats Fashions, Inc. v. Pannill Knitting, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987). "The focus in determining whether summary judgment is appropriate is the lack of disputed material facts. A material fact has been defined as a fact that will make a difference in the outcome of a case." Curtis v. United States, 168 F. Supp. 213, 216 (Ct. Cl. 1958), cert. denied, 361 U.S. 843 (1959). Thus, only disputes over facts that might affect the outcome of a suit will properly prevent an entry of judgment. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986).

2. Discharge of a Surety

Courts have generally stated the doctrine of "pro tanto discharge" or "impairment of suretyship" to be the circumstance where there has been a material departure from contractual provisions relating to payments and the security of retained funds and, as a result, a compensated surety is discharged from its obligations on the performance bond to the extent that such unauthorized payments result in prejudice or injury. National Union Indem. Co. v. G. E. Bass & Co., 369 F.2d 75, 77 (5th Cir. 1966); United States v. Reliance Ins. Co., 799 F.2d 1382, 1385 (9th Cir. 1986). In the Federal Circuit, the seminal decision in this field is National Surety Corp. v. United States, 118 F.3d 1542 (Fed. Cir. 1997).

In National Surety, the surety furnished performance and payment bonds in connection with a contract for construction of a water distribution system. The contract provided that the government would retain ten percent of all progress payments until the contractor submitted, and the contracting officer approved, a "complete project arrow diagram." The contractor did not provide the project arrow diagram. Nevertheless, the government paid the retainage. Later, the contractor abandoned the project and the surety completed. The surety then filed a claim for funds that were required to have been retained by the government.

The court relied on the principles of suretyship, including the surety's right to subrogation in the security held by the government. The court described this right as flowing from a government duty that "devolves upon the government to administer the contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded." National Surety, 118 F.3d at 1546. The court explained that the retainage requirement served as security for performance of the bonded contract, and this requirement contributed to the surety's assessment of the risk involved. The court explained that the surety was entitled to rely on the government's obligation to retain this percentage in accordance with the terms of the bonded contract, and on its right of subrogation to this security. National Surety, 118 F.3d at 1546. The court then explained the discharge doctrine:

> As a general rule a surety will be discharged where the bonded contract is materially altered or changed without the surety's knowledge or consent. In addition, where, as here, a compensated surety seeks exoneration, it must show that the alteration caused prejudice or damage.

National Surety, 118 F.3d at 1546, *citing* United States v. Reliance Ins. Co., 799 F.2d 1382, 1385 (9th Cir. 1986). The court held the government's failure to retain the required sums during contract performance was a change in the terms from those on which the surety provided its bonds, and as such, the surety was entitled to damages. More recently in Nova Casualty Co. v. United States, 72 Fed. Cl. 755 (2006), this Court faced a similar situation and applied the discharge doctrine as described in National Surety, finding the government liable to the surety for making a payment to the contractor that should not have been made.

In order to recover under the discharge/impairment theory, Lumbermens bears the initial burden of establishing that the Navy materially departed from contractual provisions related to payment and the security of retained funds. National Surety, 118 F.3d at 1545-47. Once

established, the mere fact of impairment creates a presumption that the surety was prejudiced by the total amount of the improper progress payments. Id. at 1548; Reliance Ins. Co. v. Colbert, 124 U.S. App. D.C. 339, 365 F.2d 530, 535 (D.C. Cir. 1966). The burden of proof then shifts to the Navy to show that the Lumbermens did not suffer any prejudice from the improper payments or that the Lumbermens' prejudice was mitigated. Id. *See also* Mergentime Corp. v. Washington Metro. Area Transit Auth., 775 F. Supp. 14, 21 (D.D.C. 1991) (stating that the "obligee bears the burden of persuasion on the issue of prejudice"). Here, Lumbermens seeks partial summary judgment as to entitlement only because the undisputed facts demonstrate that the Navy violated the payment terms of the contract in making payment to Landmark and reserves for trial the issue of damages.

B. Plaintiff is entitled to summary judgment as to entitlement on Count 2 because the Contracting Officer made payments for construction work in violation of § 01200, ¶ 1.2 of the Contract.

There is no dispute that the Contract required (1) Landmark to submit a Schedule of Prices and (2) the Contracting Officer to approve that Schedule of Prices *before* any payments for construction work were made. The Contract could not be more clear on this point: "Payments for construction work will not be made until the Schedule of Prices had been approved by the Contracting Officer." PPFF, 6. It is also undisputed that neither of those conditions was fulfilled; that is, Landmark did not submit a Schedule of Prices nor did the Contracting Officer approve a Schedule of Prices from Landmark. PPFF 8. Finally, it is also undisputed that the Navy paid Landmark more than $4 million for construction work. PPFF 8. Accordingly, the undisputed facts establish that the Navy made payments to Landmark in direct violation of the terms of the Contract.

This is precisely the circumstance faced by the court in National Surety, where that contract provided that the government would retain ten percent of all progress payments until the

contractor submitted, and the contracting officer approved, a "complete project arrow diagram." The contractor did not provide the project arrow diagram. Nevertheless, the government paid the retainage. Here, the Contract provides that "Payments for construction work will not be made until the Schedule of Prices has been approved by the Contracting Officer." PPFF 6. The Contracting Officer never approved the Schedule of Prices because one was never submitted. PPFF 8. Pursuant to National Surety, Lumbermens is entitled to summary judgment on the issue of entitlement, leaving only the question of damages on count 2 for trial.

C. Plaintiff is entitled to summary judgment as to entitlement on Count 3 because the Contracting Officer made payments in violation of § 01200, ¶ 1.3 of the Contract.

The Contract mandates that Landmark "shall provide an updated network analysis" with each invoice. PPFF 9. The Contract further enforces these requirements by stating that invoices "not completed in accordance with the contract requirements will be returned to the Contractor." PPFF 10. Here, it is undisputed that the Contracting Officer never reviewed or approved the NAS. PPFF 13. Nonetheless, the Navy paid Landmark more than $4 million. PPFF 8. Again, National Surety controls this situation. The Navy violated express payment term of the contract. The only question is to what extent Lumbermens was damaged, an issue to be resolved at trial. Lumbermens is entitled to summary judgment as to entitlement on Count 3 because the Navy failed to enforce the mandatory contract requirements regarding the use of a contracting officer-approved NAS as the basis for making progress payment. As a result of the Navy's failure, each payment the Navy made to Landmark was improper.

V. CONCLUSION

The Contract contains express conditions that were to be satisfied before the Navy was authorized to pay Landmark. Among other requirements, the contracting officer was obligated to obtain and approve a Schedule of Prices. He failed to do that. As a result, the

payments made for construction services were made in violation of the payment terms of the Contract. In addition, the Contract requires that the contracting officer approve the NAS and that an updated NAS be submitted with each progress payment request. Again, the contracting officer failed because he never reviewed, much less approved, he NAS. As a result, all payment made to Landmark were made in violation of the Contract's payment terms. As to counts 2 and 3, the only issue remaining for trial is the amount of damages Lumbermens suffered.

DATED this 20th day of July, 2007.

By:__s/Mark G. Jackson___________
Mark G. Jackson, WSBA #18325

GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for Plaintiff
Lumbermens Mutual Casualty Company
SEA_DOCS:856320.2 [13281-00100]