NO. 04-1255C
(Judge Robert H. Hodges, Jr.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

LUMBERMENS MUTUAL CASUALTY COMPANY,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

---

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

---

Mark G. Jackson
GARVEY SCHUBERT BARER
1191 Second Avenue, 18th Floor
Seattle, Washington 98101-2939
(206) 464-3939 (telephone)
(206) 464-0125 (facsimile)

Counsel of Record for Plaintiff
LUMBERMENS MUTUAL CASUALTY
COMPANY

July 30, 2007

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. STATEMENT OF FACTS .......... 2

A. Facts Plaintiff Will Prove at Trial .......... 2

B. Discussion of Defendant's Factual Contentions .......... 16

III. STATEMENT OF ISSUES .......... 17

IV. DISCUSSION OF LAW .......... 20

A. The Payments Clause .......... 20

B. Discharge/Impairment of Suretyship .......... 21

V. OBJECTIONS TO DEFENDANT'S WITNESS AND EXHIBITS .......... 25

VI. BIFURCATION .......... 26

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Mergentime Corp. v. Washington Metro. Area Transit Auth.*, 775 F. Supp. 14 (D.D.C. 1991) ... 23

*National Surety Corp. v. United States*, 118 F.3d 1542 (Fed. Cir. 1997) ... 22, 23, 24, 25

*National Union Indem. Co. v. G. E. Bass & Co.*, 369 F.2d 75 (5th Cir. 1966) ... 21

*Nova Casualty Co. v. United States*, 72 Fed. Cl. 755 (2006) ... 23

*Ramada Development Co. v. U.S. Fidelity & Guar. Co.*, 626 F.2d 517 (6th Cir. 1980) ... 24

*Reliance Ins. Co. v. Colbert*, 124 U.S. App. D.C. 339, 365 F.2d 530, 535 (D.C. Cir. 1966) ... 23, 24, 25

*Thomas & Sons Building Contractors, Inc.*, ASBCA No. 53395, 05-2 B.C.A. ¶ 33,083 ... 21

*United States v. Freel*, 186 U.S. 309 (1902) ... 25

*United States v. Reliance Ins. Co.*, 799 F.2d 1382 (9th Cir. 1986) ... 22, 23, 25

**RULES**

RESTATEMENT OF SECURITY § 128 ... 24, 25

RESTATEMENT OF SURETYSHIP AND GUARANTY § 41 ... 25

## I. INTRODUCTION

The construction contract underlying this litigation was not administered according to its terms and conditions. The United States, acting by and through the Unites States Navy ("Navy") violated a number of mandatory payment-related contract terms and conditions during its administration of this contract. Those violations, individually and collectively, resulted in more than $4 million in improper payments by the Navy to Landmark Construction Company ("Landmark"), the original contractor for which Plaintiff Lumbermens Mutual Casualty Company ("Lumbermens") provided both payment and performance bonds. After the Navy terminated Landmark's contract for default, it called upon Lumbermens to perform under its surety bond. Lumbermens fully performed its obligations under both its performance and payment bonds and, as a result, it is entitled to recover from the United States the damages it incurred both before and after Landmark's default termination.

In addition, pursuant to the Takeover Agreement executed between the Navy, Lumbermens and Atherton Construction, Inc. ("Atherton"),[1] Lumbermens was entitled to all of the material for which the Navy had paid Landmark and use of all of the funds that remained in the Navy's possession which it hadn't paid Landmark. The Navy failed to provide all of the material for which it paid. In addition, the Navy improperly withheld from the balance of funds remaining on the contract more than $1 million in liquidated damages because Atherton failed to complete the project by the originally scheduled completion date. However, Atherton would have completed the project significantly sooner but for differing site conditions for which it was entitled to a schedule extension. The Navy, however, refused to provide any schedule extension. Moreover, the Navy withheld liquidated damages for the completion of work that was not within

[1] Atherton was the contractor hired by Lumbermens to complete the project ("Completing Contractor").

the scope of the performance bond issued by Lumbermens. When these two factors are taken into account, Lumbermens is entitled to a remission of the liquidated damages withheld by the Navy.

## II. STATEMENT OF FACTS

### A. Facts Plaintiff Will Prove at Trial.

1. On or about April 11, 2000, the United States, through the United States Navy, Engineering Field Activity, Northwest, in Poulsbo, Washington ("Navy"), awarded Contract Number N44255-97-C-5515 ("Contract") to Landmark Construction Company ("Landmark").

2. Pursuant to the Contract, Landmark was to perform the Whole Site Repair/ Revitalization of the Maylor Capehart Housing Area on Naval Air Station, Whidbey Island, in Oak Harbor, Washington ("Project"). The Project, as originally awarded, entailed the design/ build remodeling of 160 military family housing ("MFH") units on Whidbey Island. The initial Contract price was $9,878,026.00.

3. The Contract required that Landmark provide to the Navy performance and payment bonds. The performance bond, naming the United States as obligee, was to be in the penal sum of the Contract price, *i.e.*, $9,878,026. The Contract required a payment bond in the amount of $2,500,000.

4. Lumbermens provided both the performance and payment bonds in the amounts and in the format required.

5. The Navy approved the performance and payment bonds provided by Lumbermens.

6. The Contract included in full text or incorporated by reference or a variety of clauses relevant to the issues raised in this Complaint, including: (1) FAR 52.232-5, Payments Under Fixed-Price Construction Contracts (May 1997) ("the Payments Clause"); (2) FAR

52.236-15, Schedules for Construction Contracts (Apr 1984); (3) FAR 52.245-1, Property Records (Apr 1984); (4) FAR 52.245-2, Government Property (Fixed-Price Contracts (Dec 1989)); (5) FAR 52.228-15, Performance and Payment Bonds - Construction (Sept 1996); (6) FAR 52.211-10, Commencement, Prosecuting, and Completion of Work (Apr 1984); and (7) FAR 52.211-12, Liquidated Damages - Construction (Apr 1984).[2]

7. Landmark was to begin work on the Project within 15 days after receipt of Notice to Proceed and was given 910 calendar days to complete the Project. In this case, the Contract completion date was established by the Navy as October 23, 2002.

8. Pursuant to the Payments Clause, the Navy was to make progress payments monthly as the work on the Project proceeded, or at more frequent intervals as determined by the Navy, on estimates of work accomplished.

9. The Payments Clause provides that a contractor's request for progress payments shall include, among other things, an itemization of the amounts requested, a listing of the amounts included for work performed by each subcontractor and a listing of the amounts previously paid to each subcontractor under the Contract.

10. The Payments Clause also required, among other things, that Landmark certify all payments due to suppliers and subcontractors from previous government progress payments had been made. The Payments Clause further mandated that if Landmark failed to provide the requisite progress payment certification, then "payment [to Landmark] shall not be made."

11. The Payments Clause further authorized the Navy to include in progress payments, amounts for material delivered to the site as well as for material delivered elsewhere (*i.e.*, offsite) if: (1) the Contract otherwise authorized such consideration; and (2) the Contractor

[2] The FAR is codified at Title 48 of the Code of Federal Regulations.

furnished satisfactory evidence of title and that the material would be used to perform the Contract. The Payments Clause also provided that all material covered by a progress payment shall, at the time of payment, become the sole property of the Government.

12. In addition to the Payments Clause requirements, the Contract described payment procedures in greater detail in Section 01200, Price and Payment Procedures.

13. Section 01200, ¶ 1.2 required Landmark to prepare a Schedule of Prices on forms provided by the Government and to submit the Schedule of Prices to the Government for approval by the Contracting Officer. Further, according to § 01200, ¶ 1.2, "payments [to Landmark] for construction work will not be made until the Schedule of Prices has been approved by the Contracting Officer."

14. Further, pursuant to § 01200 of the Contract, to receive progress payments, Landmark was to submit an invoice, a Contract Performance Statement (showing, among other things, the percentage of completion), an updated network analysis, a release, and a certification.

15. Section 01200 of the Contract authorized the Navy to consider for progress payments, materials delivered off-site (thereby fulfilling the condition established by the Payments Clause). However, that authority was expressly limited. For example, § 01200, ¶ 1.4.2(b) provided that payments may be made for material stored off the construction site if (1) the conditions in the Payments Clause are satisfied, (2) the material was stored within a distance of 50 miles by streets and roads to the construction site, (3) the materials were insured and protected from theft, and (4) the materials were not susceptible to deterioration while in storage. Further, materials in transit to either the job site or storage site were not eligible for payment.

16. As described above, the Contract required Landmark to submit an updated network analysis with each invoice. Section 01321, Network Analysis Schedule, in conjunction with FAR 52.236-15, Schedule for Construction Contract (Apr 1984), described the requirements for the Network Analysis Schedule ("NAS") to be prepared and submitted by Landmark and approved by the Contracting Officer.

17. The NAS consisted of "time network scaled design diagrams and accompanying mathematical analyses." Contract, § 01321, ¶ 1.4. The NAS was to be used to determine Landmark's progress on the Project and formed the basis for Landmark's progress payment requests and the Navy's approval of said progress payment requests. Thus, the NAS used scheduled activities to which were allocated costs for performing the activities.

18. For scheduling purposes, the basic concept of the network analysis diagram is to show how the start of one activity on the Project was dependent on the completion of earlier activities and how its completion affects future activities. As a result, the Contract required the Project be broken down into discrete activities.

19. According to § 01321, ¶ 1.4.2, the "minimum number of activities in the final network diagram shall be 30 per building and 1000 for the total project." Accordingly, the network diagram for a single MFH unit was to reflect at least thirty separate activities, each of which could be allocated specific costs and duration.

20. The Contract expressly required that each activity depicted in the network diagram have an assigned responsibility code and monetary value. The monetary value for each activity was to be broken down into separate amounts for material/labor and inspection/testing. Thus, by identifying all completed and partially completed activities at any given point, the Navy could determine the extent of the Contractor's progress. In addition, because each activity was

assigned a monetary value, the Navy could determine the amount of the progress payment earned by the Contractor.

21. The Contract required Landmark to submit the completed NAS to the Navy for review and approval by the Contracting Officer.

22. The Contract also contained provisions regarding liquidated damages. According to the Contract, if Landmark failed to complete the Project by October 23, 2002, the Navy could assess liquidated damages against Landmark in the amount of $75 per unit per day for each day of delay.

23. Landmark submitted a NAS as required by the Contract. The Navy's Project Engineer received the submitted NAS and simply returned it to Landmark "approved as noted." The Project Engineer did not perform any analysis of the prices listed on the NAS for any activity. Further, the Contracting Officer never reviewed or approved the NAS. Nevertheless, the Navy used Landmark's NAS, which included line items for more than $2.6 million in material. Over three-fourths of that number consisted of only five categories: $500,000 for "windows and doors"; $500,000 for "cabinets"; $300,000 for "paint"; $485,940 for "flooring"; and $287,040 for "siding."

24. The NAS submitted by Landmark and used by the Navy contained no definition of the scope of work contained in these material line items. As a result, the NAS provided by Landmark contemplated that Landmark, upon billing the Navy for $500,000 for "windows and doors" would be credited with the corresponding progress on Project completion. Thus, according to the NAS submitted by Landmark, upon the billing for the material separately identified on its NAS, Landmark would be credited by the Navy for completing 26.3% of the Project.

25. The NAS also included line items and prices for various field office overhead and labor items, outside of constructing the individual MFH units, including “personnel” for $728,834, “sitework” for $590,000, and “asbestos and lead abatement” for $882,000.

26. The NAS used by the Navy allocated only $4,363,518 to the construction of individual MFH units, or approximately 44% of the contract price, to construction activities.

27. The NAS submitted by Landmark, on which the Navy relied for making progress payments, did not identify 1000 separate activities as required by the Contract. Instead, Landmark’s NAS contained less than 600 activities. Moreover, the NAS also failed to identify 30 separate activities for each MFH Unit. Further, the NAS did not identify the cost of any individual activity for each MFH. Nor did the NAS contain a critical path, responsibility codes or unit prices for each activity. Finally, the NAS submitted by Landmark and used by the Navy was never approved by the Contracting Officer.

28. Landmark entered into a subcontract with Lloyd Enterprises, Inc. (“Lloyd”) in the amount of $590,000 to perform the “sitework.” The NAS approved by the Navy included $590,000 for the line item described as “sitework.” The NAS also identified Lloyd as the subcontractor performing that line item.

29. In its proposal, Landmark proposed to perform the sitework for less than $362,000. The Navy did not question the $230,000 increase in this item, notwithstanding that the sitework was a separate bid item and the Navy had estimated the work to cost less than $200,000. The Navy subsequently paid Landmark $590,000 for this item.

30. Between its September 18, 2000 invoice and its November 20, 2000 invoice, a total of three invoices, Landmark invoiced the Navy for more than $3,105,031, or almost one-third of the original contract value of $9.878 million. When combined with its two earlier

invoices, the total invoiced by Landmark by November 20, 2000 was more than $3.598 million, or 36.4% of contract value. However, by November 20, 2000, the Navy had not even approved Landmark's construction drawings. Nor had Landmark submitted (or the Contracting Officer approved) the Schedule of Prices required by § 01200, ¶ 1.2 of the Contract.

31. Within its September, October and November 2000 invoices, Landmark requested payment for at least $1,346,980 in material cost for such items as doors and windows, cabinets, paint, flooring and siding. The Navy paid the entire amounts requested by Landmark in each invoice. The Navy did not request from Landmark any supporting documentation identifying the quantities or types of costs of material. Nor did the Navy obtain any documentary evidence from Landmark that Landmark had obtained title to this material.

32. Included within the amount referenced in the previous paragraph was $140,000 for cabinets. That is, by November 20, 2000, Landmark requested, and the Navy subsequently approved and paid Landmark, $140,000 for cabinets. However, by November 20, 2000, Landmark had not even ordered cabinets valued at $140,000, much less paid for them. Nor were cabinets valued at $140,000 delivered to the Project site by November 20, 2000. Moreover, although the Navy paid Landmark $140,000 for cabinets at this point, Landmark never paid the supplier this amount.

33. Landmark entered into a purchase order subcontract with Tacoma Fixture Co. to provide all the cabinets required on the Project. Tacoma Fixture Co. delivered its first cabinets to Landmark on October 27, 2000. Tacoma Fixture submitted its first invoice to Landmark on November 7, 2000 in the amount of $10,405.29.

34. Landmark did not submit with its invoice to the Navy requesting payment for cabinets any documentation describing the quantity, type or size of the cabinets for which it

requested payment. Further, the Navy did not request any information from Landmark that would provide any of this information. Instead, the Navy approved Landmark's request in its entirety. Landmark was then paid for cabinets that were not even ordered, much less delivered to Landmark or the Project site.

35. Immediately upon payment by the Navy for the amount requested by Landmark for cabinets, the cabinets (like all other material for which it paid Landmark) became the sole property of the Navy.

36. On December 20, 2000, the Navy issued unilateral Modification A00008. This modification incorporated into the Contract the approved construction design.

37. On that same date, December 20, 2000, Landmark submitted its sixth invoice. In its sixth invoice, Landmark requested $230,647.36, for a cumulative total of $3,829,601.28. As with each of the five previous invoices, the Navy approved invoice number six in its entirety. Landmark was subsequently paid.

38. As a result, through the December 20, 2000 invoice, the Navy had authorized payment to Landmark of $3,829,601.28. By mid-January 2001, the Navy had received numerous complaints from Landmark's suppliers and subcontractors regarding Landmark's failure to pay its suppliers and subcontractors.

39. As a result of the numerous complaints received by the Navy from Landmark's suppliers and subcontractors, the Navy initially rejected Landmark's January 2001 invoice and demanded that Landmark provide to the Navy an accounting of all funds received by Landmark from the Navy and all amounts owed and paid by Landmark to Landmark's suppliers and subcontractors.

40. By letter dated February 7, 2001, Landmark provided accounting information to the Navy. Landmark's February 7, 2001 submission proved that Landmark had not paid its suppliers and subcontractors. That submission also proved that, to the extent Landmark had provided progress payment certifications required by the Payments Clause, such certifications were false.

41. The Navy did not analyze Landmark's February 7, 2001 submission. As a result, the Contracting Officer did not take any administrative or remedial action against Landmark. Instead, within the six week period after receipt of Landmark's February 7, 2001 submission, the Contracting Officer authorized the payment to Landmark of three separate invoices totaling $503,362.88. None of these invoices paid by the Navy were properly certified by Landmark. In fact, in the very next invoice submitted by Landmark, Landmark stated only that "per our agreement with our suppliers and vendors, they are being paid in accordance with their payment schedule." That statement does not comply with the requirements of FAR 52.232-5(c)(3). None of the other certifications submitted by Landmark complied either.

42. By bilateral Modification A00010, effective February 28, 2001, Landmark and the Navy added to the Contract the requirement to renovate 21 additional MFH units (for a total of 181) and increased the Contract price by $1,884,176. The modification did not extend the Contract completion date, which remained October 23, 2002.

43. The Navy did not obtain the consent of the surety for Modification No. A00010.

44. Between February 20, 2001 and May 1, 2001, the Navy paid, or authorized payment of, an additional $680,438.20. Thus, by May 1, 2001, the Navy had paid or authorized payment of 36.7% of the revised Contract price. However, by May 1, 2001, the Navy had

accepted less than 18 of the 181 MFH units on Contract. Landmark had performed less than 10% of the work required.

45. Landmark submitted its invoice No. 5575-12 on May 30, 2001, requesting payment of $283,594.28, for a total payment of $4,793,633. The Navy approved the payment request in its entirety and Landmark was subsequently paid.

46. As of June 1, 2001, the Navy had paid, or approved for payment, a total of $4,793,633 to Landmark. Included with that amount were amounts for materials, including $375,000 for “doors and windows,” $260,000 for “cabinets,” $156,000 for “paint,” $485,940 for “flooring,” and $257,040 for “siding.”

47. By June l, 2001, the Navy had also paid or approved for payment $458,640 for “asbestos and lead abatement,” $378,936 for “personnel,” and $590,000 for “sitework.”

48. When Landmark submitted progress payment requests for “doors and windows,” it did not submit invoices or other documentation identifying the quantities and types of windows and doors for which it sought payment. Nor did Landmark submit documentation identifying the purchase price of the doors and windows. Nor did Landmark identify the location at which this material was stored or whether the material had been purchased or was in transit.

49. Similarly, when Landmark submitted additional progress payment requests for “paint,” “flooring,” and “siding,” it failed to provide to the Navy any information which would, could or did identify type, size, quantity, cost and location of any of the material. Landmark did not submit documentation establishing the material that had been ordered or delivered. The Navy did not ask or demand that Landmark provide any further documentary information which would substantiate quantity, type, size, or location of the material. The Navy neither demanded

nor obtained any documentation that would establish title to any material for which it paid Landmark.

50. By June 1, 2001, the Navy had paid Landmark, or authorized payments totaling $458,640 for "asbestos and lead abatement," $378,936 for "personnel," and $590,000 for "sitework."

51. The $458,640 paid to Landmark for "asbestos and lead abatement" accounted for 52% of the amount budgeted by the NAS for that "activity." However, pursuant to the Navy's own records, Landmark had completed abatement in only 54 of the 160 units for which it had budgeted, or 34%.[3] Thus, the Navy paid Landmark for abating 83 units when Landmark had only abated 54. Landmark was paid $158,760 for work it had not performed.

52. The NAS included an activity identified as "personnel" for which Landmark had budgeted $728,834 for the entire Project. Separately, Landmark budgeted an amount for labor for each of the MFH units under Contract. Thus, the "personnel" activity was in addition to labor for building the MFH units. However, by June 1, 2001, the Navy had paid Landmark, or authorized payment, in the amount of $378,936 for "personnel," 52% of the amount budgeted by Landmark for this line item.

53. By letter dated June 21, 2001, Landmark notified the Navy that Landmark had furloughed its field staff and that no further work was being done pending the resolution of financial difficulties.

54. On July 11, 2001, the Navy issued Landmark a cure notice.

[3] Landmark did not re-forecast budgets for activities after the Contract was modified to add the additional 21 MFH units. Instead, Landmark simply created a single activity to which it attributed the entire price of that modification.

55. By letter dated July 20, 2001, Landmark informed the Navy that Landmark was unable to complete the Project due to financial problems and was therefore in default.

56. The Navy default terminated Landmark's contract on August 2, 2001.

57. At termination, there remained $7,392,381.24 in unpaid Contract balance. The Navy had paid Landmark almost 40% of the modified Contract price, or $4,793,633.76. However, only 22 of the 181 MFH units on Contract had been completed by Landmark and accepted by the Navy. The Navy estimated at that time that the Contract was only 12% complete (based upon units completed and returned to the Navy) or only 15% complete (if partially completed units were included).

58. Between July 2001 and May 2001, the Navy authorized payment of eleven separate invoices to Landmark, totaling $4,793,633.76. However, Landmark never provided the Navy a progress payment certification that complied with the requirements of FAR 52.232-5(c)(3) because in each instance Landmark had modified the mandatory language in the Payments Clause.

59. Effective November 20, 2001, Lumbermens, the Navy and Atherton Construction, Inc. ("Atherton") executed a Takeover Agreement, pursuant to which Lumbermens agreed to be responsible for completing the Project. Atherton was identified in the Takeover Agreement as the "Completing Contractor." Effective that same date, Lumbermens and Atherton executed a Completion Contract, pursuant to which, on behalf of Lumbermens, Atherton would perform the work necessary to complete the Project.

60. The Takeover Agreement provided, with respect to material previously paid for by the Navy for use on the Project, that:

> Insofar as the Government as any right, title or interest therein, the Government agrees that the Surety or the Completing Contractor



SEA_DOCS:857336.2

> will have the right to use, without charge, any of the materials, supplies, equipment or personal property furnished or supplied to or by the Defaulted Contractor which may be stored on the premises of the project or elsewhere, or which may have been fabricated for use in connection with the project. The Government makes no warranty as to the quantity or condition of any such materials, supplies, equipment or personal property.

61. The Takeover Agreement did not modify the original completion date of the Project, which remained as October 23, 2002.

62. The Takeover Agreement also included a reservation of rights for Lumbermens, which provided:

> This Agreement shall not be construed to waive, limit, alter or amend any of the Surety's rights or defenses under the performance bond or otherwise. Except as to the Government's mitigation of damages in accepting completion of the defaulted contract by the Surety, it is expressly understood that by entering into this Agreement the Surety does not waive, prejudice, or in any way adversely affect or limit any claim that it, as Surety, or the Defaulted Contractor might have against the Government, including any claim arising out of payments made by the Government to the Defaulted Contractor; and the Surety hereby expressly reserves, any and all rights and defenses it may have against the Government under the contract and the performance bond. Nothing in this Agreement shall prejudice the rights of the Surety to seek a judicial or other appropriate determination of its rights.

63. During performance of its Completion Contract, Atherton notified the Navy on January 31, 2002, that the existing electrical wiring system in the MFH units did not meet the requirements of the National Electrical Code. Atherton discovered the absence of the necessary ground, among other deficiencies, and notified the Navy that these circumstances constituted a changed condition.

64. The Navy, which had known of this problem for several months prior to the default termination of Landmark's contract, initially denied the problem's existence. During this period, Atherton was unable to proceed with scheduled work on its critical path.

65. Finally, on or about March 15, 2002, the Navy acknowledged the existence of the changed condition and provided Atherton with a request for proposal to obtain Atherton's price for the added scope of work necessary to correct the deficient wiring.

66. Atherton was then able to re-start work, implementing the changes directed by the Navy.

67. As a result of this changed work, Atherton incurred a delay to its critical path. Atherton requested that the Navy provide a schedule extension to accommodate this delay. The Navy refused.

68. The Navy assessed liquidated damages against Lumbermens for the period of time encompassed by the 46-day schedule extension requested by Atherton.

69. The Navy also assessed liquidated damages against Lumbermens during the period in which Atherton was completing the additional 21 MFH units placed on the Contract by Modification No. A00010, which MFH units were not within the scope of work bonded by Lumbermens.

70. The 21 MFH units added by Modification Number A00010 would have reasonably required at least 74 days to complete, absent any differing site conditions encountered by Atherton. However, Atherton did encounter additional differing site conditions in performance of the additional 21 FAF units, including delays for transite pipe and asbestos in the wallboard.

71. Together, the electrical delay and the completion of the Modification No. A00010 MFH should have resulted in a schedule extension until April 21, 2003.

72. Pursuant to the Completion Contract, Atherton completed work on the Project on June 6, 2003.

73. The Navy withheld liquidated damages against Lumbermens in the amount of $1,015,125.

74. If the Navy had extended the Contract completion date to April 21, 2003, Lumbermens would be entitled to the return of all but $28,950 of the liquidated damages withheld by the Navy.

75. Lumbermens incurred damages in excess of $4.160 million under its performance bond to complete the project. In addition, Lumbermens incurred damages of more than $550,000 under its payment bond to compensate suppliers and subcontractors that had not been paid by Landmark.

**B. Discussion of Defendant's Factual Contentions**

1. Defendant is expected to provide evidence that the Defense Accounting and Finance ("DFAS") Office would not have paid Landmark's invoices without a progress payment certification. Plaintiff does not believe the evidence from a DFAS employee will be useful or credible because the employee neither saw nor possesses Landmark's progress payment requests. Moreover, even if Landmark had submitted its standard certification with each payment request it would not matter because the certification submitted by Landmark (when it submitted one) failed to comply with the certification mandated by FAR 52.232-5(c)(3). In effect, any progress payment certification provided by Landmark violated the Payments Clause.

2. Defendant is expected to contest Plaintiff's evidence of delays caused by differing site conditions and the performance of work outside the scope of the performance bond.

3. Defendant is expected to contest Plaintiff's damages calculations. Plaintiff does not believe Defendant's expert's opinion is admissible or, if admissible, entitled to any weight. The bases of Plaintiff's contentions in this regard will be addressed in detail in a motion in limine filed in accordance with the Court's pre-trial scheduling order.

## III. STATEMENT OF ISSUES

1. Did the Navy violate FAR 52.232-5, Payments Under Fixed Price Construction Contracts, when Landmark either (a) failed to submit any progress payment certification or (b) failed to submit the progress payment certification with the language required by FAR 52.232 5(c)(3) and the Navy nonetheless approved and paid invoices submitted with either no certification or a defective certification?

2. Did the NAS submitted by Landmark and relied upon by the Navy violate § 01321 of the Contract when the NAS: (a) failed to identify at least 30 activities per building; (b) failed to include at least 1000 activities in total; (c) failed to identify responsibility codes for each activity; (d) failed to identify a critical path; and, (e) failed to include mathematical analyses that ensured progress payment were commensurate with work accomplished.

3. Did the Navy violate the payment terms of the Contract when it relied upon a NAS that did not comply with the requirements of § 01321 of the Contract to make payments to Landmark.

4. Did the Navy violate the payment terms of the Contract when it relied upon a NAS that was not approved by the Contracting Officer.

5. Did Landmark deliver to the Navy doors and windows with a value of $375,000?

6. Did the Navy violate the payment terms of the Contract when it paid Landmark $375,000 for doors and windows as a material cost without obtaining from Landmark any documentation establishing that Landmark had purchased and delivered to the Project site doors and windows with a value of $375,000.

7. Did Landmark deliver to the Navy cabinets with a value of $140,000?

8. Did the Navy violate the payment terms of the Contract when it paid Landmark $140,000 for cabinets as a material cost without obtaining from Landmark any documentation

establishing that Landmark had purchased and delivered to the Project site cabinets with a value of $140,000?

9. Did Landmark deliver to the Navy paint with a value of $156,000?

10. Did the Navy violate the payment terms of the Contract when it paid Landmark $156,000 for paint as a material cost without obtaining from Landmark any documentation establishing that Landmark had purchased and delivered to the Project site paint with a value of $156,000?

11. Did Landmark deliver to the Navy flooring with a value of $485,940?

12. Did the Navy violate the payment terms of the Contract when it paid Landmark $485,940 for flooring as a material cost without obtaining from Landmark any documentation establishing that Landmark had purchased and delivered to the Project site flooring with a value of $485,940?

13. Did Landmark deliver to the Navy siding with a value of $257,040?

14. Did the Navy violate the payment terms of the Contract when it paid Landmark $257,040 for siding as a material cost without obtaining from Landmark any documentation establishing that Landmark had purchased and delivered to the Project site siding with a value of $257,040?

15. Did the Navy violate the payment terms of Contract by permitting Landmark to invoice and be paid for overhead items based on a formula that bore no relationship to the actual work performed by Landmark?

16. Did the Navy violate the payment terms of the Contract when it paid Landmark $458,640 for asbestos and lead abatement services when: (a) Landmark's NAS showed that the total price of these services for all 160 units was $882,000; (b) the amount paid by the Navy was

52% of the total price for this scope of work; and (c) Landmark performed only 32% of the scope of work required?

17. Did the Navy violate the payment terms of the Contract when it paid Landmark $378,936 for personnel when: (a) Landmark's NAS showed that the total price for personnel was $728,834; (b) the amount paid by the Navy was 38% of the total price for this scope of work; and (c) Landmark performed no more than 15% of the Contract's scope of work?

18. Did the Navy violate the payment terms of the Contract when it paid Landmark $590,000 for site work when: (a) Landmark separately bid this scope of work in the amount of $362,000; (b) the amount bid by Landmark was established as a separate contract line item for this scope of work; (c) Landmark provided no explanation for the increase cost of this work in its NAS; (d) the Navy's estimate for this scope of work was $187,000; and, (3) the Navy had no rational basis to increase the cost of the work so separately bid?

19. Did the Navy violate the payment provisions of the Contract when it failed to withhold progress payments from Landmark after January 1, 2001 when: (a) the Navy had received numerous complaints that Landmark had not been paying its subcontractors and suppliers; (b) the Navy had demanded and received from Landmark evidence establishing both that Landmark had not paid its subcontractors and suppliers and that Landmark's progress payment certifications (to the extent they had been made and were compliant with FAR 52.232 5(c)(3)) were false; and (c) the Navy had by that time paid Landmark $3,829,602 (or 37% of the contract price)?

20. Did the Navy violate the payment terms of the Contract by failing to terminate Landmark for default upon receiving evidence from Landmark that established that the progress payment certifications submitted by Landmark were false statements?

21. Did the Navy breach the terms of the Takeover Agreement with Lumbermens by failing to provide to Lumbermens all of the materials for which the Navy had paid Landmark?

22. Did the performance of the additional 21 MFH units added by Modification A00010 to the Contract contribute to the late finish by the Completing Contractor?

23. To the extent the late finish by the Completing Contractor was caused by performing work outside the scope of the performance bond, did the Navy violate the terms of the Takeover Agreement by withholding liquidated damages?

24. Was the Completing Contractor entitled to a schedule extension as the result of differing site conditions?

25. To the extent the Completing Contractor was entitled to a schedule extension as the result of differing site conditions, did the Navy violate the terms of the Takeover Agreement by withholding liquidated damages?

## IV. DISCUSSION OF LAW

### A. The Payments Clause

Section 00720 of the Contract incorporates by reference FAR 52.232-5, Payments under Fixed-Price Construction Contracts. Section 01200, Price and Payment Procedures, Part 1.3(a) provides that "requests for payment will be processed in accordance with 'FAR 52.252-5 [sic], Payments Under Fixed-Price Construction Contract . . . .'" FAR 52.232-5(c) provides that "with each request for progress payments, the Contractor *shall* furnish the following certification, *or payment shall not be made* . . . :

> I hereby certify, to the best of my knowledge and belief, that –
>
> (1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;

> (2) Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and requirements of chapter 39 of Title 31, United States Code;
>
> (3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract; and
>
> (4) This certification is not to be construed as final acceptance of a subcontractor's performance."

FAR 52.232-5(c) (emphasis added). These certifications are mandatory. *See*, *e.g.*, *Thomas & Sons Building Contractors, Inc.*, ASBCA No. 53395, 05-2 B.C.A. ¶ 33,083 ("correctly certified invoices must be provided 'or payment shall not be made'") (quoting FAR 52.232-5). Accordingly, the failure to submit the certification, or the failure to submit the correct certification, prevents payment to the contractor.

**B. Discharge/Impairment of Suretyship**

The Complaint is primarily based upon the theory of discharge or impairment of suretyship. Courts have found the doctrine of "pro tanto discharge" or "impairment of suretyship" to be applicable where there has been a material departure from contractual provisions relating to payments and the security of retained funds. In such cases, a compensated surety is discharged from its obligations on the performance bond to the extent that such unauthorized payments result in prejudice or injury. *National Union Indem. Co. v. G. E. Bass & Co.*, 369 F.2d 75, 77 (5th Cir. 1966); *United States v. Reliance Ins. Co.*, 799 F.2d 1382, 1385 (9th Cir. 1986). In the Federal Circuit, the seminal decision in this field is *National Surety Corp. v. United States*, 118 F.3d 1542 (Fed. Cir. 1997).

In *National Surety*, the surety furnished performance and payment bonds in connection with a contract for construction of a water distribution system. The contract provided that the government would retain ten percent of all progress payments until the contractor submitted, and the contracting officer approved, a "complete project arrow diagram." The contractor did not provide the project arrow diagram. Nevertheless, the government paid the retainage. Later, the contractor abandoned the project and the surety completed. The surety then filed a claim for funds that were required to have been retained by the government.

The court relied on the principles of suretyship, including the surety's right to subrogation in the security held by the government. The court described this right as flowing from a government duty that "devolves upon the government to administer the contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded." *National Su*rety, 118 F.3d at 1546. The court explained that the retainage requirement served as security for performance of the bonded contract, and this requirement contributed to the surety's assessment of the risk involved. The court explained that the surety was entitled to rely on the government's obligation to retain this percentage in accordance with the terms of the bonded contract, and on its right of subrogation to this security. National Surety, 118 F.3d at 1546. The court then explained the discharge doctrine:

> As a general rule a surety will be discharged where the bonded contract is materially altered or changed without the surety's knowledge or consent. In addition, where, as here, a compensated surety seeks exoneration, it must show that the alteration caused prejudice or damage.

*National Surety*, 118 F.3d at 1546, citing *United States v. Reliance Ins. Co.*, 799 F.2d 1382, 1385 (9th Cir. 1986). The court held the government's failure to retain the required sums during contract performance was a change in the terms from those on which the surety provided its

bonds, and as such, the surety was entitled to damages. More recently in *Nova Casualty Co. v. United States*, 72 Fed. Cl. 755 (2006), this Court faced a similar situation and applied the discharge doctrine as described in *National Surety*, finding the government liable to the surety for making a payment to the contractor that should not have been made.

In order to recover under the discharge/impairment theory, Lumbermens bears the initial burden of establishing that the Navy materially departed from contractual provisions related to payment and the security of retained funds. *See National S*urety, 118 F.3d at 1545-47. Once established, the mere fact of impairment creates a presumption that the surety was prejudiced by the total amount of the improper progress payments. *Id.* at 1548; *Reliance Ins. Co. v. Colbert*, 124 U.S. App. D.C. 339, 365 F.2d 530, 535 (D.C. Cir. 1966). The burden of proof then shifts to the Navy to show that the Lumbermens did not suffer any prejudice from the improper payments or that the Lumbermens' prejudice was mitigated. *Id. See also Mergentime Corp. v. Washington Metro. Area Transit Auth.*, 775 F. Supp. 14, 21 (D.D.C. 1991) (stating that the "obligee bears the burden of persuasion on the issue of prejudice").

To carry its burden, the Navy must produce specific evidence showing that Landmark used the Navy's improper payments to reduce Lumbermens' subsequent performance. *See, e.g., Ramada Development Co. v. U.S. Fidelity & Guar. Co.*, 626 F.2d 517, 521-22 (6th Cir. 1980). As set forth by the Federal Circuit in *National Surety*:

> [The surety's] recovery should not exceed any losses that ensued, directly or indirectly, from the impairment of the security. Thus it is relevant to consider what the contractor did with the released funds. If the unauthorized payments were expended for the purposes of the contract so that the extent of the surety's subsequent performance was reduced thereby, any injury to the surety would to that extent be mitigated.

118 F.3d at 1548 (emphasis added).

Notably, the Government must produce specific, calculable evidence of mitigation in order to reduce the extent of Lumbermens' presumed prejudice. "If that prejudice proves impossible of rational measurement, the surety must receive a total discharge" of the improper payment. *Reliance Ins. Co. v. Colbert*, 365 F.2d 530, 535 (D.C. Cir. 1966). *See also* RESTATEMENT OF SECURITY § 128, cmt f (1941) ("If the change imposes a danger of loss upon the surety which cannot fairly be measured, the surety is discharged entirely.") If, on the other hand, the prejudice is subject to measurement, "the surety must receive only a partial discharge, measured by the extent of that prejudice." *Reliance*, 365 F.2d at 535.

**C. The Scope of the Performance Bond.**

The liability of a surety cannot be extended "beyond the terms of his undertaking." *United States v. Freel*, 186 U.S. 309, 316 (1902) (government contract to construct dry dock was materially altered without surety consent). Consequently, where a change is made to the bonded contract without the surety's consent, its liability is "extinguished." *Id. See also Reliance Insur. Co. of Philadelphia v. Colbert*, 365 F.2d 530, 534 (D.C. Cir. 1966) (when a surety "commit[s] itself with respect to one contract, amendments which convert that agreement into a significantly different one should be brought to the attention of the surety so that it may exercise its own business judgment as to whether it wishes to continue its commitment"). In such situations, the surety's obligation (1) is discharged if the modification materially increases the surety's risk; or, if the surety's risk is not materially increased, (2) is reduced to the extent of loss due to the modification. *National Surety Corp.*, 118 F.3d at 1544 (citing RESTATEMENT OF SECURITY § 128 (1941)).

Here, the question of materiality is inconsequential since Modification A00010 has already been performed, and Lumbermens merely seeks to recover the extent of its losses due to the modification. *See United States v. Reliance Insur. Co.*, 799 F.2d 1382, 1385 (9th Cir. 1986)

(permitting recovery for lost revenue due to modifications without the surety's consent); National Surety Corp., 118 F.3d at 1544 (permitting recovery for losses due to impairment of suretyship); RESTATEMENT OF SECURITY § 128, comment f (1941) ("extent of loss" recovery applicable where damages are easily measured). As stated succinctly by the Restatement of Suretyship and Guaranty:

> If the principal obligor is insolvent or otherwise unable to fulfill its duty of reimbursement or restitution, the secondary obligor would suffer a loss to the extent that its unreimbursed cost of performance exceeds that which would have been the case if the modification had not been made. *Therefore, the secondary obligation is discharged to the extent of that loss.*

RESTATEMENT OF SURETYSHIP AND GUARANTY § 41, comment d (1996). A surety simply cannot be held liable for obligations that were not subject to its consent. The Navy therefore should have granted Lumbermens a schedule extension for the number of days that it took to complete the 21 units under Modification A00010. Instead, the Navy assessed liquidated damages against Lumbermens for delays resulting therefrom. Such assessment is improper under the law of suretyship, and Lumbermens is entitled to the "extent of that loss," an amount that will be determined at a later date.

### D. Discussion of Defendant's Likely Legal Positions

Beyond Defendant's previously stated assertions that (a) this Court is without jurisdiction of Plaintiff's discharge claims and (b) Plaintiff's breach of the Takeover Agreement claims are subject to the Contract Disputes Act, Plaintiff is not aware of Defendant's legal positions or theories.

## V. OBJECTIONS TO DEFENDANT'S WITNESS AND EXHIBITS

1. Plaintiff objects to the testimony it anticipates will be offered by Defendant's damages expert and plans to file a motion in limine precluding such testimony in its entirety.

2. Plaintiff objects to any testimony Defendant may offer attempting to quantify any alleged mitigation of Plaintiff's damages. Because this is an issue which is subject to expert testimony and neither of Defendant's reports addressed this issue, Plaintiff intends to file a motion in limine precluding such testimony at trial.

## VI. BIFURCATION

Plaintiff does not request bifurcation. It believes the nature of this case requires the Court to hear and decide issues on both entitlement and quantum.

DATED this 29th day of July, 2007.

Respectfully submitted,

LUMBERMENS MUTUAL CASUALTY COMPANY

By s/Mark G. Jackson
Mark G. Jackson, WSBA #18325

Counsel of Record for Plaintiff
Lumbermens Mutual Casualty Company

Garvey Schubert Barer
1191 Second Avenue, Suite 1800
Seattle, WA 98101
206-464-3939 (phone)
206-464-0125 (facsimile)