**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LUMBERMENS MUTUAL CASUALTY COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 04-1255C<br><br>Honorable Robert H. Hodges, Jr. |

PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE
EXPERT TESTIMONY OF WILEY WRIGHT

Pursuant to Federal Rule of Evidence 702, Plaintiff Lumbermens Mutual Casualty Company ("Lumbermens") seeks to exclude the testimony of Defendant United States' ("Navy" or "government") expert on damages, Wiley R. Wright.

## I. INTRODUCTION

This case concerns the Navy's improper payment of contract funds to Landmark Construction Corporation ("Landmark"), the defaulted contractor, as a result of failures to enforce several mandatory payment terms of the contract. Lumbermens provided payment and performance bonds to Landmark and the Navy's improper payment of contract funds impaired Lumbermens' security for those bonds. Lumbermens was damaged to the extent of the Navy's overpayments because it had to pay the takeover contractor to complete the work that Landmark had been paid for, but never performed. The disputed issue about which Wright proposes to testify is how much money the Navy improperly paid to Landmark.

Wright's proffered testimony must be excluded because it is based upon a financial accounting methodology that bears no relationship to the actual issue in dispute – the value of the work that Landmark actually completed. Rather, Wright's method credits Landmark with progress payments based solely on materials *costs*, whether or not those materials were incorporated into actual work, and whether or not Landmark had actually paid its bills. In addition, Wright's method credits payments for labor expenses based on the passage of time, not work actually completed.

Moreover, the "cost-to-cost" method employed by Wright to estimate the amount of work Landmark performed is speculative and unreliable. It is not an accurate or preferred methodology for determining the amount of work a defaulted contractor performed, it is based on unjustified assumptions, it has been applied using insufficient and unreliable data, and the methodology lacks all traditional indicia of a reliable scientific, technical, or specialized method.

## II. STATEMENT OF THE ISSUES

1. Is the methodology upon which Wiley Wright's expert testimony is based and, therefore, his testimony, relevant to and helpful in resolving the disputed issue of the value of work actually performed by Landmark and, consequently, the amount that Landmark was overpaid for this work by the Navy?

2. Is the "cost-to-cost" method of calculating Landmark's "percent complete," generally, and as used by Wiley Wright, a reliable method of estimating the value of work Landmark completed?

## III. STATEMENT OF FACTS

Lumbermens was the surety for the Whole Site Repair/Revitalization of the Maylor Capehart Housing Area on the Whidbey Island Naval Air Station ("project"). Landmark was the original contractor for the project, which consisted of renovating 160 (subsequently increased to 181) military family units, but was terminated for default. At termination, the Navy had paid Landmark $4,793,633.76, almost 40% of the total Contract price. First Amended Complaint; Answers to First Amended Complaint, ¶82. However, Landmark had only renovated 22 of the 181 units, or 12% of its promised performance. *Id.* After default, the Navy called upon Lumbermens to perform under the performance bond and Lumbermens, the Navy, and Atherton Construction, Inc. ("Atherton") executed a Takeover Agreement pursuant to which Atherton would complete the project. However, the Navy had insufficient Contract funds remaining to pay Atherton and Lumbermens, pursuant to its obligations under the performance bond, paid the difference. In total, Lumbermens paid Atherton in excess of $4 million over the $7,392,381.24 Contract balance that remained when Landmark was terminated. Declaration of Matthew Muretta ("Muretta Decl."), ¶8.[1] In addition, Lumbermens made payments in excess of $550,000 to subcontractors and suppliers who had not been paid by Landmark, pursuant to its payment bond. Lumbermens' claimed damages include money it was forced to pay to Atherton to cover contract funds that the Navy improperly paid to Landmark as a result of failures to enforce the terms of the contract, including any progress payments made to Landmark for work that was not actually completed.

[1] The Muretta Declaration was previously filed by Plaintiff in its Opposition to Defendant's Motion to Dismiss and is Document 17-1 in the docket of the case.

The Navy has offered Wiley Wright, a certified public accountant, as an expert witness on damages. Specifically, Wright intends to contest Lumbermens' claimed damages and testify as to the amount of money Landmark earned before being terminated and, hence, the amount of money that the Navy overpaid Landmark. *See* Expert Report of Wiley R. Wright III ("Wright Report"), p. 2-3. Wright has set forth his opinions and methodology in his expert report and deposition.

Wright's opinion begins from the principle that overpayments to Landmark must be calculated by subtracting the value of the work performed from the amount that Landmark was paid by the Navy. *See* Wright Report, p. 3. Wright calculates this value separately for certain line items on the project schedule by estimating the percentage of work for each line item that has been completed. Wright terms this method the "percent complete method". *See id*. For materials line items, Wright indicates that there are two methods to determine the "percent complete". The first and most accurate method, according to Wright, is to rely on the actual amount of materials obtained by Landmark for the project. *Id*. However, Wright does not rely on this method because he claims that the available records are insufficient to determine the actual quantities of materials. *Id*. The second method is identified as the "cost-to-cost method." Using this methodology, Wright compares the materials costs of Landmark and the takeover contractor, Atherton, with respect to a particular line item and determines the percentage of the total cost attributable to each. *Id*. This percentage becomes Wright's proxy for the percentage of work that Landmark completed and, thus, the percentage of the total line item value that it earned. *Id*. For labor and overhead line items, Wright simply uses a time-based method, calculating the earned labor expenses based on how much labor time has been expended. *See, e.g., id*. at 7.

## IV. ARGUMENT

### A. Expert Testimony is Admissible Only if it is Relevant to a Disputed Issue and if it is Based on a Reliable Methodology.

The admissibility of expert testimony is governed by the standards of fit and reliability articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and Federal Rule of Evidence 702. Under *Daubert* and *Kumho*, the court must only admit expert opinions that are related to the issues in dispute and are reliable and non-speculative. *Daubert*, 509 U.S. at 589 ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); *Kumho Tire*, 526 U.S. at 152 (extending *Daubert* to non-scientific, technical or specialized expert evidence); *Microstrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1355 (Fed. Cir. 2005). This requirement first demands a finding that there is a "fit" between the proffered opinion and some disputed issue – simply because an expert analysis *can* be performed on certain facts and data does not mean that that analysis is helpful in resolving the issues at hand without credible grounds to support such a relationship. The court must make a finding of fitness as a precondition to admissibility. *Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."); *see also* Fed. R. Evid. 702 (providing that "scientific, technical, or other specialized knowledge" may be admitted if it "will assist the trier of fact to understand the evidence or to determine a fact in issue").

*Daubert* and *Kumho* next require a finding of reliability – that the proffered expert correctly employed methods that are well founded in the knowledge and practice of his discipline to an appropriate and adequate set of facts and data. *Daubert*, 509 U.S. at 589; *Kumho Tire*, 526 U.S. at 152 (noting that *Daubert*'s relevancy and reliability requirements are intended "to make

certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."); *see also* Fed. R. Evid. 702 (providing that an expert witness may testify in the form of an opinion if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.").

Finally, if an expert simply reaches a conclusion unjustified by the available data, the court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Ultimately, the court may not simply rely on an expert's assurances that his methods and opinions are an appropriate fit with pertinent issues, are reliable, or justified by the available facts; rather, the court must exercise its independent gatekeeping authority to admit only helpful and reliable expert testimony. *Joiner*, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

**B. Wright's Expert Methodology Does Not Fit the Relevant Damages Issue – What Was the Value of Work Landmark Actually Completed And How Much Did The Navy Pay In Excess of That Value.**

Wright's damages methodology is, by his own admission, a *financial* model of damages. Wright Report, p.3; Deposition of Wiley R. Wright ("Wright Deposition"), 46: 11-22; 47: 1-21. It is an estimate, based on Landmark's booked expenses and liabilities, of the proportion of the project's financial burden carried by Landmark. This proportion is used by Wright as a proxy for the percentage of work Landmark actually completed and, consequently, the percentage of the total contract price to which they were entitled. Wright Report, p.3; *see also* Wright

Deposition, 235: 10-16 ("Q: So the purchase of material is equal to work performed? A: For billing purposes, yes, I believe so."). As will be discussed at length below, this methodology is not a reliable method to estimate either Landmark's actual costs or the work it actually performed. However, even apart from the internal unreliability of the method, it does not fit the relevant damages issue, as required by *Daubert* and Rule 702. Specifically, Wright's methodology does *not* estimate how much work Landmark actually performed, which is the only contractual basis on which the government was permitted to approve payments.

This is a fixed-price construction contract and progress payments are made according to FAR 52.232-5, Payments under Fixed-Price Construction Contracts. FAR 52.232-5(b) provides:

> *Progress payments*. The Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, *on estimates of work accomplished* which meets the standards of quality established under the contract, as approved by the Contracting Officer.

FAR 52.232-5(b) (emphasis added). The payment clause makes clear that the pertinent factual issue with respect to damages is *not* the financial accounting question of how much money Landmark spent or how many liabilities it incurred but, rather, how much work Landmark had actually performed. Although Wright concedes that progress payments should reflect actual work accomplished, his financial methodology is rooted in his personal understanding that billing based on costs alone is appropriate. *See* Wright Deposition 146: 4-17; 157: 19-22; 158: 1-22; 159: 1-14 ("Q: The government is not so much concerned with cost as it is work accomplished, correct, on a fixed price construction contract? A: Yes."). Wright's financial model is simply not helpful in answering the practical question of whether payments were commensurate with work accomplished.

The disconnect between Wright's financial methods and the real world damages issue is readily apparent in his opinions. While it is not in dispute that at the time of termination the Navy estimated that Landmark had only completed 12% of the project (15% if work in partially completed units is counted), Wright routinely estimates in his expert report that Landmark had performed between 25 and 52% of individual line item tasks. *See* Wright Report, pp. 6-16. For example, Wright concludes that Landmark performed 48% of the asbestos and lead abatement even though the Navy's records indicate that abatement had been performed in only 34% of the housing units at the time of termination. Wright Report, pp. 5-6.

Wright's conclusions with respect to whether the government inappropriately paid for labor expenses suffers from a similar fitness deficit. Here, Wright's only method for determining the correctness of payments for labor expenses is to determine whether those payments are commensurate with the amount of time spent on the project. However, this time-based method bears no relationship to the Payments Clause, which requires payments *only* for work actually accomplished. For example, Wright opines that the Navy properly paid Landmark 52% of the budgeted cost for "personnel", a line item that included field office staff and overhead, because, in his opinion, personnel expenses are earned ratably over time. Wright Report, pp. 6-7. However, this percentage is not reconcilable with the fact that only 12% of the housing units had actually been completed, the only benchmark for payment consistent with FAR 52.232-5. Therefore, even if Wright is correct that the labor payments made to Landmark accurately reflect the amount of time spent on those tasks, that conclusion is unhelpful and irrelevant to determining the real issue in dispute, whether Landmark was properly paid for work completed. As with Wright's treatment of materials payments, this methodology lacks the requisite fit and should be excluded.

**C. <u>Wright's "Cost-to-Cost" Methodology for Estimating Work Performed from Costs and Liabilities Incurred is Not Reliable and is Inadmissible</u>.**

The particular cost-to-cost method for estimating Landmark's percentage of work complete used by Wright is unreliable for several reasons: (1) it does not satisfy any of the *Daubert* indicia of reliability; (2) it is undisputed that the cost-to-cost method is not the most accurate or preferred method to estimate a completion percentage; (3) the cost-to-cost method relies on several critical assumptions that are not supported by the facts; and (4)the cost-to-cost method as applied by Wright employs insufficient and inaccurate cost data.

1. <u>The cost-to-cost method is not supported by any of the traditional indicia of reliability</u>.

*Daubert* identified a non-exclusive list of factors that a court may consider in deciding whether an expert's methodology and, ultimately, opinion is reliable. Where appropriate, the court should consider whether a proffered expert's methodology (1) can be, or has been tested; (2) whether the methodology has been subjected to peer review and/or publication; (3) whether the methodology has a known rate of error; (4) whether there are standards governing the use of the methodology, and whether those standards were followed by the expert; and (5) whether the methodology has gained general acceptance within the expert's field for the purposes for which it has been employed. *See Daubert*, 509 U.S. at 593-94. When questioned regarding the use of the cost-to-cost method in accounting practice, Wright conceded that there was no general acceptance of using the method to determine the relative percentage complete between an original contractor and a takeover contractor but, rather, the methodology was ordinarily employed to determine the percentage complete of a single contractor. Wright Deposition, 60: 14-22 ("Q: … So what is, I guess, the basis for using the cost-to-cost method of determining percent complete in the manner you're using it? How is that accepted in your industry? A: You

won't find a statement of position or any other generally accepted accounting principle per se that deals with a calculation of percent complete in the context of a default by one contractor and the takeover of another contractor."). Although he stated his belief that the general principles of the cost-to-cost method could be applied to this "unique and special circumstance," Wright further conceded that there are no published standards for such an application of the cost-to-cost method. *Id.*; Wright Deposition, 61:5-14; 62: 7-12; 71: 6-9. Finally, Wright conceded that neither he nor any accountant he is aware of has ever applied the cost-to-cost method to determine the relative percentage of a project completed by an original and takeover contractor. Wright Deposition, 71: 9-22; 72: 1-5 ("Q: Have you ever used the cost-to-cost method before in this manner? . . . A: No, because in other circumstances, we've had complete, objective records to do the calculation differently. Q: Are you aware of anybody else using it in the manner you've used it here in your expert report? A: None that I can think of. Q: Are you aware of any articles or peer review type papers addressing the cost-to-cost method as used by you in this context? A: Not that I can think of."). Because the methodology underlying Wright's opinion is untested, unguided, and not generally employed when applied in the manner Wright has described, his testimony should be excluded as unreliable. *See Lifewise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) (finding a damages model unreliable where it was "unique to this case and not based on any recognized standard," "not in regular usage," "not peer reviewed," and "has no uniform usage in any known industry.").

2. <u>The cost-to-cost method is inferior to other available methods for calculating work actually performed by a defaulted contractor</u>.

In his expert report, after indicating that the "percent complete method" should be used to estimate the value of the actual work performed by Landmark, Wright identifies two independent methods for calculating a percent complete. Wright Report, p. 3. The first and "most accurate"

is to use the actual quantities of materials acquired by Landmark as an estimate of work completed. *Id.* In his deposition, Wright further explained that records of actual work completed are preferable. *See* Wright Deposition, 95: 13-18 ("Q: … would you prefer to use [a government inventory of asbestos and lead abated units] over the cost-to-cost method as used here for this calculation? A: Assuming they are accurate, yes."); 104; 7-22; 10: 1-15. The second method is the cost-to-cost method. Instead of directly quantifying actual levels of completed work or project expenditures, this method compares the booked expenses of the original and completion contractors to determine what portion of the total cost each spent on the project. This proportion is used as a proxy for work actually performed. Wright Report, p. 3.

The only explanation that Wright gives for employing the less accurate cost-to-cost method is that the available data was insufficient to determine actual work complete or real costs. *See* Wright Report, p. 3. However, this professed concern for using only the best data is belied by the fact that Wright assumes, without any attempt at verification, that Landmark's self reported job-to-date costs are both complete and accurate, as discussed more completely below. The lack of a consistent protocol for verifying the accuracy of data calls into serious question the reliability of Wright's method and opinions.

3. The cost-to-cost methodology's assumptions are unjustified and error inducing.

The assumptions of Wright's cost-to-cost method make it an unreliable method to estimate the work that Landmark completed. First and foremost, Wright's methodology assumes that Landmark completed actual work on the project commensurate with each of its "costs". Wright Deposition, 189: 18-22; 190:1-3 ("Q: Now, insofar as material cost, does not this cost-to-cost method also assume that all the costs incurred for material – by landmark for material – that that material was, in fact, used for the project? A: Yes. Q: Do you know if that's true? A:

No."). In other words, the method assumes a direct relationship between the contractor's expenses (regardless of whether the expenses were paid) and its percentage completion of the project. This assumption makes a cost-to-cost calculation unreliable. For example, if a contractor purchased materials but did not use them to complete any physical construction task, the cost-to-cost method would show a high percentage complete based on those costs, even though little actual work had been performed. Similarly, if a contractor overestimated the value of materials relative to the cost of labor, then under the cost-to-cost method the mere purchase of materials would yield a percentage complete that was out of sync with the actual work yet to be performed. Assuming that costs are an accurate proxy for work actually accomplished makes no allowance for on-the-ground realities and demonstrates that Wright's method is unreliable.

Second, the cost-to-cost method assumes that both the original and takeover contractor acquired materials and performed services for the same cost, and that they were equally efficient. Wright Deposition, 70: 14-18. This assumption further weakens Wright's multiple contractor cost-to-cost method because it allows one contractor's contribution to actual work completed to be overvalued simply because its per unit or per hour costs were relatively higher.

Finally, as discussed more fully below, Wright assumes without justification that the underlying job cost data is accurate. *See, e.g.*, Wright Deposition, 65: 13-18.

4. <u>Wright's methodology employs insufficient and unreliable data</u>.

To be admissible under the Rule 702/*Daubert* standard an expert's testimony must be "based upon sufficient facts or data." Fed. R. Evid. 702. Indeed, "[i]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v.*

*National Railroad Passenger Corp.*, 303 F.3d 256, 267 (2nd Cir. 2002). "Opinions derived from erroneous data are appropriately excluded." *United States v. City of Miami*, 115 F.3d 870, 873 (11th Cir. 1997) ("Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion." (internal citations omitted)).

Wright's cost-to-cost method makes no distinction between materials costs that Landmark *actually* incurred, i.e. paid to its suppliers and subcontractors, and its *obligations* to pay for materials that were never satisfied. That is, whether or not Landmark actually paid for the materials it ordered or services rendered, it incurred a "cost" for the purposes of Wright's cost-to-cost method and was credited for performance. *See, e.g.*, Wright Deposition, 41: 2-19; 43:7-14 ("Q: . . . So in the context of actually performed, as you use here, is it fair to say that your definition includes for the purposes of material, procurement, material for which the contractor has incurred a liability but not yet satisfied, as well as those material for which it has incurred a liability and satisfied? A: Yes. And that would be not just my definition; that would be consistent with generally accepted accounting principles."); 76: 6-10. Wright also testified that Landmark's job-to-date costs, on which he exclusively relied, included "both accounts paid and accounts payable." Wright Deposition, 100: 9-11. Lumping together Landmark's expenses paid and liabilities incurred is suspect because Landmark failed to pay all of its suppliers for all of the materials that were purchased; those obligations were paid instead by Lumbermens pursuant to its payment bond. By affording identical treatment to accounts paid and unsatisfied accounts payable, the cost-to-cost method routinely overestimates actual costs where, as here, a terminated contractor does not pay its bills.

In addition, Wright's cost-to-cost method does not consider primary sources of data regarding Landmark's actual expenditures for project materials, but instead relies upon a single

source of data, Landmark's self-reporting of its job-to-date costs. Wright Deposition, 161: 13-22; 162: 1-8. For example, invoices, transaction histories, and sworn testimony explaining these billing records exist for Landmark's paint, cabinet, and doors and window suppliers. Wright acknowledges having seen invoices, but he claims he did not use them because they did not adequately inventory the materials remaining at termination. *See* Wright Deposition, 53: 3-22; 54: 1-22; 55: 1-10. However, Wright never explains why an accounting of materials leftover at termination is a prerequisite to using invoices and other records of purchases and payments to calculate the expenses that Landmark incurred. Wright also did not use the government's records of work actually completed at the time of termination, records that would have eliminated altogether the need to employ a less accurate cost-based method of estimating the amount of work completed. *See, e.g.*, Wright Deposition 94: 13-22; 95: 1-12; 104:12-22; 105: 1-15 (acknowledging that accurate records of asbestos abatement likely existed and were provided to him, and that his preferred practice would be to use such records). Ultimately, Wright's reliance on a single source of data, even though primary records of work completion and actual expenses were available, calls into question his use of the cost-to-cost method, and his opinions.

Last, the accuracy of Landmark's job-to-date costs is assumed under Wright's methodology. Wright Deposition, 65: 13-18; 97: 14-21 ("Q: So what did you do to satisfy yourself of the accuracy and reliability of the information contained in [Landmark's cost records]? A: I had to assume that the information reflected in Landmark's job cost ledger was accurate in the same manner that I had to assume the cost information in Atherton's job cost ledger was accurate."); 196: 2-4. This assumption, and the lack of any protocol for verifying that data meets a desired level of accuracy, negatively affects the reliability of Wright's testimony. *See United States v. Rockwell Space Operations Co.*, 2002 U.S. Dist Lexis 6650, *27-28 (2002)

(finding an expert accountant's calculation of a subcontractor's overcharges to the government was unreliable and inadmissible where the expert accepted as true the Plaintiff's own non-expert estimates without verifying their accuracy).

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the court find the proffered opinions of Defendant's expert witness on damages unreliable and inadmissible at trial.

DATED this 1st day of August, 2007.

By:__s/Mark G. Jackson___________
Mark G. Jackson, WSBA #18325

GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for Plaintiff
Lumbermens Mutual Casualty Company