No. 04-1255C
(Judge Robert H. Hodges, Jr.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LUMBERMENS MUTUAL CASUALTY COMPANY,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

EXHIBIT B

EXPERT REPORT OF RICHARD C. PAULLIN
of CONTRACT SOLUTIONS LLC
Dated September 29, 2006

Mark G. Jackson, WSBA #18325
GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101-2939
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for
LUMBERMENS MUTUAL
CASUALTY COMPANY

EXHIBIT B
PAGE 1 OF 30

Contract Solutions LLC
Report

# Schedule and Progress Analysis

Repair/Revitalization of the
Maylor Capehart Housing Area
Naval Air Station Whidbey Island
Oak Harbor, Washington
Contract No. N44255-97-C-5515

Lumbermens Mutual Casualty Company
v.
The United States

Fed. Cl. No. 04-1255C

September 29, 2006

Richard C. Paullin
Contract Solutions LLC

EXHIBIT B
PAGE 2 OF 30

# TABLE OF CONTENTS

## I. Executive Summary

I.A Scope of Analysis ........ 1

I.B Project Background ........ 2

I.C Summary of Opinions ........ 2

## II. Schedule and Progress Analysis

II.A Introduction ........ 4

II.B Baseline Schedule ........ 4

II.C Summary of Analysis ........ 7

II.C.1 Landmark Performance Period ........ 8
May - June 2000 ........ 8
July - October 2000 ........ 9
November - December 2000 ........ 12
Project Schedules ........ 14
January - February 2001 ........ 15
March - June 21, 2001 ........ 17

II.C.2 Default and Takeover Period ........ 18
June 22, 2001 - November 20, 2001 ........ 18

II.C.3 Atherton Performance Period ........ 19
November 21 - November 27, 2001 ........ 19
November 28, 2001 - March 2002 ........ 20
Electrical Issues ........ 20
Asbestos Abatement Plan ........ 24
April 2002 - June 2003 ........ 25

Attachment A – Professional Qualifications



EXHIBIT B
PAGE 3 OF 30

# I. Executive Summary

## I.A Scope of Analysis

Contract Solutions LLC was retained by the United States Department of Justice to perform an independent schedule and progress analysis of the project involving the Repair/Revitalization of the Maylor Capehart Housing Area at Naval Air Station Whidbey Island, Oak Harbor, Washington. This report contains the professional opinions of Contract Solutions resulting from that analysis. Compensation for work performed by individuals within the firm is between $37 and $185 per hour for both analysis and testimony. Our professional qualifications are provided in Attachment A.

Our analysis of the project included a review of various project documents, including but not limited to the following:

- Solicitation and Amendments
- Proposal and Revised Proposals
- Contract No. N44255-97-C-5515
- Contract Drawings and Specifications
- Contract award letter, dated April 11, 2000
- Contract Modifications
- Network Analysis Schedules
- Other Project Schedules
- Complaint, filed August 14, 2004
- First Amended Complaint, filed March 13, 2006
- Contractor's Invoices
- Contractor's Quality Control Reports
- Contractor's Daily Production Reports
- General Correspondence
- E-mail Correspondence
- Internal Government Documents
- Internal Contractor Documents
- Internal Surety Documents
- Meeting Minutes
- Depositions and Exhibits

If additional information becomes available, Contract Solutions reserves the right to modify these opinions and supplement this report.



EXHIBIT B
PAGE 4 OF 30

## I.B Project Background

On April 11, 2000, the Government awarded Contract No. N44255-97-C-5515 to Landmark Construction Corporation ("Landmark") in the amount of $9,878,026. [App. 17][1] The contract included the following scope of work:

> Project Description: Whole site repairs and revitalization are planned for the Maylor Capehart Housing Area, Naval Air Station Whidbey Island, Oak Harbor, Washington. The scope of work includes interior and exterior renovations to 160 units of Capehart style housing. Unit improvements include widening the driveway for off street parking and removing existing carport structure and providing new garage. . . The intent of this solicitation is to procure the design and construction of these repairs and revitalization.[2] [App. 19]

Performance and payment bonds for the project were issued by Lumbermens Mutual Casualty Company[3] ("the Surety"). [App. 26] During its performance of the work, Landmark voluntarily abandoned the project and the Government terminated the contract for default. [App. 66, 71] The Surety elected to complete the project and entered into a Takeover Agreement with both the Government and a completion contractor, Atherton Construction, Inc. ("Atherton"). [App. 82]

Several problems and delays occurred during the performance of this contract, and they are discussed in detail in this report. After completion of the project the Surety filed a Complaint in the United States Court of Federal Claims on August 4, 2004, which was subsequently amended on March 13, 2006. In that Amended Complaint, the Surety seeks to recover at least $3,600,000.

## I.C Summary of Opinions

Contract Solutions performed an independent schedule and progress analysis of the entire project using critical path method (CPM) scheduling techniques as well as other methods of analysis. Table 1 (on the following page) provides a summary of our analysis regarding the delays that occurred during the project. The project was delayed from the original contract completion date of October 23, 2002, until the actual substantial completion date of June 6, 2003, which represents a total delay of 7.4 months to the overall project schedule. [App. 146] Based upon our analysis, we conclude that the all of delay to the project's critical path is non-compensable. The issues responsible for that delay are discussed in more detail in the subsequent sections of this report.

The following is a summary of our opinions:

1. The overall contract completion date was delayed by 226 days (7.4 months).
2. Landmark (working with the Government) started early construction activities ahead of schedule.
3. Landmark (at the request of the Government) began work early on several unique housing units on Baker Court.

---

[1] Exhibit 1 in the Report Appendix is abbreviated here as: App. 1.
[2] Contract Part III, page III - A - 1, paragraph A.1.a.
[3] Lumbermens Mutual Casualty Company was part of Kemper Insurance Companies ("the Surety").



EXHIBIT 6
PAGE 5 OF 30

4. Landmark initially planned for early completion of the housing units.
5. Landmark's schedules were adequate for management of this project.
6. Landmark's substantial progress on early construction activities enabled it to be several months ahead of the baseline schedule as of January 21, 2001.
7. A delay of 42 days (1.4 months) occurred during the final months of Landmark's contract performance, because of slow progress resulting from its financial difficulties.
8. A delay of 152 days (5.0 months) occurred between the furlough of Landmark personnel and execution of the Takeover Agreement, because no schedule progress was made during that period.
9. A delay of 7 days (0.2 months) occurred between execution of the Takeover Agreement and the Notice to Proceed issued by the Surety, because no schedule progress was made during that period.
10. Atherton made very little progress during its first two months of performance, when it had the opportunity to get ahead of its planned schedule.
11. Atherton's overall schedule was not delayed by the electrical issues or asbestos abatement issues and it achieved substantial completion of its work ahead of its planned schedule.
12. Atherton's planned schedule was longer than the time remaining in Landmark's contract, as of the date of the furlough; this resulted in 25 days (0.8 months) of project delay.

| Delay Period | Reason for Delay | Type of Delay | Time Period | Schedule Delay |
|---|---|---|---|---|
| 1 | Landmark slow progress due to financial difficulties | Non-compensable | Jan 21, 2001 - Jun 21, 2001 | 1.4 months |
| 2 | No progress during the default termination and takeover process | Non-compensable | Jun 22, 2001 - Nov 20, 2001 | 5.0 months |
| 3 | No progress between Takeover Agreement and Notice to Proceed | Non-compensable | Nov 21, 2001 - Nov 27, 2001 | 0.2 months |
| 4 | Atherton's planned schedule was longer than time remaining in contract | Non-compensable | Nov 28, 2001 - Jun 6, 2003 | 0.8 months |
| | Total delay | | | 7.4 months |

**Table 1 - Summary of Schedule Delays**

EXHIBIT 6
PAGE 6 OF 30

## II. Schedule and Progress Analysis

### II.A Introduction

Because both the design and construction of this project were part of the same contract, it can be called a design-build contract. (Design work was required for this particular project, although the amount of design work necessary for renovation of existing units is much less than the amount needed for conventional construction.) By selecting this type of contract, the Government was able to look to a single source of responsibility for both design and construction. In addition, the overall duration of design and construction is generally shorter for the design-build method of project delivery than for the design-bid-build method. For a project such as this, a design-build contractor often seeks to purchase long-lead items and commence construction before design is totally completed ("fast track design-build") and in so doing, shortens even further the overall duration of the project schedule. For example, a design-build contractor often begins demolition and site work before the overall building design is completed, thus allowing construction work to begin while design work is still underway.

This contract, however, required the design to be fully completed before construction could begin. [App. 19, p. III-A-1] In accordance with that requirement, Landmark's proposal communicated its intent to fully design the project before commencing construction in the field. [App. 24] But after contract award, Landmark and the Government agreed to a period of overlap or concurrency between the completion of the design phase (which included Government review and approval of the design) and the start of the construction phase. All of the project schedules issued by Landmark after contract award reflected this agreement by showing start and completion dates for certain activities that were before the dates specified by the contract. This "early completion" of certain parts of the work is often allowed by the Government in order to shorten the overall project schedule, allow exterior work to proceed during periods of good weather, and reduce the project's demands on Government personnel.

Because this agreement was made after contract award, however, the project schedules reflecting early completion of work were, by their very nature, revisions to the contract schedule. Thus, they cannot be used as a baseline from which to measure delays to the contract. In essence, the agreement between the Government and the contractor allows the contractor to attempt "early completion" of certain work but does not penalize the contractor for failing to actually finish that work early. In order to measure delays to the contract, the only true baseline schedule that can be used is the original contract schedule itself. The contract specifies this as the schedule that is to be used to measure the contractor's performance for contract clauses addressing the schedule (e.g., "Commencement, Prosecution, and Completion of Work" and "Liquidated Damages -- Construction").[4] The following section of this report will address this contract's baseline schedule in more detail.

### II.B Baseline Schedule

In addition to the requirement that the design be fully completed before construction could begin, the contract also required that Landmark commence and complete the construction work in

[4] Contract Specification Section 00721, page 1.

EXHIBIT 6
PAGE 7 OF 30

certain phases and work areas that were defined in the contract. The sequence of construction of the work areas and certain milestone dates were also defined in the contract, which stated:

> NOTE: Some of the "Scheduled Start Day" and "Completion Day" blocks have been completed. THE NUMBER OF DAYS IN THESE BLOCKS CANNOT BE ALTERED.[5] [App. 20, pp. 15-16]

The contract included the following table (indicating days after Notice to Proceed):

| CLIN | PHASE | Scheduled Start Day | Completion Day |
|---|---|---|---|
| 0001-0005 | Design Period | 0___ | 210_ |
| | Construction Mobilization | 210_ | 270_ |
| | Work Area 1 | 270_ | ____ |
| | Work Area 2A & 2B | ____ | ____ |
| | Work Area 3 | ____ | ____ |
| | Work Area 4 | ____ | ____ |
| | Work Area 5 | ____ | 590_ |
| 0006-0009 | Work Area 6 | ____ (a) | ____ |
| | Work Area 7 | ____ | ____ |
| | Work Area 8 | ____ | ____ |
| | Work Area 9 | ____ | ____ |
| | Work Area 10 | ____ | 320_ (a) |

> Note: (a) CLIN 0006, if awarded, Work Area 6 scheduled start date will be after acceptance of Work Area 4. The completion date for CLIN 0006-0009 shall be 320 days from the scheduled start date of Work Area 6.[6] [App. 20]

The contract also stated:

> After Contract Award and after design is accepted and unilateral mod executed, the Contractor will receive Work Areas 1 and 2. In sequencing the work, the Contractor shall complete Work Area 1 before receiving Work Area 3 and shall complete Work Area 2 before receiving Work Area 4, etc. until all Work Areas have been completed.[7] [App. 20]

Thus, the overall structure of the baseline schedule was defined by the contract, while the sequence and duration of each of the work phases was left for Landmark to determine. Prior to contract award, Landmark indicated in its proposed Phasing Schedule that each work area would have a 64 day duration.[8] [App. 24] This schedule was created before the final solicitation requirements were defined, however, and it was not updated to reflect the final date of contract

---

[5] Contract Part III, page III - D - 15, paragraph D.12.d.
[6] Contract Part III, page III - D - 16.
[7] Contract Part III, page III - D - 16, paragraph D.12.e.
[8] The dates indicated in the Phasing Schedule are incorrectly calculated using the durations as work days rather than calendar days. But the Phasing Schedule correctly shows 910 days as the cumulative sum of the durations, which is the contract requirement for the number of calendar days to achieve final completion of the project.



EXHIBIT B
PAGE 8 OF 30

award. [App. 25] Thus, it can only be used as an indication of Landmark's planned durations and phasing of the work, while the dates in it must be disregarded.

The contract schedule requirements and Landmark's proposed Phasing Schedule have been combined to form the baseline schedule, as represented by the following table (indicating days after Notice to Proceed):

| CLIN | PHASE | Scheduled Start Day | Completion Day |
|---|---|---|---|
| 0001-0005 | Design Period | 0 | 210 |
| | Construction Mobilization | 210 | 270 |
| | Work Area 1 | 270 | 333 |
| | Work Area 2A & 2B | 334 | 397 |
| | Work Area 3 | 398 | 461 |
| | Work Area 4 | 462 | 525 |
| | Work Area 5 | 526 | 590 |
| 0006-0009 | Work Area 6 | 590 (a) | 653 |
| | Work Area 7 | 654 | 717 |
| | Work Area 8 | 718 | 781 |
| | Work Area 9 | 782 | 845 |
| | Work Area 10 | 846 | 910 (a) |

Note: (a) The scheduled start date for Work Area 6 is after acceptance of Work Area 4, as specified by the contract. The completion date for Work Area 10 is 320 days after the scheduled start date of Work Area 6. The overall project duration is 910 days, which is the contract requirement for final completion of the project.

The contract defined the Notice to Proceed date as equal to "the date of the contract award plus fifteen (15) calendar days." [9] [App. 18] Thus, the Notice to Proceed date was defined as April 26, 2000. [App. 17] Based upon the Notice to Proceed date, Table 2 represents the baseline schedule:

| CLIN | PHASE | Duration | Scheduled Start | Completion |
|---|---|---|---|---|
| 0001-0005 | Design Period | | 4/26/00 | 11/22/00 |
| | Construction Mobilization | | 11/22/00 | 1/21/01 |
| | Work Area 1 | 64 days | 1/21/01 | 3/25/01 |
| | Work Area 2A & 2B | 64 days | 3/26/01 | 5/28/01 |
| | Work Area 3 | 64 days | 5/29/01 | 7/31/01 |
| | Work Area 4 | 64 days | 8/1/01 | 10/3/01 |
| | Work Area 5 | 65 days | 10/4/01 | 12/7/01 |
| 0006-0009 | Work Area 6 | 64 days | 12/7/01 | 2/8/02 |
| | Work Area 7 | 64 days | 2/9/02 | 4/13/02 |
| | Work Area 8 | 64 days | 4/14/01 | 6/16/02 |
| | Work Area 9 | 64 days | 6/17/02 | 8/19/02 |
| | Work Area 10 | 65 days | 8/20/02 | 10/23/02 |

**Table 2 - Baseline Schedule**

9 Contract Specification Section 00721, page 1, paragraph 1.1.a.



EXHIBIT 6
PAGE 9 OF 30

### II.C Summary of Analysis

Contract Solutions performed an independent schedule and progress analysis of the entire project. The schedule analysis portion of our work used critical path method (CPM) scheduling techniques and concluded that the issues listed in Table 3 were responsible for the overall delay to the project's as-built critical path. The critical path represents the longest chain of interrelated activities in the project schedule. A delay in completing an item on this critical path delays the completion of the entire project. To facilitate the analysis of delays to the critical path, the schedule analysis has been divided into four delay periods, or "windows" of time, which are presented in the following sections of the report in chronological order. The reason for delay in each delay period is summarized in Table 3, and will be discussed in more detail in the sections that follow.

| Delay Period | Reason for Delay | Time Period | Schedule Delay (days) | Schedule Delay (mths) |
|---|---|---|---|---|
| 1 | Landmark slow progress due to financial difficulties | Jan 21, 2001 - Jun 21, 2001 | 42 days | 1.4 months |
| 2 | No progress during the default termination and takeover process | Jun 22, 2001 - Nov 20, 2001 | 152 days | 5.0 months |
| 3 | No progress between Takeover Agreement and Notice to Proceed | Nov 21, 2001 - Nov 27, 2001 | 7 days | 0.2 months |
| 4 | Atherton's planned schedule was longer than time remaining in contract | Nov 28, 2001 - Jun 6, 2003 | 25 days | 0.8 months |
| | Total delay | | 226 days | 7.4 months |

**Table 3 - Summary of Schedule Delays**

As discussed previously, the Notice to Proceed date was defined as April 26, 2000, and the contract specified a performance period of 910 calendar days after the Notice to Proceed. Thus, the contract completion date was October 23, 2002, and it was not changed by any of the contract modifications issued by the Government. Substantial completion of the project was achieved on June 6, 2003, which was 226 days (7.4 months) after the contract completion date.[10]

[10] Atherton's daily reports indicate that three of the last four housing units were completed on June 5 and June 6, 2003, but they do not indicate when the final unit was completed. In a June 26, 2003 letter to the Public Works Department, the Government stated that the warranty on the last four units began on June 6, 2003. In an August 1, 2003 letter to Atherton, the Government stated that the project was substantially completed on June 6, 2003.



EXHIBIT 6
PAGE 10 OF 30

[App. 143, 144, 146] The Government used this June 6, 2003 substantial completion date in its calculation of liquidated damages for the contract.[11] [App. 135] A total of $1,015,125 in liquidated damages was withheld by the Government from its payments to Atherton. [App. 148] That amount was calculated in accordance with the contract, which specified liquidated damages of $75.00 per unit per day for each day of delay.[12] [App. 18]

In order to summarize the issues discussed in this analysis, the entire project has been divided into three time periods: (1) Landmark Performance Period; (2) Default and Takeover Period; and (3) Atherton Performance Period. Events occurring throughout the project will be discussed further in chronological subsections within each time period.

### *II.C.1 Landmark Performance Period*

<u>May - June 2000</u>

Because this was a design-build contract, Landmark was required to submit its schedule of prices in two different formats: one during the design period and one during the construction period.[13] [App. 19] On May 5, 2000, Landmark submitted its initial schedule of prices for the design period, which included only four line items, as specified by the contract. [App. 27] Landmark's first invoice, dated July 6, 2000, billed a total of $223,356 for two of those line items (Bonds and the 45% Design Submittal). [App. 151] Landmark submitted the schedule of prices for the construction period together with the Network Analysis Schedule in an electronic file dated June 28, 2000.[14] Landmark's first invoice also contained a printout of the schedule of prices for the construction period, which is summarized in Table 4 on the following page. [App. 151]

As shown by Table 4, Landmark assigned a relatively small percentage of the contract value (2.4%) to the Mobilization category, and it assigned 8.6% of the contract value to the Jobsite Overhead category. Landmark planned to spread the Jobsite Overhead equally over 25 months in its invoices (at four percent per month), which will be discussed in more detail below. The total dollar value of the Mobilization and Jobsite Overhead categories was $1,089,617, which was 11 percent of the total contract value.[15] This is near the industry average for total overhead on this type of project, and well below the maximum overhead possible for this type of project.

During the early part of this project, Landmark managed its activities with simple bar chart schedules, which is typical of the practice of many contractors in the industry during relatively simple phases of construction. For example, a preliminary work schedule prepared by Landmark

---

[11] The Government used June 6, 2003, as the substantial completion date in its calculation. As a result, June 5, 2003, was the last day that liquidated damages were assessed.
[12] Contract Specification Section 00721, page 1, paragraph 1.2.
[13] Contract Part III, page III - B - 1, paragraph B.3.
[14] Electronic file entitled "Revised 6-27 1030am.mpp" dated June 28, 2000.
[15] In the construction industry, total overhead is often measured as a percentage of direct costs, but can also be measured as a percentage of contract value. The overhead percentage listed here would be slightly higher than 11 percent if it were measured as a percentage of direct costs.

indicated that paperwork and design review activities would take place between June and August 2000. [App. 28] It also indicated that site work and abatement/demolition activities would begin in August 2000, prior to approval of the design. However, the contract required that Landmark submit detailed Network Analysis Schedules for Government review and approval.[16] [App. 21] Landmark submitted these schedules, but utilized them primarily for invoice billings rather than management of the construction work.

| Category | Amount | Percent of Contract |
|---|---|---|
| Bonds | $ 143,256 | 1.5 % |
| Architectural Fees | $ 200,000 | 2.0 % |
| Mobilization | $ 240,483 | 2.4 % |
| Jobsite Overhead | $ 849,134 | 8.6 % |
| Materials | $ 2,634,135 | 26.7 % |
| Site Work/Abatement/Cleanup | $ 1,479,500 | 15.0 % |
| Unit Construction | $ 4,331,518 | 43.9 % |
| **Total** | **$ 9,878,026** | **100.0 %** |

**Table 4 - Schedule of Prices [17] [App. 151]**

July - October 2000

In a meeting on July 27, 2000, the Government requested that Landmark submit a copy of the Network Analysis "to put into the file." [18] [App. 29] Landmark submitted the Network Analysis four days later, as Submittal No. 7 on July 31, 2000. [App. 30] The Government approved Landmark's initial submittals (which were required prior to the commencement of construction work) with Contract Modification A00001, dated August 8, 2000. [App. 1] With this modification, the Government authorized Landmark to proceed with limited construction activities: the installation of off-street parking (site work), abatement work, and interior demolition work. Landmark began site work and demolition work on August 9, 2000, and began abatement work on August 14, 2000. [App. 31, 33]

On August 9, 2000, Landmark submitted its revised Network Analysis as Submittal No. 7A. [App. 32] In this project schedule, Landmark planned for completion of housing unit construction in June 2002, almost four months prior to the required contract completion date. The Government returned the submittal "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark. [App. 32]

[16] Contract Specification Section 01321.
[17] The individual line items in Landmark's schedule of pries have been summarized into the seven categories shown above for ease of analysis and discussion.
[18] Design Phase Meeting minutes, dated July 27, 2000.

Landmark's second invoice, dated August 17, 2000, billed a total of $260,665 for line items in the Mobilization and Overhead categories. [App. 152] Landmark billed $161,841 for line items in the Mobilization category, which is 67% of that category. Landmark billed $98,824 for line items in the Jobsite Overhead category, which represents approximately 12% of that category. Since this was the first invoice that included line items in the Jobsite Overhead category, Landmark billed for the previous three months for these line items (at a rate of four percent per month for June, July and August). Landmark planned to spread the Jobsite Overhead equally over 25 months in its invoices, which was the duration between May 2000 (the month after the Notice to Proceed) and the completion of construction in its project schedule (June 2002).

In a meeting on August 24, 2000, Landmark provided copies of "the 'preliminary' final design" for the units in Work Area 2B (on Baker Court).[19] [App. 34] The Government had previously requested that Landmark work on those units in order to achieve early completion of them before Work Area 1. At that same meeting, Landmark indicated that interior demolition and abatement work was progressing well throughout Work Areas 1 and 2 and requested authorization to continue those activities in Work Area 3. In response to that request, the Government gave its authorization to Landmark in a meeting on August 31, 2000. [App. 36] In Contract Modification A00003, signed September 15, 2000, the Government authorized Landmark to proceed with additional limited construction activities: exterior demolition work, exterior painting, and new garage pad replacement work. [App. 3]

Landmark's third invoice, dated September 18, 2000, billed a total of $1,743,055 for line items in the following categories: [App. 153]

| **Category** | **Incremental Amount** | **Percent of Category** |
|---|---:|---:|
| Architectural Fees | $ 90,000 | 45 % |
| Mobilization | $ 28,486 | 12 % |
| Jobsite Overhead | $ 35,729 | 4 % |
| Materials | $ 851,940 | 32 % |
| Site Work/Abatement/Cleanup | $ 736,900 | 50 % |
| Unit Construction | ______ | 0 % |
| **Total** | **$ 1,743,055** | |

**Table 5 - Summary of Invoice 3** [20]

[19] Design Review Meeting minutes, dated August 24, 2000.

[20] The values on the invoice itself are the cumulative amounts billed by Landmark for each line item, up to and including the date of the invoice. The values in the table above are the incremental amounts billed on the invoice for each category (determined by subtracting the amounts on the previous invoice from the cumulative amounts on this invoice).

In this invoice, Landmark billed $28,486 (12%) for mobilization, which brought the cumulative billings to a total of 79% for this category. Landmark billed four percent again this month for Jobsite Overhead, in accordance with its plan to spread this equally over 25 months. The largest single line item billed in this invoice was $560,500 for site work (95% complete). Landmark had completed all of the site work on September 13, 2000, except for punchlist activities. [App. 35] Landmark also billed 20% of the abatement/demolition line item on this invoice.[21]

According to the September 1 meeting minutes, Landmark informed the Government of electrical problems it had discovered in the units. [App. 37] During the next several weeks, Landmark and the Government discussed the possibility of deleting certain work in exchange for the added work necessary to correct the electrical problems. [App. 38] Shortly thereafter, an agreement was reached regarding these issues and it was incorporated into the contract in Modification A00004, dated October 11, 2000. [App. 4]

Landmark submitted the Network Analysis again on September 25, 2000, as Submittal No. 7B. [App. 39] This submittal did not meet all of the requirements of Specification Section 01321, such as the number of activities in the final network diagram. For example, the contract required a minimum of 30 activities per standard building and this schedule utilized only 26 activities per building. Landmark utilized other schedules in its management of this project, however, and used this schedule primarily for billing purposes, which will be discussed further in a later subsection of this report. Specification Section 01321, Network Analysis Schedules, is typical of the scheduling specification included in large government contracts. It is more useful for other types of projects, however, and does not lend itself particularly well to management of a repetitive housing renovation project such as this one. Even if a project schedule met all the requirements of this contract, it would not be an effective management tool for this type of project. Thus, while Landmark's Network Analysis submittal did not meet all of the requirements Specification Section 01321, it was adequate for management of this project.

In this project schedule, Landmark planned for completion of construction on May 24, 2002, which was approximately three weeks earlier than its previous project schedule. After this revision to the project schedule, Landmark made a slight revision to its billings for the Jobsite Overhead category. As discussed previously, Landmark planned to spread the Jobsite Overhead equally over 25 months in its invoices. Landmark's revision to its billings simply calculated the 25 month duration one month earlier, in accordance with its earlier planned completion of construction. Thus, the revised 25 month duration was between April 2000 (the date of the Notice to Proceed) and the completion of construction in its project schedule (May 2002).

As discussed previously, the Government had requested that Landmark begin work early on the Baker Court units in Work Area 2B. Landmark agreed, and the Government authorized Landmark to proceed with renovation of three of those Baker Court units in Contract Modification A00005, dated October 11, 2000. [App. 5] Landmark's fourth invoice was dated October 19, 2000, but the cost-loaded schedule that was attached to it cannot be located. [App. 154] While it is possible to

[21] Abatement of 26 units was complete on September 1, 2000. Landmark stated that approximately 1.5 units were being completed per day. At that rate, it would have taken only four more work days to complete a total of 32 units. (32 units represents 20% of the total of 160 units in the contract, and the invoice was dated 17 calendar days after September 1, 2000.)



EXHIBIT 6
PAGE 14 OF 30