determine the approximate amounts that were included in that cost-loaded schedule, that determination is not necessary for this analysis. Instead, Landmark's billings in October and November will be combined and discussed below, with Landmark's fifth invoice.

During October and November 2000, large quantities of material were delivered to the project. For example, Landmark's cabinet supplier stated that it began to deliver cabinets to the project on October 27, 2000, and Landmark's daily reports indicate deliveries of windows, doors, and vinyl siding during those months. [App. 40, 43]

November - December 2000

In Contract Modification A00007, signed November 7, 2000, the Government authorized Landmark to proceed with additional limited construction activities: installation of windows and sliding glass doors. [App. 7] Landmark and the Government had previously negotiated a change to the contract that added sliding glass doors to 96 units (of the total of 160 units in the contract). [App. 9] Landmark ordered these sliding glass doors and began installing them, despite the fact that the Government had not yet issued a contract modification for the added work.

Landmark's fifth invoice, dated November 20, 2000, billed a total of $1,361,977 for line items in the following categories: [App. 155]

| **Category** | **Incremental Amount** | **Percent of Category** |
|---|---|---|
| Architectural Fees | $ 10,000 | 5 % |
| Mobilization | $ 22,508 | 9 % |
| Jobsite Overhead | $ 103,204 | 12 % |
| Materials | $ 956,195 | 36 % |
| Site Work/Abatement/Cleanup | $ 161,800 | 11 % |
| Unit Construction | $ 108,270 | 2 % |
| **Total** | **$ 1,361,977** | |

**Table 6 - Summary of Invoice 5** [22]

In this invoice, Landmark billed $22,508 (9.4%) for mobilization, which brought the cumulative billings to a total of 88.5% for this category. As discussed previously, Landmark made a slight revision to its billings for the Jobsite Overhead category. In this invoice, it billed for 12% of that category, for the months of May, October and November. (Landmark had not previously billed for overhead for the month of May.) This invoice brought the cumulative billings to a total of 28% for the Jobsite Overhead category, which represents seven months at four percent per month

[22] The cost-loaded schedule cannot be located for Landmark's fourth invoice. As a result, the values reported here are the total of the amounts billed on both the fourth and fifth invoices.

(April 26, 2000, through November 20, 2000). In this invoice, Landmark billed for the final $29,500 (5%) of site work, because the final punchlist work for this line item had been completed. Landmark billed $132,300 for abatement in this invoice, which brought the cumulative total to 35% for this line item. In a meeting on October 26, 2000, Landmark had stated that abatement had been completed in all of the units that were available at that time (63 units, or 39% of the total of 160 units in the contract). [App. 41]

In this invoice, Landmark billed $108,270 for four line items in the Unit Construction category, which were the units in Work Area 2B that were discussed previously. Landmark's schedule of prices called for these items to be billed when they were completed, but none of them had been completed at the time of this invoice. In a November 20, 2000 status summary, Landmark listed all four units as being between 40% and 50% complete. [App. 45] One of the units was completed the following month, in mid-December 2000, two more were completed in February 2001, and the last one was completed in March 2001.[23] [App. 49, 55]

As discussed on previous pages, the Government authorized Landmark to proceed with a significant amount of the construction work prior to final design approval. The majority of that work, such as demolition, abatement, and site work, depended only upon the specific choices made for those particular activities in the final design. Other work, such as exterior painting and the installation of windows and doors, depended only upon the specific paint, windows and doors chosen as part of the final design. Those types of specific design choices are relatively easy to make prior to completion of the final design, since they depend very little upon the remainder of the design details. Finally, renovation of the Baker Court units depended only upon the design for those particular units, not upon completion of the design for the remainder of the 160 units.

In its first five invoices, Landmark had billed the Government $1,006,970 for all the construction work that had been completed by November 20, 2000, which is only ten percent of the total contract value. Construction of some of the specific line items shown on Landmark's invoices, such as the $108,270 for the Baker Court units, had been started but not completed by November 20, 2000. Other partially completed construction activities, such as demolition work, concrete garage pad replacements, and the installation of windows and doors, were not shown as specific line items on the cost-loaded schedule, so Landmark had not yet billed for them. Landmark's total estimated cost for those unbilled items in the available units was more than double the $108,270 billed for the Baker Court units. Also, Landmark had not yet received a contract modification for the installation of the sliding glass doors in 96 units, which had been negotiated at $125,000 for additional labor and material. [App. 9] The majority of the line items billed by Landmark in its first five invoices (a total of $2,591,984) were not the construction work itself, but were needed for the construction work to proceed, such as bonds, mobilization and materials. In its first five invoices, Landmark had billed a total of $546,091 for bonds, architectural fees, and mobilization; and it had billed $237,758 for jobsite overhead and $1,808,135 for materials. All together, Landmark had billed 36.4% of the contract value by November 20, 2000.

---

[23] The unit at 1309 Baker Court was substantially completed in mid-December 2000, which allowed the base Commodore and his family to move into it before the holidays. During the following two months, Landmark completed the remaining punchlist items, and achieved final acceptance of it on February 21, 2001.

Landmark and the Government discussed the design at review meetings throughout the early part of the project, and the Government incorporated the approved final design into the contract with Contract Modification A00008, dated December 20, 2000. [App. 8] According to the contract specifications, Landmark was now authorized to proceed with the remainder of the construction work.[24] [App. 20] Landmark immediately began mechanical and electrical interior work on the other units that were available. [App. 48]

Project Schedules

(Note: This short subsection of the report digresses from the chronological discussion of project events. It is placed here so that it immediately follows the time period when Landmark received authorization to proceed with the remainder of the construction work.)

The majority of this project was comprised of simple renovation and construction work, which was very similar in each of the 160 housing units. At any particular time, Landmark would have dozens of units available for work, and of those units, there was (typically) no particular order in which they needed to be completed. For example, if electrical work was held up in one specific unit, that work could proceed in other available units. For a project such as this, CPM scheduling techniques are not particularly well-suited for day-to-day management of the construction work in the field. Rather, CPM schedules typically provide a representation, after the fact, of the work that was accomplished each month. CPM schedules simply require too much effort to update logic ties and durations to adequately show each day's planned work, because the plan in the field often changes from day to day.[25] Projects such as this are typically managed using more simplified schedules, such as bar charts, which require much less effort to update than CPM schedules.

Landmark managed this project using a combination of bar charts, tabular status summaries, and two-week look-ahead schedules. For example, as discussed previously, Landmark managed its activities with simple bar chart schedules during the early part of this project. [App. 28] During the construction work on individual housing units, Landmark managed its activities with status summaries in different formats, such as the one dated November 20, 2000, and another one dated February 6, 2001. [App. 45, 52] (After Landmark's termination, Atherton and the Government continued to use similar status summaries to manage the project.) [App. 92] Landmark also used two-week look-ahead schedules, such as those attached to the December 7, 2000 CQC Meeting Minutes.[26] [App. 46] These types of schedules are very effective tools for managing this type of project and are often utilized by contractors in addition to, or instead of, the CPM schedules that are typically required.

---

[24] Contract Part III, page III - D - 11, paragraph D.8.

[25] Summary level CPM scheduling techniques, however, can be used to retrospectively analyze progress on this type of project. These techniques compare the baseline schedule for the overall project to the work that was actually accomplished in the field, and indicate when and where delays occurred to the project schedule. Because the work has already been accomplished when these retrospective analysis techniques are employed, the CPM schedule need only be created once - it does not have to be constantly updated each day that the plan in the field changes.

[26] The schedules were referred to as a "TWO-WEEK PREVIEW" on page 4 of the meeting minutes.

Despite the fact that the contract required that Landmark to submit detailed Network Analysis Schedules, the Government utilized these other types of schedules for management of the project. For example, on November 16, 2000, the Government requested that Landmark incorporate two-week look-ahead schedules into the weekly meetings and Landmark complied with this request during subsequent meetings. [App. 44, 46] The Government demonstrated its usage of these schedules for project management in a March 14, 2001 letter to Landmark, which stated:

> In reviewing the progress status of subject contract, it is noted that there are discrepancies between what your 2 week look ahead schedule, dated March 8, 2001, shows as completed and what work is actually completed. . . It is imperative that you exercise every effort to complete each unit within the time shown on the schedule. Failure to do so will result in the assessment of liquidated damages in accordance with contract specifications.
>
> It is expected that you will have an accurate 2 week look ahead schedule at our Progress/QC meeting on March 22, 2001.[27] [App. 56]

As discussed previously, Landmark primarily utilized the Network Analysis Schedules for invoice billings rather than for management of the construction work.

<u>January - February 2001</u>

On January 2, 2001, Landmark increased its jobsite work force by over 40%, compared to the level in mid-December. [App. 47] Throughout January, Landmark continued to make progress on construction work in the units that were available. [App. 51] Despite that progress, Landmark did not include billings in its sixth or seventh invoices for any base contract construction work completed between November 20, 2000, and January 20, 2001. [App. 155, 157]

As discussed previously, the contract specified schedule requirements for certain construction milestone dates, including the start of construction on the housing units: it specified that the schedule show this activity starting 270 days after the Notice to Proceed, on January 21, 2001. [App. 20, p. 16] By that date, which was specified in the contract for the <u>start</u> of construction, Landmark had completed all of the site work, substantially completed renovation of one unit on Baker Court, partially completed renovation of three other units on Baker Court, and partially completed construction work on 49 other units. [App. 45, 51] Thus, by January 21, 2001, Landmark had made substantial progress and was several months ahead of the baseline schedule. In a letter to Landmark, the Government wrote that it was "delighted" with Landmark's efforts to finish the first unit on Baker Court and stated:

> Not only [were] the quarters completed under [an] extremely tight schedule, but the high quality of workmanship directly reflects the attention to detail by those involved. On behalf of our Navy Team, please accept my appreciation for your firm's commendable performance and exceptional cooperation through this portion of the project.[28] [App. 49]

---

[27] Government letter to Landmark, dated March 14, 2001.
[28] Government letter to Landmark, dated January 4, 2001.



EXHIBIT 5
PAGE 18 OF 30

But despite this substantial progress, Landmark was falling behind in its payments to vendors and suppliers and as a result, the Government withheld payment from Landmark for its seventh invoice, dated January 20, 2001. [App. 50] In a February 9, 2001 letter responding to the Government, Landmark stated that it had renegotiated payment terms with its vendors and that its aggressive schedule for completion of the remaining units would generate the cash flow needed to close past due accounts. [App. 53] As of the date of that letter, Landmark had more than 88 weeks left before the contract completion date to finish the remaining 159 units (which was only slightly less than baseline schedule duration of approximately 91 weeks to finish all 160 units). Landmark finished two of the units on Baker Court during February 2001, and the Government subsequently resumed payments to Landmark with its eighth invoice, which was dated February 20, 2001, and paid on March 8, 2001. [App. 158]

On February 2, 2001, the Government signed Contract Modification A00009, which added sliding glass doors to 96 units. [App. 9] As discussed previously, the Government had authorized Landmark to proceed with this work in November 2000, at which time Landmark started purchasing and installing the glass doors. [App. 40] The Government had also been discussing the possibility of adding a significant amount of work to the contract since October 31, 2000, when it requested a proposal from Landmark for the renovation of 21 additional housing units at the FAF Maylor Housing area.[29] [App. 42] In that request, the Government stated: "If additional time is required, please contact the undersigned . . ." [30] Landmark did not request any additional time to complete the work, and on February 27, 2001, both parties signed Contract Modification A00010, which added the 21 FAF units to the base contract work. [App. 10] On that same day, however, Landmark submitted a revised Network Analysis Schedule, which extended Landmark's planned construction duration by approximately five months. Landmark had previously planned to finish the base contract construction work five months early. [App. 39] Landmark's revised project schedule (Submittal 7C, dated February 27, 2001) showed completion of the construction work in the last base contract work area on October 15, 2002, approximately one week before the contract completion date. [App. 54]

On February 27, 2001, the date Contract Modification A00010 was signed, almost 20 months remained before the contract completion date, October 23, 2002. Landmark was required to finish the remainder of the base contract work, 158 units, during that 20 month period. Landmark was still on schedule, however, because the baseline schedule had planned for the completion of 160 units during a 21 month period (January 2001 through October 2002). Contract Modification A00010 added only 21 FAF units to the base contract work. Thus, Landmark had almost 20 months remaining to finish 21 additional units, which required the completion of slightly more than one additional unit per month over the base contract work.

---

[29] According to project personnel, the "FAF" acronym stands for "Funded after Fifties" and refers to the housing area immediately adjacent to the 160 units included in the base contract.
[30] Government letter to Landmark, dated October 31, 2000.



EXHIBIT 6
PAGE 19 OF 30

March - June 21, 2001

Landmark completed renovation work on three units during March 2001, and four more during April 2001.[31] [App. 57] Landmark then increased its rate of progress by completing six units during May 2001, for a cumulative total of 16 units completed. [App. 58] Finally, Landmark completed six more units during June 2001, for a cumulative total of 22 units completed. [App. 59] Despite this progress, however, Landmark's financial difficulties had caused it to fall behind schedule during this period. The baseline schedule planned for completion of Work Area 1 (16 units) by March 25, 2001, as shown by Table 2. Landmark actually completed the first 16 units two months late, on May 24, 2001. [App. 58] Landmark was able to recover some progress on the schedule during June, however, and it was approximately 1.4 months behind schedule on June 21, 2001, when its personnel were furloughed and its progress essentially stopped.[32] [App. 60, 61]

Thus, Landmark experienced an actual schedule delay of 1.4 months, which is calculated by measuring its actual progress against the baseline schedule. While it is possible to compare Landmark's progress to various other revised schedules, those comparisons will not provide an accurate measurement of delay. In order to accurately measure the amount of contract schedule delay, Landmark's progress must be measured against the baseline schedule, as discussed in Section II.A of this report. In the months after Landmark's personnel were furloughed, several different methods were used to measure delay, but all of these methods yielded different results. For example, the day after the furlough, a Government letter stated that Landmark was two weeks behind schedule. [App. 62] Three weeks later, the Government's Cure Notice stated that Landmark was at least three weeks behind schedule. [App. 64] Three weeks after that, an internal Government report stated that Landmark was approximately six weeks behind. [App. 70] Two weeks later, an internal Government analysis stated that Landmark was 16 weeks behind. [App. 73] Obviously, different measurement techniques will yield different results, but none of the examples mentioned here measure the actual contract schedule delay. Our analysis measured the actual contract schedule delay and determined it to be 42 days (1.4 months or six weeks).

Landmark's final invoice (number 13) was dated June 20, 2001, and billed a total of $278,647, but it was not paid by the Government, at the Request of the Surety. [App. 69, 163] In this invoice, Landmark billed $162,433 for six line items in the Unit Construction category, which were the units discussed above that were completed during June 2001. Landmark's previous invoice (number 12) was dated May 21, 2001, and billed a total of $283,594. [App. 162] Some of the specific line items shown on invoice number 12 were billed at a higher percentage of completion than the actual amount completed in the field. Some other partially completed construction activities were billed at a lower percentage of completion than the actual amount completed in the field. For example, demolition work, garage concrete and framing work, vinyl siding installation, mechanical and electrical work, insulation and drywall work, window and door installation, and interior finish work, were not shown as specific line items on the cost-

---

[31] Although construction work on two of the units was completed during April, they were not inspected until May 1, 2001.

[32] In order to complete the 14 units in Work Area 2 in accordance with the baseline schedule, they needed to be inspected between May 2 and May 24, 2001, at a rate of four per week. Thus, in order to meet the baseline schedule, a total of 22 units needed to be completed by May 10, 2001. Landmark personnel were furloughed on June 21, 2001, which was 42 days later (approximately 1.4 months).

EXHIBIT 6
PAGE 20 OF 30

loaded schedule, so Landmark had not yet billed for them. Landmark's total estimated cost for those unbilled partially completed activities, together with the unpaid $162,433 for the six completed units discussed above, was far greater than the amount billed at a higher percentage of completion than actually completed in the field.

### *II.C.2 Default and Takeover Period*

June 22, 2001 - November 20, 2001

After Landmark's personnel were furloughed on June 21, 2001, the Government sent a letter to Landmark the following day, which stated: "You are required to respond appropriately with your schedule and plan to improve progress by no later than July 2, 2001." [33] [App. 62] Landmark responded with a letter dated July 4, 2001, that requested another week to present a plan for the Government's review. [App. 63] Seven days later, on July 11, 2001, the Government sent a Cure Notice that provided notification to Landmark "that the Government considers your failure to diligently prosecute the work a condition that is endangering performance of the contract. Therefore, unless this condition is cured within ten (10) days of receipt of this notice, the Government may terminate for default . . ." [34] [App. 64] Landmark received the Cure Notice on July 16, 2001, and the Government began preparations for a possible termination for default decision shortly after Landmark's required response date of July 26, 2001. [App. 64, 65] The Government actually received the response on July 23, 2001, which stated that Landmark voluntarily abandoned the contract. [App. 67]

In a July 25, 2001 letter to the Government, the Surety stated:

> Owing to the unique problems and issues that exist in contract default situations, it will take some time for this takeover process to be completed and for meaningful construction activities to resume. Please be assured, however, that the Surety is aware of the completion date for the Project and the liquidated damages provision in the contract, and is attempting to proceed as quickly as possible.[35] [App. 68]

On August 2, 2001, ten days after receipt of Landmark's voluntary abandonment, the Government issued a Final Decision of the Contracting Officer that terminated Landmark's contract for default, and sent a copy to the Surety the same day. [App. 72] In its letter to the Surety, the Government provided a draft copy of a Takeover Agreement and requested that the Surety advise of its intentions regarding completion of the contract by August 14, 2001. [App. 72] According to a Government e-mail, the Surety expressed concerns with some of the language in the proposed agreement in mid-August 2001 and in response, the Government forwarded a revised copy to the Surety on September 6, 2001. [App. 75] The Surety responded five weeks later, on October 12, 2001, with revisions to the proposed agreement that were "fairly extensive and substantive" according to a Government e-mail to the Surety.[36] [App. 75] The Government received the

[33] Government letter to Landmark dated June 22, 2001.
[34] Government letter to Landmark dated July 11, 2001.
[35] Surety letter to the Government, dated July 25, 2001.
[36] Government e-mail to the Surety dated October 16, 2001.

Surety's proposed revisions on October 15, 2001, but found some of the Surety's changes to be unacceptable. [App. 75, 76] The Government coordinated internally in order to review the proposed agreement, and forwarded a revised version to the Surety two weeks later, on October 30, 2001. [App. 76, 77] The Surety responded one week later, on November 8, 2001, with minor changes, and the Government forwarded a revised copy to the Surety the same day. [App. 79, 80] The Surety and Atherton signed the Takeover Agreement, and returned it to the Government almost two weeks later, on November 20, 2001. [App. 81]

In summary, Landmark voluntarily abandoned the contract one month after its personnel were furloughed, and the Government terminated the contract for default ten days after receipt of Landmark's abandonment letter. The Surety's revisions to the proposed Takeover Agreement and its signatures on the final document required a total of ten weeks, and the Government's revisions to it required five weeks. Since no schedule progress was made during this period, the total delay to the project schedule was 152 days (5.0 months), from June 22 through November 20, 2001.

### *II.C.3 Atherton Performance Period*

November 21 - November 27, 2001

In its proposal to the Surety, dated September 5, 2001, Atherton offered a schedule of 572 days (18.8 months) for completion of the project. [App. 74] It proposed that construction would begin 31 days after mobilization, and that construction would be completed in 541 days. Atherton planned to complete construction of its first housing unit four months after mobilization, and complete the remaining 159 units in 449 days (14.8 months). On November 20, 2001, Atherton and the Surety executed the Completion Contract, which incorporated the proposed 572 day duration for completion of the project. [App. 83]

But Atherton's proposed schedule already had a delay built into it at the time of the Takeover Agreement, because its overall planned duration was longer than the amount of time remaining in Landmark's contract at the time it furloughed its personnel on June 21, 2001. [App. 60] On that date, there were 16.1 months remaining in Landmark's contract, but Atherton proposed a schedule of 18.8 months for completion of the project. [App. 74] As a result, even if Atherton were to complete its work in exactly 572 days, the overall project would still be delayed by 1.7 months. But Atherton actually completed its work earlier than planned, so the overall project delay was less than 1.7 months during its contract performance, which will be discussed in the following subsections of this report.

On November 28, 2001, Atherton obtained payment and performance bonds for this project, and the Surety issued a Notice to Proceed to Atherton the same day. [App. 86, 87] This was eight days after the Takeover Agreement was signed and no schedule progress was made prior to the date of the Notice to Proceed. [App. 82] Atherton's calculation of the 572 day Completion Contract duration included the date of the Notice to Proceed as a work day, so the total delay during this period was 7 days (0.2 months). [App. 87]



EXHIBIT 6
PAGE 22 OF 30

November 28, 2001 - March 2002

On the date of the Takeover Agreement, Atherton was already working on another nearby project at Naval Air Station Whidbey Island. For the next several months, the Atherton Project Manager on this project was also managing the other Whidbey Island project, as well as another former Landmark project for the same Surety at Bangor, Washington. [App. 94] Throughout November and December 2001, Atherton's daily reports indicate that the only activities performed were administration/project management, site clean up, and lawn mowing. [App. 84] Atherton's certified payrolls indicate that December 26, 2001, was the first date any work was performed on the project by the Project Superintendent or an hourly worker. [App. 90]

On January 18, 2002, the Surety's consultant traveled to the project site and discussed the status of the work with Atherton, then discussed the status with the Government the following week. According to the consultant's record of the conversation, the Government "was concerned with the overall slow pace of the work." [37] In the same document, the Surety's consultant also stated his opinion that Atherton's progress to date had been slow. [App. 94]

Atherton also had problems related to slow progress during this period on its other project at Bangor, Washington. Atherton's bonds on that project had been issued on the same day as this one, November 28, 2001. [App. 86, 88] On the Bangor project, the Government had approved Atherton's pre-construction submittals by February 19, 2002. In a letter dated March 5, 2002, however, the Government stated: "Since that time, we do not feel that the manpower you have working on the unfinished units constitutes a full-time working crew. . . Without an increase in manpower on the jobsite, we do not feel you will meet your schedule completion date of 30 SEP 2002." [38] [App. 109]

Despite its slow initial progress on this project, however, Atherton was able to complete its first unit on March 27, 2002, which was one day earlier than the four month duration (after the start of mobilization) in its planned schedule. [App. 74, 118] Thus, it appears that Atherton had built into its planned schedule an adequate amount of time for the slow progress it made during this period. Two other issues that occurred during this period will be addressed: (1) Electrical Issues and (2) Asbestos Abatement Plan. Since the contract modification addressing the electrical issues was signed in 2003, the two issues will be discussed separately in the following two subsections of this report.

Electrical Issues

Atherton has claimed that electrical issues delayed its work during early 2001, but Atherton did not sign a subcontract with its electrical subcontractor on this project, Bronco Electric, until January 15, 2002. [App. 91] Bronco Electric did not start work on the project until two weeks later, on January 28, 2002. [App. 93] Three days later, at a meeting on January 31, 2002,

---

[37] Global Construction Services, Inc. File Memo, dated January 30, 2002.
[38] Government letter to Atherton, dated March 5, 2002, re: Naval Submarine Base Bangor, Silverdale, WA.



EXHIBIT 6
PAGE 23 OF 30

Atherton discussed with the Government the substandard electrical work it had encountered in the units. [App. 92] If Atherton had started the electrical work during 2001 (31 days after the Surety's Notice to Proceed), at the time it had planned to start construction in its proposal schedule, then it would have discovered the electrical issues approximately one month earlier.

Atherton signed the Takeover Agreement on November 20, 2001, but did not notify the Government about the electrical issues until 2.4 months later, on January 31, 2002. [App. 82] The Government met with Atherton to look at the electrical issues in the field on the same day. [App. 96] The electrical work in question had been installed by a previous contractor approximately six years earlier. [App. 103] According to the Government's handwritten notes from the January 31 meeting, Atherton was "instructed to install per contract." [39] [App. 92] At a meeting the following week, on February 7, 2002, the Government's handwritten notes indicated that it disagreed with Atherton's position that "there are numerous electrical code violations in the homes." [40] [App. 95] At that meeting, Atherton requested that the Government look at the electrical issues in the field. [App. 100] On multiple occasions throughout the following week, the Government discussed electrical issues with Atherton and then several Government representatives met with Atherton in the field on February 14, 2002. [App. 101, 104] Several more meetings took place the following week, and in a meeting on February 21, 2002, the Government's handwritten notes indicated that it discussed electrical issues extensively with Atherton. [App. 102, 103]

In response to Atherton's requests, the Government requested additional funding for the electrical issues on February 28, 2002. [App. 106] Then, on March 1, 2002, Atherton notified the Government in writing that "since our QC Meeting of January 31, 2002 ACI has been in a project delay. Granted, work other than electrical has been accomplished and continues to proceed. However, since all tasks in a repetitious housing project are contingent on a predecessor, the delay is viewed as a total project delay." [41] [App. 108] The Government received additional funding for the electrical issues on March 13, 2002, and requested a cost proposal from Atherton the same day. [App. 107, 113] In its request, the Government stated:

> If you feel additional contract time will be required to accomplish the changed work, your proposal should contain a substantiated time extension request. This request for additional time must specifically identify what portions of the work, trades, etc., will be affected and demonstrate the impact of the proposed changed work on the current contract completion date.[42] [App. 113]

Atherton met with the Government the following day, March 14, 2002, to discuss the cost proposal. [App. 114] Atherton later stated that it was able to resume electrical work on March 18, 2002. [App. 128] Atherton's daily reports, however, indicated that electrical work was performed during both the week before and the week after March 18, 2002. [App. 110, 111] Atherton submitted its proposal on March 19, 2002, but did not request any additional time to accomplish the changed work. [App. 115, 119] In a meeting on March 29, 2002, Atherton and

---

[39] CQC Meeting Minutes, No. 30, dated January 24, 2002, with handwritten notes dated January 31, 2002.
[40] CQC Meeting Minutes, No. 31, dated January 31, 2002, with handwritten notes dated February 7, 2002.
[41] Atherton letter to the Government, dated March 1, 2002.
[42] Government letter to Atherton, dated March 13, 2002.



EXHIBIT 6
PAGE 24 OF 30

the Government negotiated and agreed to a price for the cost proposal, but that cost proposal did not include a request for any additional time. [App. 120] In a timeline of events related to this issue, the Government stated: "Last question of the meeting was is there time. ACI (J Noel) stated that he assumed not but would check." [43] [App. 97]

Ten days later, during a telephone call on April 8, 2002, Atherton discussed a time extension for the proposed electrical changes, according to a Government e-mail that documented the call. [App. 124] Three days later, on April 11, 2002, the Government sent a letter to Atherton in which it again requested a substantiated time request and repeated most of the identical language from its previous request, dated March 13, 2002. [App. 113, 125] In response, Atherton wrote a letter on April 19, 2002, which requested a 46 day time extension and included a two-week look-ahead schedule and a project schedule as backup for the request. [App. 128] Rather than illustrating an electrical delay as Atherton said they did, however, the two schedules actually showed just the opposite.

Atherton's two-week look-ahead schedule (dated April 19, 2002) actually showed that electrical progress had been achieved throughout the time period of Atherton's claimed delay. For example, it showed that rough electric work was completed in unit 1303 on February 5, 2002, and was started in units 1236 and 1240 on the same day. It also showed that rough electric work was completed in both those units on February 12, 2002, and was completed in unit 1228 on March 12, 2002. [App. 128] According to a Government status summary, all four of those units (1228, 1236, 1240, and 1303) went through their rough electrical inspections between February 5 and March 12, 2002. [App. 126] Atherton's two-week look-ahead schedule also showed that rough electric work had previously been completed in unit 1302, and Atherton's daily reports indicated that it went through rough electrical inspection on February 5, 2002. [App. 99, 128] As these examples show, progress was made on electrical work throughout the period of Atherton's claimed delay.

Atherton's project schedule (with a run date of April 19, 2002) also showed that progress had been achieved on the project throughout the time period of Atherton's claimed delay. In its April 19, 2002 letter, Atherton stated that this schedule showed "the current completion date as September 13, [2003], 85 calendar days later than the original completion date of June 20, 2003." [44] [App. 128] (Atherton's approved project schedule had previously indicated that June 20, 2003, was the planned date for the "End of project" milestone.) [App. 78] The project schedule that Atherton labeled "MP04" in its April 19, 2002 letter was actually a renamed version of the monthly project schedule update labeled "MP03" that Atherton had previously submitted to the Government, with a data date of April 3, 2002. [App. 121] Atherton's schedule contained a glaring error, however, that rendered its calculated completion date completely inaccurate.[45] We corrected that one error and recalculated the schedule, which then showed a

[43] Government PC 31 Timeline, entry for March 29, 2002.

[44] Atherton letter to the Government, dated April 19, 2002, referring to the early finish of the "Demobilize" activity in the attached project schedule.

[45] Atherton's monthly schedule update labeled "MP03" erroneously used a 67 day remaining duration for an "Abatement / demolition" activity with an original duration of only 5 days.

completion date of June 15, 2003, five days earlier than Atherton's original completion date.[46] [App. 122] Thus, Atherton's project schedule actually showed that progress had been achieved on the project throughout the time period of Atherton's claimed delay.

In response to Atherton's April 19, 2002 letter requesting a time extension, the Government sent Atherton a letter on June 4, 2002, which stated that Atherton had failed to demonstrate the impact of the proposed changed work on the project completion date. [App. 131] The Government's letter also requested a proposed revised project schedule in accordance with the contract specifications for Network Analysis Schedules, which stated:

> When a contract modification to the work is required, submit proposed revisions to the network reflecting the impact. Submit the proposed network revisions with the cost proposal for each proposed change.[47] [App. 21]

The Government did not receive a response from Atherton to its June 4, 2002 letter, so it repeated its request in a letter dated September 16, 2002. [App. 134] Atherton responded by submitting two schedules via e-mail on October 21, 2002. [App. 136] The Government analyzed those two schedules and responded in a letter on November 5, 2002, in which it stated that Atherton had not substantiated its request for additional time. The Government's letter also stated its position that Atherton's original schedule had sufficient float to prevent the electrical issues from impacting the June 22, 2003 completion date specified by Atherton's Completion Contract. [App. 83, 136]

Neither of the two schedules submitted by Atherton on October 21, 2002, supported its position that the electrical issues caused a project delay. Both of the schedules contained erroneous information, which affected the calculation of the critical path. When we corrected that erroneous information, the schedules actually showed that abatement work was on the critical path as a predecessor to the electrical work. Our analysis showed that the Asbestos Abatement Plan delayed the start of Atherton's abatement work, which will be discussed in more detail in the next subsection of this report. Our analysis also showed that the Asbestos Abatement Plan delay started before, and ended after, the time period of Atherton's claimed electrical delay. Thus, the electrical issues did not delay the critical path during the time period claimed by Atherton, between January 31 and March 18, 2002.

Several months later, in a letter dated January 10, 2003, Atherton again claimed that the electrical issues had caused a 46 day project delay and included another schedule with its letter in order to substantiate the delay. [App. 138] The Government analyzed Atherton's schedule and again concluded that a time extension was not warranted for the electrical issues, which it conveyed to Atherton in a meeting on March 13, 2003. [App. 142] The schedule submitted by Atherton actually showed that abatement activities were critical path predecessors of the electrical work, just as its previous schedules had shown. [App. 140] Throughout the next several months, Atherton and the Government discussed a contract modification for the added electrical work.

[46] Referring to the early finish of the "Demobilize" activity in the project schedule, just as Atherton had in its April 19, 2002 letter to the Government.
[47] Contract Specification Section 01321, paragraph 1.6.



EXHIBIT B
PAGE 26 OF 30

[App. 145, 146, 147] On September 26, 2003, the Government unilaterally issued Contract Modification A00015. [App. 15]

As part of our analysis, we reviewed Bronco Electric's certified payrolls to determine whether it had reduced its workforce during the time period of Atherton's claimed delay. Our analysis revealed just the opposite, that Bronco Electric actually reduced its workforce after the claimed delay period. During its first seven weeks of work on the project, through March 17, 2002, Bronco Electric averaged 1.29 workers per day on the project.[48] [App. 98] During the seven weeks after March 18, 2002 (the date Atherton stated that it was able to resume electrical work), Bronco Electric averaged only 1.08 workers per day on the project, a 16 percent reduction in its workforce. Bronco Electric did not actually increase its workforce until its third seven week period on the project (starting on May 6, 2002), when it averaged 1.6 workers per day, a 48 percent increase over the previous period. In summary, our analysis concluded that the electrical issues did not delay the project's critical path during the time period claimed by Atherton, between January 31 and March 18, 2002.

Asbestos Abatement Plan

As discussed previously, the Takeover Agreement was dated November 20, 2001. [App. 82] It stated that the "provisions and clauses of the defaulted contract, and the plans and specifications, are incorporated into this Agreement and will be binding on the Completing Contractor." [49] The contract specifications required the submission and Government approval of an Asbestos Hazard Abatement Plan "prior to starting any asbestos work." [50] [App. 23] On November 27, 2001, the Government held an informal kickoff meeting with Atherton prior to restarting construction on the project. At that meeting, the Government reminded Atherton that submittal of the Asbestos Abatement Plan was required prior to starting work. [App. 85, 89]

Three months later, on February 25, 2002, Atherton submitted its Asbestos and Lead Abatement Plans for Government approval. [App. 105] On March 13, 2002, the Government disapproved Atherton's submittal, and listed five comments as reasons for its disapproval.[51] [App. 112] The Government also requested that Atherton submit supplemental information responding to the Government's comments. [App. 112] On March 20, 2002, Atherton resubmitted the plans with the supplemental information and the Government approved Atherton's resubmittal approximately two weeks later. [App. 116] Atherton began abatement work on March 21, 2002, the day after the resubmittal. [App. 117] Thus, the Asbestos Abatement Plan delay started before, and ended after, the time period of Atherton's claimed electrical delay (between January 31 and March 18, 2002).

---

48 Seven week periods were used in our analysis because that was the amount of time that Bronco Electric worked on the project prior to March 18, 2002. If our analysis used shorter time periods, it would yield even more dramatic results.

49 Takeover Agreement, dated November 20, 2001, paragraph 1.

50 Contract Specification Section 13281, paragraph 1.4.2.

51 The Government completed its review of Atherton's submittal within the contractually specified period, which was 20 working days, according to Contract Specification Section 01330, paragraph 1.3.4. [App. 22]



EXHIBIT 6
PAGE 27 OF 30

According to Atherton's project schedules, electrical work in each unit could not proceed until abatement work was completed in that unit. Our analysis showed that the Asbestos Abatement Plan delayed the start of Atherton's abatement work in all units until March 21, 2002. Before that date, the only units available for work were the ones in which abatement work had previously been completed by Landmark. If Atherton had submitted an acceptable Asbestos Abatement Plan immediately after the Surety's Notice to Proceed (November 28, 2001), then it could have started the abatement work during 2001, at the time it had planned to start construction in its proposed schedule. Instead, the abatement work did not begin until three months later, on March 21, 2002.

April 2002 - June 2003

Atherton's abatement work proceeded during March and early April 2002 in units that were available for work. At a meeting on April 18, 2002, Atherton requested that the Government consider making additional units available with the stipulation that the Government continue maintenance of the lawns. [App. 127] The Government refused Atherton's request, and abatement work stopped on April 22, 2002. [App. 129] At the same meeting, Atherton and the Government discussed the scope of work for the 21 additional FAF units, regarding the extent of drywall removal required by the contract.[52] [App. 127] Abatement work began again on May 13, 2002, and continued throughout the rest of the project, as units became available. [App. 129] Our analysis showed that Atherton's progress on this work was ahead of schedule and did not delay the critical path of the project.

On July 11, 2002, Atherton and the Government discussed underground air ducts in the 21 additional FAF units that contained asbestos and required a minor amount of additional abatement work. [App. 132] Discussions about this issue continued during the next two months, and the Government sent a contract modification to Atherton for its signature on September 10, 2002. [App. 133] Atherton requested a minor change to the address on the modification, and the Government sent a revised version to Atherton on September 16, 2002. [App. 141] Almost three months later, on January 10, 2003, Atherton sent a letter to the Government that returned the unsigned modification and requested a time extension. [App. 139] In its letter, Atherton stated that this issue caused a delay of 103 days to the 21 FAF units, but that: "ACI is of the opinion that a 28 calendar day time extension to the overall contract performance period is warranted." [53] [App. 139] The Government responded in a February 12, 2003 letter, which stated that it found no justification for the requested time extension. [App. 141] In a meeting on March 13, 2003, the Government repeated its position that a time extension was not warranted for this issue. [App. 142] Throughout the next several months, Atherton and the Government continued to discus a contract modification for this work. [App. 145, 146, 147] On September 26, 2003, the Government unilaterally issued Contract Modification A00015. [App. 15] Our analysis showed that Atherton's work related to this issue was performed ahead of schedule and did not delay the critical path of the project.

[52] The drywall in the 21 additional FAF units contained asbestos.
[53] Atherton letter to the Government, dated January 10, 2003.

In its proposed schedule, Atherton planned to complete all 159 units in its contract during 14.8 months, at an average rate of 10.7 units per month. [App. 74] That rate was substantially higher than the rate specified by Landmark's original contract schedule, which required the completion of 160 units in 21 months, an average of only 7.6 units per month. Even with the 21 additional FAF units, the required rate was still only 8.6 units per month. Thus, Atherton's proposed schedule for completion of the project was significantly more aggressive than Landmark's contract schedule. In its proposal to the Surety, Atherton stated: "We believe our proposed performance period is very aggressive yet realistic and obtainable." [54] [App. 74] During its work on the project, Atherton's rate of progress was good enough to allow it to do better than simply meeting its proposed schedule. Instead, Atherton actually beat its proposed schedule by more than two weeks. [App. 87, 146]

As discussed previously, Atherton completed its first unit on March 27, 2002, one day earlier than planned. [App. 118] Atherton fell slightly behind schedule the following month, however, completing only two units during April. [App. 123] Atherton's progress improved slightly in May, when five units were completed. [App. 130] Then during the next three months, Atherton increased its completion rate dramatically and averaged 10.3 units per month, nearly equal to its planned rate of 10.7 units per month. In fact, Atherton's average rate was 10.5 units per month over the next ten months (June 2002 through March 2003). In its final two full months on the project, April and May 2003, Atherton made up for its slow start by averaging 21 units per month. During the first week of June 2003, Atherton finished the last four units, more than two weeks ahead of its planned schedule. [App. 143, 144] Throughout the 14.3 months between completion of the first and last units, Atherton averaged 11.1 units per month. Thus, Atherton's actual rate of progress was slightly better than its planned rate of 10.7 units per month.

Atherton was on schedule when it completed its first unit on March 27, 2002. It began to fall behind in April 2002, and was approximately two months behind its planned schedule at the end of July 2002. Atherton recovered that delay one year later, during April and May 2003, and finished more than two weeks ahead of its planned schedule. But Atherton's planned schedule already had a delay built into it at the time of the Takeover Agreement, because its overall planned duration was longer than the amount of time remaining in Landmark's contract at the time of the default. So the net delay to the overall project schedule during Atherton's contract performance was 25 days (0.8 months).

Atherton has stated that it could have finished earlier than its actual substantial completion date (June 6, 2003). [App. 146, 147] An earlier completion date, however, would have required an even more aggressive schedule than the one originally proposed by Atherton, which was already significantly more aggressive than Landmark's contract schedule. While it is always possible to accelerate a schedule to some extent, that acceleration usually comes at a higher cost. According to a Government record of a telephone conversation on November 8, 2002, Atherton was aware that the schedule could have been accelerated and actually discussed that option with the Surety, but that option involved a high cost to the Surety. [App. 137] Instead, the Surety and Atherton agreed on Atherton's proposed schedule, and their agreement included a June 2003 completion

[54] Atherton letter to the Surety, dated September 5, 2001.

date. [App. 83, 87] Atherton actually beat that completion date, but still claimed that its progress was delayed by the Government. [App. 147]

In summary, Atherton would not commit to an earlier contract completion date without compensation from the Surety, but instead requested compensation from the Government by claiming that it could have finished even earlier than June 6, 2003, which was 18 days before the date to which it did commit (June 24, 2003). [App. 87, 147] But despite this early completion, Atherton delayed the overall project schedule because its planned schedule was longer than the time remaining in Landmark's contract at the time of the default. As a result, the net delay to the overall project schedule during the Atherton Performance Period was 32 days (1.0 month).

Richard C. Paullin
Contract Solutions LLC



EXHIBIT 6
PAGE 30 OF 30