IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1255C |
| v. | ) | (Judge Robert H. Hodges) |
| | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION
IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF WILEY WRIGHT

Pursuant to Rule 7.2 (c) of the Court of Federal Claims ("RCFC"), defendant, the United States, respectfully responds to the motion of plaintiff, Lumbermens Mutual Casualty Company (Lumbermens), to exclude the testimony of Wiley M. Wright, III. We rely upon this brief and the declaration of Wiley R. Wright, III, submitted herewith. Because the exclusion of the Government's expert witness in this matter is not legally or factually warranted, Lumbermens' motion should be denied.

## BACKGROUND

It is undisputed that the Department of the Navy entered into a contract with Landmark Construction Company ("Landmark") for the repair and renovation of military housing at the Naval Air Station, Whidbey Island, Oak Harbor, Washington, and that Lumbermens provided performance and payment bonds to Landmark. During Landmark's performance of the contract, the Navy paid Landmark based upon Landmark's network schedule analysis ("NAS"), and based upon Landmark's schedule of prices. Lumbermens contends that Landmark's NAS and schedule of prices did not meet the contract requirements, and that the contracting officer's approval of

Landmark's invoices based upon those contractual provisions, as a matter of fact resulted in the Navy overpaying Landmark, and that as a matter of law, supports a cause of action for impairment of suretyship. The Government, on the other hand, contends that as a matter of fact the Navy complied with those contractual provisions, and that as matter of law, because those contractual provisions were not included in the contract for the benefit of the surety, even if the Navy had breached those provisions, such breaches do not support a cause of action for impairment of suretyship.

Because the Government's motion to dismiss Lumbermens' cause of action premised upon impairment of suretyship was denied, Mr. Wright was asked to determine to what extent, if any, the Navy overpaid Landmark.

In its motion, Lumbermens asserts that the Court should summarily prohibit Mr. Wright, the Government's expert witness on damages, from testifying at the trial of this matter. According to Lumbermens, Mr. Wright used a method to calculate the extent of the Navy's overpayments that was both irrelevant and unreliable. Lumbermens' position is unsupported and unsupportable.

## DISCUSSION

### I. Lumbermens Has Failed To Demonstrate That The Exclusion Of Mr. Wright's Expert Testimony Is Warranted Under The Facts Of This Case

The granting of a motion in limine is not appropriate when the testimony of a proposed expert witness satisfies Federal Rule of Evidence (FRE) 702 and the standards set by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). As we demonstrate below,

Mr. Wright's testimony and opinions in this matter are admissible because they satisfy the requirements of FRE 702 and Daubert and Kumho Tire.

FRE 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court's decisions in Daubert and Kumho Tire require "judges to determine that scientific testimony," as well as technical or other specialized expert testimony, "offered under FRE 702 is both relevant and reliable." FRE 702, thus, imposes upon the Court a special "gatekeeping obligation" to prevent the introduction of certain expert testimony that is irrelevant or unreliable. Kumho Tire Co., 526 U.S. at 141. Further, the party proposing to introduce expert opinion testimony "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (citing Bourjaily v. United States, 483 U.S. 171 (1987)). Expert testimony must be both relevant and reliable. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002).

Rule 702 requires that evidence or testimony be relevant in order to assist the trier of fact to understand the evidence or to determine a fact in issue. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. As part of this relevance

inquiry, the Court must determine whether the proffered expert testimony is helpful to the trier of fact. See, e.g., Daubert, 509 U.S. at 591 (helpfulness goes primarily to relevance).

Besides being relevant, the proffered expert testimony must be deemed reliable. "To gauge reliability, the [trial] judge must" not only determine whether the expert is qualified in the relevant field, but must also determine "whether the methodology underlying the expert's conclusions is reliable." Mastersv. Heston Corp., 291 F.3d 985, 991 (7th Cir. 2002). FRE 702 expressly incorporates the requirements for admission of expert testimony established by the United States Supreme Court in Daubert and Kumho Tire. Pursuant to those decisions, proposed testimony must be supported by appropriate validation, that is, "good grounds," based on what is known. Daubert, 509 U.S. at 590, 593-94; see Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; Kumho Tire, 526 U.S. at 149-50. "The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific" or other "methodology of the kind traditionally used by experts in the field." Domingo v. T.K., M.D., 289 F.3d 600, 607 (9th Cir. 2002).

The Court in Daubert set forth the following, non-exclusive list of factors for lower courts to consider in determining whether an expert's opinion is reliable: (1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error when applied; and (4) whether the theory has been "generally accepted" in the scientific community. Daubert, 509 U.S. at 593-94. At bottom, "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result." Zenith Electronics Corp. v. WH-TV

Broadcasting Corp., 395 F.3d 416, 419 (7th Cir.), cert. denied, 545 U.S. 1140 ( 2005).

II. There Is No Basis Upon Which This Court Should Exclude Mr. Wright's Testimony Because Mr. Wright Used An Appropriate And Accepted Methodology

The linchpin of Lumbermens' motion is that Mr. Wright's opinions, based as they are upon a cost-to-cost methodology to calculate the amount by which the Navy overpaid Landmark, do not meet the relevancy and reliability tests set froth in FRE 702 and Daubert. Lumbermens is mistaken.

Lumbermens has not, and can not, dispute that Mr. Wright has the requisite educational background and experience to testify as an expert in this matter. Mr. Wright is a Certified Public Accountant with more than 25 years experience in the practice of public accounting, and construction and government consulting. See Declaration Of Wiley R. Wright, III, In Support Of Defendant's Opposition To Plaintiff's Motion In Limine To Exclude Expert Testimony Of Wiley Wright (Wright Decl.), ¶¶ 2, 4. Moreover, Mr. Wright has provided expert testimony, either in deposition or trial, on more than sixty different occasions, many of which were related to pricing and cost accounting issues arising under construction contract disputes, and has testified, as an expert, in proceedings before the United States Court of Federal Claims, the Federal Boards of Contract Appeals, in domestic and international arbitration and mediation proceedings, in Federal District courts, and various state courts and boards of contract appeals. Wright Decl. ¶¶ 6,7. On no occasion has Mr. Wright been found not competent to testify in his area of expertise; his testimony has never been excluded for any reason. Wright Decl. ¶ 7. There is also no dispute that that Mr. Wright's opinions are based upon a proper factual foundation to support his analysis, and that he has not ignored significant factors that may have contributed to

Lumbermens' losses.

As set forth in Mr. Wright's declaration, it is his expert opinion that the most appropriate and most accurate method to determine the percent complete of a construction project from a financial perspective is the cost-to-cost method of analysis. Wright Decl. ¶ 12. To determine the extent of the overpayments, if any, by the Navy to Landmark, Mr. Wright had to determine the percentage of completion of the contract requirements by Landmark at the time of termination. Mr. Wright decided that the most appropriate financial accounting methodology to determine the percentage of completion was a cost-to-cost analysis. Wright Decl. ¶ 10. In Mr. Wright's expert opinion, the cost-to-cost method is a preferred method of revenue recognition under generally accepted accounting principles for construction contractors. Id. That method is both relevant and reliable under the circumstances presented by this case. Id. While Mr. Wright acknowledges that the cost-to-cost is not the only method that could be used, it is his expert opinion that under the circumstances presented by this case the cost-to-cost methodology is the most appropriate methodology to be used. Another methodology involves the determination of the actual quantities of materials received as of the termination date, and the quantities of the materials actually utilized by Atherton in the performance of their takeover contract. However, in Mr. Wright's opinion, the available records were insufficient to perform that type of analysis. Wright Decl. ¶ 13.

## III. The Methodology Used By Mr. Wright Is Generally Accepted In The Relevant Accounting Community

Under the cost-to-cost method, the percent complete is determined by comparing the relative costs incurred by each contractor, stated as a percentage. Wright Decl. ¶ 14. For

example, if each contractor incurred $100 to perform a particular line item of work then the percent-complete for contractor 1 would be 50 percent ($100 as a percentage of the total cost of $200). Id.. The cost-to-cost method is not an estimate of the proportion of the project's financial burden carried by Landmark, as Lumbermens contends, but rather a generally recognized and accepted methodology for determining the percentage complete, and the appropriate amount of the schedule of prices amounts earned by Landmark. Wright Decl. ¶ 15. Mr. Wright's analysis and calculations were performed using this recognized methodology and was based upon actual objective cost data. Id.

Moreover, Mr. Wright's methodology is reliable given that it is recognized by an authoritative body in the field of of accounting, that is, the Generally Accepted Accounting Principles (GAAP) as promulgated by the American Institute of Certified Public Accountants. Wright Decl. ¶ 16. The American Institute of Certified Public Accountants (AICPA) is the national, professional organization for all Certified Public Accountants. Wright Decl. ¶ 17. Its mission is to provide members with the resources, information, and leadership that enable them to provide valuable services in the highest professional manner to benefit the public as well as employers and clients. Id. The AICPA establishes professional standards; assist members in continually improving their professional conduct, performance and expertise; and monitors such performance to enforce current standards and requirements. Id.

The AICPA's Accounting Standards Team, though its Accounting Standards Executive Committee, develops industry-specific guidance regarding financial accounting and reporting matters, including industry-specific authoritative guidance, such as Statement of Positions and Accounting and Auditing Guides. Id. AICPA's Statement of Position (SOP) 81-1 – Accounting

for Performance of Construction-Type and Certain Production-Type Contracts, provides that the percentage of completion method is the preferred method for revenue recognition when estimates of costs to complete and extent of completion towards completion of long-term contracts are reasonablely dependable. Wright Decl. ¶ 18. SOP 81-1, Accounting Research Bulletin No. 45 (ARBNo.45), Long Term Construction-Type contracts, issued by the AICPA Committee on Accounting Procedure in 1955, describes the two generally accepted methods of accounting for long term construction-type contracts for financial reporting purposes:

> The percentage-of-completion method recognizes income as work on a contract progresses: recognition of revenues and profits generally is related to costs incurred in providing the services required under the contract.
>
> The completed-contract method recognizes income only when the contract is completed, or substantially so, and all costs and related revenue are reported as deferred items in the balance sheet until that time.

SOP 81-1 provides further that:

> The committee believes that in general when estimates of costs to complete and extent of progress toward completion of long term contracts are reasonably dependable, the percentage-of-completion method is preferable. When lack of dependable estimates or inherent hazards cause forecasts to be doubtful, the completed contract method is preferable.

Wright Decl. ¶ 19.

Under SOP 81-1, there are alternative acceptable methods of of measuring extent of progress towards completion. Wright Decl. ¶ 20. They include the cost-to-cost method, variations of the cost-to-cost method, efforts expended methods, the units of delivery method, and the units-of-work performed method. Id. Those practices are intended to conform to ARB

No.45, paragraph 4 which states:

> The committee recommends that the recognized income (under the percentage-of-completion method) be that percentage of estimate total income, either:
>
> (a) that incurred costs to date bear to estimated total costs after giving effect to estimates of costs to complete based upon most recent information, or
>
> (b) that may be indicated by such other measure of progress toward completion as may be appropriate having due regard to work performed.

Id.

Given the lack of objective, complete, and accurate data as to the units of delivery or units of work performed, it is Mr. Wright's expert opinion that the cost-to-cost approach he used is the acceptable and preferred approach under SOP 81-1, the relevant authoritative guidance. Wright Decl. ¶ 21.

Generally Accepted Accounting Principles (GAAP) are the authoritative body of accounting standards for financial reporting in the United States. Wright Decl. ¶ 22. While these standards are applicable to the presentation of financial statements, the principles and methods contained in them are relevant to other non-financial statement uses, such as the measure of revenue earned for a fixed price construction contract in a non-financial statement context. Id. Given that the cost-to-cost methodology is commonly employed for determining the percentage of completion, and the related revenue earned under fixed price contracts, and its use is supported by the relevant literature and authoritative guidance, the methodology used by Mr. Wright is reliable. Wright Decl. ¶ 23.

The cost-to-cost methodology is also relevant under the facts of this case. The cost-to-

cost methodology is directly relevant to this case because the central issue from a financial standpoint is whether Landmark was overpaid for its work on the contract. Wright Decl. ¶ 24. The determination of any overpayments is based upon the revenue that Landmark should have earned for a particular line item, for example, doors and windows, versus the amount Landmark was actually paid by the Navy for that line item. Id. The percentage of completion method that Mr. Wright used in analyzing the extent of such overpayments objectively, and consistent with authoritative guidance, measures the work performed by Landmark, and calculates the amount Landmark should have been paid based upon this objective methodology. Wright Decl. ¶ 25. The amount that Landmark should have been paid is then compared to the amount that Landmark was actually paid, any difference being the amount that Landmark was overpaid or underpaid for the particular line item or activity being evaluated. Id. Moreover, the use of actual costs for both Landmark and Atherton, the completion contractor, in Mr. Wright's calculations using the cost-to-cost method eliminates the use of estimates, as well as the concerns discussed in SOP 81-1 concerning the reliability of estimates. Wright Decl. ¶ 26. Thus, Lumbermens' claims that Mr. Wright's expert testimony should be excluded is baseless because it is a sound, generally accepted accounting methodology which is based upon actual costs.

## IV. Mr. Wright's His Opinions Are Based Upon Upon Sufficient Facts And Data, And His Opinions Are Both Relevant And Reliable

Although Lumbermens characterizes the basis for its motion as the "speculative and unreliable" nature of the accounting method utilized by Mr. Wright, it is evident that Lumbermens motion is merely based upon its disagreement with Mr. Wright's opinions.

There is no dispute that the acquisition of the materials necessary to renovate the

160 housing units is a large component of the work required under this contract. Landmark was entitled to obtain payments from the Navy for these materials under the contract as they were procured. Wright Decl. ¶ 27. The cost-to-cost method measures the amount of materials that Landmark acquired as compared to the total materials requirements. Id. Based upon this objective data, Mr. Wright calculated the amount of revenue, that is, payments Landmark received under the contract, that Landmark should have received for the materials. Id. The determination of the material costs that Landmark incurred in relation to the total material cost, that is, the cost of materials procured compared to the total cost of those materials as identified in Landmark's schedule of prices, is important to the damages calculation in this case because of the manner in which Landmark billed for its material acquisitions. Wright Decl. ¶ 28. As Lumbermens acknowledges, Landmark separately included the required materials as separate line items in its schedule of prices, and not to the costs of renovating the individual housing units. Id. The contract provided that the Navy would make progress payments for these materials line items as the materials were acquired. Id. Accordingly, for the material line items, the question of the work accomplished for individual housing units is irrelevant to the determination of the amount of material acquired in relation to the total material requirements. Id. To measure this progress, that is, materials acquired, the cost-to-cost method under the percentage of completion is the best method of measurement. Id. Lumbermens' objections to Mr. Wright's use of that methodology is not only baseless, it is absurd.

For some of the items for which Lumbermens claims that Landmark was overpaid, it was not necessary for Mr. Wright to use the cost-to cost method of analysis. Yet, in apparent disregard of those portions of Mr. Wright's expert report, Lumbermens asks the Court to exclude

those opinions based solely upon its unsupported objection to the cost-to-cost methodology. Mr. Wright's opinions regarding Lumbermens' claims are especially relevant and reliable because he relies upon facts and varying accounting methodologies as appropriate. Wright Decl. ¶ 29.

For example, site-work is one of the activities for which Lumbermens contends that the Navy overpaid Landmark. Id. Mr. Wright is of the opinion that the $590,000 that Landmark included in its schedule of prices for sitework was reasonable because the $590,000 paid to Lloyd Enterprises for the site-work is the full amount of the subcontract between the parties. Wright Decl. ¶ 30. Based upon Lloyd's Certified Payroll reports, Lloyd spent a total of 947 hours on the project that includes 458 equipment hours. Id. Based upon Lloyd's Certified Payroll Reports, the effective rate for the sitework was $623 per hour, not the $2,000 per hour claimed by Lumbermens in its complaint. Id. An alternative, and more appropriate analysis of the amount paid to Lloyd, is determining the effective sitework cost per housing unit. Id. That amount is $3,687.50 ($590,000 divided by 160 units). Id. This unit cost rate was reasonable and should not have raised any issues or concerns by the Navy. Id. It is, therefore, Mr. Wright's expert opinion that Landmark was not overpaid for sitework. Id. Despite the fact that Mr. Wright did not rely upon the cost-to-cost method of analysis for this item on Landmark's schedule of prices, Lumbermens apparently seeks to exclude Mr. Wright's testimony in this regard without any bases whatsoever.

Another example of an activity for which Mr. Wright did not use the cost-to-cost method of analysis is the Navy's payment to Landmark for personnel costs. Wright Decl. ¶ 32. Lumbermens contends that the $378,936 the Navy paid Landmark for personnel was $291, 500

more than the amount to which Landmark was entitled, and constituted 52 percent of the amount indicated in Landmark's schedule of prices for this line item. Id. Mr. Wright is of the opinion that the Navy made no overpayment for this item. Id. The personnel line item in Landmark's schedule of prices, in the amount of $728,834, was budgeted separately from the per unit labor, and consists of field office overhead or general conditions labor. Id. In Mr. Wright's opinion, it is appropriate and consistent with industry practices to budget this type of labor separately from the labor incurred for building the units. Id. Furthermore, it is a generally recognized practice in the construction industry to treat general condition or field office type labor as a time variable costs. Thus, the contract will "earn" and invoice for these costs ratably over time. Id.

Moreover, given the nature of the personnel costs it would be inappropriate to recognize or "earn" these types of costs based upon the actual percent complete of the unit construction. Id. Mr. Wright's calculations of the credit for Landmarks' labor expenses are only for general conditions labor, which is based upon a generally recognized per diem method for time variable field office overhead costs. Id. This approach is clearly appropriate and reliable because Landmark spread its general condition labor costs over the project which had a fixed period of performance. Id. Mr. Wright, therefore, credited general conditions labor over that fixed duration. Id. This method is not only consistent with the generally recognized per diem method but also consistent with Landmark's incurrence of these costs. Id. Again, despite the fact that Mr. Wright did not rely upon the cost-to-cost method of analysis for this item on Landmark's schedule of prices, Lumbermens seeks to exclude Mr. Wright's testimony in this regard without any basis whatsoever.

For other activities for which Lumbermens claims that the Navy overpaid

Landmark, it was necessary for Mr. Wright to use the cost-to-cost method of analysis. Wright Decl. ¶ 31. For example, Lumbermens contends that the $458,640 paid to Landmark for asbestos and lead abatement work accounted for 52 percent of the amount indicated in Landmark's schedule of prices for that work, while Landmark had only completed abatement in 34 percent of the housing units, thereby overpaying Landmark $158,760 for work it had not performed. Id. To determine the amount of the overpayment, if any, Mr. Wright used the cost-to-cost method. Id. Mr. Wright's analysis is as follows:

| | 180 Units | Less 21 Units | 159 Units |
|---|---|---|---|
| Landmark Construction | $242,509 | | $242,509 |
| Atherton Construction | $330,777 | 66,883 | $263,894 |
| Subtotal | $573,286 | | $506,403 |
| Average Cost Per Unit | $ 3,185 | | |
| Landmark Schedule of Value Amount | $882,000 | | |
| Amounts Paid to Landmark | $458,640 | | |
| Landmark's Earned Value | $422,377 | | |
| Overpayment | $ 36,263 | | |

Thus, it is Mr. Wright's expert opinion that the Navy overpaid Landmark $36,263 for this item, not the $158,760 claimed by Lumbermens. Id.

For some of the activities for which Lumbermens claims that the Navy overpaid Landmark, Mr. Wright's estimates of the overpayment, in fact, are greater than the amount claimed by Lumbermens. Wright Decl. ¶ 33. For example, Mr. Wright's cost-to-cost calculation for doors and windows is as follows:

| | 180 Units | Less 21 Units | 159 Units | Percent Complete |
|---|---|---|---|---|
| Landmark Construction | $ 485,784 | | $ 485,784 | 42% |
| Atherton Construction | $ 825,571 | $152,991 | $ 672,991 | 58% |
| Subtotal | $1,311,355 | | $1,158,364 | 100% |
| Average Cost Per Unit | $ 7,285 | | | |

| | | | | |
|---|---|---|---|---|
| Landmark Schedule of Value Amount | $500,000 | | | |
| Amounts Paid to Landmark | $375,000 | | | |
| Landmark's Earned Value | $209,685 | | | |
| Overpayment | $165,315 | | | |

Based upon the cost-to-cost method, it is Mr. Wright's expert opinion that the maximum overpayment for doors and windows is $165,315, not the $131,775 sought in the complaint. Id.

Mr. Wright has also rendered opinions in his expert report that do not involve the cost analysis method, the use of which has been described above, and do not involve the analysis of line items in Landmark's schedule of prices. Wright Decl. ¶ 34. For example, Lumbermens contends that it incurred damages in excess of $4 million under its performance bond, and more than $550,000 under its payment bond. Id. It is Mr. Wright's expert opinion that Lumbermens' claim is duplicative of the separate claims for materials, personnel, and subcontract costs. Id. Furthermore, Lumbermens claim is a total cost claim in which Lumbermens seeks all of its payments for the project. Id. In addition to being duplicative, the amounts for these two claims include items that are unrelated to the issues in the complaint, such as the price differences between Landmark and Atherton for performing the original scope of work. Id. Lumbermens offers no rationale whatsoever for its contention that Lumbermens was required to pay proportionately more to Atherton to complete the work than the Navy was contractually required to pay Landmark. These amounts also fail to consider the value of materials and services received by Atherton and Lumbermens for the payments made to suppliers and subcontractors under the payment bond. Id. Finally, Lumbermens' has failed to explain or document the bases for the varying amounts it is claiming. Id.

Another example of an opinion that Mr. Wright has rendered that does not rely upon the cost-to-cost method of analysis is in connection with Lumbermens' contention that as a result of

the Navy's failure to demand from Landmark a Network Analysis Schedule that complied with the contract requirements, Lumbermens has been damaged by at least $2,000,000. Wright Decl. ¶ 35. Mr. Wright is of the expert opinion that the bases for this amount is neither explained nor supported. Id. Furthermore, this amount is duplicative of the discreet claims for the material, personnel and subcontract amounts. Id.

In this case, Landmark, during the last six months it performed work under the contract, stopped paying some of its vendors and suppliers. Wright Decl. ¶ 36. Landmark's failure to pay its vendors lead to the Landmark employees on site. and responsible for performance, to abandon the project. Id. Landmark's failure in this regard is not relevant to the percentage of completion methodology. Id. The percentage of completion methodology is based upon a measurement of the acquisition of materials by Landmark and Atherton as compared to the total material requirements. Id. To the extent Landmark acquired the materials for the benefit of the project, and recorded the cost of the material acquisition (Landmarks acquisition and receipt of the materials is a prerequisite for the payment of an invoice(s) under the payment bond by Lumbermens), then these costs must be included in the percentage of completion calculation. Id. Thus, it is Mr. Wright's expert opinion that Lumbermens is not entitled to recover the monies it paid to the unpaid vendors and suppliers under the payment bond. Id.

Finally, it is Mr. Wright's expert opinion that Lumbermens use of the percentage of completion methodology is flawed, because Lumbermens used payments rather than incurred costs. Wright Decl. ¶ 37. GAAP relies upon the incurred costs, not paid amounts (accrual basis of accounting versus the cash basis). Id. Therefore, Lumbermens is incorrect to use only payments to measure costs incurred and the resultant progress. Id.

The ordering of materials by Landmark would not result in the recognition of costs. In the accrual basis of accounting, costs are only recognized upon receipt of ordered materials which, at that time, are to be included in the calculation of percentage of completion. Wright Decl. ¶ 38. Clearly, both the paid and unpaid amounts are relevant to the calculation since Landmark received the materials for the unpaid invoices. Id. In fact, Lumbermens would not have made payment under the payment bond for materials not received. Id.

Mr. Wright also disputes Lumbermens' assertion that looking at the percentage completion of the housing units is comparable to Mr. Wright's cost-to-cost percentage of completion calculation for material items. Wright Decl. ¶ 39. At the time Landmark was terminated 12 percent of the housing units in the project were complete, and 15 percent complete if work in partially completed units is counted. Id. In Mr. Wright's opinion, the 12 percent and 15 percent figures that Lumbermens refers to are the estimated percent complete figures for the actual housing units without regard to the material cost used for the construction of the units. Id. Lumbermens is comparing two different calculations and trying to give the impression that the results of one is applicable to the other. Id. If Landmark, at the time of termination, had already acquired 100 percent of the materials needed for the renovation of all of the housing units, but had not started any actual renovation, Lumbermens' position would necessarily have to be that the percentage complete was zero and, therefore, Landmark should have been paid nothing for the materials it had acquired for the project. Id. Not only is such a position patently ludicrous, the contract provided that Landmark was entitled to submit progress payment invoices for, and be paid, for materials it acquired during the performance of the contract. Id. Moreover, if Landmark had not been able to receive payments for materials as they were acquired, Landmark would in effect have to finance the project, and

consequently not be in a position to purchase materials in quantity, with the net effect of hiving to bid a higher amount, resulting in a greater cost to the Government. Id.

It is also Mr. Wright's opinion that Lumbermens fails to distinguish between the overall percentage of completion for the housing units and the percentage of completion for the individual material line items for which it seeks as its damages. Wright Decl. ¶ 40. As previously mentioned, the overall percentage of completion for the individual housing units (12 percent or 15 percent including units with partial completion) does not take into account the percent complete for the materials acquisitions. Id. The central issue in this case is whether Landmark was overpaid for material acquisitions, not for the individual housing units. Lumbermens is incorrectly applying the results of one calculation to a completely different set of data. Id.

Interestingly, Lumbermens presents no analysis and reflects no credits to its calculations for the individual housing units that were partially completed at termination but for which no payments had been made to Landmark. Wright Decl. ¶ 41. Lumbermens also presents no analysis and reflects no credits in its calculations for other Schedule of Prices line items for which Landmark was underpaid. Id. By excluding these credits, Lumbermens further overstates its damages. Id.

It is Mr. Wright's expert opinion that the damages sought by Lumbermens are premised upon a total cost approach. Wright Decl. ¶ 42. Specifically, Lumbermens is seeking the amount that Lumbermens paid Atherton over the contract balance that remained at the time Landmark was terminated, plus the payment bond payments. Id. Lumbermens, however, has failed to specifically identify its damages to the individual causes of action, and has failed to exclude from its damage amounts costs that are unrelated to the issues in this case. Id. It is Mr. Wright's expert opinion that his actual cost method results in a more accurate measure of damages. Id.

All of Mr. Wright's calculations, as opposed to Lumbermens', are based upon the actual cost data for both Landmark and Atherton. Wright Decl. ¶ 43. To the extent that the Atherton costs include items that are not the fault of the Navy, it is Mr. Wright's opinion that his percent complete calculations overstate the maximum range of the damages.

In Mr. Wright's opinion, the relevancy and reliability of the opinions he has rendered in this case are as well supported as in every other case in which he has been involved. Wright Decl. ¶ 44. Moreover, all of the opinions contained in Mr. Wright's expert report have been peer reviewed within R&M, and are therefore not only his opinions but those of his fellow shareholders, who on a combined basis have over one hundred years of experience in providing similar services in the construction and damages practice area. Wright Decl. ¶ 45. Mr. Wright's fellow shareholders have also been qualified as expert witnesses in a wide variety of forums and have provided expert testimony in over one hundred and fifty matters.

In summary, it is Mr. Wright's expert opinion that Lumbermens' alleged damages are incorrectly calculated and overstated; that the majority of Lumbermens' alleged damages are duplicative of each other; that Lumbermens' alleged damages are in effect a total cost claim; that Lumbermens has failed to properly apply the total cost approach; that the total cost approach is an inappropriate method for computing damages in these circumstances. Wright Decl. ¶ 46. It is also Mr. Wright's expert opinion that the proper measure of any overpayments should be computed by deducting the amounts paid to Landmark for each of the schedule of prices line items at issue from the earned revenue for the work actually performed as of Landmark's termination; that in order to properly determine the earned revenue of the work actually performed by Landmark as of the termination date, the percentage of completion method should be used; and that the majority of the

line items in dispute, the cost-to-cost method is the appropriate methodology to use to determine the amount, if any, of the overpayments made to Landmark. Wright Decl. ¶ 47. As we have demonstrated above, all of Mr. Wright's opinions are relevant and reliable and, therefore, there is no legal or factual basis upon which the exclusion of such evidence would be warranted. Moreover, for the numerous opinions that Mr. Wright has rendered that do not rely upon a cost-to-cost method of analysis, Lumbermens has failed to even attempt to demonstrate that such opinions are not relevant and reliable.

## CONCLUSION

Because Mr. Wright's opinions concerning Lumbermens's alleged damages satisfy the requirements under FRE 702 and Daubert, the Government respectfully requests that the Court deny Lumbermens's motion in limine to exclude the testimony of Mr. Wright.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch, Civil Division
Department of Justice
1100 L Street, NW
Washington, D.C. 20530
(202) 307-0252
(202) 307-0972 (Fax)

September 7, 2007

Attorneys for Defendant