IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LUMBERMENS MUTUAL CASUALTY COMPANY, Plaintiff, | ) | No. 04-1255C |
| v. | ) | (Judge Robert H. Hodges) |
| THE UNITED STATES, Defendant. | ) | |

DECLARATION OF WILEY R. WRIGHT, III, IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF WILEY WRIGHT

1. My name is Wiley R. Wright, III.

2. I am a Certified Public Accountant (CPA).

3. I am a Senior Shareholder of the Rubino & McGeehin Consulting Group, Inc. (R&M). R&M is a nationally recognized accounting and consulting firm that is frequently asked to prepare expert analysis and reports upon behalf of the Government and private parties. R&M's services to law firms and construction and government contract clients include:

Pre-award audits.
Accounting system design and reviews.
Cost allowability and allocability determinations under federal cost principles.
Defective pricing reviews.
Contract termination pricing analysis.
Proposal preparation and reviews.
Contract claim costing and documentation reviews.
Support in defense of fraud, waste and abuse investigations.
Claim preparation, review and analysis.
Incurred cost audits.

Examples of our construction and government contract clients include:

| | |
|---|---|
| Aerojet | Fairchild Industries |
| Alenia | General Dynamics |
| Allied Signal, Inc. | Harsco Corporation / BMY / United Defense |
| Bechtel/Becon Services | Kaiser Aerospace and Electronics Corp. |

Boeing
Booz-Allen & Hamilton, Inc.
E-Systems, Inc.
Westinghouse Electric Corp.
Clark Construction
Atkinson Construction
Lockheed Martin.
Turner Construction Company
Unisys Corp.
MCI/Worldcom
PCL Construction

4. I have more than 25 years experience in the practice of public accounting and construction and government consulting.

5. I have provided expert testimony, either in deposition or trial, on more than sixty different occasions, many of which were related to pricing and cost accounting issues arising under construction contract disputes.

6. I have testified in proceedings before the United States Court of Federal Claims, the Federal Boards of Contract Appeals, in domestic and international arbitration and mediation proceedings, in Federal District courts, and various state courts and boards of contract appeals.

7. I have never been found not competent to testify in my area of expertise. My testimony has never been excluded for any reason.

8. The United States Department of Justice retained me to independently review and analyze the alleged damages set forth in Lumbermens' complaint and first amended complaint seeking the recovery of allegedly improper payments made by the Navy to Landmark and the damages arising from the Navy's alleged breach of the takeover agreement.

9. I have prepared this declaration at the request of counsel for the Government to respond to the factual assertions made by Lumbermens in is motion in limine to exclude my testimony. I understand Lumbermens' argument to be that my testimony should be excluded because I used an accounting methodology that is not appropriate to analyze the claimed damages

in this matter because it is not relevant under the circumstances of this case and not reliable.

10. The financial accounting methodology I used determines the percentage of completion based upon a cost-to-cost analysis. In my expert opinion, the cost-to-cost method is one of the preferred methods of revenue recognition under generally accepted accounting principles for construction contractors. In my opinion, that method is both relevant and reliable under the circumstances presented by this case. Id.

11. It is my expert opinion that the cost-to-cost method is a preferred method of determining the proper revenue to be recognized, that is, the amount of each schedule of prices line items earned, under generally accepted accounting principles. It is based on objective cost data. Accordingly this method is neither speculative nor unreliable. The method reflects the indicia of an acceptable methodology.

12. It is my expert opinion that one method to determine the percent complete from a financial perspective is based upon the actual quantities of materials received, and that that method would result in the most accurate percent-complete calculation.

13. It is my expert opinion that there are insufficient records to determine the actual quantities of the materials received as of the termination date, and the quantities of the materials actually received and utilized by Atherton in the performance of their takeover contract.

14. It is my expert opinion that another acceptable method to determine the percent complete from a financial perspective is based upon a cost-to-cost method of analysis. Under this method the percent complete is determined by comparing the relative costs incurred by each contractor, stated as a percentage. For example, if each contractor incurred $100 to perform a particular line item of work then the percent-complete for contractor 1 would be 50 percent ($100

as a percentage of the total cost of $200).

15. It is my expert opinion that the cost-to-cost method is not an estimate of the proportion of the project's financial burden carried by Landmark, as Lumbermens contends, but rather a generally recognized and accepted methodology for determining the percentage complete, and the appropriate amount of the schedule of prices amounts earned by Landmark. My analysis and calculations were performed using this recognized methodology and was based upon actual objective cost data.

16. My opinion in this regard is supported by Generally Accepted Accounting Principles as promulgated by the American Institute of Certified Public Accountants.

17. The American Institute of Certified Public Accountants (AICPA) is the national, professional organization for all Certified Public Accountants. Its mission is to provide members with the resources, information, and leadership that enable them to provide valuable services in the highest professional manner to benefit the public as well employers and clients. The AICPA establishes professional standards; assist members in continually improving their professional conduct, performance and expertise; and monitors such performance to enforce current standards and requirements.

The AICPA's Accounting Standards Team, though its' Accounting Standards Executive Committee, develops industry-specific guidance regarding financial accounting and reporting matters, including industry-specific authoritative guidance, such as Statement of Positions and Accounting and Auditing Guides.

18. AICPA's Statement of Position (SOP) 81-1 – Accounting for Performance of Construction-Type and Certain Production-Type Contracts, provides that the percentage of

completion method is the preferred method for revenue recognition when estimates of costs to complete and extent of completion towards completion of long-term contracts are reasonablely dependable.

19. SOP 81-1, Accounting Research Bulletin No. 45 (ARB No.45), Long Term Construction-Type contracts, issued by the AICPA Committee on Accounting Procedure in 1955, describes the two generally accepted methods of accounting for long term construction-type contracts for financial reporting purposes:

> The percentage-of-completion method recognizes income as work on a contract progresses: recognition of revenues and profits generally is related to costs incurred in providing the services required under the contract.
>
> The completed-contract method recognizes income only when the contract is completed, or substantially so, and all costs and related revenue are reported as deferred items in the balance sheet until that time.

SOP 81-1 provides further that:

> The committee believes that in general when estimates of costs to complete and extent of progress toward completion of long term contracts are reasonably dependable, the percentage-of-completion method is preferable. When lack of dependable estimates or inherent hazards cause forecasts to be doubtful, the completed contract method is preferable.

20. Under SOP 81-1, there are alternative acceptable methods of of measuring extent of progress towards completion. They include the cost-to-cost method, variations of the cost-to-cost method, efforts expended methods, the units of delivery method, and the units-of-work performed method. Those practices are intended to conform to ARB No.45, paragraph 4 which states:

> The committee recommends that the recognized income (under the

> percentage-of-completion method) be that percentage of estimate total income, either:
>
> (a) that incurred costs to date bear to estimated total costs after giving effect to estimates of costs to complete based upon most recent information, or
>
> (b) that may be indicated by such other measure of progress toward completion as may be appropriate having due regard to work performed.

21. Given the lack of objective, complete, and accurate data as to the units of delivery or units of work performed, it is my expert opinion that the cost-to-cost approach I used is the acceptable and preferred approach under SOP 81-1, the relevant authoritative guidance.

22. Generally Accepted Accounting Principles (GAAP) are the authoritative body of accounting standards for financial reporting in the United States. While these standards are applicable to the presentation of financial statements, the principles and methods contained in them are relevant to other non-financial statement uses, such as the measure of revenue earned for a fixed price construction contract in a non-financial statement context.

23. Thus, it is my expert opinion that the cost-to-cost is methodology is commonly employed for determining the percentage of completion, and the related revenue earned, under fixed price contracts and is supported by the relevant literature and authoritative guidance.

24. It is my expert opinion that the cost-to-cost methodology is directly relevant to this case because the central issue from a financial standpoint is whether Landmark was overpaid for its work on the contract. The determination of any overpayments is based on the revenue that Landmark should have earned for a particular line item, for example, doors and windows, versus the amount Landmark was paid by the Navy for that line item.

25. The percentage of completion method I used in analyzing the extent of such overpayments is objective, and consistent with authoritative guidance. It involves measuring the work performed by Landmark, and calculating the amount Landmark should have been paid. The amount that Landmark should have been paid is compared to the amount that Landmark was actually paid, any difference being the amount that Landmark was overpaid or underpaid.

26. The use of actual costs for both Landmark and the completion contractor Atherton for the calculation of the cost-to-cost method eliminates the use of estimates, as well as the concerns discussed in SOP 81-1 concerning the reliability of estimates.

27. There is no dispute that the acquisition of the materials necessary to renovate the 160 housing units is a large component of the work required under this contract. Landmark was entitled to obtain payments from the Navy for these materials under the contract as they were procured. The cost-to-cost method measures the amount of materials that Landmark acquired as compared to the total materials requirements. Based upon this objective data, I have calculated the amount of revenue that Landmark should have received for the materials.

28. It is my expert opinion that the determination of how much material cost that Landmark incurred in relation to the total material cost, that is the cost of materials procured compared to the total cost of those materials is important to the damages calculation in this case, because of the manner in which Landmark billed for its material acquisitions. As Lumbermens acknowledges, Landmark separately included the required materials as separate line items in its schedule of prices, and not to the costs of renovating the individual housing units. The contract provided that the Navy would make progress payments for these materials line items as the materials were acquired. Accordingly, for the material line items, the question of the work

accomplished for individual housing units is irrelevant to the determination of the amount of material acquired in relation to the total material requirements. It is my expert opinion that to measure this progress, that is, materials acquired, the cost-to-cost method under the percentage of completion is the best method of measurement.

29. For some of the items for which Lumbermens claims that Landmark was overpaid, it was not necessary for me to use the cost method of analysis. For example, site-work is one of the activities for which Lumbermens contends that the Navy overpaid Landmark.

30. I am of the opinion that the $590,000 that Landmark included in its schedule of prices for sitework was reasonable because the $590,000 paid to Lloyd Enterprises for the site-work is the full amount of the subcontract between the parties. Based upon Lloyd's Certified Payroll reports, Lloyd spent a total of 947 hours on the project that includes 458 equipment hours. Based on Lloyd's Certified Payroll Reports, the effective rate for the sitework is $623.02 per hour, not the $2000 per hour claimed by Lumbermens in its complaint. An alternative and more appropriate analysis of the amount paid to Lloyd is the effective sitework cost per housing unit, which is $3,687.50 ($590,000 divided by 160 units). This unit cost rate was reasonable and should not have raised any issues or concerns by the Navy. It is, therefore, my expert opinion that Landmark was not overpaid for sitework.

31. For other activities for which Lumbermens claims that the Navy overpaid Landmark, it was necessary for me to use the cost-to-cost method of analysis. For example, Lumbermens contends that the $458,640 paid to Landmark for asbestos and lead abatement work accounted for 52 percent of the amount indicated in Landmark's schedule of prices for that work, while Landmark had only completed abatement in 34 percent of the housing units, thereby

overpaying Landmark $158,760 for work it had not performed. To determine the amount of the overpayment, if any, I used the cost-to-cost method. My analysis is as follows:

| | 180 Units | Less 21 Units | 159 Units |
|---|---|---|---|
| Landmark Construction | $242,509 | | $242,509 |
| Atherton Construction | $330,777 | 66,883 | $263,894 |
| Subtotal | $573,286 | | $506,403 |
| Average Cost Per Unit | $ 3,185 | | |
| Landmark Schedule of Value Amount | $882,000 | | |
| Amounts Paid to Landmark | $458,640 | | |
| Landmark's Earned Value | $422,377 | | |
| Overpayment | $ 36,263 | | |

Thus, it is my expert opinion that the Navy overpaid Landmark $36,263 for this item, not the $158,760 claimed by Lumbermens.

32. An example of an activity for which I did not use the cost-to-cost method of analysis is the Navy's payment to Landmark for personnel costs. Lumbermens contends that the $378,936 the Navy paid Landmark for personnel was $291, 500 more than the amount to which Landmark was entitled, and constituted 52 percent of the amount indicated in Landmark's schedule of prices for this line item. I am of the opinion that the Navy made no overpayment for this item. The personnel line item in Landmark's schedule of prices, in the amount of $728,834, was budgeted separately from the per unit labor, and consists of field office overhead or general conditions labor. It my opinion, it is appropriate and consistent with industry practices to budget this type of labor separately from the labor incurred for building the units. Furthermore, it is a generally recognized practice in the construction industry to treat general condition or field office type labor as a time variable costs and as a result "earn" and invoice for these costs ratably over time. Moreover, given the nature of the personnel costs it would be inappropriate to recognize or

"earn" these type of costs based upon the actual percent complete of the units construction. My calculations of the credit for Landmarks' labor expenses are only for general conditions labor, which is based upon a generally recognized per diem method for time variable field office overhead costs. The project had a fixed period of performance. I therefore credited general conditions labor over that fixed duration. This method is not only consistent with the generally recognized per diem method but also consistent with Landmarks incurrence of these costs.

33. For some of the activities for which Lumbermens claims that the Navy overpaid Landmark, my estimates of the overpayment is greater that the amount claimed by Lumbermens. For example, my cost-to-cost calculation for doors and windows is as follows:

| | 180 Units | Less 21 Units | 159 Units | Percent Complete |
|---|---|---|---|---|
| Landmark Construction | $ 485,784 | | $ 485,784 | 42% |
| Atherton Construction | $ 825,571 | $152,991 | $ 672,991 | 58% |
| Subtotal | $1,311,355 | | $1,158,364 | 100% |
| Average Cost Per Unit | $ 7,285 | | | |

| | | | | |
|---|---|---|---|---|
| Landmark Schedule of Value Amount | $500,000 | | | |
| Amounts Paid to Landmark | $375,000 | | | |
| Landmark's Earned Value | $209,685 | | | |
| Overpayment | $165,315 | | | |

Based on the cost-to-cost method, it is my expert opinion that the maximum overpayment for doors and windows is $165,315, not the $131,775 sought in the complaint.

34. I have also rendered opinions in my expert report that do not involve the cost analysis method the use of which I have described above, and do not involve the analysis of line items in Landmark's schedule of prices. For example, Lumbermens contends that it incurred damages in excess of $4 million under its performance bond, and more than $550,000 under its payment bond. It is my expert opinion that Lumbermens' claim is duplicative of the separate

claims for materials, personnel, and subcontract costs. Furthermore, this claim is nothing more than a total cost approach whereby Lumbermens seeks all of its payments for the project. In addition to being duplicative, the amounts for these two claims include items that are unrelated to the issues in the complaint, such as the price differences between the Landmark and Atherton for performing the original scope of work. These amounts also fail to consider the value of materials and services received by Atherton and Lumbermens for the payments made to suppliers and subcontractors under the payment bond. Finally, Lumbermens' has failed to explain or document the bases for the varying amounts it is claiming.

35. Another example of an opinion that I have rendered that does not rely upon the cost-to-cost method of analysis is in connection with Lumbermens' contention that as a result of the Navy's failure to demand from Landmark a Network Analysis Schedule that complied with the contract requirements, Lumbermens has been damaged by at least $2,000,000. I am of the expert opinion that the bases for this amount is neither explained nor supported. Furthermore, this amount is duplicative of the discreet claims for the material, personnel and subcontract amounts.

36. In this case, Landmark, during the last six months it performed work under the contract, stopped paying some of its vendors and suppliers. Landmark's failure to pay its vendors lead to the Landmark employees on site and responsible for performance to abandon the site. Landmark's failure in this regard is not relevant to the percentage of completion methodology. The percentage of completion methodology is based upon a measurement of the acquisition of materials by Landmark and Atherton as compared to the total material requirements. To the extent Landmark acquired the materials for the benefit of the project and

recorded the cost of the material acquisition (Landmarks acquisition and receipt of the materials is a prerequisite for the payment of an invoice(s) under the payment bond by the Surety) then these costs must be included in the percentage of completion calculation. Thus, it is my expert opinion that Lumbermens is not entitled to recover the monies it paid to the unpaid vendors and suppliers under the payment bond for materials that were utilized by Landmark or Atherton in the performance of the contract.

37. Lumbermens use of the percentage of completion methodology is flawed, in my opinion, because Lumbermens used payments rather than incurred costs. GAAP relies upon the incurred costs, not paid amounts (accrual basis of accounting versus the cash basis). Therefore, Lumbermens is incorrect to use only payments to measure costs incurred and the resultant progress.

38. The ordering of materials by Landmark would not result in the recognition of costs. In the accrual basis of accounting, costs are only recognized upon receipt of ordered materials which, at that time, are to be included in the calculation of percentage of completion. Clearly both the paid and unpaid amounts are relevant to the calculation since Landmark received the materials for the unpaid invoices. In fact, Lumbermens would not have made payment under the payment bond for materials not received.

39. Lumbermens' argument that at the time Landmark was terminated 12 percent of the project was complete, and 15 percent complete if work in partially completed units is counted, is comparable to my cost-to-cost percentage of completion calculation for material items is flawed. The 12 percent and 15 percent figures that Lumbermens refers to are the estimated percent complete figures for the actual housing units without regard to the material cost used for the construction of the units. Lumbermens is comparing two different calculations and trying to give the impression that

the results of one is applicable to the other. If Landmark, at the time of termination, had already acquired 100 percent of the materials needed for the renovation of all of the housing units, but had not started any actual renovation, Lumbermens' position would necessarily have to be that the percentage complete was zero and, therefore, Landmark should have been paid nothing for the materials it had acquired for the project. Not only is such a position patently ludicrous, the contract provided that Landmark was entitled to submit progress payment invoices for, and be paid, for materials it acquired during the performance of the contract. Moreover, if Landmark had not been able to receive payments for materials as they were acquired, Landmark would in effect have to finance the project, and consequently not be in a position to purchase materials in quantity, with the net effect of having to bid a higher amount, resulting in a greater cost to the Government.

40. Lumbermens fails to distinguish between the overall percentage of completion for the housing units and the percentage of completion for the individual material line items for which it seeks as its damages. As previously mentioned, the overall percentage of completion for the individual housing units (12 percent or 15 percent including units with partial completion) does not take into account the percent complete for the materials acquisitions. The central issue in this case is whether Landmark was overpaid for material acquisitions, not for the individual housing units. Lumbermens is incorrectly applying the results of one calculation to a completely different set of data.

41. Interestingly, Lumbermens presents no analysis and reflects no credits to its calculations for the individual housing units that were partially completed at termination but no payments were made to Landmark. Lumbermens also presents no analysis and reflects no credits

to its calculations for other Schedule of Prices line items for which Landmark was underpaid. By excluding these credits, Lumbermens further overstates its damages.

42. It is my expert opinion that the damages sought by Lumbermens are premised upon a total cost approach. Specifically, Lumbermens is seeking the amount that Lumbermens paid Atherton over the contract balance that remained at the time Landmark was terminated, plus the payment bond payments. Lumbermens, however, has failed to specifically identify its damages to the individual causes of action, and has failed to exclude from its damage amounts costs that are unrelated to the issues in this case. It is my expert opinion that my actual cost method results in a more accurate measure of damages.

43. All of my calculations, as opposed to Lumbermens', are based upon the actual cost data for both Landmark and Atherton. To the extent that the Atherton costs include items that are not the fault of the Navy, it is my opinion that my percent complete calculations overstate the maximum range of the damages.

44. In my opinion, the reasonableness and competency of the opinions I have rendered in this case are as well supported as in every other case in which I have been involved.

45. All of the opinions contained in my expert report have been peer reviewed within R&M, and are therefore not only my opinions but those of my fellow shareholders who on a combined basis have over one hundred years providing similar services in the construction and damages practice area. My fellow shareholders have also been qualified as expert witnesses in a wide variety of forums and have provided expert testimony in over one hundred and fifty matters.

46. In summary, it is my expert opinion that Lumbermens' alleged damages are

incorrectly calculated and overstated; that the majority of Lumbermens' alleged damages are duplicative of each other; that Lumbermens' alleged damages are in effect a total cost claim; that Lumbermens has failed to properly apply the total cost approach; that the total cost approach is an inappropriate method for computing damages in these circumstances.

47. It is also my expert opinion that the proper measure of any overpayments should be computed by deducting the amounts paid to Landmark for each of the schedule of prices line items at issue from the earned revenue for the work actually performed as of Landmark's termination; that in order to properly determine the earned revenue of the work actually performed by Landmark as of the termination date, the percentage of completion method should be used; and that the majority of the line items in dispute, the cost-to-cost method is the appropriate methodology to use to determine the amount, if any, of the overpayments made to Landmark.

48. All of my expert opinion are based upon my review and analysis of all of the relevant documents in this matter, and upon my discussions with Landmark personnel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 4, 2007.

Wiley R. Wright, III