IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-1255C (Judge Robert H. Hodges) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 7.2 (c) of the Court of Federal Claims ("RCFC"), defendant, the United States, responds to the motion of plaintiff, Lumbermens Mutual Casualty Company (Lumbermens) for partial summary judgment upon its cause of action premised upon impairment of suretyship, and pursuant to RCFC 56 (b) cross moves for partial summary judgment in favor of defendant and against Lumbermens upon that same claim. Lumbermens' motion must fail because, as a matter of law, Lumbermens cannot establish the breach of a contract provision intended for the benefit of Lumbermens. Without the establishment of such a provision, Lumbermens' cause of action premised upon the concept of impairment of suretyship must fail as a matter of law. Because Lumbermens can not establish as a matter of law that the alleged breach of the contract at issue gives rise to a cause of action premised upon impairment of suretyship, judgment should be granted in favor of the Government. Moreover, as a factual matter, because there are genuine issues of material fact in dispute, Lumbermens' motion must fail.

BACKGROUND

It is undisputed that the Department of the Navy entered into a contract with Landmark Construction Company (Landmark) for the repair and renovation of military housing at the Naval Air Station, Whidbey Island, Oak Harbor, Washington, and that Lumbermens provided performance and payment bonds to Landmark. During Landmark's performance of the contract, the Navy paid Landmark based upon Landmark's network analysis schedule(NAS) and schedule of prices. Lumbermens contends that the Navy, by allowing Landmark to submit a NAS and a schedule of prices that did not meet the contract provisions, breached the contract, and according to Lumbermens, as a matter of law, such breaches give rise to a cause of action for impairment of suretyship. Lumbermens is incorrect because as a matter of fact the Navy complied with those contractual provisions, and because as a matter of law, even if the Navy did not fully comply with those requirements, Lumbermens has failed to state a cause of action for impairment of suretyship because it has failed to establish that the inclusion of such requirements in the contract was for the benefit of the surety.

The linchpin of Lumbermens' argument is that the Navy breached contract specifications pertaining to the Navy's payment of Landmark's requests for progress payments, which payments resulted in the Navy overpaying Landmark. The gravamen of Lumbermens' position must be that the contract specifications at issue were included in the contract for the benefit of the surety because there is no support for the proposition that the breach of a contract specification that does not provide security for the surety supports the discharge of a surety for its obligations under its payment and performance bonds. Because Lumbermens has not, and can not, demonstrate that the contract provisions at issue in this case were for the benefit of

Lumbermens, Lumbermens' motion must fail.

## ARGUMENT

### I. Standard of Review

Summary judgment may be granted where there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. Doe v. United States, 48 Fed. Cl. 495, 499 (2000) (citing Anderson, 477 U.S. at 247-48; Lane Bryant, Inc. v. United States, 35 F.3d 1570 (Fed. Cir. 1994)). Summary judgment will not be granted, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Id. (quoting Anderson, 477 U.S. at 248).

Pursuant to RCFC 56(c), summary judgment shall not be granted if the pleadings do not show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The party moving for summary judgment has the initial burden to produce evidence showing the absence of a genuine issue of material fact. This burden may be discharged, however, if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. Doe, 48 Fed. Cl. at 500 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)) (additional citations omitted). "If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof." Id. (citations omitted).

## II. Breach Of A Contractual Provision That Does Not Provide Security For the Surety Does Not, As a Matter of Law, Discharge The Surety

Lumbermens contends that the Navy's alleged failure to precisely follow the contract's payment terms impairs its suretyship and thus, as a matter of law, allows a pro tanto discharge of the surety. Plaintiff's Motion for Partial Summary Judgment ("Motion"), at 2. Specifically, Lumbermens alleges that the Navy breached § 01200, ¶ 1.2 of the contract which requires the contractor to submit, and the Navy contracting officer to approve, a schedule of prices before payment. Lumbermens also alleges that the Navy breached § 01321 of the contract, which requires that the contractor submit, and the contracting officer approve, a Network Analysis Schedule (NAS) prior to payment. Motion, at 2, 3. Such contractual provisions, however, typically included in all such Navy construction contracts, are intended to facilitate the Navy's ability to manage the contract. Such provisions are for the benefit of the Navy. Lumbermens has not, and can not, establish as a matter of fact or law, that the inclusion of such contractual provisions was intended for the benefit of Lumbermens. Such provisions provide no security for the surety in its bonded performance, and, as such, the alleged breach does not as a matter of law impair the suretyship.

The Federal Circuit recognizes that a surety has equitable rights in the security provided, by the terms of the contract, for the performance to which it is bonded—such that change of those terms may discharge the surety. National Surety Corp. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997). Clearly, the surety has bonded itself based upon certain terms which informed its assessment of the risk. Id., at 1547. From this reliance arises a Governmental duty "to administer the contract, during the course of its performance, in a way that does not

materially increase the risk that was assumed by the surety when the contract was bonded." Id., at 1546.

Significantly, however, the Federal Circuit has never recognized any basis for discharge based upon contractual provisions other than a term that specifically provides security for performance under the contract. The contractual provision at issue in National Surety was the clause that mandated that the Government retain a certain percentage from every progress payment made to the contractor. The Federal Circuit held the government liable for improperly releasing to the contractor the mandatory retainage, The Federal Circuit held that "the retainage provision…serves to protect the surety"; "to administer the contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded"; "Contract terms that provide security for the bonded performance cannot be ignored, waived, or modified without consideration of the surety's interests." Id., at 1545-7 (citations omitted). The Federal Circuit noted that "the retainage requirement served as security for performance," and that the surety was "entitled to rely on the government's obligation…" National Surety Corp. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997).

Retainage has long been understood to stand specifically as a security for the surety against default. Prairie State Nat. Bank v. United States, 164 U.S. 227, 233 (1896): "That a stipulation in a building contract for the retention, until the completion of the work, of a certain portion of the consideration, is as much for the indemnity of him who may be guarantor of the performance of the work, as for him for whom the work is to be performed, that it raises an equity in the surety in the fund to be created, and that a disregard of such stipulation by the

voluntary act of the creditor operates to release the sureties, is amply sustained by authority."

Lumbermens has not, and can not, cite any precedent to support its proposition that the contract provisions at issue here were included in the contract for the benefit of Lumbermens. The contract specifications that Lumbermens claims that the agency beached were not included in the contract for the benefit of Lumbermens. No court has found liability for the breach of a contract provision that serves as tool for the Government to manage a contract, such as the ones at issue here. See generally Declaration Of Richard Paullin In Support of Defendant's Opposition To Plaintiff's Motion For Partial Summary Judgment (Paullin Decl.) and Declaration Of John Santiago In Support of Defendant's Opposition To Plaintiff's Motion For Partial Summary Judgment (Santiago Decl.).

Unlike a mandatory retainage provision, the Government's requirement that a contractor provide a NAS and schedule of prices are not the type of requirements that a surety would rely upon in deciding to bond a contract. The schedule of prices provided by the contractor merely sets forth in a very general way how the contractor has allocated the amount of the fixed price contract among various material and labor activities necessary to complete performance under the contract. The contractor is in no way required to demonstrate to the Government that the amounts shown are in fact the actual amounts the contractor expects to spend because the contractor's profits are built into those amounts. It is important to note that while a requirement for a contractor to provide a schedule of prices (or a schedule of values) is a standard contractual provision in Government contracts, the Government is unaware of any other case brought by a surety alleging that the breach of such a provision impaired the rights of the surety. Similarly, the requirement that a contractor provide a NAS is a rather standard requirement in Government

contracts. The NAS is used for the planning and management of a project, as well as measurement of a construction contractor's performance. Paullin Decl., ¶19; Santiago Decl., ¶ 23.

Discharge of a surety can only occur upon an alteration of those terms which provide the surety's security. To discharge the surety for any change in the terms of a contract, such as those governing design, performance, or payment, would both impede the completion of government projects and the function of the surety in the first place. The use of standardized contracts will be impaired because parties will fear binding themselves to unnecessary protocol. Contracting officers and contractors would then be less able to adapt to changed or unforeseen conditions. Worst of all, sureties frequently would be eligible for a pro tanto discharge upon default. Such discharges would leave the government to face the risk of completing the performance or paying the subcontractors and would thus contravene the entire purpose of surety bonds in the first place. The Government, therefore, urges the Court not to expand the law regarding impairment of suretyship beyond that which the Federal Circuit established in National Surety Corp. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997).

III. The Existence Of Genuine Issues Of Material Fact In Dispute Regarding Whether The Navy Breached Contractual Provisions Pertaining To The Schedule of Price And The NAS Preclude The Grant Of Summary Judgment

Lumbermens contends that it is undisputed that Landmark submitted no schedule of prices and the contracting officer did not approve a schedule of prices. Plaintiff's Motion for Partial Summary Judgment (Pl.'s Motion) at 2. As we demonstrate below, Landmark in fact did submit a schedule of prices and the contracting officer in fact did approve Landmark's schedule of prices. Lumbermens further contends that the contracting officer did not review or approve

the NAS prepared and used by Landmark to obtain progress payments. Pl.'s Motion at 5. As we demonstrate below, the contracting officer in fact properly delegated the review and approval of the NAS to the project engineer and the project engineer reviewed and approved Landmark's NAS. Moreover, the contracting officer approved Landmark's NAS submittal with Contract Modification A00001.

A. Landmark Submitted A Schedule of Prices; The Contracting Officer's Delegated Representative Approved The Schedule of Prices; And The Contracting Officer Approved The Schedule of Prices In Modification A00001

Part III - Design, ¶ B.3.a, of the contract referenced the schedule of prices as follows:

> Design Schedule of Prices: Within five working days after the Notice to Proceed, submit one original Schedule of Prices, with the following breakdown . . .
>
> -Bonds (Lump Sum)
> -Design
> (45% Design Submittal)
> (Final Design Submittal)
> -Construction (Lump Sum)
>
> For Schedule of Prices requirements during construction, see Part IV, Section 01200, Price and Payment Procedures.

With respect to the schedule of prices, Section 01200, ¶ 1.2, of the contract provided as follows:

> Prepare a Schedule of Prices on the forms furnished by the Government. The Schedule of Prices shall be a detailed breakdown of the contract price, giving quantities for each of the various kinds of work, unit prices, and extended prices. Submit the Schedule of Prices to the Government with the Final Design Submittal in accordance with Section III for approval by the Contracting Officer. Payments for construction work will not be made until the Schedule of Prices has been approved by the

Contracting Officer.

A "schedule of prices" is a detailed statement provided by a construction contractor that allocates a dollar value for each of the various parts of the work as a portion of the total contract value. Paullin Decl., ¶16; Santiago Decl., ¶7. A "schedule of prices" is often is used as the basis for submitting and reviewing progress payments. Paullin Decl., ¶ 17; Santiago Decl., ¶8. The ROICC Handbook describes the purpose of the schedule of prices as follows:

> Remember, the purpose of a schedule of prices is to provide a vehicle for progress payments, nothing more. There are very few requirements dictated by law or regulation; the ROICC must protect the government and be reasonable with the contractor to achieve an acceptable schedule of prices.

Paullin Decl., ¶17; Santiago Decl., ¶8.

Landmark submitted an initial schedule of prices on May 5, 2000. Paullin Decl., ¶8; Santiago Decl., ¶9 . The contract required the submittal of this initial schedule of prices during the design phase of the project. Id. The contract also provided for the submittal of another schedule of prices for the construction phase of the project. Paullin Decl., ¶ 9; Santiago Decl., ¶10. This schedule of prices was to be submitted with the Final Design Submittal, which was planned to occur approximately six months after contract award. Id.

Landmark submitted the schedule of prices for the construction phase of the contract in an electronic file dated June 28, 2000, as part of its NAS. Paullin Decl., ¶10; Santiago Decl., ¶11. Landmark made this submittal approximately four months prior to the date required by the contract. Id. Landmark's first invoice, dated July 6, 2000, also contained a printout of the schedule of prices for the construction phase of the contract, as part of the NAS. Paullin Decl., ¶11; Santiago Decl., ¶12. Landmark submitted the schedule of prices again on July 31, 2000, as

part of its submittal of the NAS. Paullin Decl., ¶12; Santiago Decl., ¶13. The contracting officer approved that submittal with Contract Modification A00001, dated August 8, 2000. Id.

On August 9, 2000, Landmark submitted a revised NAS, that contained a schedule of prices. Paullin Decl., ¶13; Santiago Decl., ¶14. Kevin McAteer, the project engineer assigned to this project by the Navy, returned the submittal marked "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark. Id.

In the opinion of the contracting officer and the Government's scheduling expert, the schedule of prices, along with the NAS provided by Landmark, were suitable for billing purposes and for day-to-day management of the construction work, Paullin Decl., ¶36 ;Santiago Decl., ¶¶16,27. Furthermore, in the opinion of the contracting officer, the payment of Landmark's invoices by the Navy was in accordance with the schedule of prices submitted by Landmark with its invoices. Santiago Decl., ¶17. It is also the opinion of the contracting officer and the Government's scheduling expert that Landmark's submittal of the schedule of prices as part of the NAS satisfied the intent of Contract Section 01200, ¶ 1.2. Paullin Decl. ¶21; Santiago Decl., ¶ 20. The contracting officer's opinion in this regard is supported by the ROICC Handbook, which provides as follows:

> The schedule of prices is a tool for making progress payments in accordance with FAR 52.232-5. The contractor will use the format of NAVFAC Form 4330/4, "Schedule of Prices (Construction Contract)," Appendix Tab (12). The contractor may generate his own computer generate[d] form, as long as the required information is include[d.] There may be a cost-loaded CPM on some contracts that will be the basis for the schedule of prices.

Id.

In short, the evidence supports the Government's position that the Navy did not breach

the contractual provisions pertaining to the requirement for a schedule of prices. At a minimum, there is a genuine issue of material fact in dispute that precludes the granting of Lumbermens' motion for partial summary judgment.

B. The Contracting Officer Properly Delegated The Review Of The NAS To The Project Engineer, the Project Engineer Reviewed Landmark's NAS, And The Contracting Officer Approved Landmark's NAS

A "network analysis schedule," or NAS, is a method of graphically portraying the planning and scheduling of a project's activities in a way that allows mathematical analysis of the project schedule. Paullin Decl., ¶18; Santiago Decl., ¶ 22. A "network analysis schedule" is used for the planning and management of a project, as well as measurement of a construction contractor's performance. Paullin Decl., ¶19; Santiago Decl., ¶ 23. The ROICC Handbook provides in pertinent part as follows:

> All construction contracts require the contractor to submit a progress schedule, preferably in a computer generated Critical Path Method (CPM) network analysis. Gantt (bar) charts are still used on some smaller contracts. Either type of progress schedule is intended to demonstrate that the contractor has a reasonable plan for completing the contract. It also provides a management tool to monitor progress and for informing the customer of contract performance.

Id.

As previously stated, Landmark submitted its NAS (containing a schedule of prices) on July 31, 2000. Paullin Decl., ¶12; Santiago Decl., ¶ 24. The contracting officer approved that submittal with Contract Modification A00001, dated August 8, 2000. Id. Also, as previously stated, Landmark submitted a revised NAS on August 9, 2000. Paullin Decl., ¶13; Santiago Decl., ¶ 25. Kevin McAteer, the project engineer, returned the submittal

marked "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark. Id.

In the opinion of the contracting officer and the Government's scheduling expert, the NAS provided by Landmark was suitable for day-to-day management of the construction work. Paullin Decl., ¶36; Santiago Decl., ¶27. Moreover, the contracting officer properly delegated his authority to review and approve Landmark's NAS submittal to Kevin McAteer, the project engineer,[1] who was familiar with analysis of NAS submittals. Paullin Decl. ¶25; Santiago Decl., ¶30. He did this because he was not experienced in the analysis of critical path method (CPM) schedules for the purpose of NAS submittal review. Id. Throughout his career as a contracting officer, he routinely delegated the analysis and approval of NAS submittals to the project engineer, and was authorized to do so by the FAR and by the Naval Facilities Acquisition Supplement (NFAS). Santiago Decl., ¶28, 29, 30. The NFAS provides that certain contract administration functions can be delegated to a Contract Administration Office (CAO), in accordance with FAR 42.302. The NFAS further provides that a ROICC office, such as the one to which the project engineer was assigned in this case, can serve as a CAO. Paullin Decl., ¶23; Santiago Decl., ¶ 28.

FAR Subpart 42.3 is applicable to CAO functions and provides as follows:

> **FAR 42.302 Contract administration functions.**
>
> (a) The contracting officer normally delegates the following contract administration functions to a CAO. The contracting

---

1 At the start of this project, Kevin McAteer served as the Assistant Resident Officer in Charge of Construction (AROICC) for the Navy. The NFAS defines the AROICC position as follows: A Civil Engineer Corps officer designated by the ROIC/ROICC for the administration of assigned contracts.

> officer may retain any of these functions . . . unless the cognizant Federal agency (see 2.101) has designated the contracting officer to perform these functions.
>
> > (1) Review the contractor's compensation structure.
> >
> > . . .
> >
> > (12) Review and approve or disapprove the contractor's requests for payments under the progress payments or performance-based payments clauses.
> >
> > (13) Make payments on assigned contracts when prescribed in agency acquisition regulations.
> >
> > . . .
> >
> > (40) Perform engineering surveillance to assess compliance with contractual terms for schedule, cost, and technical performance in the areas of design, development, and production.

On this project, Landmark's NAS submittal was used primarily for billing purposes. Paullin Decl., ¶31; Santiago Decl., ¶33. Together with the NAS, Landmark and the Navy managed this project with tabular status summaries (containing lists of activities with dates). Paullin Decl., ¶34 ; Santiago Decl., ¶33. In the opinion of the contracting officer and the Government's expert in scheduling, Landmark's NAS submittal was adequate for management of this project and it satisfied the intent of Section 01321 of the contract. Paullin Decl., ¶35; Santiago Decl., ¶33. In fact, after Landmark's termination, Atherton Construction, Inc. ("Atherton") and the Navy managed the project using tabular status summaries that were very similar to those previously used by Landmark. Paullin Decl., ¶35; Santiago Decl., ¶34. Like Landmark's, Atherton's NAS submittal did not strictly meet all of the contract requirements, but was adequate for billing purposes. Id.

With respect to the requirements for processing Landmark's invoices, Section 01200, ¶ 1.3, of the contract provided as follows:

a. Content of Invoice. Requests for payment will be processed in accordance with "FAR 52.252-5,[2] Payments Under Fixed-Price Construction Contract" and shall consist of the following:

(1) The Contractor's invoice shall be submitted on NAVFAC Form 7300/41, which may be obtained from the Contracting Officer. The invoice shall show, in summary form, the basis for arriving at the amount of the invoice.

(2) The Contract Performance Statement, on the form furnished by the Government for this purpose, shall show, in detail, the estimated cost, percentage of completion, and value of completed performance.

(3) The Contractor shall provide an updated network analysis.

(4) Contractor's Final Release Form (with request for final payment only).

(5) QC Manager's invoice certification

. . .

d. Invoices not completed in accordance with contract requirements will be returned to the Contractor for correction of the deficiencies.

. . .

In the opinion of the contracting officer, he fully complied with Section 01200, ¶ 1.3 when he authorized payment of Landmark's invoices. Santiago Decl., ¶37. It is also his opinion that he did not authorize payments to Landmark in violation of either Section 01200, ¶ 1.2 or Section 01200, ¶ 1.3 of the contract. Santiago Decl., ¶¶36, 37.

In short, the evidence supports the Government's position that the Navy did not breach the contractual provisions pertaining to the requirement for a schedule of prices. At a minimum, there is a genuine issue of material fact in dispute that precludes the granting of Lumbermens'

---

[2] The contract contains a typographical error; it should have referenced FAR 52.232-5.

motion for partial summary judgment.

CONCLUSION

Lumbermens has failed to demonstrate that as a matter of law the breach of contractual provisions pertaining to progress payments gives rise to a cause of action premised upon impairment of suretyship. Accordingly, the Government respectfully requests that the Court deny Lumbermens' motion for partial summary judgment, and grant our cross-motion for summary judgment, dismissing Lumbermens' causes of action sounding in impairment of suretyship. In the alternative, the Government requests that the Court deny Lumbermens' motion for partial summary judgment because the existence of genuine issues of material fact in dispute preclude the granting of Lumbermens' motion.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch, Civil Division
Department of Justice
1100 L Street, NW
Washington, D.C. 20530
(202) 307-0252
(202) 307-0972 (Fax)

September 7, 2007

Attorneys for Defendant