IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LUMBERMENS MUTUAL CASUALTY COMPANY,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | ) | No. 04-1255C<br>(Judge Robert H. Hodges) |

DECLARATION OF JOHN SANTIAGO IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## BACKGROUND

1. My name is John Santiago.

2. I was employed by the Navy from June 1981 to 2005. I retired in February 2005.

3. I served as a Navy contracting officer from around 1987 or 1988 until my retirement. I served as the contracting officer on more than 600 contracts.

4. I was the contracting officer on the contract between Landmark Construction Corporation (Landmark) and the Navy. I was also the contracting officer on the contract between Lumbermens Mutual Casualty Company and the Navy.

## SCHEDULE OF PRICES

5. Part III - Design, ¶ B.3.a, of the contract referenced the schedule of prices as follows:

> Design Schedule of Prices: Within five working days after the Notice to Proceed, submit one original Schedule of Prices, with the following breakdown . . .
>
> -Bonds (Lump Sum)
> -Design
> (45% Design Submittal)
> (Final Design Submittal)
> -Construction (Lump Sum)

> For Schedule of Prices requirements during construction, see Part IV, Section 01200, Price and Payment Procedures.

6. With respect to the schedule of prices, Section 01200, ¶ 1.2, of the contract provided as follows:

> Prepare a Schedule of Prices on the forms furnished by the Government. The Schedule of Prices shall be a detailed breakdown of the contract price, giving quantities for each of the various kinds of work, unit prices, and extended prices. Submit the Schedule of Prices to the Government with the Final Design Submittal in accordance with Section III for approval by the Contracting Officer. Payments for construction work will not be made until the Schedule of Prices has been approved by the Contracting Officer.

7. My understanding is that a "schedule of prices" is a detailed statement provided by a construction contractor that allocates a dollar value for each of the various parts of the work as a portion of the total contract value.

8. My understanding of the purpose of a "schedule of prices" is that it is used as the basis for submitting and reviewing progress payments. This is further supported by the ROICC Handbook, which provides as follows:

> Remember, the purpose of a schedule of prices is to provide a vehicle for progress payments, nothing more. There are very few requirements dictated by law or regulation; the ROICC must protect the government and be reasonable with the contractor to achieve an acceptable schedule of prices.

9. Landmark submitted an initial schedule of prices on May 5, 2000. The contract required the submittal of this initial schedule of prices during the design phase of the project.[1]

10. The contract also provided for the submittal of another schedule of prices for the

---

1 Contract Part III, page III - B - 1, ¶ B.3.a.

construction phase of the project.[2] This schedule of prices was to be submitted with the Final Design Submittal, which was planned to occur approximately six months after contract award.[3]

11. Landmark submitted the schedule of prices for the construction phase of the contract in an electronic file dated June 28, 2000, as part of the Network Analysis Schedule (NAS). Landmark made this submittal approximately four months prior to the date required by the contract.

12. Landmark's first invoice, dated July 6, 2000, also contained a printout of the schedule of prices for the construction phase of the contract, as part of the NAS. The following is an excerpt from the first page of that NAS, showing the beginning of the section that Landmark identified as the schedule of prices:

| Task Name | Amount Bid |
|---|---|
| **Maylor Capehart Housing** | **$9,878,026.00** |
| Received Contract | $0.00 |
| Partnering Meeting | $0.00 |
| Pre-Design Meeting | $0.00 |
| **Design Phase** | **$0.00** |
| **Submittals** | **$0.00** |
| Govt. Review Submittal | $0.00 |
| Construction Mobilizat | $0.00 |
| Mutual Understanding | $0.00 |
| **Schedule of Pricing** | **$5,514,508.00** |
| Doors & Windows | $500,000.00 |
| Cabinets | $500,000.00 |
| Toilets & Accessories | $100,000.00 |
| Paint | $300,000.00 |
| . . . | |

2 Contract Section 01200, page 1, ¶ 1.2.

3 Contract Part III, page III - D - 8, ¶ D.7.a.

13. Landmark submitted the schedule of prices again on July 31, 2000, as part of its submittal of the NAS. I approved that submittal with Contract Modification A00001, dated August 8, 2000.

14. Landmark submitted a revised NAS, that contained a schedule of prices, on August 9, 2000. Kevin McAteer, the project engineer assigned to this project by the Navy, returned the submittal marked "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark.

15. The contract specifications authorized work to proceed when a submittal was "approved as noted" provided the contractor "takes no exception to the notations."[4] Landmark did not take exception to the notations, and resubmitted the NAS on September 25, 2000.

16. In my opinion, the schedule of prices provided by Landmark was suitable for billing purposes.

17. It is my opinion that the payment of material costs to Landmark by the Navy was in accordance with the schedule of prices information submitted by Landmark with its invoices.

18. I was satisfied with, and relied upon, in part, Landmark's schedule of prices.

19. In my opinion, Landmark's schedule of prices, in conjunction with my knowledge of the project and material acquisitions, was sufficient information for me to evaluate the progress made with respect to the material acquired.

20. It is my opinion that Landmark's submittal of the schedule of prices as part of the NAS satisfied the intent of Contract Section 01200, ¶ 1.2. This opinion is further supported by the ROICC Handbook, which provides as follows:

---

[4] Contract Section 01330, page 6, ¶ 1.3.9.c.

> The schedule of prices is a tool for making progress payments in accordance with FAR 52.232-5. The contractor will use the format of NAVFAC Form 4330/4, "Schedule of Prices (Construction Contract)," Appendix Tab (12). The contractor may generate his own computer generate[d] form, as long as the required information is include[d.] There may be a cost-loaded CPM on some contracts that will be the basis for the schedule of prices.

21. Lumbermens' Motion for Partial Summary Judgment states on page 2 that it is "undisputed that Landmark submitted no schedule of prices and the Contracting Officer did not approve a schedule of prices." I disagree with that statement for the following reasons: (a) Landmark submitted an initial schedule of prices, (b) payment for Landmark's first invoice was made based upon the line items in that initial schedule of prices, (c) Landmark submitted a revised schedule of prices as part of its NAS submittal, and (d) I approved Landmark's NAS submittal, which contained the schedule of prices.

<u>NETWORK ANALYSIS SCHEDULE (NAS)</u>

22. My understanding is that a "network analysis schedule" is a method of graphically portraying the planning and scheduling of a project's activities in a way that allows mathematical analysis of the project schedule.

23. My understanding of the purpose of a "network analysis schedule" is that it is used for planning and management of a project as well as measurement of a construction contractor's performance. This is further supported by the ROICC Handbook, which provides as follows:

> All construction contracts require the contractor to submit a progress schedule, preferably in a computer generated Critical Path Method (CPM) network analysis. Gantt (bar) charts are still used on some smaller contracts. Either type of progress schedule is intended to demonstrate that the contractor has a reasonable plan for completing the contract. It also provides a management tool to

monitor progress and for informing the customer of contract performance.

24. As previously stated, Landmark submitted its NAS (containing a schedule of prices) on July 31, 2000. I approved that submittal with Contract Modification A00001, dated August 8, 2000.

25. As previously stated, Landmark submitted a revised NAS on August 9, 2000. Kevin McAfeer, the project engineer assigned to this project by the Navy, returned the submittal marked "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark.

26. The contract specifications authorized work to proceed when a submittal was "approved as noted" provided the contractor "takes no exception to the notations."[5] Landmark did not take exception to the notations, and resubmitted the NAS on September 25, 2000.

27. In my opinion, the NAS (and the schedule of prices) provided by Landmark was suitable for day-to-day management of the construction work.

28. The Naval Facilities Acquisition Supplement (NFAS) provides that certain contract administration functions can be delegated to a Contract Administration Office (CAO), in accordance with FAR 42.302, and states that a ROICC office can serve as a CAO.

29. FAR Subpart 42.3 is applicable to CAO functions and provides as follows:

> **FAR 42.302 Contract administration functions.**
>
> (a) The contracting officer normally delegates the following contract administration functions to a CAO. The contracting officer may retain any of these functions . . . unless the cognizant Federal agency (see 2.101) has designated the contracting officer to perform these functions.

---

[5] Contract Section 01330, page 6, ¶ 1.3.9.c.

(1) Review the contractor's compensation structure.

. . .

(12) Review and approve or disapprove the contractor's requests for payments under the progress payments or performance-based payments clauses.

(13) Make payments on assigned contracts when prescribed in agency acquisition regulations.

. . .

(40) Perform engineering surveillance to assess compliance with contractual terms for schedule, cost, and technical performance in the areas of design, development, and production.

. . .

30. I am not experienced in the analysis of critical path method (CPM) schedules for the purpose of NAS submittal review. For this contract, I delegated that responsibility to Kevin McAteer, the project engineer,[6] who was familiar with analysis of NAS submittals. Mr. McAteer would report his findings to me after reviewing the submittals. Throughout my career as a contracting officer, I routinely delegated the analysis and approval of NAS submittals to the project engineer.

31. Lumbermens' Motion states on page 5 that "[t]he Contracting Officer did not either review or approve the NAS prepared and used by Landmark to obtain progress payments." I disagree with that statement for the following reasons: (a) I properly delegated the review of the NAS to the Project Engineer and discussed that review with him, (b) I approved Landmark's NAS submittal with Contract Modification A00001.

32. Prior to Landmark's failure to pay its vendors and supplies, which led to Landmark's abandonment of the project, I had no issues with the quality and timeliness of

---

[6] At the start of this project, Kevin McAteer served as the Assistant Resident Officer in Charge of Construction (AROICC) for the Navy. The NFAS defines the AROICC position as follows: A Civil Engineer Corps officer designated by the ROIC/ROICC for the administration of assigned contracts.

Landmark's work, or with the performance of Landmark's employees on site who were managing and implementing the renovation work.

33. On this project, Landmark's NAS submittal was used primarily for billing purposes. Together with the NAS, Landmark and the Navy managed this project with tabular status summaries (containing lists of activities with dates). In my opinion, Landmark's NAS submittal was adequate for management of this project and it satisfied the intent of Section 01321 of the contract.

34. After Landmark's termination, Atherton Construction, Inc. ("Atherton") and the Navy managed the project using tabular status summaries that were very similar to those previously used by Landmark. Like Landmark's, Atherton's NAS submittal did not strictly meet all of the contract requirements. In my opinion, however, it was adequate for billing purposes.

35. With respect to the requirements for processing Landmark's invoices, Section 01200, ¶ 1.3, of the contract provided as follows:

> a. Content of Invoice. Requests for payment will be processed in accordance with "FAR 52.252-5,[7] Payments Under Fixed-Price Construction Contract" and shall consist of the following:
>
> (1) The Contractor's invoice shall be submitted on NAVFAC Form 7300/41, which may be obtained from the Contracting Officer. The invoice shall show, in summary form, the basis for arriving at the amount of the invoice.
>
> (2) The Contract Performance Statement, on the form furnished by the Government for this purpose, shall show, in detail, the estimated cost, percentage of completion, and value of completed performance.

[7] The contract contains a typographical error; it should have referenced FAR 52.232-5.

(3) The Contractor shall provide an updated network analysis.

(4) Contractor's Final Release Form (with request for final payment only).

(5) QC Manager's invoice certification

. . .

d. Invoices not completed in accordance with contract requirements will be returned to the Contractor for correction of the deficiencies.

. . .

36. It is my opinion that I did not authorize payments to Landmark in violation of Section 01200, ¶ 1.2, of the contract.

37. It is my opinion that I fully complied with Section 01200, ¶ 1.3, when I authorized payment of Landmark's invoices.

38. It is my opinion that Landmark's NAS submittal was adequate for management of this project and it satisfied the intent of Section 01321 of the contract.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 4, 2007.

John Santiago