IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1255C |
| v. | ) | (Judge Robert H. Hodges) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF RICHARD PAULLIN IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1. My name is Richard Paullin.

2. I am currently a partner in the firm of Contract Solutions LLC. I specialize in the analysis of schedules and delays in contract disputes involving both construction projects and military development programs. I previously worked as an employee of The Barrington Consulting Group, and of Peterson & Company Consulting. I have eighteen years of consulting experience.

3. During my work as a consultant, I have been required to develop and review a wide variety of information including, but not limited to, the following: critical path method (CPM) schedules, as-planned and as-built information, logic diagrams, labor and cost curves, invoices and pricing information, specifications and drawings, contracts, and correspondence files.

4. I have provided expert testimony and consulting services to the United States Department of Justice in connection with Lumbermens Mutual Casualty Company v. United States, Fed. Cl. No. 04-1255C.

5. In connection with these services, I reviewed all of the documents produced by the various parties involved in this project. This type of review is routinely completed by consultants during the performance of a schedule and delay analysis. The following paragraphs describe certain documents and contract provisions related to the schedule of prices and the Network Analysis Schedule (NAS).

6. Part III - Design, ¶ B.3.a, of the contract provided as follows:

> Design Schedule of Prices: Within five working days after the Notice to Proceed, submit one original Schedule of Prices, with the following breakdown . . .
>
> -Bonds (Lump Sum)
> -Design
> (45% Design Submittal)
> (Final Design Submittal)
> -Construction (Lump Sum)
>
> For Schedule of Prices requirements during construction, see Part IV, Section 01200, Price and Payment Procedures.

7. Part IV, Section 01200, ¶ 1.2, of the contract provided as follows:

> Prepare a Schedule of Prices on the forms furnished by the Government. The Schedule of Prices shall be a detailed breakdown of the contract price, giving quantities for each of the various kinds of work, unit prices, and extended prices. Submit the Schedule of Prices to the Government with the Final Design Submittal in accordance with Section III for approval by the Contracting Officer. Payments for construction work will not be made until the Schedule of Prices has been approved by the Contracting Officer.

8. Landmark Construction Corporation (Landmark) submitted an initial schedule of prices on May 5, 2000. The contract provided for the submittal of this initial schedule of prices during the design phase of the project.[1]

---

[1] Contract Part III, page III - B - 1, ¶ B.3.a.

9. The contract also provided for the submittal of another schedule of prices for the construction phase of the project.[2] This schedule of prices was to be submitted with the Final Design Submittal, which was planned to occur approximately six months after contract award.[3]

10. Landmark submitted the schedule of prices for the construction phase of the contract in an electronic file dated June 28, 2000, as part of the NAS. Landmark made this submittal approximately four months prior to the date required by the contract.

11. Landmark's first invoice, dated July 6, 2000, also contained a printout of the schedule of prices for the construction phase of the contract, as part of the NAS. The following is an excerpt from the first page of that NAS, showing the beginning of the section that Landmark identified as the schedule of prices:

| Task Name | Amount Bid |
|---|---|
| **Maylor Capehart Housing** | **$9,878,026.00** |
| Received Contract | $0.00 |
| Partnering Meeting | $0.00 |
| Pre-Design Meeting | $0.00 |
| **Design Phase** | **$0.00** |
| **Submittals** | **$0.00** |
| Govt, Review Submittal | $0.00 |
| Construction Mobilizat | $0.00 |
| Mutual Understanding | $0.00 |
| **Schedule of Pricing** | **$5,514,508.00** |
| Doors & Windows | $500,000.00 |
| Cabinets | $500,000.00 |
| Toilets & Accessories | $100,000.00 |
| Paint | $300,000.00 |
| . . . | |

---

2 Contract Section 01200, page 1, ¶ 1.2.

3 Contract Part III, page III - D - 8, ¶ D.7.a.

12. Landmark submitted the schedule of prices again on July 31, 2000, as part of its submittal of the NAS. The Navy's contracting officer approved that submittal with Contract Modification A00001, dated August 8, 2000, which stated:

> Reviews of your submitted network analysis, schedule, safety plan, quality control plan, demolition plan, asbestos removal plan, lead removal plan and waste management plan have been completed. These submittals, required prior to any construction work commencing, are approved or approved as noted.

13. Landmark submitted a revised NAS on August 9, 2000. The Navy's project engineer (Kevin McAteer) returned the submittal "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark.

14. The contract specifications authorized work to proceed when a submittal was "approved as noted" provided the contractor "takes no exception to the notations."[4] Landmark did not take exception to the notations, and resubmitted the NAS on September 25, 2000.

15. During my work as a consultant, I routinely review schedules of prices and NAS submittals. The following paragraphs describe my opinions regarding these documents, based upon my training and experience.

16. My understanding is that a "schedule of prices" is a detailed statement provided by a construction contractor that allocates a dollar value for each of the various parts of the work as a portion of the total contract value.[5]

17. My understanding of the purpose of a "schedule of prices" is that it is used as the

---

[4] Contract Section 01330, page 6, ¶ 1.3.9.c.

[5] Many contracts refer to a "schedule of values" rather than a "schedule of prices." With respect to this contract, it is my understanding that these terms have the same meaning.

basis for submitting and reviewing progress payments. This is further supported by the ROICC Handbook, a Navy document referenced by the plaintiff in connection with its schedule analysis of this project, which provides as follows:

> Remember, the purpose of a schedule of prices is to provide a vehicle for progress payments, nothing more. There are very few requirements dictated by law or regulation; the ROICC must protect the government and be reasonable with the contractor to achieve an acceptable schedule of prices.[6]

18. My understanding is that a "network analysis schedule" is a method of graphically portraying the planning and scheduling of a project's activities in a way that allows mathematical analysis of the project schedule.

19. My understanding of the purpose of a "network analysis schedule" is that it is used for planning and management of a project as well as measurement of a construction contractor's performance. This is further supported by the ROICC Handbook, which provides as follows:

> All construction contracts require the contractor to submit a progress schedule, preferably in a computer generated Critical Path Method (CPM) network analysis. Gantt (bar) charts are still used on some smaller contracts. Either type of progress schedule is intended to demonstrate that the contractor has a reasonable plan for completing the contract. It also provides a management tool to monitor progress and for informing the customer of contract performance.[7]

20. Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion") states on page 2: "Here, it is undisputed that Landmark submitted no schedule of prices and the Contracting Officer did not approve a schedule of prices." I disagree with that statement for the

---

[6] Document entitled ROICCHandbook.pdf, p. 64, from https://portal.navfac.navy.mil/

[7] Document entitled ROICCHandbook.pdf, p. 65, from https://portal.navfac.navy.mil/

following reasons: (a) Landmark submitted an initial schedule of prices, (b) payment for Landmark's first invoice was made based on the line items in that initial schedule of prices, (c) Landmark submitted a revised schedule of prices as part the NAS submittal, (d) the contracting officer approved Landmark's NAS submittal, which contained the schedule of prices.

21. It is my opinion that Landmark's submittal of the schedule of prices as part of the NAS satisfied the intent of Contract Section 01200, ¶ 1.2. This opinion is further supported by the ROICC Handbook, which provides as follows:

> The schedule of prices is a tool for making progress payments in accordance with FAR 52.232-5. The contractor will use the format of NAVFAC Form 4330/4, "Schedule of Prices (Construction Contract)," Appendix Tab (12). The contractor may generate his own computer generate[d] form, as long as the required information is include[d.] There may be a cost-loaded CPM on some contracts that will be the basis for the schedule of prices.[8]

22. Plaintiff's Motion states on page 5: "The Contracting Officer did not either review or approve the NAS prepared and used by Landmark to obtain progress payments." I disagree with that statement for the following reasons: (a) the contracting officer delegated the review of the NAS to the Project Engineer and discussed that review with him, (b) the contracting officer approved Landmark's NAS submittal with Contract Modification A00001.

23. The Naval Facilities Acquisition Supplement (NFAS) provides that certain contract administration functions can be delegated to a Contract Administration Office (CAO), in accordance with FAR 42.302, and states that a ROICC office can serve as a CAO.[9]

---

[8] Document entitled ROICCHandbook.pdf, pp. 63-64, from https://portal.navfac.navy.mil/

[9] Document entitled NFAS%20CH9.PDF, p. 65, from https://portal.navfac.navy.mil/

24. FAR Subpart 42.3 is applicable to CAO functions and provides as follows:

**FAR 42.302 Contract administration functions.**

(a) The contracting officer normally delegates the following contract administration functions to a CAO. The contracting officer may retain any of these functions . . . unless the cognizant Federal agency (see 2.101) has designated the contracting officer to perform these functions.

(1) Review the contractor's compensation structure.

. . .

(12) Review and approve or disapprove the contractor's requests for payments under the progress payments or performance-based payments clauses.

(13) Make payments on assigned contracts when prescribed in agency acquisition regulations.

. . .

(40) Perform engineering surveillance to assess compliance with contractual terms for schedule, cost, and technical performance in the areas of design, development, and production.

. . .

25. The Navy's contracting officer, John Santiago, was not experienced in the analysis of CPM schedules for the purpose of NAS submittal review. Instead, he delegated that responsibility to the project engineer, Kevin McAteer,[10] who was familiar with analysis of NAS submittals and who would report his findings to the contracting officer after reviewing the submittals. During my work as a consultant, I have observed that it is fairly typical for analysis and approval of NAS submittals to be delegated to the project engineer.

26. The NAS section of this contract appears to be primarily comprised of standard boilerplate scheduling specifications, with only a few specific details customized for this

---

[10] At the start of this project, Kevin McAteer served as the Assistant Resident Officer in Charge of Construction ("AROICC") for the Navy. The NFAS defines the AROICC position on page 13 as follows: A Civil Engineer Corps officer designated by the ROIC/ROICC for the administration of assigned contracts.

project.[11] In contrast, the Design Section of this contract appears to be customized for this project and it contains scheduling requirements that are specific to this project.[12] This is typical of a "design-build contract" in which normal "build contract" specifications are tailored to fit the different scheduling requirements of a design-build project.

27. Many of the NAS requirements were not customized for this project and they conflict with other contract requirements. For example, Contract Part IV (Construction) required submittal of a detailed NAS "within 40 calendar days after contract award."[13] However, Contract Part III (Design) required submittal of the NAS with both the Final Design Submittal and the Approved for Construction Submittal, both of which were planned to be made significantly more than 40 days after contract award.[14]

28. Submittal of a very detailed CPM schedule would have been necessary in order to satisfy all of the contract requirements for the NAS. On a design-build project such as this, it is apparent that a complex construction schedule in the form of a NAS is not needed 40 days after contract award, at a time when only design activities are planned to take place. Rather, the NAS is needed approximately three months prior to the planned start of construction, at the time of the Final Design Submittal.

29. Section 01321, ¶ 1.4.2, of the contract provided as follows: "The minimum number of activities in the final network diagram shall be 30 per building and 1000 for the total

---

11 Contract Section 01321, page 2, ¶ 1.4.2.

12 Contract Part III, page III - D - 8, ¶ D.7; page III - D - 15, ¶ D.12.

13 Contract Section 01321, page 4, ¶ 1.5.2.

14 Contract Part III, page III - D - 16, ¶ D.12.f. and ¶ D.12.g.

project." Rather than inserting the full 30 activities per building into the NAS, Landmark utilized 26 activities per building instead. Rather than inserting the full 1000 activities into the NAS, Landmark utilized 585 activities instead.

30. While Landmark's NAS submittal did not meet the exact requirements of Section 01321 for the number of activities in the final network diagram, it met the intent of those requirements. In my opinion, the number of activities in Landmark's NAS submittal (26 activities per building and 585 activities overall) was reasonable for this type of project.

31. While Landmark's NAS submittal did not meet all of the contract requirements, it was primarily used on this project for billing purposes, rather than scheduling purposes. Instead, Landmark and the Navy utilized other types of schedules to manage this project.

32. The majority of this project was comprised of simple renovation and construction work, which was very similar in each of the 160 housing units. At any particular time, Landmark would have dozens of units available for work, and of those units, there was (typically) no particular order in which they needed to be completed. For example, if electrical work was held up in one specific unit, that work could proceed in other available units.

33. In my opinion, on a project such as this, CPM scheduling techniques are not well-suited for day-to-day management of the construction work in the field. CPM schedules simply require too much effort to update logic ties and durations to adequately show each day's planned work, because the plan in the field often changes from day to day. Projects such as this are typically managed using more simplified schedules, such as bar charts, which require much less effort to update than CPM schedules.

34. Landmark managed this project using a combination of bar charts, tabular status

summaries (containing lists of activities with dates), and two-week look-ahead schedules. For example, Landmark managed its activities with simple bar chart schedules during the early part of this project. During the construction work on individual housing units, Landmark managed its activities with status summaries in different formats. Landmark also used two-week look-ahead schedules, which are very effective tools for managing this type of project and are often utilized by contractors in addition to, or instead of, the CPM schedules that are typically required.

35. After Landmark's termination, Atherton Construction, Inc. ("Atherton") and the Navy managed the project using tabular status summaries that were very similar to those previously used by Landmark. Like Landmark's, Atherton's NAS submittal did not meet all of the contract requirements, but it was primarily used on this project for billing purposes, rather than scheduling purposes.

36. It is my opinion that Landmark's NAS submittal was adequate for management of this project and satisfied the intent of Contract Section 01321. Moreover, if a project schedule met all the contract requirements for the NAS, it would not be an effective management tool for this type of project.

37. Attached as Exhibit A to this declaration is a copy of the expert report that I prepared in connection with this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 4, 2007.

Richard Paullin

Richard Paullin