IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LUMBERMENS MUTUAL CASUALTY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 04-1255C<br>(Judge Robert H. Hodges) |

DEFENDANT'S PROPOSED FINDINGS OF FACT
AND PROPOSED CONCLUSIONS OF LAW

Pursuant to the Court's August 22, 2007 scheduling order and Appendix A, ¶14, of the Rules of the Court of Federal Claims, defendant hereby submits is Proposed Conclusions of Law and Proposed Findings of Fact.

## PROPOSED CONCLUSIONS OF LAW

### Impairment Of Suretyship

1. A surety has equitable rights in the security provided, by the terms of the contract, for the performance to which it is bonded—such that change of those terms may discharge the surety. National Surety Corp. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997). To the extent that a surety has bonded itself based upon its reliance upon certain contractual terms which informed its assessment of the risk, the Government has a duty to administer the contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded. See National Surety, 118 F.3d 1 at 1546-1547.

2. The Federal Circuit has never recognized any basis for discharge of a surety based upon contractual provisions other than the mandatory retainage provision at issue in National

Surety, which the Federal Circuit held provided security for performance. National Surety Corp. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997).

3. A contractual obligation to withhold a percentage of progress payments is not primarily for the benefit of the Government because the Government is entitled to rely upon the payment and performance bonds to insure performance under the contract. A contractual obligation to withhold a percentage of progress payments is clearly not for the benefit of the contractor who would prefer that each progress payment invoice be paid in full.

4. Retainage has long been understood to stand specifically as a security for the surety against default. Prairie State Nat. Bank v. United States, 164 U.S. 227, 233 (1896): "That a stipulation in a building contract for the retention, until the completion of the work, of a certain portion of the consideration, is as much for the indemnity of him who may be guarantor of the performance of the work, as for him for whom the work is to be performed, that it raises an equity in the surety in the fund to be created, and that a disregard of such stipulation by the voluntary act of the creditor operates to release the sureties, is amply sustained by authority."

5. This Court should not expand the law regarding impairment of suretyship beyond that which the Federal Circuit established in National Surety Corp. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997).

6. Issues involving contract interpretation present questions of law to be decided by this Court. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997-98 (Fed. Cir.1996).

7. The language of the contract must be given its plain meaning, and the contract "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts". Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed .Cir.2003)

(en banc).

8. "An interpretation giving rise to reasonable meaning to all parts of a contract will be endorsed over one that leaves portions of the contract meaningless." Gresham, Smith & Partners v. United States, 24 Cl. Ct. 796, 802 (1991); see also Nielsen-Dillingham Builders, J.V. v. United States, 43 Fed. Cl. 5, 11 (1999) ("[P]ermitting [the contractor's interpretation] to govern would render considerable portions of the [contract] useless, meaningless, or otherwise surplusage. The court is precluded from entertaining such an interpretation.").

9. A specific contract provision will control over a general contract provision. See Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1369 (Fed. Cir .2005) ("Our precedent establishes as a principle of contract interpretation") (citing Hol-Gar Mfg. v. United States, 351 F.2d 972, 980 (Ct. Cl.1965).

10. A plaintiff's claims must be proven by a preponderance of the evidence, and must demonstrate liability, causation, and injury. Wilner Construction Co. v. United States, 24 F.3d 1397, 1401 (Fed Cir. 1994).

11. A plaintiff must prove that damages allegedly resulting from the Government's breach of a contract "was attributable solely to, and was therefore directly caused by, the [breach]." J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 456 F.2d 1315, 1330 (1972). See also Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) ("[T]he plaintiff can only recover those items of damage which are the proximate result of the acts of the Government. . . . For damages to be direct there must be no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly nor even probably.")

Breach of Contract Claims

12. This Court does not possess jurisdiction to consider Lumbermens' cause of action based upon breach of contract claims.

13. Lumbermens, having entered into a contract with the Government, covered by the Contract Disputes Act, must allege that it met the jurisdictional prerequisite of the Act. That is, Lumbermens, as a jurisdictional prerequisite to suit, was required to submit a claim to the contracting officer. Lumbermens' claims that the Navy breached the takeover agreement arise, if at all, under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 601 et seq.

14. With respect to disputes arising pursuant to the CDA, Congress has granted this court "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the CDA See § 1491(a)(2).

15. Pursuant to section 6 of the CDA, "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a).

16. Under section 10(a)(1) of that Act, the court's jurisdiction encompasses actions filed in the appropriate forum within a specified time period triggered by the date of the receipt by the contractor of the decision of the CO concerning the claim. 28 U.S.C. § 1491(a)(2); 41 U.S.C. §§ 605(a), 609(a)(3).

17. The CDA sets forth a detailed process that the contractor must comport with prior to instituting suit in this Court. 41 U.S.C. §§ 605(a)-(c). As the court in Witherington Construction Corp. v. United States, 45 Fed. Cl. 208, 211 (1999), stated: "[T]o gain a jurisdictional foothold in this [C]ourt, a plaintiff pursuing a contract claim must satisfy two

fundamental jurisdictional requirements--it must submit a claim for money presently due and must obtain a 'final decision' on that claim, either actual or deemed."

18. The CDA bars Lumbermens claim because it arises under the takeover agreement and Lumbermens has failed to satisfy the jurisdictional prerequisite contained in sections 605(a) and 605(c)(1) by submitting a certified claim to the CO.

19. The requirements of sections 605(a) and 605(c)(1) apply to contract claims of a surety that executes a takeover agreement following contractor default, see, e.g., Transamerica Insurance Company v. United States, 6 Cl. Ct. 367, 370 (1984), because a surety becomes a contractor subject to the CDA by executing such an agreement with the government. Westech Corporation v. United States, 20 Cl. Ct. 745, 749 (1990); 41 U.S.C. § 601(4).

20. Lumbermens' claims are clearly ones "arising under" the takeover agreement for purposes of the provision in the CDA requiring submission of its claim to the contracting officer as a jurisdictional prerequisite. See CDA, §§ 2(4), 6(a), (c)(1), 41; Transamerica Insurance Company v. United States, 31 Fed. Cl. 602, 39 (1994).

21. This Court lacks jurisdiction to entertain Lumbermens' cause of action premised upon the Navy's breach of the takeover agreement because Lumbermens, prior to filing its complaint, failed to submitted a certified claim to the contracting officer for a final decision as required by the CDA, 41 U.S.C. § 601 et seq.

22. Because Lumbermens failed to submit a claim, Lumbermens failed to comply with the CDA; therefore, Lumbermen's cause of action premised upon the Navy's breach of the takeover agreement should be dismissed.

DEFENDANT'S PROPOSED FINDINGS OF FACT

Schedule Of Prices: Section 01200, ¶ 1.2

1. Lumbermens claims that the Navy breached Section 01200, ¶ 1.2 of the contract, pertaining to the requirement that Landmark submit a schedule of prices.

2. Part III - Design, ¶ B.3.a, of the contract, references the schedule of prices as follows:

> Design Schedule of Prices: Within five working days after the Notice to Proceed, submit one original Schedule of Prices, with the following breakdown . . .
>
> -Bonds (Lump Sum)
> -Design
> (45% Design Submittal)
> (Final Design Submittal)
> -Construction (Lump Sum)
>
> For Schedule of Prices requirements during construction, see Part IV, Section 01200, Price and Payment Procedures.

3. With respect to the schedule of prices, Section 01200, ¶ 1.2, of the contract provided as follows:

> Prepare a Schedule of Prices on the forms furnished by the Government. The Schedule of Prices shall be a detailed breakdown of the contract price, giving quantities for each of the various kinds of work, unit prices, and extended prices. Submit the Schedule of Prices to the Government with the Final Design Submittal in accordance with Section III for approval by the Contracting Officer. Payments for construction work will not be made until the Schedule of Prices has been approved by the Contracting Officer.

4. A "schedule of prices" is a detailed statement provided by a construction contractor that allocates a dollar value for each of the various parts of the work as a portion of the

total contract value.

5. The purpose of a "schedule of prices" is that it is used as the basis for submitting and reviewing progress payments.

6. The ROICC Handbook provides as follows:

> Remember, the purpose of a schedule of prices is to provide a vehicle for progress payments, nothing more. There are very few requirements dictated by law or regulation; the ROICC must protect the government and be reasonable with the contractor to achieve an acceptable schedule of prices.

7. Landmark submitted an initial schedule of prices on May 5, 2000. The contract required the submittal of this initial schedule of prices during the design phase of the project.

8. The contract also provided for the submittal of another schedule of prices for the construction phase of the project. This schedule of prices was to be submitted with the Final Design Submittal, which was planned to occur approximately six months after contract award.

9. Landmark submitted the schedule of prices for the construction phase of the contract in an electronic file dated June 28, 2000, as part of the Network Analysis Schedule (NAS). Landmark made this submittal approximately four months prior to the date required by the contract.

10. Landmark's first invoice, dated July 6, 2000, also contained a printout of the schedule of prices for the construction phase of the contract, as part of the NAS. The following is an excerpt from the first page of that NAS, showing the beginning of the section that Landmark identified as the schedule of prices:

| Task Name | Amount Bid |
|---|---|
| **Maylor Capehart Housing** | **$9,878,026.00** |
| Received Contract | $0.00 |

| | | |
|---|---|---|
| Partnering Meeting | $0.00 | |
| Pre-Design Meeting | $0.00 | |
| **Design Phase** | **$0.00** | |
| **Submittals** | **$0.00** | |
| Govt, Review Submittal | $0.00 | |
| Construction Mobilizat | $0.00 | |
| Mutual Understanding | $0.00 | |
| **Schedule of Pricing** | **$5,514,508.00** | |
| Doors & Windows | | $500,000.00 |
| Cabinets | | $500,000.00 |
| Toilets & Accessories | | $100,000.00 |
| Paint | | $300,000.00 |
| . . . | | |

11. Landmark submitted the schedule of prices again on July 31, 2000, as part of its submittal of the NAS. John Santiago, the contracting officer, approved that submittal with Contract Modification A00001, dated August 8, 2000.

12. Landmark submitted a revised NAS, that contained a schedule of prices, on August 9, 2000. Kevin McAteer, the project engineer assigned to this project by the Navy, returned the submittal marked "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark.

13. The contract specifications authorized work to proceed when a submittal was "approved as noted" provided the contractor "takes no exception to the notations." Landmark did not take exception to the notations, and resubmitted the NAS on September 25, 2000.

14. Mr. Santiago was satisfied with, and relied upon, in part, Landmark's schedule of prices.

15. In Mr. Santiago's opinion, Landmark's schedule of prices, in conjunction with his knowledge of the project and material acquisitions, was sufficient information for him to

evaluate the progress made with respect to the material acquired.

16. In the opinion of Mr. Santiago, the schedule of prices provided by Landmark was suitable for billing purposes.

17. In the opinion of Mr. Santiago, the payment of material costs to Landmark by the Navy was in accordance with the schedule of prices information submitted by Landmark with its invoices.

18. In Mr. Santiago's opinion, Landmark's submittal of the schedule of prices as part of the NAS satisfied the intent of Contract Section 01200, ¶ 1.2.

19. The ROICC Handbook provides as follows:

> The schedule of prices is a tool for making progress payments in accordance with FAR 52.232-5. The contractor will use the format of NAVFAC Form 4330/4, "Schedule of Prices (Construction Contract)," Appendix Tab (12). The contractor may generate his own computer generate[d] form, as long as the required information is include[d.] There may be a cost-loaded CPM on some contracts that will be the basis for the schedule of prices.

20. Contrary to the assertion of Lumbermens, Landmark submitted a schedule of prices, and the contracting officer approved that schedule of prices.

21. In summary, Landmark submitted an initial schedule of prices, payment for Landmark's first invoice was made based upon the line items in that initial schedule of prices, Landmark submitted a revised schedule of prices as part of its NAS submittal, and the contracting officer approved Landmark's NAS submittal, which contained the schedule of prices.

Network Analysis Schedule (NAS)

22. A "network analysis schedule" is a method of graphically portraying the planning and scheduling of a project's activities in a way that allows mathematical analysis of the project

schedule.

23. The purpose of a network analysis schedule is for the planning and management of a project, as well as measurement of a construction contractor's progress.

24. The ROICC Handbook provides as follows:

> All construction contracts require the contractor to submit a progress schedule, preferably in a computer generated Critical Path Method (CPM) network analysis. Gantt (bar) charts are still used on some smaller contracts. Either type of progress schedule is intended to demonstrate that the contractor has a reasonable plan for completing the contract. It also provides a management tool to monitor progress and for informing the customer of contract performance.

25. As previously stated, Landmark submitted its NAS (containing a schedule of prices) on July 31, 2000. Mr. Santiago approved that submittal with Contract Modification A00001, dated August 8, 2000.

26. As previously stated, Landmark submitted a revised NAS on August 9, 2000. Kevin McAteer, the project engineer assigned to this project by the Navy, returned the submittal marked "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark.

27. The contract specifications authorized work to proceed when a submittal was "approved as noted" provided the contractor "takes no exception to the notations." Landmark did not take exception to the notations, and resubmitted the NAS on September 25, 2000.

28. The NAS (and the schedule of prices) provided by Landmark was suitable for day-to-day management of the construction work.

29. The Naval Facilities Acquisition Supplement (NFAS) provides that certain

contract administration functions can be delegated to a Contract Administration Office (CAO), in accordance with FAR 42.302, and states that a ROICC office can serve as a CAO.

30. FAR Subpart 42.3 is applicable to CAO functions and provides as follows:

> **FAR 42.302 Contract administration functions.**
>
> (a) The contracting officer normally delegates the following contract administration functions to a CAO. The contracting officer may retain any of these functions . . . unless the cognizant Federal agency (see 2.101) has designated the contracting officer to perform these functions.
>
> > (1) Review the contractor's compensation structure.
> >
> > . . .
> >
> > (12) Review and approve or disapprove the contractor's requests for payments under the progress payments or performance-based payments clauses.
> >
> > (13) Make payments on assigned contracts when prescribed in agency acquisition regulations.
> >
> > . . .
> >
> > (40) Perform engineering surveillance to assess compliance with contractual terms for schedule, cost, and technical performance in the areas of design, development, and production.
> >
> > . . .

31. Mr. Santiago was not experienced in the analysis of critical path method (CPM) schedules for the purpose of NAS submittal review. For this contract, Mr. Santiago delegated that responsibility to Kevin McAteer, the project engineer, who was familiar with analysis of NAS submittals.

32. At the start of this project, Kevin McAteer served as the Assistant Resident Officer in Charge of Construction (AROICC) for the Navy.

33. The NFAS defines the AROICC position as follows: A Civil Engineer Corps

officer designated by the ROIC/ROICC for the administration of assigned contracts.

34. Mr. McAteer reported his findings to Mr. Santiago after reviewing the submittals. Throughout his career as a contracting officer, Mr. Santiago routinely delegated the analysis and approval of NAS submittals to the project engineer.

35. Contrary to Lumbermens assertion, the contracting officer did review and approve the NAS prepared and used by Landmark to obtain progress payments because Mr. Santiago properly delegated the review of the NAS to the project engineer and discussed that review with him, and approved Landmark's NAS submittal with Contract Modification A00001.

36. Prior to Landmark's failure to pay its vendors and suppliers, which led to Landmark's abandonment of the project, Mr. Santiago had no issues with the quality and timeliness of Landmark's work, or with the performance of Landmark's employees on site who were managing and implementing the renovation work.

37. On this project, Landmark's NAS submittal was used primarily for billing purposes. Together with the NAS, Landmark and the Navy managed this project with tabular status summaries (containing lists of activities with dates).

38. Landmark's NAS submittal was adequate for management of this project and it satisfied the intent of Section 01321 of the contract.

39. After Landmark's termination, Atherton Construction, Inc. (Atherton) and the Navy managed the project using tabular status summaries that were very similar to those previously used by Landmark.

40. Like Landmark's, Atherton's NAS submittal did not strictly meet all of the contract requirements. In Mr. Santiago's opinion, however, it was adequate for billing purposes.

41. Lumbermens contends that the Navy's alleged failure to precisely follow the contract's payment terms impairs its suretyship and thus, as a matter of law, allows a pro tanto discharge of the surety.

42. Lumbermens alleges that the Navy breached § 01200, ¶ 1.2 of the contract which requires the contractor to submit, and the Navy contracting officer to approve, a schedule of prices before payment.

43. With respect to the requirements for processing Landmark's invoices, Section 01200, ¶ 1.3, of the contract provided as follows:

> a. Content of Invoice. Requests for payment will be processed in accordance with [FAR 52.232-5], Payments Under Fixed-Price Construction Contract" and shall consist of the following:
>
> (1) The Contractor's invoice shall be submitted on NAVFAC Form 7300/41, which may be obtained from the Contracting Officer. The invoice shall show, in summary form, the basis for arriving at the amount of the invoice.
>
> (2) The Contract Performance Statement, on the form furnished by the Government for this purpose, shall show, in detail, the estimated cost, percentage of completion, and value of completed performance.
>
> (3) The Contractor shall provide an updated network analysis.
>
> (4) Contractor's Final Release Form (with request for final payment only).
>
> (5) QC Manager's invoice certification
>
> . . .
>
> d. Invoices not completed in accordance with contract requirements will be returned to the Contractor for correction of the deficiencies.
>
> . . .

44. The Navy fully complied with Section 01200, ¶ 1.3 when payment of Landmark's invoices was authorized.

45. The Navy did not authorize payments to Landmark in violation of Section 01200, ¶ 1.3 of the contract.

46. Landmark's NAS submittal was adequate for management of this project and it satisfied the intent of Section 01321 of the contract.

47. The inclusion of this provision is for the benefit of the Navy.

48. Lumbermens has not, and can not, establish as a matter of fact or law, that the inclusion of such contractual provisions was intended for the benefit of Lumbermens.

49. This provision provides no security for the surety in its bonded performance.

50. The schedule of prices provided by the contractor merely sets forth in a very general way how the contractor has allocated the amount of the fixed price contract among various material and labor activities necessary to complete performance under the contract. The contractor is in no way required to demonstrate to the Government that the amounts shown are in fact the actual amounts the contractor expects to spend because the contractor's profits are built into those amounts.

51. Landmark in fact did submit a schedule of prices and the contracting officer in fact did approve Landmark's schedule of prices.

<u>Impairment Of Suretyship</u>

52. The linchpin of Lumbermens' argument is that the Navy breached contract specifications pertaining to the Navy's payment of Landmark's requests for progress payments, which payments resulted in the Navy overpaying Landmark.

53. The gravamen of Lumbermens' position must be that the contract specifications at issue were included in the contract for the benefit of the surety because there is no support for the proposition that the breach of a contract specification that does not provide security for the surety supports the discharge of a surety for its obligations under its payment and performance bonds.

54. The contract specifications that Lumbermens claims that the agency beached were included for the benefit of the Navy in administering the contract and making payments.

55. No court has found liability for the breach of a contract provision that serves as tool for the Government to manage a contract, such as the ones at issue here.

56. Unlike a mandatory retainage provision, the Government's requirement that a contractor provide a network analysis schedule and schedule of prices are not the type of requirements that a surety would rely upon in deciding to bond a contract.

57. Discharge of a surety can only occur upon an alteration of those terms which provide the surety's security.

58. To discharge the surety for any change in the terms of a contract, such as those governing the management and administration of a contract would impair the ability of contracting officers to manage and administer contract in an efficient and cost effective manner.

59. If the use of standardized contract clauses, such as the ones at issue in this case, is discouraged, the contracting process will become more burdensome and less efficient.

Expert Opinions Of Wiley R. Wright, III

60. Lumbermens has not, and can not, dispute that Mr. Wright has the requisite educational background and experience to testify as an expert in this matter.

61. Mr. Wright is a Certified Public Accountant with more than 25 years experience

in the practice of public accounting, and construction and government consulting.

62. Mr. Wright has provided expert testimony, either in deposition or trial, on more than sixty different occasions, many of which were related to pricing and cost accounting issues arising under construction contract disputes, and has testified, as an expert, in proceedings before the United States Court of Federal Claims, the Federal Boards of Contract Appeals, in domestic and international arbitration and mediation proceedings, in Federal District courts, and various state courts and boards of contract appeals.

63. On no occasion has Mr. Wright been found not competent to testify in his area of expertise; his testimony has never been excluded for any reason.

64. There is also no dispute that Mr. Wright's opinions are based upon a proper factual foundation to support his analysis, and that he has not ignored significant factors that may have contributed to Lumbermens' losses.

65. It is Mr. Wright's expert opinion that the most appropriate and most accurate method to determine the percent complete of a construction project from a financial perspective is the cost-to-cost method of analysis.

66. To determine the extent of the overpayments, if any, by the Navy to Landmark, Mr. Wright had to determine the percentage of completion of the contract requirements by Landmark at the time of termination.

67. Mr. Wright decided that the most appropriate financial accounting methodology to determine the percentage of completion was a cost-to-cost analysis.

68. In Mr. Wright's expert opinion, the cost-to-cost method is a preferred method of revenue recognition under generally accepted accounting principles for construction contractors.

69. The cost-to-cost method is both relevant and reliable under the circumstances presented by this case.

70. While Mr. Wright acknowledges that the cost-to-cost is not the only method that could be used, it is his expert opinion that under the circumstances presented by this case the cost-to-cost methodology is the most appropriate methodology to be used. Another methodology involves the determination of the actual quantities of materials received as of the termination date, and the quantities of the materials actually utilized by Atherton in the performance of their takeover contract. However, in Mr. Wright's opinion, the available records were insufficient to perform that type of analysis.

71. Under the cost-to-cost method, the percent complete is determined by comparing the relative costs incurred by each contractor, stated as a percentage.

72. For example, if each contractor incurred $100 to perform a particular line item of work then the percent-complete for contractor 1 would be 50 percent ($100 as a percentage of the total cost of $200).

73. The cost-to-cost method is not an estimate of the proportion of the project's financial burden carried by Landmark, as Lumbermens contends, but rather a generally recognized and accepted methodology for determining the percentage complete, and the appropriate amount of the schedule of prices amounts earned by Landmark.

74. Mr. Wright's analysis and calculations were performed using this recognized methodology and was based upon actual objective cost data. Id.

75. Mr. Wright's methodology is reliable given that it is recognized by an authoritative body in the field of of accounting, that is, the Generally Accepted Accounting

Principles (GAAP) as promulgated by the American Institute of Certified Public Accountants.

76. The American Institute of Certified Public Accountants (AICPA) is the national, professional organization for all Certified Public Accountants.

77. Its mission is to provide members with the resources, information, and leadership that enable them to provide valuable services in the highest professional manner to benefit the public as well as employers and clients.

78. The AICPA establishes professional standards; assist members in continually improving their professional conduct, performance and expertise; and monitors such performance to enforce current standards and requirements.

79. The AICPA's Accounting Standards Team, though its Accounting Standards Executive Committee, develops industry-specific guidance regarding financial accounting and reporting matters, including industry-specific authoritative guidance, such as Statement of Positions and Accounting and Auditing Guides.

80. AICPA’s Statement of Position (SOP) 81-1 – Accounting for Performance of Construction-Type and Certain Production-Type Contracts, provides that the percentage of completion method is the preferred method for revenue recognition when estimates of costs to complete and extent of completion towards completion of long-term contracts are reasonablely dependable.

81. SOP 81-1, Accounting Research Bulletin No. 45 (ARBNo.45), Long Term Construction-Type contracts, issued by the AICPA Committee on Accounting Procedure in 1955, describes the two generally accepted methods of accounting for long term construction-type contracts for financial reporting purposes:

> The percentage-of-completion method recognizes income as work on a contract progresses: recognition of revenues and profits generally is related to costs incurred in providing the services required under the contract.
>
> The completed-contract method recognizes income only when the contract is completed, or substantially so, and all costs and related revenue are reported as deferred items in the balance sheet until that time.

82. SOP 81-1 provides further that:

> The committee believes that in general when estimates of costs to complete and extent of progress toward completion of long term contracts are reasonably dependable, the percentage-of-completion method is preferable. When lack of dependable estimates or inherent hazards cause forecasts to be doubtful, the completed contract method is preferable.

83. Under SOP 81-1, there are alternative acceptable methods of of measuring extent of progress towards completion, including the cost-to-cost method, variations of the cost-to-cost method, efforts expended methods, the units of delivery method, and the units-of-work performed method. Those practices are intended to conform to ARB No.45, paragraph 4 which states:

> The committee recommends that the recognized income (under the percentage-of-completion method) be that percentage of estimate total income, either:
>
> (a) that incurred costs to date bear to estimated total costs after giving effect to estimates of costs to complete based upon most recent information, or
>
> (b) that may be indicated by such other measure of progress toward completion as may be appropriate having due regard to work performed.

Id.

84. Given the lack of objective, complete, and accurate data as to the units of delivery or units of work performed, it is Mr. Wright's expert opinion that the cost-to-cost approach he used is the acceptable and preferred approach under SOP 81-1, the relevant authoritative guidance.

85. Generally Accepted Accounting Principles (GAAP) are the authoritative body of accounting standards for financial reporting in the United States.

86. While these standards are applicable to the presentation of financial statements, the principles and methods contained in them are relevant to other non-financial statement uses, such as the measure of revenue earned for a fixed price construction contract in a non-financial statement context.

87. Given that the cost-to-cost methodology is commonly employed for determining the percentage of completion, and the related revenue earned under fixed price contracts, and its use is supported by the relevant literature and authoritative guidance, the methodology used by Mr. Wright is reliable.

88. The cost-to-cost methodology is directly relevant to this case because the central issue from a financial standpoint is whether Landmark was overpaid for its work on the contract.

89. The determination of any overpayments is based upon the revenue that Landmark should have earned for a particular line item, for example, doors and windows, versus the amount Landmark was actually paid by the Navy for that line item.

90. The percentage of completion method that Mr. Wright used in analyzing the extent of such overpayments objectively, and consistent with authoritative guidance, measures the work performed by Landmark, and calculates the amount Landmark should have been paid

based upon this objective methodology.

91. The amount that Landmark should have been paid is then compared to the amount that Landmark was actually paid, any difference being the amount that Landmark was overpaid or underpaid for the particular line item or activity being evaluated.

92. The use of actual costs for both Landmark and Atherton, the completion contractor, in Mr. Wright's calculations using the cost-to-cost method eliminates the use of estimates, as well as the concerns discussed in SOP 81-1 concerning the reliability of estimates.

93. There is no dispute that the acquisition of the materials necessary to renovate the 160 housing units is a large component of the work required under this contract, and that Landmark was entitled to obtain payments from the Navy for these materials under the contract as they were procured.

94. The cost-to-cost method measures the amount of materials that Landmark acquired as compared to the total materials requirements.

95. Based upon this objective data, Mr. Wright calculated the amount of revenue, that is, payments Landmark received under the contract, that Landmark should have received for the materials.

96. The determination of the material costs that Landmark incurred in relation to the total material cost, that is, the cost of materials procured compared to the total cost of those materials as identified in Landmark's schedule of prices, is important to the damages calculation in this case because of the manner in which Landmark billed for its material acquisitions.

100. As Lumbermens acknowledges, Landmark separately included the required materials as separate line items in its schedule of prices, and not to the costs of renovating the

individual housing units.

101. The contract provided that the Navy would make progress payments for these materials line items as the materials were acquired. Accordingly, for the material line items, the question of the work accomplished for individual housing units is irrelevant to the determination of the amount of material acquired in relation to the total material requirements.

102. To measure this progress, that is, materials acquired, the cost-to-cost method under the percentage of completion is the best method of measurement.

103. For some of the items for which Lumbermens claims that Landmark was overpaid, it was not necessary for Mr. Wright to use the cost-to cost method of analysis. For example, site-work is one of the activities for which Lumbermens contends that the Navy overpaid Landmark.

104. Mr. Wright is of the opinion that the $590,000 that Landmark included in its schedule of prices for sitework was reasonable because the $590,000 paid to Lloyd Enterprises for the site-work is the full amount of the subcontract between the parties. Based upon Lloyd's Certified Payroll reports, Lloyd spent a total of 947 hours on the project that includes 458 equipment hours. Based upon Lloyd's Certified Payroll Reports, the effective rate for the sitework was $623 per hour, not the $2,000 per hour claimed by Lumbermens in its complaint. Id. An alternative, and more appropriate analysis of the amount paid to Lloyd, is determining the effective sitework cost per housing unit. That amount is $3,687.50 ($590,000 divided by 160 units). This unit cost rate was reasonable and should not have raised any issues or concerns by the Navy. It is, therefore, Mr. Wright's expert opinion that Landmark was not overpaid for sitework.

105. Another example of an activity for which Mr. Wright did not use the cost-to-cost method of analysis is the Navy's payment to Landmark for personnel costs.

106. Lumbermens contends that the $378,936 the Navy paid Landmark for personnel was $291,500 more than the amount to which Landmark was entitled, and constituted 52 percent of the amount indicated in Landmark's schedule of prices for this line item. Mr. Wright is of the opinion that the Navy made no overpayment for this item. The personnel line item in Landmark's schedule of prices, in the amount of $728,834, was budgeted separately from the per unit labor, and consists of field office overhead or general conditions labor.

107. In Mr. Wright's opinion, it is appropriate and consistent with industry practices to budget this type of labor separately from the labor incurred for building the units. Id. Furthermore, it is a generally recognized practice in the construction industry to treat general condition or field office type labor as a time variable costs. Thus, the contract will "earn" and invoice for these costs ratably over time.

108. Moreover, given the nature of the personnel costs it would be inappropriate to recognize or "earn" these types of costs based upon the actual percent complete of the unit construction.

109. Mr. Wright's calculations of the credit for Landmarks' labor expenses are only for general conditions labor, which is based upon a generally recognized per diem method for time variable field office overhead costs. This approach is clearly appropriate and reliable because Landmark spread its general condition labor costs over the project which had a fixed period of performance. Mr. Wright, therefore, credited general conditions labor over that fixed duration. This method is not only consistent with the generally recognized per diem method but also

consistent with Landmark's incurrence of these costs.

110. For other activities for which Lumbermens claims that the Navy overpaid Landmark, it was necessary for Mr. Wright to use the cost-to-cost method of analysis. For example, Lumbermens contends that the $458,640 paid to Landmark for asbestos and lead abatement work accounted for 52 percent of the amount indicated in Landmark's schedule of prices for that work, while Landmark had only completed abatement in 34 percent of the housing units, thereby overpaying Landmark $158,760 for work it had not performed. To determine the amount of the overpayment, if any, Mr. Wright used the cost-to-cost method. Mr. Wright's analysis is as follows:

| | 180 Units | Less 21 Units | 159 Units | Percent Complete |
|---|---|---|---|---|
| Landmark Construction | $242,509 | | $242,509 | 48 % |
| Atherton Construction | $330,777 | 66,883 | $263,894 | 52% |
| Subtotal | $573,286 | | $506,403 | 100 % |
| Average Cost Per Unit | $ 3,185 | | | |

| | | | | |
|---|---|---|---|---|
| Landmark Schedule of Value Amount | $882,000 | | | |
| Amounts Paid to Landmark | $458,640 | | | |
| Landmark's Earned Value | $422,377 | | | |
| Overpayment | $ 36,263 | | | |

111. Thus, it is Mr. Wright's expert opinion that the Navy overpaid Landmark $36,263 for this item, not the $158,760 claimed by Lumbermens.

112. For some of the activities for which Lumbermens claims that the Navy overpaid Landmark, Mr. Wright's estimates of the overpayment, in fact, are greater than the amount claimed by Lumbermens. For example, Mr. Wright's cost-to-cost calculation for doors and

windows is as follows:

| | 180 Units | Less 21 Units | 159 Units | Percent Complete |
|---|---|---|---|---|
| Landmark Construction | $ 485,784 | | $ 485,784 | 42% |
| Atherton Construction | $ 825,571 | $152,991 | $ 672,991 | 58% |
| Subtotal | $1,311,355 | | $1,158,364 | 100% |
| Average Cost Per Unit | $ 7,285 | | | |
| Landmark Schedule of Value Amount | $500,000 | | | |
| Amounts Paid to Landmark | $375,000 | | | |
| Landmark's Earned Value | $209,685 | | | |
| Overpayment | $165,315 | | | |

113. Based upon the cost-to-cost method, it is Mr. Wright's expert opinion that the maximum overpayment for doors and windows is $165,315, not the $131,775 sought in the complaint.

114. Mr. Wright has also rendered opinions in his expert report that do not involve the cost analysis method, the use of which has been described above, and do not involve the analysis of line items in Landmark's schedule of prices. For example, Lumbermens contends that it incurred damages in excess of $4 million under its performance bond, and more than $550,000 under its payment bond.

115. It is Mr. Wright's expert opinion that Lumbermens' claim is duplicative of the separate claims for materials, personnel, and subcontract costs. Furthermore, Lumbermens claim is a total cost claim in which Lumbermens seeks all of its payments for the project. In addition to being duplicative, the amounts for these two claims include items that are unrelated to the issues in the complaint, such as the price differences between Landmark and Atherton for performing the original scope of work. Lumbermens offers no rationale whatsoever for its contention that Lumbermens was required to pay proportionately more to Atherton to complete the work than the

Navy was contractually required to pay Landmark. These amounts also fail to consider the value of materials and services received by Atherton and Lumbermens for the payments made to suppliers and subcontractors under the payment bond. Finally, Lumbermens' has failed to explain or document the bases for the varying amounts it is claiming.

116. With respect to Lumbermens' contention that as a result of the Navy's failure to demand from Landmark a NAS that complied with the contract requirements, Lumbermens has been damaged by at least $2,000,000, Mr. Wright is of the expert opinion that the bases for this amount is neither explained nor supported. Furthermore, this amount is duplicative of the discreet claims for the material, personnel and subcontract amounts.

117. Landmark, during the last six months it performed work under the contract, stopped paying some of its vendors and suppliers.

118. Landmark's failure to pay its vendors and suppliers led to the Landmark's on site employees (who were responsible for performance under the contract) abandoning the project. Landmark's failure in this regard, however, is not relevant to the percentage of completion methodology used by Mr. Wright. The percentage of completion methodology is based upon a measurement of the acquisition of materials by Landmark and Atherton as compared to the total material requirements. To the extent Landmark acquired the materials for the benefit of the project, and recorded the cost of the material acquisition (Landmarks acquisition and receipt of the materials is a prerequisite for the payment of an invoice(s) under the payment bond by Lumbermens), then these costs must be included in the percentage of completion calculation. Thus, it is Mr. Wright's expert opinion that Lumbermens is not entitled to recover the monies it paid to the unpaid vendors and suppliers under the payment bond.

119. Finally, it is Mr. Wright's expert opinion that Lumbermens use of the percentage of completion methodology is flawed, because Lumbermens used payments rather than incurred costs.

120. GAAP relies upon the incurred costs, not paid amounts (accrual basis of accounting versus the cash basis). Therefore, Lumbermens is incorrect to use only payments to measure costs incurred and the resultant progress.

121. The ordering of materials by Landmark would not result in the recognition of costs. In the accrual basis of accounting, costs are only recognized upon receipt of ordered materials which, at that time, are to be included in the calculation of percentage of completion. Clearly, both the paid and unpaid amounts are relevant to the calculation since Landmark received the materials for the unpaid invoices. In fact, Lumbermens would not have made payment under the payment bond for materials not received.

122. Mr. Wright also disputes Lumbermens' assertion that looking at the percentage completion of the housing units is comparable to Mr. Wright's cost-to-cost percentage of completion calculation for material items. At the time Landmark was terminated 12 percent of the housing units in the project were complete, and 15 percent complete if work in partially completed units is counted. In Mr. Wright's opinion, the 12 percent and 15 percent figures that Lumbermens refers to are the estimated percent complete figures for the actual housing units without regard to the material cost used for the construction of the units. Lumbermens is comparing two different calculations and trying to give the impression that the results of one is applicable to the other. If Landmark, at the time of termination, had already acquired 100 percent of the materials needed for the renovation of all of the housing units, but had not started any

actual renovation, Lumbermens' position would necessarily have to be that the percentage complete was zero and, therefore, Landmark should have been paid nothing for the materials it had acquired for the project. Not only is such a position patently ludicrous, the contract provided that Landmark was entitled to submit progress payment invoices for, and be paid, for materials it acquired during the performance of the contract. Moreover, if Landmark had not been able to receive payments for materials as they were acquired, Landmark would in effect have to finance the project, and consequently not be in a position to purchase materials in quantity, with the net effect of hiving to bid a higher amount, resulting in a greater cost to the Government.

123. It is also Mr. Wright's opinion that Lumbermens fails to distinguish between the overall percentage of completion for the housing units and the percentage of completion for the individual material line items for which it seeks as its damages. As previously mentioned, the overall percentage of completion for the individual housing units (12 percent or 15 percent including units with partial completion) does not take into account the percent complete for the materials acquisitions. The central issue in this case is whether Landmark was overpaid for material acquisitions, not for the individual housing units. Lumbermens is incorrectly applying the results of one calculation to a completely different set of data.

124. Lumbermens presents no analysis and reflects no credits to its calculations for the individual housing units that were partially completed at termination but for which no payments had been made to Landmark. Lumbermens also presents no analysis and reflects no credits in its calculations for other Schedule of Prices line items for which Landmark was underpaid. By excluding these credits, Lumbermens further overstates its damages.

125. It is Mr. Wright's expert opinion that the damages sought by Lumbermens are

premised upon a total cost approach. Specifically, Lumbermens is seeking the amount that Lumbermens paid Atherton over the contract balance that remained at the time Landmark was terminated, plus the payment bond payments. Lumbermens, however, has failed to specifically identify its damages to the individual causes of action, and has failed to exclude from its damage amounts costs that are unrelated to the issues in this case. It is Mr. Wright's expert opinion that his actual cost method results in a more accurate measure of damages.

126. All of Mr. Wright's calculations, as opposed to Lumbermens', are based upon the actual cost data for both Landmark and Atherton. To the extent that the Atherton costs include items that are not the fault of the Navy, it is Mr. Wright's opinion that his percent complete calculations overstate the maximum range of the damages.

127. In Mr. Wright's opinion, the relevancy and reliability of the opinions he has rendered in this case are as well supported as in every other case in which he has been involved. All of the opinions contained in Mr. Wright's expert report have been peer reviewed within R&M, and are therefore not only his opinions but those of his fellow shareholders, who on a combined basis have over one hundred years of experience in providing similar services in the construction and damages practice area. Mr. Wright's fellow shareholders have also been qualified as expert witnesses in a wide variety of forums and have provided expert testimony in over one hundred and fifty matters.

128. In summary, it is Mr. Wright's expert opinion that Lumbermens' alleged damages are incorrectly calculated and overstated; that the majority of Lumbermens' alleged damages are duplicative of each other; that Lumbermens' alleged damages are in effect a total cost claim; that Lumbermens has failed to properly apply the total cost approach; and that the total cost approach

is an inappropriate method for computing damages in these circumstances. It is also Mr. Wright's expert opinion that the proper measure of any overpayments should be computed by deducting the amounts paid to Landmark for each of the schedule of prices line items at issue from the earned revenue for the work actually performed as of Landmark's termination; that in order to properly determine the earned revenue of the work actually performed by Landmark as of the termination date, the percentage of completion method should be used; and that the majority of the line items in dispute, the cost-to-cost method is the appropriate methodology to use to determine the amount, if any, of the overpayments made to Landmark. In conclusion, Mr. Wright is of the opinion that the maximum amount by which the Navy overpaid Landmark is approximately $1,000,000.

129. The amount by which the Navy underpaid Landmark is approximately $1,000,000.

Expert Opinions of Richard Paullin With Contract Solutions, LLC

130. Contract Solutions LLC was retained to perform an independent schedule and progress analysis of the project involving the Repair/Revitalization of the Maylor Capehart Housing Area at Naval Air Station Whidbey Island, Oak Harbor, Washington.

131. In performing its analysis, Richard Paullin of Contract Solutions reviewed numerous project documents, including, but not limited to the following: the solicitation and amendments; Proposal and revised proposals; Contract no. N44255-97-c-5515; Contract drawings and specifications; Contract award letter, dated April 11, 2000; Contract modifications; Network analysis schedules; other project schedules; Complaint, filed August 14, 2004; First amended complaint, filed March 13, 2006; Contractor's invoices; Contractor's quality control

reports; Contractor's daily production reports; General correspondence; E-mail correspondence; Internal government documents; Internal contractor documents; Internal surety documents; Meeting minutes, and Depositions and exhibits.

132. Mr. Paullin performed an independent schedule and progress analysis of the entire project using critical path method (CPM) scheduling techniques, as well as other methods of analysis.

133. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that the project was delayed from the original contract completion date of October 23, 2002, until the actual substantial completion date of June 6, 2003, which represents a total delay of 7.4 months to the overall project schedule.

134. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that all of delay to the project's critical path is inexcusable and, therefore, non-compensable.

135. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Landmark (working with the Government) started early construction activities ahead of schedule.

136. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Landmark (at the request of the Government) began work early on several unique housing units on Baker Court.

137. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Landmark initially planned for early completion of the housing units.

138. Based upon his review and analysis of all relevant documents, Mr. Paullin is of

the opinion that Landmark's schedules were adequate for management of this project.

139. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Landmark's substantial progress on early construction activities enabled it to be several months ahead of the contract schedule as of January 21, 2001.

140. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that a delay of 42 days (1.4 months) occurred during the final months of Landmark's contract performance, because of slow progress resulting from its financial difficulties.

141. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that a delay of 152 days (5.0 months) occurred between the furlough of Landmark personnel and execution of the Takeover Agreement, because no schedule progress was made during that period.

142. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that a delay of 7 days (0.2 months) occurred between execution of the Takeover Agreement and the Notice to Proceed issued by the Surety, because no schedule progress was made during that period.

143. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Atherton made very little progress during its first two months of performance, when it had the opportunity to get ahead of its planned schedule.

144. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Atherton's overall schedule was not delayed by the electrical issues or asbestos abatement issues and it achieved substantial completion of its work ahead of its planned schedule.

145. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Atherton's planned schedule was longer than the time remaining in Landmark's contract, as of the date of the furlough; this resulted in 25 days (0.8 months) of project delay.

146. Because both the design and construction of this project were part of the same contract, it can be called a design-build contract. Design work was required although the amount of design work necessary for renovation of existing units is much less than the amount needed for conventional construction.

147 By selecting this type of contract, the Government was able to look to a <u>single source</u> of responsibility for both design and construction. In addition, the overall duration of design and construction is generally shorter for the design-build method of project delivery than for the design-bid-build method.

148. For a project such as this, a design-build contractor often seeks to purchase long-lead items and commence construction before design is totally completed ("fast track design-build") and in so doing, shortens even further the overall duration of the project schedule.

149. Landmark's contract required the design to be fully completed before construction could begin. In accordance with that requirement, Landmark's proposal stated that it intended to fully design the project before commencing construction in the field.

150. After contract award, Landmark and the Government agreed to a period of overlap or concurrency between the completion of the design phase (which included Government review and approval of the design) and the start of the construction phase.

151. All of the project schedules issued by Landmark after contract award reflected this agreement by showing start and completion dates for certain activities that were before the dates

specified by the contract.

152. This "early completion" of certain parts of the work is often allowed by the Government in order to shorten the overall project schedule, allow exterior work to proceed during periods of good weather, and reduce the project's demands on Government personnel.

153. Because this agreement was made after contract award, the project schedules reflecting early completion of work were, by their very nature, revisions to the contract schedule. Thus, they cannot be used as a baseline from which to measure delays to the contract. In essence, the agreement between the Government and the contractor allows the contractor to attempt "early completion" of certain work but does not penalize the contractor for failing to actually finish that work early.

154. In order to measure delays to the contract, the only true baseline schedule that can be used is the original contract schedule itself. The contract specifies this as the schedule that is to be used to measure the contractor's performance for contract clauses addressing the schedule (e.g., "Commencement, Prosecution, and Completion of Work" and "Liquidated Damages -- Construction").

155. In addition to the requirement that the design be fully completed before construction could begin, the contract also required that Landmark commence and complete the construction work in certain phases and work areas that were defined in the contract. The sequence of construction of the work areas and certain milestone dates were also defined in the contract.

156. The overall structure of the baseline schedule was defined by the contract, while the sequence and duration of each of the work phases was left for Landmark to determine.

157. In summary, in the opinion of Mr. Paullin, 1.4 months of delay was attributable to Landmark's slow progress due to financial difficulties; 5 months of delay was due to the default and Lumbermens negotiating with the takeover contractor; 0.2 months of delay was due to no progress between the execution of the takeover agreement and the notice to proceed; and 0.8 months of delay was due to the fact that Atherton's planned schedule was longer than time remaining in contract, for a total of 7.4 months of delay.

158. Because this was a design-build contract, Landmark was required to submit its schedule of prices in two different formats: one during the design period and one during the construction period. On May 5, 2000, Landmark submitted its initial schedule of prices for the design period, which included only four line items, as specified by the contract. Landmark's first invoice, dated July 6, 2000, billed a total of $223,356 for two of those line items (Bonds and the 45% Design Submittal). Landmark submitted the schedule of prices for the construction period together with the Network Analysis Schedule in an electronic file dated June 28, 2000. Landmark's first invoice also contained a printout of the schedule of prices for the construction period.

159. Landmark assigned a relatively small percentage of the contract value (2.4 percent) to the Mobilization category, and it assigned 8.6 percent of the contract value to the Jobsite Overhead category. Landmark planned to spread the Jobsite Overhead equally over 25 months in its invoices (at four percent per month). The total dollar value of the Mobilization and Jobsite Overhead categories was $1,089,617, which was 11 percent of the total contract value. This is near the industry average for total overhead on this type of project, and well below the maximum overhead possible for this type of project.

| Category | Amount | Percent of Contract |
|---|---|---|
| Bonds | $ 143,256 | 1.5 % |
| Architectural Fees | $ 200,000 | 2.0 % |
| Mobilization | $ 240,483 | 2.4 % |
| Jobsite Overhead | $ 849,134 | 8.6 % |
| Materials | $ 2,634,135 | 26.7 % |
| Site Work/Abatement/Cleanup | $ 1,479,500 | 15.0 % |
| Unit Construction | $ 4,331,518 | 43.9 % |
| Total | $ 9,878,026 | 100.0 % |

160. In the construction industry, total overhead is often measured as a percentage of direct costs, but can also be measured as a percentage of contract value. The overhead percentage listed here would be slightly higher than 11 percent if it were measured as a percentage of direct costs.

161. During the early part of this project, Landmark managed its activities with simple bar chart schedules, which is typical of the practice of many contractors in the industry during relatively simple phases of construction. For example, a preliminary work schedule prepared by Landmark indicated that paperwork and design review activities would take place between June and August 2000. It also indicated that site work and abatement/demolition activities would begin in August 2000, prior to approval of the design. However, the contract required that Landmark submit detailed Network Analysis Schedules for Government review and approval. Landmark submitted these schedules, but utilized them primarily for invoice billings rather than management of the construction work.

July - October 2000

162. In a meeting on July 27, 2000, the Government requested that Landmark submit a copy of the Network Analysis "to put into the file." Landmark submitted the Network Analysis

four days later, as Submittal No. 7 on July 31, 2000. The Government approved Landmark's initial submittals (which were required prior to the commencement of construction work) with Contract Modification A00001, dated August 8, 2000. With this modification, the Government authorized Landmark to proceed with limited construction activities: the installation of off-street parking (site work), abatement work, and interior demolition work. Landmark began site work and demolition work on August 9, 2000, and began abatement work on August 14, 2000.

163. On August 9, 2000, Landmark submitted its revised Network Analysis as Submittal No. 7A. In this project schedule, Landmark planned for completion of housing unit construction in June 2002, almost four months prior to the required contract completion date. The Government returned the submittal "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark.

164. Landmark's second invoice, dated August 17, 2000, billed a total of $260,665 for line items in the Mobilization and Overhead categories. Landmark billed $161,841 for line items in the Mobilization category, which is 67 percent of that category. Landmark billed $98,824 for line items in the Jobsite Overhead category, which represents approximately 12 percent of that category. Since this was the first invoice that included line items in the Jobsite Overhead category, Landmark billed for the previous three months for these line items (at a rate of four percent per month for June, July and August). Landmark planned to spread the Jobsite Overhead equally over 25 months in its invoices, which was the duration between May 2000 (the month after the Notice to Proceed) and the completion of construction in its project schedule (June 2002).

165. In a meeting on August 24, 2000, Landmark provided copies of "the 'preliminary'

final design" for the units in Work Area 2B (on Baker Court). The Government had previously requested that Landmark work on those units in order to achieve early completion of them before Work Area 1. At that same meeting, Landmark indicated that interior demolition and abatement work was progressing well throughout Work Areas 1 and 2 and requested authorization to continue those activities in Work Area 3. In response to that request, the Government gave its authorization to Landmark in a meeting on August 31, 2000. In Contract Modification A00003, signed September 15, 2000, the Government authorized Landmark to proceed with additional limited construction activities: exterior demolition work, exterior painting, and new garage pad replacement work.

166. Landmark's third invoice, dated September 18, 2000, billed a total of $1,743,055 for line items in the following categories:

| Category | Incremental Amount | Percent of Category |
|---|---|---|
| Architectural Fees | $ 90,000 | 45 % |
| Mobilization | $ 28,486 | 12 % |
| Jobsite Overhead | $ 35,729 | 4 % |
| Materials | $ 851,940 | 32 % |
| SiteWork/Abatement/Cleanup | $ 736,900 | 50 % |
| Unit Construction | | 0 % |
| **Total** | **$ 1,743,055** | |

167. In this invoice, Landmark billed $28,486 (12 percent) for mobilization, which brought the cumulative billings to a total of 79 percent for this category. Landmark billed four percent again this month for Jobsite Overhead, in accordance with its plan to spread this equally over 25 months. The largest single line item billed in this invoice was $560,500 for site work (95 percent complete) (a portion of the Site Work/Abatement/Cleanup line item in the preceding table). Landmark had completed all of the site work on September 13, 2000, except for punch-

list activities. Landmark also billed 20 percent of the abatement/demolition line item on this invoice.

168. Other than the funds provided to Landmark by the Navy that corporate Landmark stole, all payments made under the contract were used by Landmark to perform under the contract.

169. When the Government makes progress payments to a contractor under a fixed price contract, the reasonable expectation is that those payments will be used to further performance under the contract, an expectation the Government's experts necessarily employed as well in this case.

170. Without making such a basic assumption, a cost analysis and a delay analysis could not be accomplished since there would be no performance to measure, in terms of dollars spent, or progress made. In this case, the evidence will demonstrate that the only reason that Landmark defaulted was that Landmark's corporate office (corporate Landmark personnel) did not provide the Landmark personnel responsible for performance under the contract (on-site Landmark personnel) all of the progress payments made by the Navy. Corporate Landmark personnel stole the money that was intended to be used by the on-site Landmark personnel to complete the project.

171. There is no evidence that Navy personnel on Whidbey Island were aware, or should have been aware, of the fraud being perpetrated against the project by corporate Landmark personnel. All of the contract funds that the Navy paid to Landmark were either used by Landmark in its performance pursuant to the contract, or were stolen by corporate Landmark

personnel through no fault of the Government.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch, Civil Division
Department of Justice
1100 L Street NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

October 15, 2007

Attorneys for Defendant