IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1255C |
| v. | ) | (Judge Robert H. Hodges) |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S ADDITIONAL PROPOSED FINDINGS OF FACT

1. On or about April 11, 2000, the United States, through the United States Navy, Engineering Field Activity, Northwest, in Poulsbo, Washington (Navy), awarded Contract Number N44255-97-C-5515 (Contract) to Landmark Construction Corporation (Landmark).

2. Pursuant to the contract, Landmark was to perform the Whole Site Repair/ Revitalization of the Maylor Capehart Housing Area on Naval Air Station, Whidbey Island, in Oak Harbor, Washington (project). The project, as originally awarded, entailed the design/ build remodeling of 160 military family housing (MFH) units on Whidbey Island. The initial contract price was $9,878,026.00, with a performance period of 910 calendar days after the notice to proceed (NTP). The contract included the following scope of work:

> Project Description: Whole site repairs and revitalization are planned for the Maylor Capehart Housing Area, Naval Air Station Whidbey Island, Oak Harbor, Washington. The scope of work includes interior and exterior renovations to 160 units of Capehart style housing. Unit improvements include widening the driveway for off street parking and removing existing carport structure and providing new garage . . . The intent of this solicitation is to procure the design and construction of these repairs and revitalization.

3. The contract required that Landmark provide to the Navy performance and payment bonds. The performance bond, naming the United States as obligee, was to be in the

penal sum of the contract price, that is, $9,878,026. The contract required a payment bond in the amount of $2,500,000.

4. Lumbermens Mutual Casualty Company (Lumbermens) provided both the performance and payment bonds in the amounts and in the format required.

5. The Navy approved the performance and payment bonds provided by Lumbermens.

6. The contract included in full text, or incorporated by reference, clauses relevant to the issues raised in this complaint, including: (1) FAR 52.232-5, Payments Under Fixed-Price Construction Contracts (May 1997) (Payments Clause); (2) FAR 52.236-15, Schedules for Construction Contracts (Apr 1984); (3) FAR 52.245-1, Property Records (Apr 1984); (4) FAR 52.245-2, Government Property (Fixed-Price Contracts (Dec 1989)); (5) FAR 52.228-15, Performance and Payment Bonds - Construction (Sept 1996); (6) FAR 52.211-10, Commencement, Prosecution, and Completion of Work (Apr 1984); and (7) FAR 52.211-12, Liquidated Damages - Construction (Apr 1984).

7. Landmark was to begin work on the project within 15 days after receipt of the NTP, and was given 910 calendar days to complete the project. In this case, the contract completion date was established by the Navy as October 23, 2002.

8. Pursuant to the Payments Clause, the Navy was to make progress payments monthly as the work on the project proceeded, or at more frequent intervals as determined by the Navy, on estimates of work accomplished.

9. The Payments Clause provides that a contractor's request for progress payments shall include, among other things, an itemization of the amounts requested, a listing of the

amounts included for work performed by each subcontractor and a listing of the amounts previously paid to each subcontractor under the contract.

10. The Payments Clause also required, among other things, that Landmark certify all payments due to suppliers and subcontractors from previous government progress payments had been made. The Payments Clause further mandated that if Landmark failed to provide the requisite progress payment certification, then "payment [to Landmark] shall not be made."

11. The Payments Clause further authorized the Navy to include in progress payments, amounts for material delivered to the site as well as for material delivered elsewhere, such as offsite), if: (1) the contract otherwise authorized such consideration; and (2) the contractor furnished satisfactory evidence of title and that the material would be used to perform the contract. The Payments Clause also provided that all material covered by a progress payment

shall, at the time of payment, become the sole property of the Government.

12. In addition to the Payments Clause requirements, the contract described payment procedures in greater detail in Section 01200, Price and Payment Procedures.

13. Section 01200, ¶ 1.2 required Landmark to prepare a Schedule of Prices on forms provided by the Government and to submit the Schedule of Prices to the Government for approval by the contracting officer. Further, according to § 01200, ¶ 1.2, "payments [to Landmark] for construction work will not be made until the Schedule of Prices has been approved by the contracting officer."

14. Pursuant to § 01200 of the contract, to receive progress payments, Landmark was to submit an invoice, a Contract Performance Statement (showing, among other things, the

percentage of completion), an updated network analysis, and a certification. A release was required for the final payment.

15. Section 01200 of the contract authorized the Navy to consider for progress payments, materials delivered off-site (thereby fulfilling the condition established by the Payments Clause). However, that authority was expressly limited. For example, § 01200, ¶ 1.4.2 provided that payments may be made for material stored off the construction site if (1) the conditions in the Payments Clause are satisfied, (2) the material was stored within a distance of 50 miles by streets and roads to the construction site, (3) the materials were insured and protected from theft, and (4) the materials were not susceptible to deterioration while in storage. Further, materials in transit to either the job site or storage site were not eligible for payment.

16. The contract required Landmark to submit an updated network analysis with each invoice. Section 01321, Network Analysis Schedules (NAS), in conjunction with FAR 52.236-15, Schedules for Construction Contracts (Apr 1984), described the requirements for the NAS to be prepared and submitted by Landmark and approved by the contracting officer.

17. The NAS consisted of "time network scaled logic diagrams and accompanying mathematical analyses." Contract, § 01321, ¶ 1.4. The NAS was to be used to determine Landmark's progress on the project, formed the basis for Landmark's progress payment requests, and the Navy's approval of those progress payment requests. Thus, the NAS used scheduled activities to which were allocated costs for performing the activities.

18. For scheduling purposes, the basic concept of the NAS is to show how the start of one activity on the project was dependent upon the completion of earlier activities and how its

completion affects future activities. As a result, the contract required the project be broken down into discrete activities.

19. According to § 01321, ¶ 1.4.2, the "minimum number of activities in the final network diagram shall be 30 per building and 1000 for the total project. Buildings that have the same detailed activities shall be shown as summary of activities (one activity per building) with the detailed activities shown at least [at] one location."

20. The contract required that each activity depicted in the NAS have an assigned responsibility code and monetary value. The monetary value for each activity was to be broken down into separate amounts for material/equipment, labor and inspection/testing. Thus, by identifying all completed and partially completed activities at any given point, the Navy could determine the extent of the contractor's progress. In addition, because each activity was assigned a monetary value, the Navy could determine the amount of the progress payment earned by the contractor.

21. The contract required Landmark to submit the completed NAS to the Navy for review and approval by the contracting officer.

22. The contract also contained provisions regarding liquidated damages. According to the contract, if Landmark failed to complete the project by October 23, 2002, the Navy could assess liquidated damages (LDs) against Landmark in the amount of $75 per unit per day for each day of delay.

23. Landmark submitted a NAS as required by the contract. The Navy's project engineer received the submitted NAS and returned it to Landmark marked "approved as noted." The project engineer did not perform any analysis of the prices listed on the NAS for any

activity, nor was he contractually required to do so. The contracting officer approved the NAS in modification A00001. The Navy used Landmark's NAS, which included line items for more than $2.6 million in material. Over three-fourths of that number consisted of five categories: $500,000 for "doors and windows," $500,000 for "cabinets," $300,000 for "paint," $485,940 for "flooring," and $287,040 for "siding."

24. While the NAS submitted by Landmark, and used by the Navy, contained no definition of the scope of work contained in these material line items, the contract did not require the inclusion of such definitions. The contract, however, did require quantities and unit prices for the schedule of prices.

25. The NAS included line items and prices for various field office overhead and labor items, outside of constructing the individual MFH units, including "personnel" for $728,834.

26. The NAS used by the Navy allocated $4,363,518 to the completion of all construction work on all of the individual MFH units, or approximately 44 percent of the contract price to complete all construction work.

27. The NAS submitted by Landmark did not identify 1000 separate activities as required by the contract. Landmark's NAS contained fewer than 600 activities. The NAS identified 26 separate activities, rather than 30 separate activities, for each MFH unit. While the NAS did not identify the cost of every individual activity for each MFH, or a critical path, responsibility code, or unit prices for each activity, the contract did not require the inclusion of such information. The NAS identified a lump sum for each MFH unit, which was payable only after the unit was completed.

28. Landmark entered into a subcontract with Lloyd Enterprises, Inc. (Lloyd) in the amount of $590,000 to perform the "sitework." The NAS approved by the Navy included $590,000 for the line item described as "sitework." The NAS also identified Lloyd as the subcontractor performing that line item.

29. In its proposal, Landmark proposed to perform the sitework for less than $362,000. The Navy did not question the $230,000 increase in this item. The Navy subsequently paid Landmark $590,000 for this item.

30. Between its September 18, 2000 invoice and its November 20, 2000 invoice, a total of three invoices, Landmark invoiced the Navy for more than $3,105,031, or almost one-third of the original contract value of $9.878 million. When combined with its two earlier invoices, the total invoiced by Landmark by November 20, 2000, was more than $3.598 million, or 36.4 percent of contract value. By November 20, 2000, the Navy had not approved Landmark's construction drawings. The Navy approved the drawings in December 2000.

31 In its September, October, and November 2000 invoices, Landmark requested payment for at least $1,246,980 in material costs for such items as doors and windows, cabinets, paint, flooring and siding. The Navy paid the amounts requested by Landmark in each invoice. While the Navy did not request from Landmark any supporting documentation identifying the quantities or types of costs of material, or evidencing that Landmark had obtained title to this material, the contract did not require the inclusion of such information.

32. Included within the amount referenced in the previous paragraph was $140,000 for cabinets. That is, by November 20, 2000, Landmark requested, and the Navy subsequently approved and paid Landmark, $140,000 for cabinets. By November 20, 2000, Landmark had not

ordered cabinets valued at $140,000, nor had Landmark paid for them. Cabinets valued at $140,000 had not been delivered to the project site by November 20, 2000. The Navy paid Landmark $140,000 for cabinets. Landmark never paid the supplier this amount.

33. Landmark entered into a purchase order subcontract with Tacoma Fixture Co. to provide all the cabinets required on the project. Tacoma Fixture Co. delivered its first cabinets to Landmark on October 27, 2000. Tacoma Fixture submitted its first invoice to Landmark on November 7, 2000, in the amount of $10,405.27.

34. While Landmark did not submit with its invoice to the Navy requesting payment for cabinets in the amount of ???? any documentation describing the quantity, type, or size of the cabinets for which it requested payment, the contract did not require the inclusion of such information. The Navy approved Landmark's request. Landmark was paid for some cabinets that had not been ordered.

35. Immediately upon payment by the Navy for the amount requested by Landmark for cabinets, the cabinets, like all other material for which it paid Landmark, became the sole property of the Navy.

36. On December 20, 2000, the Navy issued unilateral Modification A00008. This modification incorporated into the contract the approved construction design.

37. On December 20, 2000, Landmark submitted its sixth invoice to the Navy for payment. In its sixth invoice, Landmark requested $230,647.36, for a cumulative total of $3,829,601.28. As with each of the five previous invoices, the Navy approved invoice number six. Landmark was subsequently paid.

38. Through the December 20, 2000 invoice, the Navy had authorized payment to

Landmark of $3,829,601.28. By mid-January 2001, the Navy had some complaints from Landmark's suppliers and subcontractors regarding Landmark's failure to pay its suppliers and subcontractors. The Navy referred such suppliers and subcontractors to Lumbermens for payment under the payment bond.

39. As a result of the complaints received by the Navy from Landmark's suppliers and subcontractors, the Navy rejected Landmark's January 2001 invoice, and demanded that Landmark provide to the Navy an accounting of all funds received by Landmark from the Navy, and all amounts owed and paid by Landmark to Landmark's suppliers and subcontractors.

40. By letter dated February 7, 2001, Landmark provided accounting information to the Navy. Landmark's February 7, 2001 submission indicated that Landmark had not paid some of its suppliers and subcontractors.

41. In response to February 7, 2001 submission, the contracting officer took no action against Landmark. In response to claims under the Miller Act made by unpaid suppliers and subcontractors, Lumbermens did not take any action against Landmark. Within the six week period after receipt of Landmark's February 7, 2001 submission, the contracting officer authorized the payment to Landmark of three invoices totaling $503,362.88. In the next invoice submitted by Landmark, Landmark stated that "per our agreement with our suppliers and vendors, they are being paid in accordance with their payment schedule."

42. By bilateral Modification A00010, effective February 28, 2001, Landmark and the Navy added to the contract the requirement to renovate 21 additional MFH units, for a total of 181, and increased the contract price by $1,884,176. The modification did not extend the

contract completion date, which remained October 23, 2002.

43. The Navy requested, but did not receive, the consent of the surety for Modification No. A00010.

44. Between February 20, 2001, and May 1, 2001, the Navy paid, or authorized payment of, an additional $680,438.20. Thus, by May 1, 2001, the Navy had paid or authorized payment of about 37 percent of the revised contract price. By May 1, 2001, the Navy had accepted fewer than 18 of the MFH units on the contract.

45. Landmark submitted invoice No. 5515-12 on May 21, 2001, requesting payment of $283,594.28, for a total payment of $4,793,633. The Navy approved the payment request and Landmark was subsequently paid.

46. As of June 1, 2001, the Navy had paid, or approved for payment, a total of $4,793,633 to Landmark. Included with that amount were amounts for materials, including $375,000 for “doors and windows,” $260,000 for “cabinets,” $156,000 for “paint,” $485,940 for “flooring,” and $287,040 for “siding.”

47. By June l, 2001, the Navy had also paid or approved for payment $458,640 for “asbestos and lead abatement,” $378,993.68 for “personnel,” and $590,000 for “sitework.”

48. While it is true that when Landmark submitted progress payment requests for “doors and windows,” it did not submit invoices or other documentation identifying the quantities and types of windows and doors for which it sought payment; the purchase price of the doors and windows; the location at which this material was stored; and whether the material had been purchased or was in transit, Landmark was not contractually required to do so.

49. While it is true that when Landmark submitted progress payment requests

for "paint," "flooring," and "siding," it did not provide to the Navy any information about the type, size, quantity, cost, and location of any of the material, Landmark was not contractually required to do so. While it is true that Landmark did not submit documentation with its progress payment requests establishing that the material that had been ordered or delivered, Landmark was not contractually required to do so. While it is true that the Navy did not ask that Landmark provide any further documentary information which would substantiate the quantity, type, size, or location of the material, it was not contractually required to do so. While it is true that the Navy neither demanded nor obtained any documentation that would establish title to any material for which it paid Landmark, it was not contractually required to do so. .

50. By June 1, 2001, the Navy had paid Landmark or authorized payments totaling $458,640 for "asbestos and lead abatement," $378,993.68 for "personnel," and $590,000 for "sitework."

51. The $458,640 paid to Landmark for "asbestos and lead abatement" accounted for 52 percent of the amount budgeted for in the NAS for that "activity." According to the project's records, Landmark had completed abatement in 56 of the 160 units for which it had budgeted, or 35 percent.[1]

52. The NAS included an activity identified as "personnel" for which Landmark had budgeted $728,834 for the entire project. Separately, Landmark budgeted an amount for labor for each of the MFH units to be renovated under the contract. Thus, the "personnel" activity was in addition to labor for building the MFH units. By June 1, 2001, the Navy had paid Landmark,

---

[1] Landmark did not re-forecast budgets for activities after the contract was modified to add the additional 21 MFH units. Instead, Landmark simply created a single activity to which it attributed the entire price of that modification.

or authorized payment, in the amount of $378,993.68 for "personnel," 52 percent of the amount budgeted by Landmark for this line item.

53. By letter dated June 21, 2001, Landmark notified the Navy that Landmark planned

to furlough its field staff pending the resolution of financial difficulties.

54. On July 11, 2001, the Navy issued Landmark a cure notice.

55. By letter dated July 20, 2001, Landmark informed the Navy that Landmark was unable to complete the project due to financial problems and was therefore in default.

56. The Navy default terminated Landmark's contract on August 2, 2001.

57. At termination, there remained $7,392,381.24 in unpaid contract balance. The Navy had paid Landmark approximately 39 percent of the modified contract price, or $4,793,633.76. At the time of termination, 22 of the 181 MFH units on contract had been completed by Landmark and accepted by the Navy. The Navy estimated at that time that the contract was 12 percent complete, based upon units completed and returned to the Navy, or 15 percent complete if partially completed units were included.

58. Between July 2000 and May 2001, the Navy authorized payment of eleven separate invoices to Landmark, totaling $4,793,633.76.

59. Effective November 20, 2001, Lumbermens, the Navy, and Atherton Construction, Inc. (Atherton) executed a Takeover Agreement, pursuant to which Lumbermens agreed to be responsible for completing the roject. Atherton was identified in the Takeover Agreement as the "Completing Contractor." Effective that same date, Lumbermens and Atherton executed a Completion Contract, pursuant to which, upon behalf of Lumbermens,

Atherton would perform the work necessary to complete the project.

60. The Takeover Agreement provided, with respect to material previously paid for by the Navy for use on the Project, that:

> Insofar as the Government as any right, title or interest therein, the Government agrees that the Surety or the Completing Contractor will have the right to use, without charge, any of the materials, supplies, equipment or personal property furnished or supplied to or by the Defaulted Contractor which may be stored on the premises of the project or elsewhere, or which may have been fabricated for use in connection with the project. The Government makes no warranty as to the quantity or condition of any such materials, supplies, equipment or personal property.

61. The Takeover Agreement did not modify the original completion date of the project, which remained as October 23, 2002.

62. The Takeover Agreement also included a reservation of rights for Lumbermens, which provided:

> This Agreement shall not be construed to waive, limit, alter or amend any of the Surety's rights or defenses under the performance bond or otherwise. Except as to the Government's mitigation of damages in accepting completion of the defaulted contract by the Surety, it is expressly understood that by entering into this Agreement the Surety does not waive, prejudice, or in any way adversely affect or limit any claim that it, as Surety, or the Defaulted Contractor might have against the Government, including any claim arising out of payments made by the Government to the Defaulted Contractor; and the Surety hereby expressly reserves, any and all rights and defenses it may have against the Government under the contract and the performance bond. Nothing in this Agreement shall prejudice the rights of the Surety to seek a judicial or other appropriate determination of its rights.

63. On January 31, 2002, during performance of its Completion Contract, Atherton notified the Navy that the existing electrical wiring system in the MFH units did not meet the

requirements of the National Electrical Code. Atherton discovered the absence of the necessary ground, among other deficiencies, and notified the Navy that these circumstances constituted a changed condition.

64. Lumbermens claims that the Navy had known of this problem for several months prior to the default termination of Landmark's contract and initially denied the problem's existence. Lumbermens claims that during this period Atherton was unable to proceed with scheduled work on its critical path.

65. On February 28, 2002, the Navy requested additional funding for the electrical issues. On March 1, 2002, Atherton notified the Navy that it viewed the delay resulting from the electrical problem as a "total project delay." On March 13, 2002, the Navy received additional funding for the electrical problem. On or about March 15, 2002, the Navy acknowledged the existence of the changed condition and provided Atherton with a request for proposal to obtain Atherton's price for the added scope of work necessary to correct the deficient wiring.

66. Lumbermens claims that Atherton was then able to re-start work, implementing the changes directed by the Navy.

67. As a result of this changed work, Atherton claimed that it incurred a delay to its critical path, and requested that the Navy provide a schedule extension to accommodate this delay. The Navy refused because it was of the opinion that the delay was not on the critical path.

68. The Navy assessed LDs against Lumbermens for the period of time encompassed by the 46-day schedule extension requested by Atherton.

69. Lumbermens claims that the Navy improperly assessed LDs during the period in which Atherton was completing the additional 21 MFH units included in the contract by modification A00010. The Navy also assessed LDs against Lumbermens starting on October 24, 2002, more than six months after Atherton began work on the 21 MFH units. Most of the 21 units were completed concurrently with the 160 base units. The last of the 21 MFH units was completed seven days after the last base unit was completed. While it is true that the MFH units that were the subject of modification No. A00010 were not within the scope of work Lumbermens bonded in connection with Landmark's contract, the Government contends that those units were within the scope of the work of the contract executed by the Navy, Lumbermens, and Atherton.

70. Lumbermens claims that the 21 MFH units added by modification A00010 would

have reasonably required at least 74 days to complete, absent any differing site conditions encountered by Atherton. The Government claims Atherton would have completed the work 14 days earlier if it had not worked on the 21 MFH units. While Lumbermens claims that Atherton encountered additional differing site conditions in performance of the additional 21 MFH units, including delays for transite pipe and asbestos in the wallboard, the Government contends that Atherton was not delayed by either the transite pipe issue or the asbestos in the wallboard issue.

71. While Lumbermens claims that together the electrical delay and the completion of the modification A00010 MFH units should have resulted in a contract extension of until April 21, 2003, the Government contends that Atherton was not delayed by the electrical issue and, even assuming that modification A00010 had not been a bilateral modification (which it

was), the addition of those units delayed Atherton by only 14 days.

72. Pursuant to the Completion Contract, Atherton completed work on the project on June 6, 2003.

73. The Navy withheld LDs against Lumbermens in the amount of $1,015,125.

74. If the Navy had extended the contract completion due date to April 21, 2003, Lumbermens would be entitled to the return of all but $52,500 of the LDs.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch, Civil Division
Department of Justice
1100 L Street, NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
(202) 307-0252
(202) 307-0972 (Fax)

November 28, 2007

Attorneys for Defendant