IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LUMBERMENS MUTUAL CASUALTY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1255C |
| v. | ) | (Judge Robert H. Hodges) |
| | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

Pursuant to the Court's order, defendant hereby submits is Post-Trial Brief.

FACTS ESTABLISHED AT TRIAL

On April 11, 2000, the United States, acting through the Department of the Navy, entered into Contract No. N44255-97-C-5515 with Landmark Construction Company (Landmark), in the amount of $9,878,026, for the design and renovation of 160 military housing units at the Naval Air Station, Whidbey Island, Oak Harbor, Washington. Defendant's Exhibit (Def.'s Exh.) 1-1 at 2. The contract included the following scope of work:

> Project Description: Whole site repairs and revitalization are planned for the Maylor Capehart Housing Area, Naval Air Station Whidbey Island, Oak Harbor, Washington. The scope of work includes interior and exterior renovations to 160 units of Capehart style housing. Unit improvements include widening the driveway for off street parking and removing existing carport structure and providing new garage. . . The intent of this solicitation is to procure the design and construction of these repairs and revitalization.

Def.'s Exh. 1-1, Design Submittals at III-A-1.

Because the contract was for a construction project, the prime contractor was required to

post a payment and a performance bond pursuant to the Miller Act.[1] See 40 U.S.C. § 3131. Lumbermens Mutual Casualty Company (Lumbermens) provided performance and payment bonds to Landmark. Def.'s Exh. 1-2 at 1-2; Def.'s Exh. 1-3 at 1-2. Pursuant to these bonds, Lumbermens guaranteed that Landmark's contract would be completed in the event of Landmark's default, and that the Navy would not have to pay more than the contract price. Id. See also United States v. Munsey Trust Co., 332 U.S. 234, 244 (1947). The performance bond provided by Lumbermens gave Lumbermens the option of taking over and completing performance upon Landmark's default, or of assuming liability for the Navy's costs in completing the contract which were in excess of the contract price. Def.'s Exh. 1-3 at 1. In the alternative, a surety, such as Lumbermens, can provide funds to an insolvent contractor to complete performance. See Aetna Cas. & Sur. Co. v. United States, 845 F.2d 971, 975 (Fed. Cir.1988). A surety bond creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee (here, the Government). Balboa Ins. Co. v. United States, 775 F.2d 1158, 1160 (Fed. Cir.1985). If the surety fails to perform, the Government can sue it on the bonds. Id.

The contract specified a performance period of 910 calendar days after the Notice to Proceed (NTP). Def.'s Exh. 1-1 at 1. Because the NTP date was April 26, 2000, the contract completion date was October 23, 2002. Def.'s Exh. 7-2 at 1. The contract completion date was never extended. See Def.'s Exh. 1-1.

---

[1] Federal Acquisition Regulation (FAR) 28.102-1, Performance and Payment Bonds and Alternative Payment Protections for Construction Contracts, General, provides as follows: (a) The Miller Act (40 U.S.C., § 270a - 270f) requires performance and payment bonds for any construction contract exceeding $100,000.

On February 27, 2001, the Navy was informed that Landmark was delinquent in paying some of its vendors. Def.'s Exh. 4-2 at 1. In accordance with FAR 28.106-6 (B), the Navy notified the vendors of the identity of Landmark's surety, that is, Lumbermens, to whom they could submit claims for payment. Def.'s Exh. 5-17 at 1.

The contract was modified, effective February 28, 2001, to add an additional 21 units (the FAF units). Def.'s Exh. 1-1, Modification A00010 at 1-4. Modification A00010 (Mod. 10) increased the contract value by $1,884,176, but did not extend the contract performance period. Id. Landmark requested that Lumbermens increase the value of the bond to cover the increase in the scope of work added to the contract by the modification. See Def.'s Exh. 8.4 and 8.5. While Lumbermens indicated that it was considering Landmark's request, Lumbermens ultimately declined to increase the amount of Landmark's bond to cover the increased scope of work. Id. The FAR requires that in the event that the scope of work is increased on a construction project, the value of the bond be commensurately increased. Without the required bond, a notice to proceed can not be issued. There is no evidence in the record that a NTP on the renovation of the FAF units was ever issued to Landmark.

On or about June 21, 2001, Landmark abandoned the project. Def.'s Exh. 9-5 at 1; Testimony of John Santiago (Santiago Test.) at 194 and 196.

On August 2, 2001, the Navy terminated Landmark's contract for default. Def.'s Exh. 10-9 at 1.

Prior to Landmark's failure to pay its vendors and contractors, which led to Landmark's abandonment of the project, John Santiago, the contracting officer (CO) had no issues with the quality and timeliness of Landmark's work, or with the performance of Landmark's employees

on site who were managing and implementing the renovation work. Santiago Test. at 192. In fact, there is no evidence in the record that prior to Landmark's failure to pay its vendors and contractors, that Landmark would not have been able to successfully complete the project.

Lumbermens elected to complete the project that it had bonded, that is, the scope of work covered by the contract prior to Mod 10 that added the 21 FAF units. There is no evidence in the record that that the Navy required that Lumbermens complete the scope of work added to the contract by Mod 10, that is, work valued at almost $2M that Lumbermens had not bonded.

On November 20, 2001, Lumbermens executed a completion contract with Atherton Construction Company (Atherton). Def.'s Exh. 12-3 at 1. The completion contract provided that Atherton was required to complete the work covered by Mod. 10. See Def.'s Exh. 12-3 at 2. Atherton's cost proposal incorporated by reference into the completion contract, included the scope of work covered by Mod. 10. See Def.'s Exh. 12-3. That completion contract provided in pertinent part as follows:

> Contract Documents. This Contract consists of the terms and provisions contained herein, including: the Completing Contractor's proposal dated September 5, 2001 attached hereto as Exhibit l; the Completing Contractor's supplements to its proposal, dated September 8 and September 10, 2001 and attached hereto as Exhibits 2 and 3; the Takeover Agreement between Surety and the Government for the subject Project; all documents or specific portions of documents which may be referred to herein or in any Exhibits attached hereto and incorporated herein by reference, thereby making them a part hereof; and the Original Contract, including all General, Supplementary and Special Conditions, specifications, forms, addenda and documents forming a part of the Original Contract, and all of the Original Contract, all of which are incorporated herein by reference and which are hereinafter referred to collectively as the "Contract Documents."
>
> Work to be performed. The Completing Contractor shall

> furnish and pay for labor, materials, services and equipment and shall do everything else necessary to perform and satisfactorily complete the Original Contract, including modifications A001 through A0012 issued thereto, as required by the Contract Documents.

Thus, pursuant to the completion contract, Atherton was required to complete the scope of work covered by Landmark's contract, including the scope of work added by Mod 10.

The completion contract also provided as follows:

> Price.
> a. The Surety shall pay to the Completing Contractor and the Completing Contractor agrees to receive and accept $10,537,291.00 (the "Full Price") as full compensation for the performance and completion of the work as described in the Contract Documents. The Price represents the unpaid contract balance, including retainages, in the amount of $7,392,381.24 remaining on the Original Contract, to be paid by the Government (the "Government Price"), and an additional amount of $3,144,909.76 to be paid by the Surety (the "Surety Price"), all as hereinafter provided.

Thus, it is clear that the approximately $2M added to the contract by Mod 10 was considered by Lumbermens as part of the balance on Landmark's contract. While plaintiff called no witnesses to testify from either Lumbermens or Atherton, a reasonable inference to be drawn from the evidence is that Lumbermens made a decision to complete the scope of work covered by Mod 10, even thought Lumbermens was not legally required to do so, because it was in the best financial interest of Lumbermens to obtain the approximately $2M that was added to the contract value by Mod 10.

With respect to bonds, the completion contract provided as follows:

> Performance and Payment Bonds. The Completing Contractor shall provide the Surety with Performance and Payment Bonds each in the penal sum of $10,537,291.00 in the form attached hereto and

> incorporated herein as Exhibit 4 prior to the Completing Contractor commencing work.

Thus, the completion contract required Atherton to obtain bonds that covered the scope of work contemplated by Landmark's contract, including the previously unbonded scope of work covered by Mod 10.

On November 20, 2001, Lumbermens executed a takeover agreement with the Navy. Def.'s Exh. 12-2 at LMB007511-LMB007514. That agreement provided in pertinent part as follows:

> This Takeover Agreement is for completion of defaulted Contract N44255-97-C-5515.
>
> This Takeover Agreement is entered into this 20th day of November 2001 by and between Lumbermens Mutual Casualty Company, . . .(hereinafter 'Surety'), the United States of America represented by the Department of the Navy (hereinafter `Government') and Atherton Construction, Inc., . . . (hereinafter "Completing Contractor").

The takeover contract clearly is for the provision of the same construction covered by Landmark's contract, and is a contract to which both the Government and Lumbermens were parties.

The takeover contract also provided as follows:

> Whereas, the Surety has advised the Government that it will undertake the completion of the work and will contract with the Completing Contractor for completing the work remaining under the contract in accordance with its terms and conditions of the terminated contract.
>
> The Completing Contractor, will perform or procure the performance of all work and other obligations of the defaulted contract not presently completed or fulfilled.

> The provisions and clauses of the defaulted contract, and the plans and specifications, are incorporated into this Agreement and will be binding on the Completing Contractor.

Thus, the takeover contract required that Lumbermens complete the scope of work covered by Landmark's contract, including the completion of the 21 FAF units covered by Mod 10. There is no evidence in the record that Lumbermens ever objected to the inclusion of the scope of work covered by Mod 10 in the takeover contract, or that Lumbermens executing the takeover contract with the Government was anything other than a voluntary act.

The takeover agreement also proved as follows:

> Insofar as the Government has any right, title or interest therein, the Government agrees that the Surety or the Completing Contractor will have the right to use, without charge, any of the materials, supplies, equipment or personal property furnished or supplied to or by the Defaulted Contractor which may be stored on the premises of the project or elsewhere, or which may have been fabricated for use in connection with the project. The Government makes no warranty as to the quantity or condition of any such materials, supplies, equipment or personal property.

Thus, it is clear that the Government made no representations to Lumbermens regarding the quantity or condition of any materials purchased by Landmark under its contract. Clearly, it was Lumbermens' responsibility to ensure that that the materials paid for by the Government under the contract were available for Lumbermens' use in completing the contract. There is no evidence in the record that Lumbermens did not have the opportunity, during the approximately five months between Landmark's abandonment of the project and the execution of the takeover contract, to perform a detailed and complete inventory of all materials purchased under the contract or that Lumbermens ever sought any consideration from the Government, prior to executing the takeover contract, for the fact that materials that had been paid for by the

Government were not available for Lumbermens' use.

Substantial completion of the project was achieved on June 6, 2003, which was 226 days (7.4 months) after the contract completion date. Def.'s Exh. 13-9 at 4. The Navy used the June 6, 2003 substantial completion date in its calculation of liquidated damages for the contract. Id. A total of $1,015,125 in liquidated damages was withheld by the Navy from its payments to Atherton. Id. That amount was calculated in accordance with the contract, which specified liquidated damages of $75.00 per unit per day for each day of delay. Def.'s Exh. 1-1 at 00721, page 1.

After completion of the project Lumbermens filed a Complaint in the United States Court of Federal Claims on August 4, 2004, which was subsequently amended on March 13, 2006. In its Amended Complaint, Lumbermens seeks to recover at least $3,600,000. The gravamen of Lumbermens' complaint is that the Navy, in its administration of Landmark's contract, impaired its suretyship rights. Thus, Lumbermens is seeking an equitable remedy in this Court. It is thus incumbent upon this Court to consider, as a matter of equity, whether the Navy or Lumbermens was in a better position to prevent, or at least, minimize the losses incurred as the result of Landmark not paying its vendors and contractors, acts which clearly were the proximate cause of Landmark abandoning the project, and the Navy issuing the termination for default.

## ARGUMENT

### I. Lumbermens' Losses Were Caused By Its Own Failures In Issuing And Administering The Bonds

Lumbermens issued a performance bond in the amount of $9,878,026 on April 20, 2000 to Landmark Construction Corporation. Rich Barrick, Attorney-in-fact, executed the bond upon

behalf of Lumbermens. Def.'s Exh. 1-3 at 1-2. Lumbermens also issued a payment bond in the amount of $2,500,000 on April 20, 2000 to Landmark Construction Corporation. Rich Barrick, Attorney-in-fact, executed the bond upon behalf of Lumbermens. Def.'s Exh. 1-2 at 1-2.

A. Lumbermens Failed To Execute Due Diligence In Issuing The Bonds

There is no evidence in the record, either testimonial or documentary that, prior to issuing the payment and performance bonds, Lumbermens conducted any investigation whatsoever into the integrity, experience, reputation, or professionalism of Landmark or any of its employees.

In fact, the only basis for even an inference that Lumbermens took any action in this regard, is the fact that on April 14, 2000 a General Agreement of Indemnity was executed. Def.'s Exh. 1-4 at LMB 006771 - 006773. The indemnity agreement is significant for two reasons. Firstly, in addition to Douglas Pourier, the President of Landmark Construction Corporation, Lumbermens required that six other entities execute the agreement, namely, James Shannon, Partner, Cambridge Ventures; William Clary, President, PI Construction Company; James Shannon, President, Cambridge Construction Services Corporation; Michael E. McGinnis, President, American ECO Corporation; and Rich Barrick, President, Allied Surety Agency, LLC. Def.'s Exh. 1-4 at LMB 006773. Secondly, there is no evidence in the record, either testimonial or documentary that, prior to issuing the payment and performance bonds, Lumbermens conducted any investigation whatsoever into the financial resources, integrity, experience, reputation, or professionalism of any of the indemnitors on the bonds. If Lumbermens had exercised due diligence before issuing the payment and performance bonds, Lumbermens would have, or should have, recognized that the seven indemnitors neither individually or collectively had the financial resources to indemnify Lumbermens for potential losses resulting from the

Navy terminating Landmark for default. Lumbermens' failure to exercise due diligence in issuing the bonds to Landmark defeats its claim for impairment of suretyship.

B. Lumbermens Failed To Exercise Due Diligence In Not Requiring A Reserve

The General Agreement of Indemnity provided as follows:

> If the Company shall set up a reserve to cover any claim, suit or judgement under any such bond, the indemnitors will, immediately upon demand, deposit with the Company a sum of money equal to such reserve, such sum to be held by the Company as collateral security on such bond, and such sum and any other money or property which shall have been, or shall hereafter be, pledged as collateral security on any such bond shall, unless otherwise agreed in writing by the Company, be available, in the discretion of the Company, as collateral security on any other or all bonds coming within the scope of this Agreement.

Def.'s Exh. 1-4 at LMB 006771.

There is no evidence in the record, either testimonial or documentary, that Lumbermens set up a reserve and required the indemnitors to deposit with Lumbermens assets sufficient to protect Lumbermens against losses incurred under the bonds. Lumbermens' failure to set up a reserve defeats its claim for impairment of suretyship.

C. Lumbermens Failed To Exercise Due Diligence In Not Requiring That Landmark Have The Payee Clause of the Contract Changed

When Lumbermens became aware that Landmark was not paying its vendors and contractors, Lumbermens could have insisted that Landmark request that the contracting officer change the payee clause of the contract so that the Navy made payments under the contract to a bank account over which Lumbermens had joint control with Landmark. If the payee clause had been so changed, Lumbermens would have been able to ensure that the vendors and subcontractors were paid with the proceeds from the payments made by the Navy under the

contract. Given that the non-payment of vendors and subcontractors was a red flag that Landmark's performance under the contract was in jeopardy, Lumbermens had the ability under the provisions of the bond, as further explained below, to threaten Landmark that Lumbermens would take over performance of the contract if Landmark did not change the payee clause of the contract. There is no evidence in the record, either testimonial or documentary that Lumbermens took any steps whatsoever to have the payee clause of the contract changed. Lumbermens' failure to exercise due diligence in requiring that landmark have the payee clause of the contract changed defeats its claim for impairment of suretyship.

D. Lumbermens Failed To Exercise Due Diligence In Failing To Takeover Landmark's Contract When It Was Put On Notice That Landmark Was Not Paying Its Subcontractors

The General Agreement of Indemnity provided as follows:

> ...in the event the Indemnitors ... abandon, forfeit or breach such contract ... or fail, neglect or refuse to pay for any labor or materials used in the prosecution of such contract ... the Company shall have the right ... to take possession of the work under the contract and ... to complete the contract(s), or clause, or consent, to the completion thereof.

Def.'s Exh. 1-4 at LMB 006771.

According to the transcript of a meeting held in Denver, Colorado, on June 4, 2001, Rich Barrick, who executed both the performance and payment bonds upon behalf of Lumbermens, and who was also an indemnitor on both bonds, in referring to a claim made by Landmark's subcontractors and vendors, stated as follows: "October - December is the date that I will tell you is the time that we began getting notice. A notice here, a notice there." Def.'s Exh. 5-1 at DOJ0089. In addition, in November 2001, Lumbermens held a large loss meeting. Def.'s Exh.

5-5 at LMB 006801. The date of loss under Landmark's bonds was given as January 2, 2001. Id.

Thus as early as October 2000, and certainly by early January 2001, Lumbermens was on notice that Landmark's successful completion of the contract was jeopardized by its failure to pay its vendors and subcontractors. There is no evidence in the record, either testimonial or documentary, however, that Lumbermens, after it became aware that Landmark was failing, neglecting or refusing to pay for labor or materials used in the prosecution of its contract, took "possession of the work under the contract." Lumbermens' failure to exercise due diligence in taking over the contract defeats its claim for impairment of suretyship.

E. Lumbermens Failed To Exercise Due Diligence In Failing To Attempt To Recoup Its Losses From The Indemnitors On The Bonds

The General Agreement of Indemnity provided pertinent information as follows:

> The indemnitors will indemnify ... the Company ... [for all] expense which the Company may pay or incur by ... having executed ... or by reason of the failure of the Indemnitors to perform or comply with any of the covenants or conditions of this agreement.

Def.'s Exh. 1-4 at LMB 006771.

There is no evidence in the record, either testimonial or documentary, that Lumbermens diligently pursued its rights against any of the indemnitors. Lumbermens' failure to exercise due diligence in seeking to re-coup its losses form the indemnitors defeats its claim for impairment of suretyship.

F. The Navy Could Not Have Prevented The Losses Incurred By Lumbermens Resulting From Landmark's Financial Inability Or Refusal To Pay Its Subcontractors

When the Navy became aware in January 2001 that there was a problem with Landmark's payments to its vendors and subcontractors, the Navy, in contrast to Lumbermens, lacked the legal ability to correct the situation by withholding payments to Landmark.

While FAR 52.232-9, Limitations on Withholding Payments, authorizes the temporary withholding of amounts otherwise payable to the contractor for supplies delivered or services performed, that provision only applies to a"supply contract, service contract, time-and-materials contract, labor-hour contract, or research and development contract." In contrast, for construction contracts, FAR 28.106-7, Subcontractor Payments, provide that during contract performance, agencies shall not withhold payments due contractors or assignees because subcontractors or contractors have not been paid. Moreover, FAR 32.112-1(b), Subcontractors Assertion of Non-Payment, provides that if the contracting officer finds that the prime contractor is not paying its subcontractors, the CO may encourage the contractor to make timely payment to the subcontractor or supplier. In short, while Lumbermens could have eliminated the risk of loss under the bonds, or at least minimized that risk, by not issuing the bonds, by ensuring that the indemnitors had sufficient financial resources to cover the losses, by setting up a reserve, by having the payee clause of the contract changed, and by taking over the contract when Landmark stopped paying its vendors and subcontractors, the Navy could only "encourage" Landmark to pay. Morever, the very essence of providing bonds on Government construction contracts is to protect the Government from losses cased by the default of prime contractors. Thus as a matter of equity, Lumbermens should bear the loss in connection with this contract.

## II. Lumbermens Failed To Establish That As A Matter Of Law The Contract Provisions Pertaining To the Schedule of Prices Give Rise To A Cause Of Action Premised Upon Impairment Of Suretyship And Failed To Establish Such Provisions Were Breached

Lumbermens alleges that the Navy breached Section 01200, ¶ 1.2 of the contract, which requires the contractor to submit, and the Navy's CO to approve, a schedule of prices before payment. Amend. Compl. ¶ 18.

With respect to the schedule of prices, Section 01200, ¶ 1.2, of the contract provided as follows:

> SUBMITTALS
>
> Submit a Schedule of Prices as identified in paragraph 1.2 below in accordance with the Section titled "Submittal Procedures."
>
> 1.2. SCHEDULE OF PRICES
> Prepare a Schedule of Prices on the forms furnished by the Government. The Schedule of Prices shall be a detailed breakdown of the contract price, giving quantities for each of the various kinds of work, unit prices, and extended prices. Submit the Schedule of Prices to the Government with the Final Design Submittal in accordance with Section III for approval by the Contracting Officer. Payments for construction work will not be made until the Schedule of Prices has been approved by the Contracting Officer.

Def.'s Exh. 1-1, Construction at 5.

A "schedule of prices" is a detailed statement provided by a construction contractor that allocates a dollar value for each of the various parts of the work as a portion of the total contract value. Testimony of Kevin McAteer (McAteer Test.) at 494. A "schedule of prices" is used as the basis for submitting and reviewing progress payments. Id.

The Resident Officer in Charge of Construction (ROICC) Handbook provides as follows:

> Remember, the purpose of a schedule of prices is to provide a vehicle for progress payments, nothing more. There are very few requirements dictated by law or regulation; the ROICC must protect the government and be reasonable with the contractor to achieve an acceptable schedule of prices.

Def.'s Exh. 6-4.

Part III - Design, ¶ B.3.a, of the contract, references the schedule of prices as follows:

> Design Schedule of Prices: Within five working days after the Notice to Proceed, submit one original Schedule of Prices, with the following breakdown . . .
>
> -Bonds (Lump Sum)
> -Design
> (45% Design Submittal)
> (Final Design Submittal)
> -Construction (Lump Sum)
>
> For Schedule of Prices requirements during construction, see Part IV, Section 01200, Price and Payment Procedures.

Def.'s Exh. 1-1, Design at 5.

Lumbermens contends that the Navy failed to require that Landmark meet the letter of the contract requirement regarding the schedule of prices and that as a consequence Lumbermens's surety rights were impaired. Lumbermens's claim is without legal or factual merit. In fact, Lumbermens submitted no evidence whatsoever that Lumbermens had even reviewed the contract prior to issuing the bonds, let alone that it relied upon any of the contractual provisions relating to the schedule of prices requirements in issuing such bonds. Lumbermens failed to establish that this provision was intended to provide security for the surety in its bonded performance. On the contrary, the evidence establishes that the inclusion of this provision was for the benefit of the Navy in administering the contract.

The schedule of prices provided by the contractor merely sets forth in a very general way how the contractor has allocated the amount of the fixed price contract among various material

and labor activities necessary to complete performance under the contract. The contractor is in no way required to demonstrate to the Government that the amounts shown are in fact the actual amounts the contractor expects to spend, because the contractor's profits are built into those amounts shown in the schedule of prices.

In accordance with the contract, Landmark submitted an initial schedule of prices for the design phase of the project on May 5, 2000. Def.'s Exh. 6-1;Paullin Test at 1400. This initial schedule of prices provided as follows:

| Number | Category | Price |
|---|---|---|
| 1 | Bonds | $143,256 |
| 2 | Design | |
| | (40 Percent Completion) | $90,000 |
| | (Final Completion) | $110,000 |
| 3 | Construction | $9,404,770 |

Id.

There is no testimonial or documentary evidence in the record that this schedule of prices did not fully comply with the contract requirements. See Paullin Test. at 1475.

The construction schedule of prices was to be submitted with the Final Design Submittal, which was planned to occur approximately six months after contract award, that is, on February 27, 2001. Def.'s Exhibit 7-10. Landmark submitted the schedule of prices for the construction phase of the contract in an electronic file dated June 28, 2000, as part of the Network Analysis Schedule (NAS). Def.'s Exh. 6-2; McAteer Test. at 497; Paullin Test. at 1400. Landmark made this submittal approximately four months prior to the date required by the contract. Def.'s Exhibit 6-2 at 1.

Landmark's first invoice, dated July 6, 2000, also contained a printout of the schedule of

prices for the construction phase of the contract, as part of the NAS. Def.'s Exh. 3-1 at Lumbermens 03603-03620; Paullin Test. at 1400. The following is an excerpt from the first page of that NAS, showing the beginning of the section that Landmark identified as the schedule of prices:

| Task Name | Amount Bid |
|---|---|
| Maylor Capehart Housing | $9,878,026.00 |
| Received Contract | $0.00 |
| Partnering Meeting | $0.00 |
| Pre-Design Meeting | $0.00 |
| Design Phase | $0.00 |
| Submittals | $0.00 |
| Govt, Review Submittal | $0.00 |
| Construction Mobilizat | $0.00 |
| Mutual Understanding | $0.00 |
| Schedule of Pricing | $5,514,508.00 |
| Doors & Windows | $500,000.00 |
| Cabinets | $500,000.00 |
| Toilets & Accessories | $100,000.00 |
| Paint | $300,000.00 |
| . . . | |

Def.'s Exh. 3-1 at LUMBERMENS03603; McAteer Test. at 497; Paullin Test. at 1400.

Landmark submitted the schedule of prices again on July 31, 2000, as part of its submittal of the NAS. Def.'s Exh. 7-5; McAteer Test. at 497; Paullin Test. at 1400. John Santiago, the contracting officer, approved that submittal with Contract Modification A00001, dated August 9, 2000. Def.'s Exh. 7-6; Paullin Test. at 1405.

Landmark submitted a revised NAS, that contained a schedule of prices, on August 9, 2000. Def.'s Exh. 7-6 at LUMBERMENS15547; Paullin Test. at 1405-1406. Kevin McAteer,

the project engineer assigned to this project by the Navy, returned the submittal marked "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark. Def.'s Exh. 7-6 at LUMBERMENS15547; Paullin Test. at 1406. The comments read as follows:

> (1) Contractor's "Final Acceptance" activity indicates completion on 20 Dec 02. The Contact Completion Date is 23 Oct 02.
>
> (2) Very few relationships were included to connect the tasks. The entire schedule was built with the use of constraints. This means the schedule will remain static and there is no critical path. As efficiencies, inefficiencies, updates and changes occur, you and the contractor will not have a planning tool showing what activities must be worked on to accomplish the work within the stated contract duration. The requirement to show the interdependence of activities is in Spec Para 01321.1 4.1
>
> (3) Government durations for Activities 96, 31, 29, 61, 37, 34, 44, 58, 118, 22, 16 and 19 are less than the 20 Work Days required in Spec Para 01330.1.3.4.b
>
> (4) All Government "inspection" activities are zero duration milestones, meaning at the most you are given 1 day to review and accept a housing unit.
>
> (5) Review all line items to ensure tasks are not completed on non-working days.
>
> (6) Resubmit once above corrections are made.

Def.'s Exhibit 7-6 at LUMBERMENS15548.

The contract specifications authorized work to proceed when a submittal was "approved as noted," provided the contractor "takes no exception to the notations." Def.'s Exh. 7-6 at LUMBERMENS15547; Paullin Test. at 1406. Landmark did not take exception to the notations,

and resubmitted the NAS on September 25, 2000. Def.'s Exh. 7-7 at LUMBERMENS15620; Paullin Test. at 1406.

Mr. Santiago was satisfied with, and relied upon Landmark's schedule of prices. Santiago Test. at 170. In Mr. Santiago's opinion, Landmark's schedule of prices, in conjunction with his knowledge of the project and material acquisitions, was sufficient information for him to evaluate the progress made with respect to the material acquired. Id. In the opinion of Mr. Santiago, the schedule of prices provided by Landmark was suitable for billing purposes. Santiago Test. at 171. Mr. Santiago also testified that the payment of material costs to Landmark by the Navy was in accordance with the schedule of prices information submitted by Landmark with its invoices. Id. In Mr. Santiago's opinion, Landmark's submittal of the schedule of prices as part of the NAS satisfied the intent of Contract Section 01200, ¶ 1.2. Id. Mr. Santiago's testimony on cross-examination was consistent with his testimony on direct-examination in this regard:

> Q It meets all the requirements for it to be proper payment?
>
> A Yes, it does.
>
> Q So you say you made a conscious decision to allow Landmark to use the network analysis schedule as a schedule of prices, correct?
>
> A The network analysis schedule had a schedule. It also depicted percentages for monies that would be allowed to be paid for. Yes.
>
> Q And you say you made a conscious decision to allow them to do that within the network analysis schedule?
>
> A Yes, we made a conscious decision to do that.

Santiago Test. at 203.

Richard Paullin,[2] the Government's expert scheduling witness also testified about this issue. In Mr. Paullin's opinion, the schedule of prices provided by Landmark was suitable for billing purposes. Paullin Test. at 1385. In addition, in the opinion of Mr. Paullin, the payment of material costs to Landmark by the Navy was in accordance with the schedule of prices submitted by Landmark with its invoices. Paullin Test. at 1395-1396. In Mr. Paullin's opinion, Landmark's submittal of the schedule of prices as part of the NAS satisfied the intent of Contract Section 01200, ¶ 1.2. Paullin Test. at 1383. Mr. Paullin's testimony on cross-examination was consistent with his testimony on direct-examination in this regard:

> Q And you would agree that the progress payments pursuant to Section 1200 of the contract, or, excuse me, Section 1200, paragraph 1.3, are based on an updated network analysis schedule, correct?
>
> A Yes, they are.

Moreover, the schedule of prices used by the Navy in connection with the payment of invoices was consistent with the ROICC handbook. The ROICC Handbook provides as follows:

> The schedule of prices is a tool for making progress payments in accordance with FAR 52.232-5. The contractor will use the format of NAVFAC Form 4330/4, "Schedule of Prices (Construction Contract)," Appendix Tab (12). The contractor may generate his own computer generate[d] form, as long as the required information is include[d.] There may be a cost-loaded CPM on some contracts that will be the basis for the schedule of prices.

---

[2] Richard Paullin has a BS degree in mechanical engineering from Cornell University. Mr. Paullin has also taken several courses in claims, and scheduling, and earned value and courses of that nature over the last 18 years. See Def.'s Exh. 17; Paullin Test. at 1343. Mr. Paullin's qualifications to testify as an expert were not challenged. See Transcript at 1342-1470.

Def.'s Exh. at 6-4.

Contrary to the assertion of Lumbermens, Landmark submitted a schedule of prices, and the contracting officer approved that schedule of prices. See Def.'s Exh. at 7-6; see also Paullin Test.; Santiago Test.; and McAteer Test.

There is no legal requirement, as Lumbermens appears to assert, that the Navy do an in-depth analysis of the accuracy or validity of the values Landmark used in its construction schedule of prices. As Mr. McAteer testified, it was his delegated responsibility to review Landmark's schedule of prices to ensure that all major material purchases and labor activities were included, that such amounts were reasonable, and that the total value of all such activities equaled the value of the contract. McAteer Test. at 489. On cross-examination in this regard, Mr. McAteer testified as follows:

> Q Mr. McAteer, is it your testimony that you were or that you had the authority to approve the network analysis schedule required by Section 1321 of the contract?
>
> A I believe so, yes.
>
> Q From where did you get that authority?
>
> A Basically the authority would have been passed down from John Santiago in his capacity.
>
> Q He specifically delegated to you the authority to review and approve the network analysis schedule?
>
> A Not specifically for this contract, but that was our working arrangement.

McAteer Test. at 755.

Mr. Santiago testified that he relied upon Mr. McAteer in this regard. Santiago Test. at

169. In addition, Mr. Paullin testified that in his opinion the values were reasonable. Paullin Test. at 1395-1396. Mr. Paullin was virtually unchallenged on cross-examination. Similarly, Mr. Wright also testified in this regard that for the amounts contained in Landmark's schedule of prices for the line items in question, it was his opinion that those amounts were reasonable. Wright test. at 1679. Mr. Wright’s testimony on cross-examination was consistent with this opinion. See Testimony of Wiley Wright (Wright Test. )at 1842-1849.

In summary, Landmark submitted an initial schedule of prices, payment for Landmark’s first invoice was made based upon the line items in that initial schedule of prices, Landmark submitted a revised schedule of prices as part of its NAS submittal, and the contracting officer approved Landmark’s NAS submittal, which contained the schedule of prices. Landmark submitted a schedule of prices that met the intent of the contract; was adequate for the Navy’s administration of the contract; and was properly approved.

## III. Lumbermens Failed To Establish That As A Matter Of Law The Contract Provisions Pertaining To The Network Analysis Schedule Give Rise To A Cause Of Action Premised Upon Impairment Of Suretyship And Failed To Establish Such Provisions Were Breached

Lumbermens contends that the Navy failed to follow the contractual requirements pertaining to the NAS. Amend. Compl., ¶ 23-24. With respect to the network schedule analysis, Landmark’s contract at Section 01321 provided as follows:

> PART 1. GENERAL 1.1 DESCRIPTION:
>
> Prepare a progress chart pursuant to the clause entitled "FAR 52.236-15, Schedules for Construction Contracts" of the Contract Clauses that shall consist of a network analysis system. Include scheduling of construction, creation of the network, production of the reports, execution of the plan described by the network, participation in meetings with the Contracting Officer, and

> submission of progress and revision data, as hereinafter set forth. Utilize conventional NAS (Precedence Diagram) technique to satisfy both time and cost applications.
>
> 1.4.1 Diagrams
>
> Show the order and interdependence of activities and the sequence in which the work is to be accomplished as planned. The basic concept of a network analysis diagram will be followed to show how the start of a given activity is dependent on the completion of preceding activities and how its' completion restricts or restrains the start of following activities.

Def.'s Exh. 1-1, Construction at 01321-1.

Section 01321 of Lumbermen's contract also provided as follows:

> 1.5.2 Completed Network
>
> Submit the complete network analysis, consisting of the network mathematical analysis and network diagrams, with in 40 calendar days after contract award. Submit three copies of both the diagrams described in paragraph entitled "Diagrams" and required sorts listed in paragraph entitled "Required Sorts".
>
> 1.5.3 Review and Evaluation
>
> The Contractor shall participate in a review and evaluation of the proposed network diagrams and analysis by the Contracting Officer. Revisions necessary as a result of this review shall be resubmitted for approval of the Contracting Officer within 10 calendar days after the conference. The approved schedule shall then be the schedule to be used by the Contractor for planning, organizing, and directing the work, reporting progress, and requesting payment for work accomplished.
>
> 1.5.4 Changes to the Network Analysis Schedule
>
> If changes in the method of operating and scheduling are desired, the Contracting Officer shall be notified in writing stating the reasons for the change. If the Contracting Officer considers these changes to be of a major nature, the Contractor may be required to revise and submit for approval, without additional cost to the

> Government, network diagrams and required sorts. A change may be considered of a major nature if the estimated time required or actually used for an activity or the network logic is varied from the original plan to a degree that there is a reasonable doubt as to the effect on the contract completion date. Changes, which affect activities with adequate float time, shall be considered a major change when their cumulative effect could extend the contract completion date.

Def.'s Exh. 1-1, Construction at 01321-4.

A "network analysis schedule" is a method of graphically portraying the planning and scheduling of a project's activities in a way that allows mathematical analysis of the project schedule. The purpose of a network analysis schedule is for the planning and management of a project, as well as measurement of a construction contractor's progress. Paullin Test. at 1366.

The ROICC Handbook provides as follows:

> All construction contracts require the contractor to submit a progress schedule, preferably in a computer generated Critical Path Method (CPM) network analysis. Gantt (bar) charts are still used on some smaller contracts. Either type of progress schedule is intended to demonstrate that the contractor has a reasonable plan for completing the contract. It also provides a management tool to monitor progress and for informing the customer of contract performance.

Def.'s Exh. at 6-4.

Lumbermens contends that the Navy failed to require that Landmark meet the letter of the contract requirement regarding the NAS and that as a consequence, Lumbermens's surety rights were impaired. Lumbermens's claim is without legal or factual merit. In fact, Lumbermens submitted no evidence whatsoever that Lumbermens had even reviewed the contract prior to issuing the bonds, let alone that it relied upon any of the contractual provisions

relating to the schedule requirements in issuing such bonds. Lumbermens failed to establish that the NAS provisions were intended to provide security for the surety in its bonded performance. On the contrary, the evidence establishes that the inclusion of such provisions was for the benefit of the Navy in administering the contract.

As previously stated, Landmark submitted its construction schedule of prices on July 31, 2000, as part of its submittal of the NAS. Def.'s Exh. 7-5; McAteer Test. at 497; Paullin Test. at 1400. John Santiago, the contracting officer, approved that submittal with Contract Modification A00001, dated August 9, 2000. Def.'s Exhibit 7-6; Paullin Test. at 1405.

Also, as previously stated, Landmark submitted a revised NAS on August 9, 2000. Kevin McAteer returned the submittal marked "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark. See Def.'s Exh. at 7-5; Santiago Test. at 216; Paullin Test. at 1406. McAteer Test. at 729

The contract specifications authorized work to proceed when a submittal was "approved as noted" provided the contractor "takes no exception to the notations." See Def.'s Exh. at 7-6 at 15547; Santiago Test. at 216; Paullin Test. at 1406; McAteer Test. at 729. Landmark did not take exception to the notations, and resubmitted the NAS on September 25, 2000. See Def.'s Exh.7-7; Santiago Test. at 216; Paullin Test. at 1406.

While the NAS was not in strict compliance with the contract requirement, in the opinion of Mr. Santiago, the contracting officer, Mr. McAteer, the Navy's scheduling expert, and Mr. Paullin, the Government's scheduling expert, the NAS (and the schedule of prices) provided by Landmark was suitable for day-to-day management of the construction work. Santiago Test. at 170; Paullin Test. at 1401-1402.

Lumbermen's contention that the delegation of the authority to approve the NAS to Mr. McAteer was invalid is wholly lacking in legal and factual merit. Moreover, to contend that Mr. Santiago's approval of the NAS could impact a surety's rights more than Mr. McAteer's is absurd. The fact is that the Navy approved Landmark's NAS. The Naval Facilities Acquisition Supplement (NFAS) provides that certain contract administration functions can be delegated to a Contract Administration Office (CAO), in accordance with FAR 42.302, it provides that a ROICC office can serve as a CAO. Def.'s Exh. 7-12 at 65.

FAR Subpart 42.3, applicable to CAO function, provides as follows:

> FAR 42.302 Contract administration functions.
>
> (a) The contracting officer normally delegates the following contract administration functions to a CAO. The contracting officer may retain any of these functions . . . unless the cognizant Federal agency (see 2.101) has designated the contracting officer to perform these functions.
>
> > (1) Review the contractor's compensation structure.
> >
> > . . .
> >
> > (12) Review and approve or disapprove the contractor's requests for payments under the progress payments or performance-based payments clauses.
> >
> > (13) Make payments on assigned contracts when prescribed in agency acquisition regulations.
> >
> > . . .
> >
> > (40) Perform engineering surveillance to assess compliance with contractual terms for schedule, cost, and technical performance in the areas of design, development, and production.
> >
> > . . .

FAR 42.302.

Mr. Santiago was admittedly not experienced in the analysis of critical path method

(CPM) schedules for the purpose of NAS submittal review. Santiago Test. at 169; McAteer Test. at 489. For this contract, Mr. Santiago delegated that responsibility to Mr. McAteer, the project engineer, who was familiar with analysis of NAS submittals. Santiago Test. at 169; McAteer Test. at 489.

The NFAS defines the AROICC position, such as the one held by M. McAteer, as follows: A Civil Engineer Corps officer designated by the ROIC/ROICC for the administration of assigned contracts. Def.'s Exh. 7-12 at 16.

Mr. McAteer reported his findings to Mr. Santiago after reviewing the submittals. Santiago Test. at 183. McAteer Test. at 755. Throughout his career as a contracting officer, Mr. Santiago routinely delegated the analysis and approval of NAS submittals to the project engineer. Santiago Test. at 183.

Contrary to Lumbermens' assertion, Mr. Santiago, the contracting officer, did review and approve the NAS prepared and used by Landmark to obtain progress payments because Mr. Santiago properly delegated the review of the NAS to the project engineer; that is, Mr. McAteer, discussed that review with him, and approved Landmark's NAS submittal with Contract Modification A00001.

On this project, Landmark's NAS submittal was used primarily for billing purposes. Paullin Test. at 1401. Together with the NAS, Landmark and the Navy adequately managed this project with tabular status summaries (containing lists of activities with dates). Def.'s Exh. 7-3 at 1; Paullin Test. at 1455.

After Landmark's termination, Atherton and the Navy managed the project using tabular status summaries that were very similar to those previously used by Landmark. Paullin Test. at

1445. Like Landmark's, Atherton's NAS submittal did not strictly meet all of the contract requirements. Paullin Test. at 1445. In Mr. Paullin's opinion, however, like Landmark's NAS, Atherton's NAS was adequate for billing purposes. Paullin Test. at 1401; Paullin Report at 3.

In summary, Landmark's NAS submittal was adequate for management of this project and it satisfied the intent of Section 01321 of the contract. Even if the Navy did not precisely follow the contract's terms, such failure does not constitute an impairment of Lumbermens suretyship because the contractual provisions were not included in the contract for the benefit of the surety, but to assist the Navy in the management of the contract; Lumbermens did not rely upon the inclusion of such provisions when it executed the payment and performance bonds, and the Navy fulfilled the intent of such provisions. Landmark submitted a NAS that met the intent of the contract; was adequate for the Navy's administration of the contract; the responsibility for approving the NAS was properly delegated to Mr. McAteer and was properly approved.

## IV. Lumbermens Failed To Establish That As A Matter Of Law The Contract Provisions Pertaining To The Payment of Invoices Give Rise To A Cause Of Action Premised Upon Impairment Of Suretyship And Failed To Establish Such Provisions Were Breached

Lumbermens alleges that the Navy breached Section 01200, ¶ 1-2, of the contract which requires the Navy to follow certain procedures in authorizing the payment of Landmark's invoices. Amend. Compl., ¶ 18. Lumbermens' alleges that the Navy did not comply with Section 1-3 (a) of the contract captioned "Contractor's Invoice and Contract Performance Statement." Amend. Compl., ¶ 19.

With respect to the requirements for processing Landmark's invoices, Section 01200, ¶ 1.3, of the contract provided as follows:

a. Content of Invoice. Requests for payment will be

processed in accordance with [FAR 52.232-5], Payments Under Fixed-Price Construction Contract" and shall consist of the following:

(1) The Contractor's invoice shall be submitted on NAVFAC Form 7300/41, which may be obtained from the Contracting Officer. The invoice shall show, in summary form, the basis for arriving at the amount of the invoice.

(2) The Contract Performance Statement, on the form furnished by the Government for this purpose, shall show, in detail, the estimated cost, percentage of completion, and value of completed performance.

(3) The Contractor shall provide an updated network analysis.

(4) Contractor's Final Release Form (with request for final payment only).

(5) QC Manager's invoice certification

d. Invoices not completed in accordance with contract requirements will be returned to the Contractor for correction of the deficiencies.

. . .

Def.'s Exh. 1-1, Construction at 01200.

In summary, the evidence establishes that the Navy fully complied with Section 01200, ¶ 1.3, when payment of Landmark's invoices was authorized; the Navy did not authorize payments to Landmark in violation of Section 01200, ¶ 1.3 of the contract; and Landmark's NAS submittal was adequate for management of this project and it satisfied the intent of Section 01321 of the contract.

The inclusion of this provision was for the benefit of the Navy. Lumbermens has not, and can not, establish as a matter of fact or law, that the inclusion of such contractual provisions was

intended for the benefit of Lumbermens. In fact, Lumbermens submitted no evidence whatsoever that Lumbermens had even reviewed the contract prior to issuing the bonds, let alone that it relied upon any of the contractual provisions relating to payments under the contract in issuing such bonds. Moreover, the documents and testimonial evidence establish that any invoice not completed in accordance with the contract requirements would have been returned to Landmark for corrections. There is no evidence that the invoices could not have been paid. Lumbermens, therefore, can not establish that the absence of a required certification impaired Lumbermen's surety rights. The gravamen of Lumbermen's argument appears to be not so much that the invoices did not all contain the required certifications, but that the percentages applied to the schedule of prices were in come cases inflated, leading to an overpayment. The Government at trial conceded that in some cases, this was true. See Wright Report at 54; Wright Test. at 1676, While there also instances of under-payments, the critical fact is that it was Landmark's responsibility to certify to the accuracy of the percentages, not the Navy's.

With respect to quality control, the contract provides as follows:

> Provide a QC Manager at the work site whose only duties and responsibilities are to implement and manage the QC program on this contract. The QC Manager shall report directly to an officer of the firm and shall not be the same individual as, nor be subordinate to, the project superintendent or project manager.

Exh. 1-1, Section 01450, Para. 1.5.1.1.

In addition, the contract proves as follows:

> Furnish a certificate to the Contracting Officer with each payment request, signed by the QC Manager, attesting that as-built drawings are current and attesting that the work for which payment is requested, including stored material, is in compliance with contract requirements.

Exh. 1-1, Section 01450, Para. 1.13.2.

In addition, the contract provides as follows:

> Requests for payment will be processed in accordance with "FAR 52.252-5, Payments Under Fixed-Price Construction Contract" and shall consist of the following:
>
> (1) The Contractor's invoice shall be submitted on NAVFAC Form 7300/41, which may be obtained from the Contracting Officer. The invoice shall show, in summary form, the basis for arriving at the amount of the invoice.
>
> (2) The Contract Performance Statement, on the form furnished by the Government for this purpose, shall show, in detail, the estimated cost, percentage of completion, and value of completed performance.
>
> (3) The Contractor shall provide an updated network analysis.
> (4) Contractor's Final Release Form (with request for final payment only).
>
> (5) QC Manager's invoice certification.

Exh. 1-1, Section 01200, Paragraph 1.3.a.

While the contract understandably does not discuss the Navy's quality assurance program, since that program imposes no requirements upon the contractor, quality assurance is covered in NAVFAC P-455 "Construction Quality Management Program." NAVFAC P-455 provides in pertinent part as follows:

> This publication defines NAVFAC's policy for construction quality management and outlines the concepts, requirements, and procedures used to execute NAVFAC's Construction Quality Management (CQM) Program.
>
> The CQM Program implements the Contractor's Quality Control (QC) and the Government's Quality Assurance (QA) Systems, tools designed to support the management of NAVFAC's construction and environmental restoration work. All NAVFAC

> construction type contracts, for work to be performed in the United States and its territories, will comply with the requirements and procedures outlined in this manual.

Exh. 9-14, Introduction, p. i.

The following points are fundamental to the CQM Program:

> The Government is not responsible for controlling the quality of the contractor's work.
>
> Contractors have always been implicitly responsible for the quality of their work; under the CQM Program, the Contractor is contractually assigned QC responsibilities. The Contractor controls the quality of the work.
>
> The level of quality is established by the contract requirements in the specifications and drawings. FAR Contract Clause 52.246-12 "Inspection of Construction" indicates that all work is subject to inspection by the Government, i.e.; the Government has the right to inspect (For fixed price contracts, which exceed the simplified acquisition threshold).
>
> The Government must assure that construction work conforms to contract requirements by ensuring that the Contractor's Quality Control (QC) System is properly functioning. This is the role of NAVFAC's Quality Assurance (QA) System.
>
> QC requirements expedite the work by reducing delays associated with Government inspections, submittal approvals, and testing. The accomplishment of submittal approvals, inspection, and testing through construction contractors promotes unified administration in comparison to accomplishing these functions through other arrangements.

Exh. 9-14, Executive Summary, p. xiii.

Thus it is clear that quality control, including the provision of the percent complete in connection with the submission of progress payment invoices, was the responsibility of Landmark, and not the responsibility of the Navy. Tate Robbins, a Landmark employee, was

responsible for quality control, Tr. 167:2-21, 486:4-487:4, 490:10-491:6, 808:13-809-8, while Ron Martin, a Navy employee, was responsible for quality assurance. Tr. 171:17-23 and 487:5-24. It was Tate Robbins who signed the quality control certification on Landmark's invoices, not Ron Martin. See Tr. 741:12-743:11, 746:17-747:12, 809:19-810:18.[3]

IV. Lumbermens Failed To Establish Its Damages Resulting From The Alleged Breaches

Expert Opinions Of Wiley R. Wright, III

Lumbermens has not, and can not, dispute that Mr. Wright has the requisite educational background and experience to testify as an expert in this matter. Mr. Wright is a Certified Public Accountant with more than 25 years experience in the practice of public accounting, and construction and government consulting. Mr. Wright has provided expert testimony, either at depositions or trials, on more than sixty different occasions, many of which were related to pricing and cost accounting issues arising under construction contract disputes, and has testified, as an expert, in proceedings before the United States Court of Federal Claims, the Federal Boards of Contract Appeals, in domestic and international arbitration and mediation proceedings, in Federal District courts, and various state courts and boards of contract appeals. Wright Test. at 1644. On no occasion has Mr. Wright been found not competent to testify in his area of expertise; his testimony has never been excluded for any reason. Wright Test. at 1645.

[3] The copies of the progress payment invoices submitted by Landmark during the performance of the contract which were introduced into evidence were admittedly incomplete. It is clear, however, that an incomplete invoice would not have been processed. See Contractor's Invoice and Contract Performance Statement, part d: "Invoices not completed in accordance with contract requirements will be returned to the Contractor for correction of the deficiencies." Moreover, the fact that Landmark was the target of a criminal investigation is the likely reason that neither the Government, nor Lumbermens, which had the right to Landmark's files after Landmark has been defaulted, could locate complete copies of all of the invoices. See Def. Exh. 10-10.

Moreover, the evidence demonstrated that Mr. Wright's opinions were based upon a proper factual foundation to support his analysis, and that he has not ignored significant factors that may have contributed to Lumbermens' losses. See Wright Test. at 1642-1761. As Mr. Wright testified, the most appropriate and most accurate method to determine the percent complete of a construction project from a financial perspective is the cost-to-cost method of analysis. Wright Test. at 1655. To determine the extent of the overpayments, if any, by the Navy to Landmark, Mr. Wright had to determine the percentage of completion of the contract requirements by Landmark at the time of termination. Id. In Mr. Wright's expert opinion, the cost-to-cost method is a preferred method of revenue recognition under generally accepted accounting principles for construction contractors, and was both relevant and reliable under the circumstances presented by this case. Wright Test. at 1656.

While Mr. Wright acknowledged that the cost-to-cost is not the only method that could be used, it is his expert opinion that under the circumstances presented by this case the cost-to-cost methodology is the most appropriate methodology to be used. Wright Test. at 1655-56. Another methodology involves the determination of the actual quantities of materials received as of the termination date, and the quantities of the materials actually utilized by Atherton in the performance of their takeover contract. Id. However, in Mr. Wright's opinion, the available records were insufficient to perform that type of analysis. Wright Test. at 1656.

Under the cost-to-cost method, the percent complete is determined by comparing the relative costs incurred by each contractor, stated as a percentage. Id. For example, if each contractor incurred $100 to perform a particular line item of work then the percent-complete for contractor 1 would be 50 percent ($100 as a percentage of the total cost of $200). Id. Thus, the

cost-to-cost method is not an estimate of the proportion of the project's financial burden carried by Landmark, as Lumbermens contends, but rather a generally recognized and accepted methodology for determining the percentage complete, and the appropriate amount of the schedule of prices amounts earned by Landmark. Id. Mr. Wright's analysis and calculations were performed using this recognized methodology and were based upon actual objective cost data. Id.

Mr. Wright's methodology is reliable given that it is recognized by an authoritative body in the field of of accounting, that is, the Generally Accepted Accounting Principles (GAAP)[4] as promulgated by the American Institute of Certified Public Accountants. See Def.'s Exh. 14. The American Institute of Certified Public Accountants (AICPA) is the national, professional organization for all Certified Public Accountants. Id. Its mission is to provide members with the resources, information, and leadership that enable them to provide valuable services in the highest professional manner to benefit the public as well as employers and clients. Id. The AICPA establishes professional standards; assists members in continually improving their professional conduct, performance and expertise; and monitors such performance to enforce current standards and requirements. Id.

The AICPA's Accounting Standards Team, though its Accounting Standards Executive Committee, develops industry-specific guidance regarding financial accounting and reporting matters, including industry-specific authoritative guidance, such as Statement of Positions and Accounting and Auditing Guides. Id.

---

[4] Generally Accepted Accounting Principles (GAAP) are the authoritative body of accounting standards for financial reporting in the United States.

AICPA's Statement of Position (SOP) 81-1 – Accounting for Performance of Construction-Type and Certain Production-Type Contracts, provides that the percentage of completion method is the preferred method for revenue recognition when estimates of costs to complete and extent of completion towards completion of long-term contracts are reasonably dependable. Id. SOP 81-1, Accounting Research Bulletin No. 45 (ARBNo.45), Long Term Construction-Type contracts, issued by the AICPA Committee on Accounting Procedure in 1955, describes the two generally accepted methods of accounting for long term construction-type contracts for financial reporting purposes:

> The percentage-of-completion method recognizes income as work on a contract progresses: recognition of revenues and profits generally is related to costs incurred in providing the services required under the contract.
>
> The completed-contract method recognizes income only when the contract is completed, or substantially so, and all costs and related revenue are reported as deferred items in the balance sheet until that time.

SOP 81-1 provides further that:

> The committee believes that in general when estimates of costs to complete and extent of progress toward completion of long term contracts are reasonably dependable, the percentage-of-completion method is preferable. When lack of dependable estimates or inherent hazards cause forecasts to be doubtful, the completed contract method is preferable.

Id.

Under SOP 81-1, there are alternative acceptable methods of measuring the extent of progress towards completion, including the cost-to-cost method, variations of the cost-to-cost method, efforts expended methods, the units of delivery method, and the units-of-work

performed method. Id. Those practices are intended to conform to ARB No.45, paragraph 4 which states:

> The committee recommends that the recognized income (under the percentage-of-completion method) be that percentage of estimate total income, either:
>
> (a) that incurred costs to date bear to estimated total costs after giving effect to estimates of costs to complete based upon most recent information, or
>
> (b) that may be indicated by such other measure of progress toward completion as may be appropriate having due regard to work performed.

Id.

Given the lack of objective, complete, and accurate data as to the units of delivery or units of work performed, it is Mr. Wright's expert opinion that the cost-to-cost approach he used is the acceptable and preferred approach under SOP 81-1, the relevant authoritative guidance. Wright Test. at 1656.

While these standards are applicable to the presentation of financial statements, the principles and methods contained in them are relevant to other uses, such as the measure of revenue earned for a fixed price construction contract in a non-financial statement context. Def.'s Exh. 14.

Given that the cost-to-cost methodology is commonly employed for determining the percentage of completion, and the related revenue earned under fixed price contracts, and its use is supported by the relevant literature and authoritative guidance, the methodology used by Mr. Wright is reliable. Id. The cost-to-cost methodology is directly relevant to this case because the central issue from a financial standpoint is whether Landmark was overpaid for its work on the

contract. See Wright Test. at 1642-61. The determination of any overpayments is based upon the revenue that Landmark should have earned for a particular line item, for example, doors and windows, versus the amount Landmark was actually paid by the Navy for that line item. Wright Test. at 1660-70.

The percentage of completion method, that Mr. Wright used in analyzing the extent of such overpayments, objectively, and consistent with authoritative guidance, measures the work performed by Landmark, and calculates the amount that Landmark should have been paid based upon this objective methodology. Wright Test. at 1672. The amount that Landmark should have been paid is then compared to the amount that Landmark was actually paid, any difference being the amount that Landmark was overpaid or underpaid for the particular line item or activity being evaluated. Id. The use of actual costs for both Landmark and Atherton, the completion contractor, in Mr. Wright's calculations using the cost-to-cost method eliminates the use of estimates, as well as the concerns discussed in SOP 81-1 concerning the reliability of estimates. Wright Test. at 1679.

There is no dispute that the acquisition of the materials necessary to renovate the 160 housing units is a large component of the work required under this contract, and that Landmark was entitled to obtain payments from the Navy for these materials under the contract as they were procured. See Wright Test. at 1642-71. The cost-to-cost method measures the amount of materials that Landmark acquired as compared to the total materials requirements. Wright Test. at 1702.

Based upon this objective data, Mr. Wright calculated the amount of revenue, that is, payments Landmark received under the contract, that Landmark should have received for the

materials. Id. The determination of the material costs that Landmark incurred in relation to the total material cost, that is, the cost of materials procured compared to the total cost of those materials as identified in Landmark's schedule of prices, is important to the damages calculation in this case because of the manner in which Landmark billed for its material acquisitions. Id. As Lumbermens acknowledges, Landmark separately included the required materials as separate line items in its schedule of prices and, thus, did not include such costs in the schedule of prices line items for each individual housing units. See Wright Report.

The contract provided that the Navy would make progress payments for these materials line items as the materials were acquired. Def.'s Exh. 1-1, Construction at 01200. Accordingly, for the material line items, the question of the work accomplished for individual housing units is irrelevant. To measure this progress, that is, materials acquired, the cost-to-cost method under the percentage of completion is the best method of measurement. Wright Test. at 1655.

For some of the items for which Lumbermens claims that Landmark was overpaid, it was not necessary for Mr. Wright to use the cost-to cost method of analysis. Wright Test. at 1681. For example, site-work is one of the activities for which Lumbermens contends that the Navy overpaid Landmark. Wright Test. at 1672. Mr. Wright is of the opinion that the $590,000 that Landmark included in its schedule of prices for sitework was reasonable because the $590,000 paid to Lloyd Enterprises for the site-work is the full amount of the subcontract between the parties. Wright Test. at 1732. Based upon Lloyd's Certified Payroll reports, Lloyd spent a total of 947 hours on the project that includes 458 equipment hours. Wright Test. at 1844. Based upon Lloyd's Certified Payroll Reports, the effective rate for the sitework was $623 per hour, not the $2,000 per hour claimed by Lumbermens in its complaint. Id. An alternative, and more

appropriate analysis of the amount paid to Lloyd, is determining the effective sitework cost per housing unit. That amount is $3,687.50 ($590,000 divided by 160 units). Wright Report at 42. This unit cost rate was reasonable and should not have raised any issues or concerns by the Navy. It is, therefore, Mr. Wright's expert opinion that Landmark was not overpaid for sitework. Wright Report at 43.

Another activity for which Mr. Wright did not use the cost-to-cost method of analysis is the Navy's payment to Landmark for personnel costs. Wright Test. at 1672. Lumbermens contends that the $378,936 the Navy paid Landmark for personnel was $291,500 more than the amount to which Landmark was entitled, and constituted 52 percent of the amount indicated in Landmark's schedule of prices for this line item. Wright Report at 9. Mr. Wright is of the opinion that the Navy made no overpayment for this item. Wright Report at 71. The personnel line item in Landmark's schedule of prices, in the amount of $728,834, was budgeted separately from the per housing unit labor, and consists of field office overhead . Wright Report at 9. In Mr. Wright's opinion, it is appropriate and consistent with industry practices to budget this type of labor separately from the labor incurred for building the units. Id. Furthermore, it is a generally recognized practice in the construction industry to treat general condition or field office type labor as a time variable costs. Id. Thus, the contract will "earn" and invoice for these costs ratably over time. Id. Moreover, given the nature of the personnel costs it would be inappropriate to recognize or "earn" these types of costs based upon the actual percent complete of the unit construction. Id.

Mr. Wright's calculations of the credit for Landmarks' labor expenses are only for general conditions labor, which is based upon a generally recognized per diem method for time

variable field office overhead costs. Wright Test. at 1672. This approach is clearly appropriate and reliable because Landmark spread its general condition labor costs over the project, which had a fixed period of performance. Id. Mr. Wright, therefore, credited general conditions labor over that fixed duration. This method is not only consistent with the generally recognized per diem method but also consistent with Landmark's incurrence of these costs. Id.

For other activities for which Lumbermens claims that the Navy overpaid Landmark, it was necessary for Mr. Wright to use the cost-to-cost method of analysis. Wright Test. at 1681. For example, Lumbermens contends that the $458,640 paid to Landmark for asbestos and lead abatement work accounted for 52 percent of the amount indicated in Landmark's schedule of prices for that work, while Landmark had only completed abatement in 34 percent of the housing units, thereby overpaying Landmark $158,760 for work it had not performed. Wright Report at 7. To determine the amount of the overpayment, if any, Mr. Wright used the cost-to-cost method. Mr. Wright's analysis is as follows:

| | 180 Units | Less 21 Units | 159 Units | Percent Complete |
|---|---|---|---|---|
| Landmark Construction | $242,509 | | $242,509 | 48 % |
| Atherton Construction | $330,777 | 66,883 | $263,894 | 52% |
| Subtotal | $573,286 | | $506,403 | 100 % |
| Average Cost Per Unit | $ 3,185 | | | |

| | | | | |
|---|---|---|---|---|
| Landmark Schedule of Value Amount | $882,000 | | | |
| Amounts Paid to Landmark | $458,640 | | | |
| Landmark's Earned Value | $422,377 | | | |
| Overpayment | $ 36,263 | | | |

Thus, it is Mr. Wright's expert opinion that the Navy overpaid Landmark $36,263 for this

item, not $158,760 as claimed by Lumbermens. Wright Report at 6.

For some of the activities for which Lumbermens claims that the Navy overpaid Landmark, Mr. Wright's estimates of the overpayment, in fact, are greater than the amount claimed by Lumbermens. For example, Mr. Wright's cost-to-cost calculation for doors and windows is as follows:

| | 180 Units | Less 21 Units | 159 Units | Percent Complete |
|---|---|---|---|---|
| Landmark Construction | $ 485,784 | | $ 485,784 | 42% |
| Atherton Construction | $ 825,571 | $152,991 | $ 672,991 | 58% |
| Subtotal | $1,311,355 | | $1,158,364 | 100% |
| Average Cost Per Unit | $ 7,285 | | | |
| Landmark Schedule of Value Amount | $500,000 | | | |
| Amounts Paid to Landmark | $375,000 | | | |
| Landmark's Earned Value | $209,685 | | | |
| Overpayment | $165,315 | | | |

Based upon the cost-to-cost method, it is Mr. Wright's expert opinion that the maximum overpayment for doors and windows is $165,315, not the $131,775 sought by Lumbermens in the complaint. Wright Report at 6.

Mr. Wright has also rendered opinions that do not involve the cost-to-cost analysis method, the use of which has been described above, and do not involve the analysis of line items in Landmark's schedule of prices. For example, Lumbermens contends that it incurred damages in excess of $4 million under its performance bond, and more than $550,000 under its payment bond. Wright Test. at 1732. According to Mr. Wright, Lumbermens' claim is duplicative of the separate claims for materials, personnel, and subcontract costs. Wright Report at 7. Furthermore, Lumbermens claim is a total cost claim in which Lumbermens seeks all of its payments for the project. Id. In addition to being duplicative, the amounts for these two claims

include items that are unrelated to the issues in the complaint, such as the price differences between Landmark and Atherton for performing the original scope of work. Id. Lumbermens offers no rationale whatsoever for its contention that Lumbermens was required to pay proportionately more to Atherton to complete the work than the Navy was contractually required to pay Landmark. These amounts also fail to consider the value of materials and services received by Atherton and Lumbermens for the payments made to vendors and subcontractors under the payment bond. Finally, Lumbermens has failed to explain or document the bases for the varying amounts it is claiming.

With respect to Lumbermens' contention that, as a result of the Navy's failure to demand from Landmark a NAS that complied with the contract requirements, Lumbermens has been damaged by at least $2,000,000, Mr. Wright is of the expert opinion that the bases for this amount are neither explained nor supported by Lumbermens. Wright test. at 1733. Furthermore, this amount is duplicative of the discreet claims for the material, personnel and subcontract amounts. Id.

As previously mentioned, Landmark, during the last six months it performed work under the contract, stopped paying some of its vendors and contractors. Landmark's failure to pay its vendors and contractors led to Landmark's on-site employees (who were responsible for performance under the contract) abandoning the project. Def.'s Exh. 9-5 at 1; Santiago Test. at 194 and 196. Landmark's failure in this regard, however, is not relevant to the percentage of completion methodology used by Mr. Wright. The percentage of completion methodology is based upon a measurement of the acquisition of materials by Landmark and Atherton as compared to the total material requirements. To the extent Landmark acquired the materials for

the benefit of the project, and recorded the cost of the material acquisition (Landmarks acquisition and receipt of the materials is a prerequisite for the payment of an invoice(s) under the payment bond by Lumbermens), then these costs must be included in the percentage of completion calculation. Thus, it is Mr. Wright's expert opinion that Lumbermens is not entitled to recover the monies it paid to the unpaid vendors and contractors under the payment bond. See Wright Test. at 1642-1671.

Finally, it is Mr. Wright's expert opinion that Lumbermens use of the percentage of completion methodology is flawed, because Lumbermens used payments rather than incurred costs. Wright Test. at 1728. GAAP relies upon the incurred costs, not paid amounts (accrual basis of accounting versus the cash basis). Def.'s Exh. 14. Therefore, Lumbermens is incorrect to use only payments to measure costs incurred and the resultant progress. Id. The ordering of materials by Landmark would not result in the recognition of costs. In the accrual basis of accounting, costs are only recognized upon receipt of ordered materials which, at that time, are to be included in the calculation of percentage of completion. Id. Clearly, both the paid and unpaid amounts are relevant to the calculation, because Landmark received the materials for the unpaid invoices. In fact, Lumbermens would not have made payment under the payment bond for materials not received. Def.'s Exh. 1-2.

Mr. Wright also disputed Lumbermens' assertion that looking at the percentage completion of the housing units is comparable to Mr. Wright's cost-to-cost percentage of completion calculation for material items. At the time Landmark was terminated 12 percent of the housing units in the project were complete, and 15 percent complete if work in partially completed units is counted. In Mr. Wright's opinion, the 12 percent and 15 percent figures that

Lumbermens refers to are the estimated percent complete figures for the actual housing units without regard to the material cost used for the construction of the units. Lumbermens is comparing two different calculations and trying to give the impression that the results of one is applicable to the other. Wright Report at 7. If Landmark, at the time of termination, had already acquired 100 percent of the materials needed for the renovation of all of the housing units, but had not started any actual renovation, Lumbermens' position would necessarily have to be that the percentage complete was zero and, therefore, Landmark should have been paid nothing for the materials it had acquired for the project. Not only is such a position patently ludicrous, the contract provided that Landmark was entitled to submit progress payment invoices for, and be paid, for materials it acquired during the performance of the contract. Def.'s Exh. 1-1, Construction at 01200. Moreover, if Landmark had not been able to receive payments for materials as they were acquired, Landmark would in effect have to finance the project, and consequently not be in a position to purchase materials in quantity, with the net effect of having to bid a higher amount, resulting in a greater cost to the Government.

It is also Mr. Wright's opinion that Lumbermens fails to distinguish between the overall percentage of completion for the housing units and the percentage of completion for the individual material line items for which it seeks as its damages. Wright Report at 7. As previously mentioned, the overall percentage of completion for the individual housing units (12 percent or 15 percent including units with partial completion) does not take into account the percent complete for the materials acquisitions. The central issue in this case is whether Landmark was overpaid for material acquisitions, not for the individual housing units. Lumbermens is incorrectly applying the results of one calculation to a completely different set of

data.

Lumbermens presented no analysis and reflects no credits to its calculations for the individual housing units that were partially completed at termination but for which no payments had been made to Landmark. Declaration of Wiley Wright in Support of Defendant's Opposition to Plaintiff's Motion in Limine To Exclude Expert Testimony of Wiley R. Wright, III (Wright Decl.), ¶ 41. Lumbermens also presents no analysis and reflects no credits in its calculations for other Schedule of Prices line items for which Landmark was underpaid. Id. By excluding these credits, Lumbermens further overstates its damages. Id.

It is Mr. Wright's expert opinion that the damages sought by Lumbermens are premised upon a total cost approach. Wright Test. at 1683. Specifically, Lumbermens is seeking the amount that Lumbermens paid Atherton over the contract balance that remained at the time Landmark was terminated, plus the payment bond payments. Lumbermens, however, has failed to specifically identify its damages to the individual causes of action, and has failed to exclude from its damage amounts costs that are unrelated to the issues in this case. It is Mr. Wright's expert opinion that his actual cost method results in a more accurate measure of damages. Wright Test. at 1684.

All of Mr. Wright's calculations, as opposed to Lumbermens', are based upon the actual cost data for both Landmark and Atherton. Wright Test. at 1684. To the extent that the Atherton costs include items that are not the fault of the Navy, it is Mr. Wright's opinion that his percent complete calculations overstate the maximum range of the damages. Wright Decl., ¶ 43 In Mr. Wright's opinion, the relevancy and reliability of the opinions he has rendered in this case are as well supported as in every other case in which he has been involved. Wright Decl., ¶ 45. All of

the opinions contained in Mr. Wright's expert report have been peer reviewed within Rubino & McGeehin, and are therefore not only his opinions but those of his fellow shareholders, who on a combined basis have over one hundred years of experience in providing similar services in the construction and damages practice area. Wright Decl., ¶ 45. Mr. Wright's fellow shareholders have also been qualified as expert witnesses in a wide variety of forums and have provided expert testimony in over one hundred and fifty matters. Id.

In summary, it is Mr. Wright's expert opinion that Lumbermens' alleged damages are incorrectly calculated and overstated; that the majority of Lumbermens' alleged damages are duplicative of each other; that Lumbermens' alleged damages are in effect a total cost claim; that Lumbermens has failed to properly apply the total cost approach; and that the total cost approach is an inappropriate method for computing damages in these circumstances. It is also Mr. Wright's expert opinion that the proper measure of any overpayments should be computed by deducting the amounts paid to Landmark for each of the schedule of prices line items at issue from the earned revenue for the work actually performed as of Landmark's termination; that in order to properly determine the earned revenue of the work actually performed by Landmark as of the termination date, the percentage of completion method should be used; and that the majority of the line items in dispute, the cost-to-cost method is the appropriate methodology to use to determine the amount, if any, of the overpayments made to Landmark. In conclusion, Mr. Wright is of the opinion that the maximum amount by which the Navy overpaid Landmark is approximately $1,000,000.

V. Lumbermens Failed To Establish As A Matter Of Law And As A Matter Of Fact That It Is Entitled To Delay Damages

Expert Opinions of Richard Paullin With Contract Solutions, LLC

Contract Solutions LLC was retained to perform an independent schedule and progress analysis of the project involving the Repair/Revitalization of the Maylor Capehart Housing Area at Naval Air Station Whidbey Island, Oak Harbor, Washington. Paullin Report at 1. In performing his analysis, Richard Paullin of Contract Solutions reviewed numerous project documents, including, but not limited to the following: the solicitation and amendments; Proposal and revised proposals; Contract no. N44255-97-c-5515; Contract drawings and specifications; Contract award letter, dated April 11, 2000; Contract modifications; Network analysis schedules; other project schedules; Complaint, filed August 14, 2004; First amended complaint, filed March 13, 2006; Contractor's invoices; Contractor's quality control reports; Contractor's daily production reports; General correspondence; E-mail correspondence; Internal government documents; Internal contractor documents; Internal surety documents; Meeting minutes, and Depositions and exhibits. Id.

Mr. Paullin performed an independent schedule and progress analysis of the entire project using critical path method (CPM) scheduling techniques, as well as other methods of analysis. Paullin Report at 2. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that the project was delayed from the original contract completion date of October 23, 2002, until the actual substantial completion date of June 6, 2003, which represents a total delay of 7.4 months to the overall project schedule. Paullin Report at 2; Paullin Test. at 1460. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that

all of delay to the project's critical path is inexcusable and, therefore, non-compensable. Id. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Landmark (working with the Government) started early construction activities ahead of schedule. Paullin Report at 2; Paullin Test. at 1356. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Landmark (at the request of the Government) began work early on several unique housing units on Baker Court. Paullin Report at 3; Paullin Test. at 1356. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Landmark initially planned for early completion of the housing units. Paullin Report at; Paullin Test. at 1355. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Landmark's schedules were adequate for management of this project. Paullin Report at 3; Paullin Test. at 1355. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Landmark's substantial progress on early construction activities enabled it to be several months ahead of the contract schedule as of January 21, 2001. Paullin Report at 3; Paullin Test. at 1367. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that a delay of 42 days (1.4 months) occurred during the final months of Landmark's contract performance, because of slow progress resulting from its financial difficulties. Paullin Report at 3; Paullin Test. at 1369. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that a delay of 152 days (5.0 months) occurred between the furlough of Landmark personnel and execution of the Takeover Agreement, because no schedule progress was made during that period. Paullin Report at 3; Paullin Test. at 1370. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that a delay of 7 days (0.2 months) occurred between execution of

the Takeover Agreement and the Notice to Proceed issued by the Surety, because no schedule progress was made during that period. Id. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Atherton made very little progress during its first two months of performance, when it had the opportunity to get ahead of its planned schedule. Paullin Report at 3; Paullin Test. at 1370-71. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Atherton's overall schedule was not delayed by the electrical issues or asbestos abatement issues, as alleged by Lumbermens, and it achieved substantial completion of its work ahead of its planned schedule. Paullin Report at 3; Paullin Test. at 1371. Based upon his review and analysis of all relevant documents, Mr. Paullin is of the opinion that Atherton's planned schedule was longer than the time remaining in Landmark's contract, as of the date of the furlough; this resulted in 25 days (0.8 months) of project delay. Paullin Report at 3; Paullin Test. at 1373.

Landmark's contract was a design-build contract because it required both design and construction activities. Def's Exh. 1-1; Paullin Report at 5; Paullin Test. at 1352. By selecting this type of contract, the Navy was able to look to a single source of responsibility for both design and construction. Paullin Report at 5. In addition, the overall duration of design and construction is generally shorter for the design-build method of project delivery than for the design-bid-build method. Id. For a project such as this, a design-build contractor often seeks to purchase long-lead items and commence construction before design is totally completed ("fast track design-build") and in so doing, shortens even further the overall duration of the project schedule. Id. For example, a design-build contractor often begins demolition and site work before the overall building design is completed, thus allowing construction work to begin while

design work is still underway. Id.

Landmark's contract required the design to be fully completed before construction could begin. Def.'s Exh. 1-1, Design at 1; Paullin Report at 5. In accordance with that requirement, Landmark intended to fully design the project before commencing construction in the field. Def.'s Exh. 1-1, Design at 1; Paullin Report at 5; Paullin Test. at 1376-1378. After contract award, however, Landmark and the Navy agreed to a period of overlap or concurrency between the completion of the design phase (which included Navy review and approval of the design) and the start of the construction phase. Def's Exh. 7-3 at LMB004983; Paullin Report at 5. All of the project schedules issued by Landmark after contract award reflected this agreement by showing start and completion dates for certain activities that were before the dates specified by the contract. Paullin Report at 6; Paullin Test. at 1388. The "early completion" of certain portions of the work is often allowed by the Government in order to shorten the overall project schedule, allow exterior work to proceed during periods of good weather, and reduce the project's demands on Government personnel. Paullin Report at 5.

Because this agreement was made after contract award, the project schedules submitted by Landmark with its proposal, reflecting early completion of work were, by their very nature, revisions to the contract schedule. Def's Exh. 7-5; Def's Exh. 7-6; Def's Exh. 7-7; Paullin Report at 5. In essence, the agreement between the Navy and Landmark allowed Landmark to attempt "early completion" of certain work without penalizing Landmark for failing to actually finish that work early. Paullin Report at 5.

In addition to the requirement that the design be fully completed before construction could begin, the contract also required that Landmark commence and complete the construction

work in certain phases and work areas that were defined in the contract. Paullin Report at 6. The sequence of construction of the work areas and certain milestone dates were also defined in the contract. Id.

In order to measure delays to the contract, the only true baseline schedule that can be used is the original contract schedule itself. Id. The contract specifies this as the schedule that is to be used to measure the contractor's performance for contract clauses addressing the schedule. Id. See also Def.'s Exh. 1.

In addition to the requirement that the design be fully completed before construction could begin, the contract also required that Landmark commence and complete the construction work in certain phases and work areas that were defined in the contract. Paullin Report at 6. The sequence of construction of the work areas and certain milestone dates were also defined in the contract. Id. The overall structure of the baseline schedule was defined by the contract, while the sequence of work within a work area and the duration of each of the work phases was left for Landmark to determine. Id.

In summary, in the opinion of Mr. Paullin, 1.4 months of delay was attributable to Landmark's slow progress due to financial difficulties; 5 months of delay was due to the default and Lumbermens negotiating with the takeover contractor; 0.2 months of delay was due to no progress between the execution of the takeover agreement and the notice to proceed; and 0.8 months of delay was due to the fact that Atherton's planned schedule was longer than time remaining in contract, for a total of 7.4 months of delay. Paullin Report at 9.

Because this was a design-build contract, Landmark was required to submit its schedule of prices in two different formats: one during the design period and one during the construction

period. Paullin Report at 10. On May 5, 2000, Landmark submitted its initial schedule of prices for the design period, which included only four line items, as specified by the contract. Id. Landmark's first invoice, dated July 6, 2000, billed a total of $223,356 for two of those line items (Bonds and the 45% Design Submittal). Id. Landmark submitted the schedule of prices for the construction period together with the Network Analysis Schedule in an electronic file dated June 28, 2000. Id. Landmark's first invoice also contained a printout of the schedule of prices for the construction period. Id.

Landmark assigned a relatively small percentage of the contract value (2.4 percent) to the Mobilization category, and it assigned 8.6 percent of the contract value to the Jobsite Overhead category. Id. Landmark planned to spread the Job-site Overhead equally over 25 months in its invoices (at four percent per month). Id. The total dollar value of the Mobilization and Jobsite Overhead categories was $1,089,617, which was 11 percent of the total contract value. Id. This is near the industry average for total overhead on this type of project, and well below the maximum overhead possible for this type of project. Id.

| Category | Amount | Percent of Contract |
|---|---|---|
| Bonds | $ 143,256 | 1.5 % |
| Architectural Fees | $ 200,000 | 2.0 % |
| Mobilization | $ 240,483 | 2.4 % |
| Jobsite Overhead | $ 849,134 | 8.6 % |
| Materials | $ 2,634,135 | 26.7 % |
| Site Work/Abatement/Cleanup | $ 1,479,500 | 15.0 % |
| Unit Construction | $ 4,331,518 | 43.9 % |
| Total | $ 9,878,026 | 100.0 % |

In the construction industry, total overhead is often measured as a percentage of direct costs, but can also be measured as a percentage of contract value. Id. The overhead percentage

listed here would be slightly higher than 11 percent if it were measured as a percentage of direct costs. Id.

During the early part of this project, Landmark managed its activities with simple bar chart schedules, which is typical of the practice of many contractors in the industry during relatively simple phases of construction. Id. For example, a preliminary work schedule prepared by Landmark indicated that paperwork and design review activities would take place between June and August 2000. Id. It also indicated that site work and abatement/demolition activities would begin in August 2000, prior to approval of the design. Id. However, the contract required that Landmark submit detailed Network Analysis Schedules for Government review and approval. Id. Landmark submitted these schedules, but utilized them primarily for invoice billings rather than management of the construction work. Id.

July - October 2000

In a meeting on July 27, 2000, the Government requested that Landmark submit a copy of the Network Analysis "to put into the file." Paullin Report at 11. Landmark submitted the Network Analysis four days later, as Submittal No. 7 on July 31, 2000. Id. The Government approved Landmark's initial submittals (which were required prior to the commencement of construction work) with Contract Modification A00001, dated August 8, 2000. Id. With this modification, the Government authorized Landmark to proceed with limited construction activities: the installation of off-street parking (site work), abatement work, and interior demolition work. Id. Landmark began site work and demolition work on August 9, 2000, and began abatement work on August 14, 2000. Id.

On August 9, 2000, Landmark submitted its revised Network Analysis as Submittal No. 7A. Id. In this project schedule, Landmark planned for completion of housing unit construction in June 2002, almost four months prior to the required contract completion date. Id. The Government returned the submittal "Approved as Noted" on September 11, 2000, and attached six comments to be addressed by Landmark. Id.

Landmark's second invoice, dated August 17, 2000, billed a total of $260,665 for line items in the Mobilization and Overhead categories. Id. Landmark billed $161,841 for line items in the Mobilization category, which is 67 percent of that category. Id. Landmark billed $98,824 for line items in the Jobsite Overhead category, which represents approximately 12 percent of that category. Id. Since this was the first invoice that included line items in the Jobsite Overhead category, Landmark billed for the previous three months for these line items (at a rate of four percent per month for June, July and August). Id. Landmark planned to spread the Jobsite Overhead equally over 25 months in its invoices, which was the duration between May 2000 (the month after the Notice to Proceed) and the completion of construction in its project schedule (June 2002). Id.

In a meeting on August 24, 2000, Landmark provided copies of "the 'preliminary' final design" for the units in Work Area 2B (on Baker Court). Id. The Government had previously requested that Landmark work on those units in order to achieve early completion of them before Work Area 1. Id. At that same meeting, Landmark indicated that interior demolition and abatement work was progressing well throughout Work Areas 1 and 2 and requested authorization to continue those activities in Work Area 3. Paullin Report at 12. In response to that request, the Government gave its authorization to Landmark in a meeting on August 31,

2000. Id. In Contract Modification A00003, signed September 15, 2000, the Government authorized Landmark to proceed with additional limited construction activities: exterior demolition work, exterior painting, and new garage pad replacement work. Id.

Landmark's third invoice, dated September 18, 2000, billed a total of $1,743,055 for line items in the following categories:

| Category | Incremental Amount | Percent of Category |
|---|---|---|
| Architectural Fees | $ 90,000 | 45 % |
| Mobilization | $ 28,486 | 12 % |
| Jobsite Overhead | $ 35,729 | 4 % |
| Materials | $ 851,940 | 32 % |
| SiteWork/Abatement/Cleanup | $ 736,900 | 50 % |
| Unit Construction | | 0 % |
| Total | $ 1,743,055 | |

Id.

In this invoice, Landmark billed $28,486 (12 percent) for mobilization, which brought the cumulative billings to a total of 79 percent for this category. Id. Landmark billed four percent again this month for Jobsite Overhead, in accordance with its plan to spread this equally over 25 months. Id. The largest single line item billed in this invoice was $560,500 for site work (95 percent complete) (a portion of the Site Work/Abatement/Cleanup line item in the preceding table). Id. Landmark had completed all of the site work on September 13, 2000, except for punch-list activities. Id. Landmark also billed 20 percent of the abatement/demolition line item on this invoice. Id.

The evidence clearly demonstrated that the only reason that Landmark defaulted was that Landmark's corporate office (corporate Landmark personnel) did not provide the Landmark personnel responsible for performance under the contract (on-site Landmark personnel) all of the

progress payments made by the Navy. Corporate Landmark personnel misappropriated the money that was intended to be used by the on-site Landmark personnel to complete the project. There is no evidence in the record that Navy personnel on Whidbey Island were aware, or should have been aware, of the fraud being perpetrated against the project by corporate Landmark personnel. The evidence demonstrates that all of the contract funds that the Navy paid to Landmark were either used by Landmark in its performance pursuant to the contract, or were misappropriated by corporate Landmark personnel through no fault of the Government.

A plaintiff's claims must be proven by a preponderance of the evidence, and must demonstrate liability, causation, and injury. Wilner Construction Co. v. United States, 24 F.3d 1397, 1401 (Fed Cir. 1994). A plaintiff must prove that damages allegedly resulting from the Government's breach of a contract "was attributable solely to, and was therefore directly caused by, the [breach]." J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 456 F.2d 1315, 1330 (1972). See also Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) ("[T]he plaintiff can only recover those items of damage which are the proximate result of the acts of the Government. . . . For damages to be direct there must be no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly nor even probably.")

## VI. Lumbermens Failed To Establish As A Matter Of Law That Its Suretyship Rights Were Impaired By The Actions Of The Navy

The linchpin of Lumbermens' argument is that the Navy breached contract specifications pertaining to the Navy's payment of Landmark's requests for progress payments, which payments resulted in the Navy overpaying Landmark. The gravamen of Lumbermens' position,

thus, must be that the contract specifications at issue were included in the contract for the benefit of the surety. There is no support for the proposition that the breach of a contract specification that does not provide security for the surety supports the discharge of a surety for its obligations under its payment and performance bonds.

The evidence clearly establishes that the contractual requirements that Lumbermens contends that the Navy breached were included in the contract for the benefit of the Navy in administering the contract and making payments. No court has found liability for the breach of a contract provision that serves as a tool for the Government to manage a contract, such as the ones at issue here.

Unlike a mandatory retainage provision, the Government's requirement that a contractor provide a network analysis schedule and schedule of prices are not the type of requirements that a surety would rely upon in deciding to bond a contract. Discharge of a surety can only occur upon an alteration of those terms which provide the surety's security. In fact, to discharge the surety for any change in the terms of a contract, such as those governing the management and administration of a contract, would impair the ability of contracting officers to manage and administer a contract in an efficient and cost-effective manner. If the use of standardized contract clauses, such as the ones at issue in this case, is discouraged, the contracting process will become more burdensome and less efficient.

A surety has equitable rights in the security provided, by the terms of the contract, for the performance to which it is bonded—such that change of those terms may discharge the surety. National Surety Corp. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997). To the extent that a surety has bonded itself based upon its reliance upon certain contractual terms which informed

its assessment of the risk, the Government has a duty to administer the contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded. See National Surety, 118 F.3d 1 at 1546-1547.

The Federal Circuit has never recognized any basis for discharge of a surety based upon contractual provisions other than the mandatory retainage provision at issue in National Surety, which the Federal Circuit held provided security for performance. National Surety Corp. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997). A contractual obligation to withhold a percentage of progress payments is not primarily for the benefit of the Government because the Government is entitled to rely upon the payment and performance bonds to insure performance under the contract. A contractual obligation to withhold a percentage of progress payments is clearly not for the benefit of the contractor who would prefer that each progress payment invoice be paid in full.

Retainage has long been understood to stand specifically as a security for the surety against default. Prairie State Nat. Bank v. United States, 164 U.S. 227, 233 (1896): "That a stipulation in a building contract for the retention, until the completion of the work, of a certain portion of the consideration, is as much for the indemnity of him who may be guarantor of the performance of the work, as for him for whom the work is to be performed, that it raises an equity in the surety in the fund to be created, and that a disregard of such stipulation by the voluntary act of the creditor operates to release the sureties, is amply sustained by authority."

This Court should not expand the law regarding impairment of suretyship beyond that which the Federal Circuit established in National Surety Corp. v. United States, 118 F.3d 1542, 1546 (Fed. Cir. 1997).

## VI. Lumbermens Failed To Establish As A Matter Of Law That It Was Not Required To Submit A Certified Claim In Connection With The Alleged Breach Of The Takeover Agreement

Issues involving contract interpretation present questions of law to be decided by this Court. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997-98 (Fed. Cir.1996). The language of the contract must be given its plain meaning, and the contract "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts". Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed .Cir.2003) (en banc). "An interpretation giving rise to reasonable meaning to all parts of a contract will be endorsed over one that leaves portions of the contract meaningless." Gresham, Smith & Partners v. United States, 24 Cl. Ct. 796, 802 (1991); see also Nielsen-Dillingham Builders, J.V. v. United States, 43 Fed. Cl. 5, 11 (1999) ("[P]ermitting [the contractor's interpretation] to govern would render considerable portions of the [contract] useless, meaningless, or otherwise surplusage. The court is precluded from entertaining such an interpretation.").

A specific contract provision will control over a general contract provision. See Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1369 (Fed. Cir .2005) ("Our precedent establishes as a principle of contract interpretation") (citing Hol-Gar Mfg. v. United States, 351 F.2d 972, 980 (Ct. Cl.1965).

This Court does not possess jurisdiction to consider Lumbermens' cause of action based upon breach of contract claims pertaining to the takeover agreement. Lumbermens, having entered into the takeover agreement with the Government, covered by the Contract Disputes Act, must allege that it met the jurisdictional prerequisite of the Act. That is, Lumbermens, as a jurisdictional prerequisite to suit, was required to submit a claim to the contracting officer.

Lumbermens' claims that the Navy breached the takeover agreement arise, if at all, under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 601 et seq.

With respect to disputes arising pursuant to the CDA, Congress has granted this court "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the CDA  See 28 U. S. C. § 1491(a)(2). Pursuant to section 6 of the CDA, "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a).

Under section 10(a)(1) of that Act, the court's jurisdiction encompasses actions filed in the appropriate forum within a specified time period triggered by the date of the receipt by the contractor of the decision of the CO concerning the claim. 28 U.S.C. § 1491(a)(2); 41 U.S.C. §§ 605(a), 609(a)(3).

The CDA sets forth a detailed process that the contractor must comport with prior to instituting suit in this Court. 41 U.S.C. §§ 605(a)-(c). As the court in Witherington Construction Corp. v. United States, 45 Fed. Cl. 208, 211 (1999), stated: "[T]o gain a jurisdictional foothold in this [C]ourt, a plaintiff pursuing a contract claim must satisfy two fundamental jurisdictional requirements--it must submit a claim for money presently due and must obtain a 'final decision' on that claim, either actual or deemed."

The CDA bars Lumbermens' claim because it arises under the takeover agreement and Lumbermens has failed to satisfy the jurisdictional prerequisite contained in sections 605(a) and 605(c)(1) by submitting a certified claim to the CO. The requirements of sections 605(a) and 605(c)(1) apply to contract claims of a surety that executes a takeover agreement following

contractor default, see, e.g., Transamerica Insurance Company v. United States, 6 Cl. Ct. 367, 370 (1984), because a surety becomes a contractor subject to the CDA by executing such an agreement with the government. Westech Corporation v. United States, 20 Cl. Ct. 745, 749 (1990); 41 U.S.C. § 601(4).

Lumbermens' claims are clearly ones "arising under" the takeover agreement for purposes of the provision in the CDA requiring submission of its claim to the contracting officer as a jurisdictional prerequisite. See CDA, §§ 2(4), 6(a), (c)(1), 41; Transamerica Insurance Company v. United States, 31 Fed. Cl. 602, 39 (1994). This Court lacks jurisdiction to entertain Lumbermens' cause of action premised upon the Navy's breach of the takeover agreement because Lumbermens, prior to filing its complaint, failed to submitted a certified claim to the contracting officer for a final decision as required by the CDA, 41 U.S.C. § 601 et seq. Because Lumbermens failed to submit a claim, Lumbermens failed to comply with the CDA; therefore, Lumbermen's cause of action premised upon the Navy's breach of the takeover agreement should be dismissed for lack of subject matter jurisdiction.

CONCLUSION

For all of the foregoing reasons, the Government respectfully roquets that the Court enter judgment in favor of the Government.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch, Civil Division
Department of Justice
1100 L Street NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

August 7, 2008 Attorneys for Defendant