NO. 04-1255C
(Judge Robert H. Hodges, Jr.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

LUMBERMENS MUTUAL CASUALTY COMPANY,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

---

# PLAINTIFF'S POST TRIAL BRIEF

---

Mark G. Jackson
GARVEY SCHUBERT BARER
1191 Second Avenue, 18th Floor
Seattle, Washington 98101-2939
(206) 464-3939 (telephone)
(206) 464-0125 (facsimile)

Counsel of Record for Plaintiff
LUMBERMENS MUTUAL CASUALTY COMPANY

August 8, 2008

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ..... 1

II. PROPOSED FINDINGS OF FACT ..... 4

III. LAW AND ARGUMENT ..... 36

A. This Court Has Jurisdiction Over Lumbermen's Claims. ..... 36

1. This Court Has Jurisdiction Over Lumbermens' Discharge/Impairment of Suretyship Claims. ..... 37
2. Lumbermens's Claims Based on Breach of the Takeover Agreement are not Subject to the Contract Disputes Act. ..... 39

B. Lumbermens Proved Its Claims for Discharge/Impairment of Suretyship. ..... 44

1. The Navy Paid Landmark Invoices Notwithstanding the Absence of the Mandatory Progress Payment Certification. ..... 46
2. The Navy Violated the Terms of the Contract When it Paid Landmark for Construction Work Without the Schedule of Prices Required by § 01200, ¶ 1.2. ..... 47
3. The Navy Violated the Terms of the Contract When it Paid Landmark's Invoices Based on an Un-approved and Noncompliant NAS. ..... 48
4. The Navy Violated the Terms of the Contract When it Paid for Materials Without Obtaining Any Evidence Either that Landmark Had Title to the Materials or that the Materials Were Onsite. ..... 50
5. The Contracting Officer Abused Any Discretion He May Have Had in Approving Landmark's Invoices Because He Completely Abdicated His Responsibility in the Payment Process. ..... 51

C. Lumbermens Proved its Claims Under the Takeover Agreement. ..... 53

1. The Navy Breached the Takeover Agreement by Failing to Provide the Materials to Which it had Title. ..... 54
2. The Navy Improperly Withheld Liquidated Damages for Delays Attributable to Work on the FAF Units that Was Outside the Scope of Lumbermens Performance Bond. ..... 55
3. The Navy Improperly Withheld Liquidated Damages from the Unpaid Contract Balance Because it Failed to (a) Account for the Impact of the FAF Units on the Bonded Work and (b) the Electrical Delay. ..... 55

D. Lumbermens is Entitled to Damages. 56

1. Lumbermens is Entitled to Damages in the Amount of $2,768,624.73 as the Result of the Navy's Failure to Require Progress Payment Certifications or to Obtain and Approve a NAS that Complied with the Requirements of the Contract. 60
2. Lumbermens is Entitled to $1,487,110 Under Count 14, Because the Navy Failed to Provide Lumbermens the Material to Which the Navy Had Obtained Title. 67
3. Lumbermens is Entitled to $853,225 As Damages for Breach of the Takeover Agreement as The Result of Improper Deductions for Liquidated Damages. 67

IV. CONCLUSION. 68

# TABLE OF AUTHORITIES

Page

**CASES**


Admiralty Construction, Inc. v. Dalton, 156 F.3d 1217 (Fed. Cir. 1998) ............................ 44, 45

American Ins. Co. v. U.S., 62 Fed. Cl. 151 (2004) ............................................................ 54

*Argonaut Ins. Co. v. United States*, 193 Ct. Cl. 483, 434 F.2d 1362 (1970) ............................... 54

CEMS, Inc. v. United States, 65 Fed. Cl. 473 (2005) ....................................................54, 55, 56

Coastal Corp. v. United States, 713 F.2d 728 (Fed. Cir. 1983) ................................................ 41

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ............................66, 67, 69

Fireman's Fund Ins. Co. v. England, 313 F.3d 1344 (Fed. Cir. 2002)...................................... 42

Fireman's Fund Ins. Co. v. United States, 909 F.2d 495 (Fed. Cir. 1990)................................. 38

G.E. Boggs & Assocs., Inc. v. Roskens, 969 F.2d 1023 (Fed. Cir. 1992)................................. 40

General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ............................................................ 69

Gutz v. United States, 45 Fed. Cl. 291 (1999) .......................................................................... 42

Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 421 (2002)........................................................................................................................ 56

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)............................................................. 66

LifeWise Master Funding v. Telebank, 374 F.3d 917 (10th Cir. 2004)..................................... 69

Marshall Associated Contractors, Inc. & Columbia Excavating, Inc., 2001-1 B.C.A. (CCH) ¶ 31,248, at 154,259, 2001 WL 59573 (I.B.C.A.2001)............................................... 55

Mergentime Corp. v. Washington Metro. Area Transit Auth., 775 F. Supp. 14 (D.D.C. 1991)........................................................................................................................ 63

Microstrategy Inc. v. Business Objects, S.A., 429 F.3d 1344 (Fed. Cir. 2005).......................... 66

National Surety Corp. v. United States, 118 F.3d. 1542 (Fed. Cir. 1997)37, 38, 39, 47, 50, 54, 63, 64, 65

National Union Indem. Co. v. G. E. Bass & Co., 369 F.2d 75 (5th Cir. 1966) .......................... 46

Nova Casualty Co. v. United States, 72 Fed. Cl. 755 (2006) ............................................. 39, 49

Ramada Development Co. v. U.S. Fidelity & Guar. Co., 626 F.2d 517 (6th Cir. 1980) ............ 64

Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995) ........................................................ 45

Reliance Ins. Co. v. Colbert, 124 U.S. App. D.C. 339, 365 F.2d 530 (D.C. Cir. 1966) ........ 63, 64

Sharman Co., Inc. v. United States, 2 F.3d 1564 n.6 (Fed. Cir. 1993)...................................... 45

SIPCO Servs. & Marine Inc. v. United States, 41 Fed. Cl. 196 (1998) ..................................... 54

St. Paul Fire and Marine Ins. Co. v. United States, 1994 U.S. Claims LEXIS 189, 39 Cont. Cas. Fed. (CCH) ¶ 76,706 (1994) .............................................................................. 43

Thomas & Sons Building Contractors, Inc., ASBCA No. 53395, 05-2 B.C.A. ¶ 33,083 ............................................................................................................................ 49

Travelers Indemnity Co. v. United States, 16 Cl. Ct. 142 (1988)....................................... 42, 45

*U.S. Fidelity & Guaranty Co.*, 475 F.2d at 1384 ................................................................ 54

U.S. Fire Ins. Co. v. United States, 78 Fed. Cl. 308 (2007) ......................................................... 54

United Pac. Ins. Co. v. Roche, 401 F.3d 1362 (Fed. Cir. 2005) ................................................ 42

United States v. Reliance Ins. Co., 799 F.2d 1382 (9th Cir. 1986)........................................... 46

United States v. Seaboard Surety Co., 817 F.2d 956 (2nd Cir. 1987)........................................ 44

Westech Corp. v. United States, 20 Cl. Ct. 745 (1990)...................................................... 41, 45

**STATUTES**

41 U.S.C § 602(a) (1978)........................................................................................................ 38

41 U.S.C. § 601(4)..................................................................................................................... 42

41 U.S.C. § 605(a)..................................................................................................................... 41

41 U.S.C. § 609(a)(1) ................................................................................................................ 42

Contract Disputes Act, 41 U.S.C. §§ 601-14.............................................................................. 37

**REGULATIONS**

FAR 32.102(e)(1)(2)..................................................................................................................... 1

FAR 52.211-10.............................................................................................................................. 4

FAR 52.211-12.............................................................................................................................. 4

FAR 52.228-15 ........ 4

FAR 52.232-5 ........ 4, 6, 7, 45

FAR 52.232-5(c)(3) ........ 26, 32

FAR 52.236-15 ........ 4, 11

FAR 52.245-1 ........ 4, 19

FAR 52.245-2 ........ 4, 19

# I. INTRODUCTION

The Navy owed Lumbermens the duty to administer the Landmark contract so as not to materially increase Lumbermens's risk under that contract. The Navy failed miserably in the performance of that duty because it failed to enforce the mandatory payment provisions in the contract and, as a result, paid Landmark millions more than it should have. Thus, when the Navy terminated Landmark's contract for default, the contract balance available to Lumbermens to complete performance contained $2,768,624.73 million less than it should have. Further, when the Navy promised to make the remaining contract balance available to Lumbermens to complete the project with a new contractor, the Navy breached the Takeover Agreement by improperly withholding liquidated damages and refusing to pay out the remaining contract balance. As a result, Lumbermens was damaged in the amount of $853,225. Accordingly, as the direct result of (1) the Navy's failure to administer the Landmark contract according to its terms and (2) its breach of the Takeover Agreement, Lumbermens is entitled to judgment in the amount of $3,621,849.73.

This case arises primarily from the government's failure to require from Landmark a Network Analysis Schedule ("NAS") that complied with the terms of the contract and to use that compliant NAS as the foundation for evaluating and approving Landmark's progress payment requests. Because the government failed to comply with the payment provisions of the contract, it significantly overpaid Landmark and, when the government terminated Landmark's contract for default, funds that should have been available to the surety to complete the project no longer existed.

The importance of a proper NAS in the payment process cannot be overstated because the NAS was the document on which Landmark's requests for progress payment were based. The

contract required that the NAS be a cost-loaded schedule, with a minimum of number of activities, where each activity was placed on the schedule with start and finish dates and each activity was assigned a monetary value. Those requirements existed for the sole reason of permitting the government to determine, at any given point in time, the value of the work performed by Landmark. Making that determination was vital, because it was the only way the government could "ensure that payments are commensurate with work accomplished." FAR 32.102(e)(1)(2). Indeed, the contract expressly required that the NAS be used as the basis for requesting progress payments. That is why the contract also expressly established an updated NAS as a mandatory component of a proper invoice. By failing to review or approve the NAS submitted by Landmark, the government used a non-compliant NAS, which caused it to overpay Landmark and thereby damage the surety.

The failure to review or approve the NAS, or to require a contract compliant NAS, was further compounded by two additional violations of the contract's payment provisions. First, the government failed to take any reasonable steps to determine that Landmark was actually entitled to $4.8 million the government paid. Indeed, within four months after issuing Landmark a limited notice to proceed, the contracting officer approved for payment invoices totaling $3.37 million, or 34% of the contract value—all within the first five invoices submitted by Landmark. Notwithstanding the significant amounts requested by Landmark, nobody in the government questioned anything. Nobody asked to see a single bill of lading, receipt of delivery invoice. Nobody in the government did anything to ensure that Landmark was entitled to the amounts for which it invoiced.

As it turned out, Landmark was obviously not entitled to the amounts paid by the Navy. Landmark was inflating its invoices, seeking payment for goods not delivered and services not

performed. And the Navy paid those invoices without question. Of course, had the Navy simply enforced the contract's payment provisions, those invoices would not have been approved, nor payment made.

Second, the Navy never required Landmark to submit either the quantification of amounts previously paid to subcontractors and suppliers or the certification that the suppliers and subcontracts had been paid. All of this information was mandatory. None of it was ever provided by Landmark or requested by the Navy. Had the Navy demanded and obtained this information, the extent of Landmark's overbilling would have been obvious and the Navy would not have paid. However, because the Navy did not obtain this information, it continued to pay Landmark for goods and services never ordered, delivered or performed.

As a result of the Navy's failure to enforce the contract, by the time Landmark's contract was terminated for default, the Navy had overpaid Landmark by $2.8 million. These are the damages to which Lumbermens is entitled as the result of the Navy's failure to enforce the mandatory payment provision of the contract.

In addition, Lumbermens is entitled to damages for the Navy's breach of the Takeover Agreement. In that agreement, the Navy promised to make available the remaining contract balance to pay for the remaining work–the work that was covered by the performance bond. The Navy breached that agreement because it wrongfully withheld from the contract balance liquidated damages. Those liquidated damages were wrongful, in part, because they were based on the performance of work that was not even subject to the performance bond.

In the end, Lumbermens established at trial that the Navy violated the mandatory payment provisions of the contract and breached the Takeover Agreement. Lumbermens is entitled to judgment in the amount of $3,621,849.73.

## II. PROPOSED FINDINGS OF FACT

Most of the facts in this case are not contested. For example, the facts regarding contract award, the payments made to Landmark, the contract balance available to Lumbermens to complete the project, the payments made by Lumbermens under both its payment and performance bond and the government's failure to obtain Lumbermens's consent to the modification adding almost $1.9 million in work to the contract, are all uncontested. However, there are certain facts that are contested. Set forth below are the facts relevant to the resolution of this case. Those that are contested are italicized and followed by an analysis of the evidence that supports the finding proposed by Lumbermens.

1. On or about April 11, 2000, the United States, through the United States Navy, Engineering Field Activity, Northwest, in Poulsbo, Washington ("Navy"), awarded Contract Number N44255-97-C-5515 ("Contract") to Landmark Construction Company ("Landmark"). Pl. Ex. 1.

2. Pursuant to the Contract, Landmark was to perform the Whole Site Repair/ Revitalization of the Maylor Capehart Housing Area on Naval Air Station, Whidbey Island, in Oak Harbor, Washington ("Project"). Pl. Ex. 2, ¶ A.1.a. The Project, as originally awarded, entailed the design/ build remodeling of 160 military family housing ("MFH") units on Whidbey Island. Id. The initial Contract price was $9,878,026.00. Pl. Ex. 1.

3. The Contract required that Landmark provide to the Navy performance and payment bonds. Pl. Ex. 1. The performance bond, naming the United States as obligee, was to be in the penal sum of the Contract price, *i.e.*, $9,878,026. Id. The Contract required a payment bond in the amount of $2,500,000. Id.

4. Lumbermens provided both the performance and payment bonds in the amounts and in the format required. Pl. Ex. 23.

5. The Navy approved the performance and payment bonds provided by Lumbermens. Pl. Ex. 26.

6. The Contract included in full text or incorporated by reference or a variety of clauses relevant to the issues raised in this Complaint, including: (1) FAR 52.232-5, Payments Under Fixed-Price Construction Contracts (May 1997) ("the Payments Clause"); (2) FAR 52.236-15, Schedules for Construction Contracts (Apr 1984); (3) FAR 52.245-1, Property Records (Apr 1984); (4) FAR 52.245-2, Government Property (Fixed-Price Contracts (Dec 1989)); (5) FAR 52.228-15, Performance and Payment Bonds - Construction (Sept 1996); (6) FAR 52.211-10, Commencement, Prosecuting, and Completion of Work (Apr 1984); and (7) FAR 52.211-12, Liquidated Damages - Construction (Apr 1984). Pl. Ex. 12.

7. Landmark was to begin work on the Project within 15 days after receipt of Notice to Proceed and was given 910 calendar days to complete the Project. In this case, the Contract completion date was established by the Navy as October 23, 2002. Pl. Ex. 1.

8. *Mr. Santiago was the administrative contracting officer who was assigned the responsibility of administering the Landmark contract.*

The government trial attorney claimed during the trial on more than one occasion that Mr. Santiago was not the administrative contracting officer.[1] That is not true. As Mr. Santiago himself testified, he was the contracting officer: "Yes, I was assigned the responsibility as the administrative contracting officer for this contract." Tr. 199/22-24. During his testimony, he

---

[1] See Tr. 468/9-11 ("No. He is the ACO's representative. So there is some ACO that's at a higher level than Mr. Santiago."); Tr. 465/7-8 ("He was a contract specialist assigned to be the ACO's representative."); Tr. 469/2-3 ("he was the ACO's representative").

consistently described himself as the administrative contracting officer.[2] Every invoice he signed authorizing payment to Landmark, he signed as the "contracting officer."[3] The minutes of the preconstruction conference between the government and Landmark expressly identified Mr. Santiago as the "Administrative Contracting Officer." Pl. Ex. 29, p. 2. Mr. Santiago was the contracting officer. There is simply no credible argument to be made to the contrary.

9. The Contract established requirements that Landmark was to satisfy in order to obtain progress payments. These requirements were set forth in the Payments Clause and in § 01200 of the Contract. Pl. Ex. 8.

10. The Payments Clause provides that a contractor's request for progress payments shall include, among other things:

a. an itemization of the amounts requested;

b. a listing of the amounts included for work performed by each subcontractor; and,

c. a listing of the amounts previously paid to each subcontractor under the Contract.

Pl. Ex. 13.

11. *Landmark's invoices did not comply with the requirements of FAR 52.232-5, Payments Under Fixed-Price Construction Contracts (May 1997), because they did not contain the information required by ¶ (b)(1).*

---

[2] See Tr. 200/5 (describing himself as "the administrative contracting officer"); Tr. 203/20-21 ("In my capacity as the contracting officer…."); Tr. 212/2-3 ("I am the administrative contracting officer administering the contract, yes."); Tr. 212/9-10 ("I was the administrative contracting officer during this time.").

[3] See Def. Ex. 3 (Invoices).

Not one single invoice approved by the Contracting Officer for payment included the "listing of the amounts previously paid to each subcontractor." See Def. Exs. 3-1 to 3-12. That information was mandatory. Mr. Santiago agreed that he never received the substantiation required by (b)(1). Tr. 356/15-17.

12. The Payments Clause also required that Landmark certify that all payments due to suppliers and subcontractors from previous government progress payments had been made. Specifically, the Payments Clause required Landmark to certify:

> I hereby certify, to the best of my knowledge and belief, that--
> (i) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;
>
> (ii) Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code;
>
> (iii) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract; and
>
> (iv) This certification is not to be construed as final acceptance of a subcontractor's performance.

Id.

13. Only paragraph (iv) may be omitted consistent with the Payments Clause. Id. The Payments Clause further mandated that if Landmark failed to provide the requisite progress payment certification, then "payment shall not be made." Id.

14. *Landmark's invoices did not comply with the requirements of FAR 52.232-5, Payments Under Fixed-Price Construction Contracts (May 1997), because they did not contain the progress payment certification required by ¶ c(1).*

The government was able to produce a progress payment certification that was *close*[4] to that required by the Payments Clause only for invoices 1, 10 and 11, which invoices totaled $693,925.60. Def. Exs. 3-1, 3-10 and 3-11. However, even these "partial" certifications were defective because they omitted key works that rendered the certification meaningless. In addition, however, Lumbermens is entitled to a finding that Landmark did not submit any progress payment certifications with Invoices Nos. 2 through 9.

The primary evidence offered at trial that each invoice approved by the contracting officer contained the required certification was the testimony of the contracting officer, Mr. Santiago:

> Q: And if you received an invoice from Landmark that did not contain a progress payment certification signed by Brady Farley or another Landmark employee authorized to sign it, what would you do with the invoice.
>
> A: That invoice would be returned as unacceptable.
>
> Q: Did that happen in every case?
>
> A: Every time we didn't have the proper certification, it would be returned.

Tr. 179/17-180/1. Lumbermens walked the contracting officer through the certification requirements of the Payments Clause and Mr. Santiago again confirmed that he obtained the Payments Clause certification. Tr. 330/19-22. As the invoices themselves prove, Mr. Santiago's testimony simply isn't true.

---

[4] Even the certifications the government was able to produce were incomplete. Compare Pl. Ex. 13, ¶ (b)(1) (FAR clause containing the required certification) with Def. Exs. 3-1, 3-10 and 3-11 (certification's missing key words, the absence of which renders the certification meaningless).

First, as invoices 1, 10, and 11 establish, the certifications that were "close," were never returned nor questioned by Mr. Santiago. Second, while invoice number 7 (Def. Ex. 3-7) did lack a certification and was returned, it was returned only because the Navy had received complaints that Landmark was not paying its subcontractors and suppliers. Pl. Exs. 44, 46. No mention was made of the defective certification, which stated, "Greg Smith has informed ROICC and EFA NW accounts payables for the Whidbey site will be current within 30 days." Def. Ex. 7.

Third, and most importantly, Mr. Santiago approved for payment Landmark invoice number 8, which contained the following certification by Landmark in lieu of the certification mandated by the Payments Clause "Per our agreements with our suppliers and vendors, they are being paid in accordance with their payment agreement." Def. Ex. 3-8. Moreover, Mr. Santiago testified that he would have accepted the "certification" contained in invoice number 8 for other invoices because, in his view, it was sufficient. Tr. 352/20-23; 353/22-24.

Given these facts, there is simply no basis to conclude that Landmark provided the progress payment certifications required by the Payments Clause.

15. The Payments Clause authorized the Navy to include in progress payments amounts for material delivered to the site as well as for material delivered elsewhere (*i.e.*, offsite) if: (1) the Contract otherwise authorized such consideration; and (2) the Contractor furnished satisfactory evidence of title and that the material would be used to perform the Contract. Id.

16. *The Navy approved for payment materials that were delivered offsite without obtaining evidence of title to the material.*

Although this finding is not contested, it is important to note that the Navy never obtained evidence of title to any material it paid for, regardless of where that material was supposedly

stored. Mr. Santiago, when he approved the invoices for payment, simply never asked any questions regarding what material was being obtained by the Navy (Tr. 366/2-3) or for any document establishing that Landmark had obtained title to the material. (Tr. 366/14-15).

17. Finally, the Payments Clause also provided that all material covered by a progress payment shall, at the time of payment, become the sole property of the Government. Id. However, the contracting officer never knew what material he was buying when he approved any invoice.

18. In addition to the Payments Clause requirements, the Contract described payment procedures in greater detail in § 01200, Price and Payment Procedures.

19. Section 01200, ¶ 1.2 required Landmark to prepare a Schedule of Prices on forms provided by the Government and to submit the Schedule of Prices to the Government for approval by the Contracting Officer. Further, according to § 01200, ¶ 1.2, "payments [to Landmark] for construction work will not be made until the Schedule of Prices has been approved by the Contracting Officer." Pl. Ex. 8.

20. *The contracting officer waived the requirement of § 01200, ¶ 1.2(b), that Landmark submit a schedule of prices showing a "detailed breakdown of the contract price, giving quantities for each of the various kinds of work, unit prices, and extended prices" before making payment for construction work.*

Section 01200, ¶ 1.2, required the contractor to submit a schedule of prices showing a "detailed breakdown of the contract price, giving quantities for each of the various kinds of work, unit prices, and extended prices." Pl. Ex. 8, ¶ 1.2. Further, the contract stated that payments for construction work "will not be made until the Schedule of Prices has been approved by the Contracting Officer." Id. Mr. Santiago admitted he was the individual that was

to review and approved Landmark's schedule of prices. Tr. 199/1-200/6. Mr. Santiago waived the requirements of § 01200, ¶ 1.2. Tr. 201/16-21. He did not memorialize that decision in any way. Tr. 201/22-202/2. There was no modification to the contract removing that requirement. Tr. 208/19-209/1.

21. *The schedule of prices component of the NAS did not contain the information required by § 01200, ¶ 1.2.*

Mr. Santiago testified that he intended to allow Landmark to use Landmark's NAS to provide the Schedule of Prices. Tr. 204/1-5. However, the schedule of prices contained in the NAS did not meet the requirements of § 01200, ¶ 1.2, because it did not contain "quantities for the various kinds of work" or "unit pricing." Tr. 232/19-24. Moreover, although he testified that he intended to permit Landmark use its NAS to comply with the requirements of § 01200, ¶ 1.2, Mr. Santiago never reviewed, evaluated or approved the schedule of prices contained in Landmark's NAS.[5] Mr. Santiago testified that he did not even discuss the NAS, or its schedule of prices, with Mr. McAteer, the project engineer. Tr. 237/10-11. Indeed, the first time Mr. Santiago even saw the schedule of prices or the NAS in which it was contained was when he received Landmark's invoice. Tr. 240/5-8.

22. Further, pursuant to § 01200 of the Contract, to receive progress payments Landmark was to submit:

a. an invoice;

---

[5] See Tr. 209/6-7 ("No, I personally did not review the schedule of prices."); Tr. 209/113-18 (he did not evaluate the schedule of prices); Tr. 212/19-20 ("I did not review it, no. I did not review it."); Tr. 212/22 ("I personally did not approve it either, no."); Tr. 241/7-9 ("I did not feel the need to review that portion of the network analysis schedule. It was Kevin McAteer's expertise.").

b. a Contract Performance Statement (showing, among other things, the percentage of completion);

c. an updated network analysis;

d. a release; and

e. a certification.

Pl. Ex. 8.

23. The contract required that Landmark submit, and the Navy use, a NAS that complied with the requirements of § 01321.

24. Section 01200 of the Contract authorized the Navy to consider for progress payments materials delivered off-site (thereby fulfilling the condition established by the Payments Clause). However, that authority was expressly limited. For example, § 01200, ¶ 1.4.2(b) provided that payments may be made for material stored off the construction site if (1) the conditions in the Payments Clause are satisfied, (2) the material was stored within a distance of 50 miles by streets and roads to the construction site, (3) the materials were insured and protected from theft, and (4) the materials were not susceptible to deterioration while in storage. Further, materials in transit to either the job site or storage site were not eligible for payment. Id.

25. The Contract required Landmark to submit an updated network analysis with each invoice. Section 01321, Network Analysis Schedule, in conjunction with FAR 52.236-15, Schedule for Construction Contract (Apr 1984), described the requirements for the Network Analysis Schedule ("NAS") to be prepared and submitted by Landmark and approved by the Contracting Officer. Pl. Ex. 9.

26. *The NAS was to be used to determine Landmark's progress on the Project and formed the basis for Landmark's progress payment requests and the Navy's approval of said progress payment requests*. Pl. Ex. 9, ¶ 1.5.6.

The Contract expressly required that each activity depicted in the network diagram have an assigned responsibility code and monetary value. The monetary value for each activity was to be broken down into separate amounts for material/labor and inspection/testing. Thus, from a contract compliant NAS, by identifying all completed and partially completed activities at any given point, the Navy could determine the extent of the Contractor's progress. In addition, because each activity was assigned a monetary value, a contract compliant NAS was the document from which the government could determine the amount of the progress payment earned by Landmark. Pl. Ex. 9.

27. For scheduling purposes, the basic concept of the network analysis diagram is to show how the start of one activity on the Project was dependent on the completion of earlier activities and how its completion affects future activities. As a result, the Contract required the Project be broken down into discrete activities. Pl. Ex. 9.

28. According to § 01321, ¶ 1.4.2, the "minimum number of activities in the final network diagram shall be 30 per building and 1000 for the total project." Accordingly, the network diagram for a single MFH unit was to reflect at least thirty separate activities, each of which must be allocated specific costs and duration. Pl. Ex. 9.

29. *The contracting officer, not the project engineer, was the approval authority for the NAS.*

Government trial counsel argued in her opening statement that Mr. Santiago had "no expertise in those areas" and, as a result, Mr. McAteer was authorized to approve the NAS on

behalf of the contracting officer. Tr. 120/5-10. Her argument is based on the premise that the NAS is a technical submittal for which Mr. McAteer, as the project engineer, was responsible.[6] Indeed, according to Mr. Santiago, he relied totally on Mr. McAteer not only for the schedule component of the NAS, but also on the schedule of prices component of the NAS.[7] However, the evidence does not support the government's argument for at least four reasons.

First, the contract specifically assigned the responsibility for reviewing and approving the NAS to the contracting officer. The contract required Landmark to provide several submittals for the NAS. Pl. Ex. 9, ¶ 1.2.1. Each of these submittals was annotated with the letter "G". Id. That designation meant that the contracting officer was the approval authority, not Mr. McAteer. Pl. Ex. 10, ¶ 13.3.2 ("At each 'Submittal' paragraph in the individual specification sections, a notation 'G,' following a submittal item, indicates the Contracting Officer is the approving authority for that submittal item.")[8] Mr. Santiago, after reviewing that provision during cross-examination, agreed that the contract required him, as the contracting officer, to approve the NAS. Tr. 212/11-15.

Second, the purported delegation of that authority from Mr. Santiago to Mr. McAteer did not happen:

Q: From where did you get that authority [to approve the NAS]?"

---

[6] See Tr. 168/10-24 (the NAS is a technical issue for which the contracting officer's representative is responsible); Tr. 169/9-18 (approval of the NAS and the schedule of prices was delegated to Mr. McAteer); Tr. 449/18-450/9 (the NAS was a technical submittal and Mr. McAteer was authorized to approve technical submittals).

[7] Tr. 169/17-18 ("Yes, I did. I did defer any questions that we had regarding the schedule of prices to Kevin [McAteer].")

[8] See Pl. Ex. 10, ¶ 1.1.3 (defining "Approving Authority" as "The person authorized to approve a submittal.")

A: Basically the authority would have been passed down from John Santiago in his capacity.

Q: He specifically delegated to you the authority to review and approve the network analysis schedule?

A: Not specifically for this contract, but that was our working arrangement.

Tr. 755/5-12.[9] Of course, that was by no means a consistent "working arrangement." Indeed, Messrs. Santiago and McAteer didn't follow that process for the review and approval of the completing contractor's NAS for this very same contract. Mr. Santiago disapproved Atherton's NAS by letter dated March 25, 2002. Pl. Ex. 162. One week later, Mr. Santiago approved Atherton's NAS for use by letter dated April 2, 2002. Pl. Ex. 167. Clearly, Mr. Santiago knew how to comply with the requirements of the contract, he simply chose not to when administering the contract during Landmark's performance.

Third, the premise of the government's argument (that the NAS was a "technical submittal" for which Mr. McAteer was responsible) is false. The NAS submittals are "SD-18, Records" submittals. Pl. Ex. 9, ¶ 1.2.1. Submittals which are designated as "SD-18" submittals are specifically defined by the contract as "[d]ocumentation to ensure compliance with an administrative requirement or to establish an administrative mechanism. A type of administrative submittal." Pl. Ex. 10, p. 11 (emphasis added). Moreover, the ROICC manual (upon which government trial counsel relied for the purported delegation of authority to Mr. McAteer (Tr. 121/3-12)) identifies as "technical submittals" those submittals required by sections 02000 through 16000 of the contract. Tr. 781/20-22. The NAS is required by a 01000

[9] See also Tr. 757/15-24 (Mr. McAteer did not discuss with Mr. Santiago the purported delegation of this authority from Mr. Santiago "because [their] relationship was always that type.")

specification section. Pl. Ex. 9; Tr. 781/24-782/5. Thus, neither the contract nor the ROICC manual identifies the NAS as a technical submittal. To the contrary, both identify the NAS as an administrative submittal.

Fourth, and finally, given the purpose of the NAS, that fact it was to be reviewed and approved by the contracting officer is obvious. The NAS, as a cost loaded schedule, was the primary document upon which invoicing was based.[10] An updated version of the NAS was the basis for each invoice submitted by the contractor.[11] The authority to pay a contractor is uniquely vested in the contracting officer, not the project engineer.

30. *The contracting officer did not review or approve Landmark's NAS.*

There was significant testimony regarding when the NAS was "approved" and by whom. One point, however, there is no conflicting evidence. Mr. Santiago neither reviewed nor approved the NAS used by Landmark to bill the Navy.

Q: Okay. But you did not review the network analysis schedule that was used by Landmark and the Navy in this contract, did you?

A: I did not review it, no. I did not review it.

Q: And you did not approve it either, did you?

A: I personally did not approve either, no.

Tr. 212/16-22. The contracting officer did not review or approve the NAS used by the Navy to administer Landmark's contract.

---

[10] See Tr. 779/3-7 (NAS was primary document upon which invoicing was based); Tr. 317/3-7 (the NAS was "the source" of information upon which the government relied to make payment to the contractor).

[11] See Pl. Ex. 8, ¶ 1.3.a.3 (a proper invoice requires the submission of an updated network analysis); Pl. Ex. 9, ¶ 1.5.6 ("use the accumulated cost of completed and partially completed activities as the basis for requesting progress payments").

31. *The Landmark NAS used by the Navy did not comply with the requirements of § 01321 because, among other things, it could not be used to determine the percentage of work performed by Landmark.*

The contracting officer had no idea whether the NAS used by the Navy actually satisfied the requirements of § 01321.[12] It did not. Although the NAS was to serve as the foundation for each progress payment,[13] the NAS used by the Navy to administer the Landmark contract could not be used for its intended purpose—to determine what percentage of the work had been accomplished.[14]

Q: Now, as of November 20th, which, I guess, is the date of this invoice, you still accepted no units back from the contractor. Correct?

A: Yes. That is correct.

Q: And this is showing percentage of completion at 35%--right?—this invoice?

A: Yes. That is correct.

Q: Is that an accurate statement: "Thirty-five percent of the work was completed?"

A: No. It's not an accurate statement, as far as 35 percent of the work being completed.

Q: Can you tell, from looking at the network analysis schedule attached to this invoice, how much of the work was completed? What percentage of

[12] Tr. 239/25 ("I don't have any idea whether it did, no.")

[13] Pl. Ex. 9, ¶ 1.5.6 ("use the accumulated cost of completed and partially completed activities as the basis for requesting progress payments").

[14] See Tr. 372/2-15 (NAS couldn't be used to determine the percentage of work that had been accomplished).

the work was completed? Let me rephrase that. Not you, personally. Is it possible to look at this network analysis schedule and tell what percentage of the work has been completed by this point?

A: I don't believe so.

Tr. 376/7-377/2. Mr. Santiago admitted that the percentage of performance complete taken from Landmark's NAS and placed on each invoice actually represented percent paid, not percent complete. Tr. 371/15-372/1. Even Mr. Paullin, one of the government's expert witnesses, testified that the NAS (even when combined with the two-week look ahead reports) "did not satisfy all the requirements of Section 1321 of the contract." Tr. 1475/5-6. Indeed, according to Mr. Paullin, the Navy did not rely on an updated NAS for payment purposes. Tr. 1483/19-21. Mr. Santiago testified that he did not use the NAS for that purpose:

Q: Well, your duty was to make sure that the payments were commensurate with the work performed, right? That's what the FAR requires. Right?

A: Yes. This is what the FAR requires.

Q: And that was your obligation as the ACO, correct?

A: Yes. That was my obligation as the ACO based on information I received from my engineer and the people in the field.

Q: And the tool that you had at your disposal to accomplish that duty, to perform that duty, was primarily the NAS, the network analysis schedule. Right?

A: I, personally, didn't use the NAS, like I said.

Q: Your tool, in fact, was Mr. McAteer, then. Right?

A: That is correct. Mr. McAteer is who I relied on.

Tr. 388/23-389/16. The NAS was not, and could not have been, used to determine the percentage of completion at any given point and, as a result, did not comply with the requirements of the contract.

The final evidence of this fact is apparent from a simple comparison of the last Landmark invoice approved for payment by the Navy and the Navy's own evaluation of the percentage of work performed when Landmark's contract was terminated. The last invoice approved for payment to Landmark stated that the "percentage of performance complete" was "39%."[15] Def. Ex. 3-12. In contrast, the administrative contracting officer in his recommendation to terminate Landmark's contract, stated:

> Percentage of completion: 15% (to date, 22 units or 12% of the units have been completed and returned, there are an additional 56 units in various states of renovation.

Pl. Ex. 121, ¶ (1)(xiv). That simple comparison results in a disparity between amount paid and percentage complete of almost 25% of total contract value, but it is actually worse than that. Landmark had not yet begun performing the additional FAF units added to the contract. As a result, it had been paid 47% of the contract value (after subtracting the value of the FAF scope of work), and had only completed 14% of the MFH units originally on contract, or 18% taking into account the partially completed units. As a result, payments actually exceeded the value of work performed by almost 30% of contract value. The NAS did not comply with the requirements of the contract because it could not be used to determine the value of work performed at any given point.

[15] The testimony clearly established that the "percentage complete" on each invoice actually represented "percent billed" or "percent paid."

The reason the NAS could not be used to determine the percentage of completion of the project was because the government did not enforce specific requirements of § 01321. The NAS submitted by Landmark, on which the Navy relied for making progress payments, did not identify 1000 separate activities as required by the Contract. Instead, Landmark's NAS contained less than 600 activities. Moreover, the NAS also failed to identify 30 separate activities for each MFH Unit. Further, the NAS did not identify the cost of any individual activity for each MFH. Nor did the NAS contain a critical path, responsibility codes or unit prices for each activity.

Moreover, the NAS included line items for more than $2.6 million in material. Over three-fourths of that number consisted of only five categories: $500,000 for "windows and doors"; $500,000 for "cabinets"; $300,000 for "paint"; $485,940 for "flooring"; and $287,040 for "siding." The NAS submitted by Landmark and used by the Navy contained no definition of the scope of work contained in these material line items. As a result, the NAS provided by Landmark contemplated that Landmark, upon billing the Navy $500,000 for "windows and doors", for example, would be credited with the corresponding progress on Project completion. Thus, according to the NAS submitted by Landmark, upon billing for the material line items separately identified on its NAS, Landmark would be credited by the Navy for completing 26.3% of the Project.

32. Pursuant to FAR 52.245-1, the Property Records clause, the Navy was obligated to maintain official Government property records in connection with Government property under the Contract. Pl. Ex. 15. The Property Records clause expressly relieved the Contractor (i.e., Landmark) of that responsibility. Id.

33. Pursuant to FAR 52.245-2, the Government Property (Fixed-Price Contracts) clause, materials purchased by Landmark for the project for which they would be reimbursed by the Navy became Government property when they were delivered to Landmark by the vendor from which they were purchased. Pl. Ex. 15.

34. The Contract also contained provisions regarding liquidated damages. According to the Contract, if Landmark failed to complete the Project by October 23, 2002, the Navy could assess liquidated damages against Landmark in the amount of $75 per unit per day for each day of delay.

35. The NAS also included line items and prices for various field office overhead and labor items, outside of constructing the individual MFH units, including "personnel" for $728,834, "sitework" for $590,000, and "asbestos and lead abatement" for $882,000.

36. Landmark entered into a subcontract with Lloyd Enterprises, Inc. ("Lloyd") in the amount of $590,000 to perform the "sitework." The scope of work in this subcontract was limited to providing a flat, compacted and asphalt paved off-street parking space adjacent to the existing asphalt slab at each MFH Unit. The NAS approved by the Navy included $590,000 for the line item described as "sitework." The NAS also identified Lloyd as the subcontractor performing that line item.

37. In its proposal, Landmark proposed to perform the sitework for less than $362,000. Pl. Ex. 1, CLINS 0010AA, 0010AB. The Navy did not question the $230,000 increase in this item, notwithstanding that the sitework was a separate bid item and that the Navy had estimated the work to cost less than $200,000. Lloyd submitted two invoices to Landmark, the first on August 25, 2000 for $159,496.60 and the second on September 15, 2000 for $430,502.40. Landmark paid Lloyd for those invoices and invoiced the Navy for the full

$590,000 "sitework" cost in its September 2000 invoice. The Navy subsequently paid Landmark $590,000 for this item.

38. *Brady Farley, Landmark's project manager, determined the amount to be requested for payment by Landmark and requested payment from the Navy.*

The government argued at trial that, Mr. Tate Robins, the third-party quality control manager, was responsible for certifying the percent complete and, as a result, the payment amount requested by Landmark and elicited testimony for Mr. Farley to that effect:

Q: What was Tate Robins's responsibility with respect to preparing the invoice?

A: He didn't prepare the invoice. He was responsible to make sure that everything that was on site met the specifications and whatever we were billing for was the quantity and the quality of what we were billing for. If we're saying it was 100 percent complete, he would verify that it was 100 percent complete.

Tr. 810/6-14. On this point, neither the government's argument nor Mr. Farley's testimony, is credible.

First, the QC manager's "only duties and responsibilities are to implement and manage the QC program on this contract." Def. Ex. 1; p. IV-01450-3, ¶ 1.5.1.1. His only role in the invoicing process was to submit a quality control invoice. Id. at p. IV-01450-10, ¶ 1.13.1. Nowhere in the specification section describing the QC manager's duties or in his certification is the QC manager commenting upon the quantity of material or work for which Landmark invoiced.

Second, the invoice form itself contradicts both the government's argument and Mr. Farley's testimony. Pursuant to § 01200, ¶ 1.3.a.1.2, Landmark was to submit a "contract performance statement," showing "in detail" the "percentage of completion." Each invoice contained that statement, right above Mr. Farley's signature. Def. Exs. 3-1 to 3-12.

Third, the draft NAS for Landmark's September invoice (Def. Ex. 3-4 (beginning at pg. LMB000843)) was prepared by Mr. Farley, not Mr. Robins. Tr. 849/25-850/1. Mr. Farley, not Mr. Robins, identified the amounts Landmark invoiced for. Moreover, the QC manager did not order materials for Landmark. Tr. 836/16-18. Mr. Farley developed the percent complete for Landmark.

Fourth, and finally, the Stipulation of Facts Regarding Ron Martin [Docket 111] addresses this issue. There, the government stipulated that Mr. Martin, the Navy's Quality Assurance representative, met with Mr. Farley and Mr. Robins to agree on the percent complete for invoicing purposes. As the government stipulated, "[f]or each invoice, Mr. Martin accepted the percentage complete requested by Landmark's project manager," Brady Farley.

Landmark's QC manager did not determine, nor did he certify, Landmark's percent complete. Instead, Mr. Farley determined Landmark's purported percentage of completion and invoiced the government on behalf of Landmark.

39. Between its September 18, 2000 invoice and its November 20, 2000 invoice, a total of three invoices, Landmark invoiced the Navy for more than $3,105,031, or almost one-third of the original contract value of $9.878 million. Def. Exs. 3-3, 3-4 and 3-5. When combined with its two earlier invoices, the total invoiced by Landmark by November 20, 2000 was more than $3.598 million, or 36.4% of contract value. Def. Ex. 3-5. However, by November 20, 2000, the Navy had not even approved Landmark's construction drawings.

Pl. Ex. 19 (design approved on Dec. 20, 2000). Nor had Landmark submitted (or the Contracting Officer approved) the Schedule of Prices required by § 01200, ¶ 1.2 of the Contract or received approval from the contracting officer for its NAS.

40. Within its September, October and November 2000 invoices, Landmark requested payment for at least $1,346,980 in material cost for such items as doors and windows, cabinets, paint, flooring and siding. Def. Exs. 3-3, 3-4 and 3-5. The Navy paid the entire amounts requested by Landmark in each invoice. Id. The Navy did not request from Landmark any supporting documentation identifying the quantities, types, or costs of material.[16] Nor did the Navy obtain any documentary evidence from Landmark that Landmark had obtained title to this material. Had the Navy asked to see any invoice, bill of lading or other proof that Landmark had obtained title to the material for which it sought payment, the Navy would have learned either Landmark had not even ordered material of that value, much less obtained title to it. As a result had the Navy enforced the payment provisions, it would not have approved payment to Landmark.

41. Included within the September, October and November 2000 invoice payments to Landmark for materials line items was $140,000 for cabinets. That is, by November 20, 2000, Landmark requested, and the Navy subsequently approved and paid Landmark, $140,000 for cabinets. However, by November 20, 2000, Landmark had not even ordered cabinets valued at $140,000, much less paid for them. Nor were cabinets valued at $140,000 delivered to the Project site by November 20, 2000. Moreover, although the Navy paid Landmark $140,000 for cabinets at this point, Landmark never paid the supplier this amount.[17]

---

[16] See Tr. 366/8-18 (never saw, received or asked for any bills of lading or invoices for materials for invoice).

[17] Stipulation of Facts Regarding Vendors ("Vendor Stip."), ¶¶ 1-22.

42. Landmark entered into a purchase order subcontract with Tacoma Fixture Co. to provide all the cabinets required on the Project.[18] Tacoma Fixture Co. delivered its first cabinets to Landmark on October 27, 2000.[19] Tacoma Fixture submitted its first invoice to Landmark on November 7, 2000 in the amount of $10,405.27.[20]

43. Landmark did not submit with its invoice to the Navy requesting payment for cabinets any documentation describing the quantity, type or size of the cabinets for which it requested payment. Nor did it inform the Navy when – if at all – it had purchased or was purchasing the cabinets or where the cabinets would be stored. Landmark did not inform the Navy whether the cabinets were in transit. Further, the Navy did not request any information from Landmark that would provide any of this information. Instead, the Navy approved Landmark's request in its entirety. Landmark was then paid for cabinets that were not even ordered, much less delivered to Landmark or the Project site.

44. Immediately upon payment by the Navy for the amount requested by Landmark for cabinets, the cabinets (like all other material for which it paid Landmark) became the sole property of the Navy.

45. On December 20, 2000, the Navy issued unilateral Modification A00008. Pl. Ex. 19. This modification incorporated into the Contract the approved construction design. Id.

46. On that same date, December 20, 2000, Landmark submitted its sixth invoice. Def. Ex. 3-6. In its sixth invoice, Landmark requested $230,647.36, for a cumulative total of

[18] Vendor Stip., ¶ 2; Tr. 825/5-7A.
[19] Vendor Stip., ¶¶ 4, 5.
[20] Vendor Stip., ¶ 5.

$3,829,601.28. Id. As with each of the five previous invoices, the Navy approved invoice number six in its entirety. Landmark was subsequently paid.

47. As a result, through the December 20, 2000 invoice, the Navy had authorized payment to Landmark of $3,829,601.28. Id. By mid-January 2001, the Navy had received numerous complaints from Landmark's suppliers and subcontractors regarding Landmark's failure to pay its suppliers and subcontractors. Pl. Ex. 44.

48. As a result of the complaints received by the Navy from Landmark's suppliers and subcontractors, the Navy initially rejected Landmark's January 2001 invoice and demanded that Landmark provide to the Navy an accounting of all funds received by Landmark from the Navy and all amounts owed and paid by Landmark to Landmark's suppliers and subcontractors. Pl. Exs. 44, 46.

49. *By letter dated February 7, 2001, Landmark provided accounting information to the Navy. Pl. Ex. 47. Landmark's February 7, 2001 submission proved that Landmark had not paid its suppliers and subcontractors. That submission also proved that, to the extent Landmark had provided statements purporting to be progress payment certifications required by the Payments Clause, such certifications were false. The Navy ignored this information.*

By comparing the amounts paid by the Navy to Landmark for various subcontractors and suppliers (taken from Landmark's November 2000 invoice, Def. Ex. 3-5) with the amounts paid by Landmark for those same supplies (Pl. Ex. 47), the Navy would have discovered the following:

| Material | Supplier | Amount Paid by Navy | Amount Paid by Landmark |
|---|---|---|---|
| Doors and Windows | Harbor Building Supply | $ 250,000 | $182,647.60 |
| Cabinets | Tacoma Fixtures | $ 140,000 | 0 |
| Paint | Parker Paint | $ 84,000 | 0 |
| Mechanical Supplies | Coastal Mechanical | $ 220,000 | $ 37,237.55 |

| | | | |
|---|---|---|---|
| Electrical Supplies | Coastal Electrical | $ 209,155 | $185,636.00 |
| Flooring | Resource Management | $ 485,940 | $350,836.43 |
| Siding | Harbor Building | $ 287,040 | 0 |
| Asbestos Abatement | C&C | $ 308,700 | $242,529.21 |
| **TOTALS** | | $1,984,835 | $998,886.79 |

Thus, according to the data then available to the Navy, it could have determined, with respect to these eight line items above, that either (1) it had overpaid Landmark by almost $1 million or (2) Landmark was almost $1 million behind in payments to its subcontractors and suppliers. If the former, the Navy should have immediately stopped payment until this was resolved. If the latter–and to the extent Landmark had actually provided the progress payment certification required by the Payments Clause–the Navy had evidence that Landmark had falsely certified payment to its subcontractors and suppliers and, again, should have made no further payments to Landmark. The contracting officer did not analyze Landmark's February 7, 2001 submission. Tr. 428/7-13. As a result, the Contracting Officer did not take any administrative or remedial action against Landmark.

50. Within the six week period after receipt of Landmark's February 7, 2001 submission, the Contracting Officer authorized the payment to Landmark of three separate invoices totaling $503,362.88. None of these invoices were properly certified by Landmark. In the very next invoice submitted by Landmark, Landmark stated only that "per our agreement with our suppliers and vendors, they are being paid in accordance with their payment schedule." That statement does not comply with the requirements of FAR 52.232-5(c)(3). Nevertheless, the contracting officer approved that invoice for payment. Def. Ex.3-8

51. By bilateral Modification A00010, effective February 28, 2001, Landmark and the Navy added to the Contract the requirement to renovate 21 additional MFH units (for a total

of 181) and increased the Contract price by $1,884,176. Pl. Ex. 20. The modification did not extend the Contract completion date, which remained October 23, 2002. Id.

52. *The Navy did not obtain the consent of the surety for Modification A00010.*

When the contracting officer issued Modification A00010, adding the additional 21 FAF units and increasing the contract price by almost $1.9 million, he did not obtain the surety's consent:

Q: And within three weeks after receipt of this information from the contractor, at Exhibit 47, you modified the contract to increase the scope of work by almost $1.9 million. Right?

A: Yes. That's correct.

Q: You never obtained the surety's consent for that scope of work, did you?

A: No. We never received the surety's consent.

Q: You sought it, though. Right? You sought that consent. You asked for the consent.

A: Yes. We did ask for it.

Q: But you didn't get it. You didn't receive it.

A: No. We never received the consent.

Tr. 430/5-18. In an effort to overcome that problem, government trial counsel argued in her opening statement that Lumbermens agreed in the Takeover Agreement to perform that additional scope of work that was outside the bonded performance. Tr. 146/14-147/6. The government's argument is simply without merit.

The Takeover Agreement executed by Lumbermens contained an absolute reservation of rights:

> This Agreement shall not be construed to waive, limit, alter or amend any of the Surety's rights or defenses under the performance bond or otherwise. Except as to the Government's mitigation of damages, in accepting completion of the defaulted contract by the Surety, it is expressly understood that by entering into this Agreement the Surety does not waive, prejudice, or in any way adversely affect or limit any claim that it, as Surety, or the Defaulted Contractor may have against the Government . . . and the Surety hereby expressly reserves, any and all rights and defenses it may have against the Government under the contract and the performance bond.

Pl. Ex. 142, ¶ 14.

One of the Surety's rights and/or defenses was to assert that the FAF units were outside the scope of the performance bond. By signing the Takeover Agreement, it did not waive that right and/or defense. It clearly did not agree to extend the scope of the performance bond to cover the additional work.

53. Between February 20, 2001 and May 1, 2001, the Navy paid, or authorized payment of, an additional $680,438.20. Thus, by May 1, 2001, the Navy had paid or authorized payment of 36.7% of the revised Contract price. However, by May 1, 2001, the Navy had accepted only eight of the 181 MFH units on Contract.

54. Landmark submitted its invoice No. 5575-12 on May 30, 2001, requesting payment of $283,594.28, for a total payment of $4,793,633. The Navy approved the payment request in its entirety and Landmark was subsequently paid.

55. As of June 1, 2001, the Navy had paid, or approved for payment, a total of $4,793,633 to Landmark. Included with that amount were amounts for materials, including

$375,000 for "doors and windows," $260,000 for "cabinets," $156,000 for "paint," $485,940 for "flooring," and $287,040 for "siding."

56. Tacoma Fixture invoiced Landmark for cabinets for only 27 MFH units and in total billed Landmark only $84,560.98 for these cabinets. Landmark paid Tacoma Fixture only $38,213.56 for these materials. Tacoma Fixture Company was paid $46,347.42 by Lumbermens under the payment bond. Vendor Stip., ¶¶ 1-22.

57. Landmark acquired doors, door hardware, molding, windows and window blinds for the Project from Harbor Building Supply. Vendor Stip., ¶¶ 65-74. Harbor Building Supply shipped $310,916 of doors, door hardware, molding, windows and window blinds to Landmark. Id. Landmark also acquired the siding required for the Project from Harbor Building Supply. Id. As of June 1, 2001, Harbor Building Supply shipped to Landmark 400 squares (40,000 square feet) of siding as well as corner and trim siding and in total billed Landmark $58,676 for this siding. Id. at ¶ 71(f). In total, Landmark paid Harbor Building Supply only $386,548 for these and other materials. Id. at ¶ 73.

58. Landmark acquired paint and painting supplies from Parker Paint. Id. at ¶¶ 23-38. Parker Paint invoiced Landmark for 1,500 gallons of paint and painting supplies and in total billed Landmark only $22,843.74 for these materials. Id. at ¶ 36. Landmark paid Parker Paint only $4,000 for these materials. Id. at ¶ 37. Parker Paint was paid $23,340.02 by Lumbermens under the payment bond. Id. at ¶ 38.

59. Landmark acquired carpet, carpet pad, vinyl flooring and other flooring materials from Resource Management, Inc. Id. at ¶¶ 55-58. Carpeting was originally shipped to Landmark's warehouse in Lakewood, Washington and only later transferred to the project site.

Resource Management, Inc. invoiced Landmark only $350,836.43 for these materials and was paid by Landmark. Id. at ¶ 58.

60. When Landmark submitted progress payment requests for “doors and windows,” it did not submit invoices or other documentation identifying the quantities and types of windows and doors for which it sought payment. Nor did Landmark submit documentation identifying the purchase price of the doors and windows. Nor did Landmark identify the location at which this material was stored or whether the material had been purchased or was in transit. Immediately upon payment by the Navy for the amount requested by Landmark for “doors and windows,” said doors and windows (like all other material for which it paid Landmark) became the sole property of the Navy.

61. Similarly, when Landmark submitted additional progress payment requests for “paint,” “flooring,” and “siding,” it failed to provide to the Navy any information which would, could or did identify type, size, quantity, cost and location of any of the material. Landmark did not submit documentation establishing the material that had been ordered or delivered. The Navy did not ask or demand that Landmark provide any further documentary information which would substantiate quantity, type, size, or location of the material. The Navy neither demanded nor obtained any documentation that would establish title to any material for which it paid Landmark. Immediately upon payment by the Navy for the amounts requested by Landmark for “paint,” “flooring,” and “siding,” said material became the sole property of the Navy.

62. By June l, 2001, the Navy had also paid or approved for payment $458,640 for “asbestos and lead abatement,” $378,936 for “personnel,” and $590,000 for “sitework.”

63. The $458,640 paid to Landmark for “asbestos and lead abatement” accounted for 52% of the amount budgeted by the NAS for that “activity.” However, pursuant to the Navy’s

own records, Landmark had completed abatement in only 54 of the 160 units for which it had budgeted, or 34%.[21] Pl. Ex. 131. Thus, the Navy paid Landmark for abating 83 units when Landmark had only abated 54. Landmark was paid $158,760 for work it had not performed.[22]

64. Landmark acquired demolition and hazardous waste disposal services from C&C Construction Corporation. Hazardous waste removal services, including asbestos, were subcontracted to Thermatech Northwest Inc. C&C Construction Corporation invoiced Landmark only $242,529.21 for these services and was paid by Landmark. Thermatech Northwest Inc. invoiced Landmark only $93,622.75 for asbestos removal but received no payment from Landmark. Thermatech Northwest was paid $93,622.75 by Lumbermens under the payment bond.

65. The NAS included an activity identified as "personnel" for which Landmark had budgeted $728,834 for the entire Project. Separately, Landmark budgeted an amount for labor for each of the MFH units under Contract. Thus, the "personnel" activity was in addition to labor for building the MFH units. However, by June 1, 2001, the Navy had paid Landmark, or authorized payment, in the amount of $378,936 for "personnel," 52% of the amount budgeted by Landmark for this line item. By June 1, 2001 Landmark was approximately 12% complete with the project.

---

[21] Landmark did not re-forecast budgets for activities after the Contract was modified to add the additional 21 MFH units. Instead, Landmark simply created a single activity to which it attributed the entire price of that modification.

[22] The price for these services should have been allocated across the work on a unit price basis so that the Navy could have ensured that it paid only for work actually performed. This is how Mr. McAteer evaluated the percent complete after Landmark's contract was terminated. See Pl. Ex. 130.

66. By letter dated June 21, 2001, Landmark notified the Navy that Landmark had furloughed its field staff and that no further work was being done pending the resolution of financial difficulties.

67. On July 11, 2001, the Navy issued Landmark a cure notice.

68. By letter dated July 20, 2001, Landmark informed the Navy that Landmark was unable to complete the Project due to financial problems and was therefore in default.

69. The Navy terminated Landmark's contract for default on August 2, 2001.

70. At termination, there remained $7,392,381.24 in unpaid Contract balance. The Navy had paid Landmark almost 40% of the modified Contract price, or $4,793,633.76. However, only 22 of the 181 MFH units on Contract had been completed by Landmark and accepted by the Navy. The Navy estimated at that time that the Contract was only 12% complete (based upon units completed and returned to the Navy) or only 15% complete (if partially completed units were included). During the course of Landmark's performance, the Navy paid Landmark in excess of $2.4 million for materials that, at the time of payment, had not been incorporated into the Project.

71. Between July 2000 and May 2001, the Navy authorized payment of eleven separate invoices to Landmark, totaling $4,793,633.76. However, Landmark never provided the Navy a progress payment certification that complied with the requirements of FAR 52.232-5(c)(3) because in each instance Landmark had either modified the mandatory language in the Payments Clause or submitted no certification whatsoever.

72. Effective November 20, 2001, Lumbermens, the Navy and Atherton Construction, Inc. ("Atherton") executed a Takeover Agreement, pursuant to which Lumbermens agreed to be responsible for completing the Project. Pl. Ex. 142. Atherton was identified in the Takeover

Agreement as the "Completing Contractor." Effective that same date, Lumbermens and Atherton executed a Completion Contract, pursuant to which, on behalf of Lumbermens, Atherton would perform the work necessary to complete the Project. Pl. Ex. 143.

73. Lumbermens and the Completing Contractor fully complied with the terms and conditions of the Takeover Agreement.

74. The Takeover Agreement provided, with respect to material previously paid for by the Navy for use on the Project, that:

> Insofar as the Government has any right, title or interest therein, the Government agrees that the Surety or the Completing Contractor will have the right to use, without charge, any of the materials, supplies, equipment or personal property furnished or supplied to or by the Defaulted Contractor which may be stored on the premises of the project or elsewhere, or which may have been fabricated for use in connection with the project. The Government makes no warranty as to the quantity or condition of any such materials, supplies, equipment or personal property.

Pl. Ex. 142, ¶ 10.

75. The Takeover Agreement did not modify the original completion date of the Project, which remained as October 23, 2002.

76. The Takeover Agreement also included a reservation of rights for Lumbermens, which provided:

> This Agreement shall not be construed to waive, limit, alter or amend any of the Surety's rights or defenses under the performance bond or otherwise. Except as to the Government's mitigation of damages in accepting completion of the defaulted contract by the Surety, it is expressly understood that by entering into this Agreement the Surety does not waive, prejudice, or in any way adversely affect or limit any claim that it, as Surety, or the Defaulted Contractor might have against the Government, including any claim arising out of payments made by the Government to the Defaulted Contractor; and the Surety hereby expressly reserves, any and all rights and defenses it may have against the Government under the contract and the performance bond. Nothing in this Agreement shall prejudice the rights of the Surety to seek a judicial or other appropriate determination of its rights.

Pl. Ex. 142, ¶ 14.

77. During performance of its Completion Contract, Atherton notified the Navy on January 31, 2002, that the existing electrical wiring system in the MFH units did not meet the requirements of the National Electrical Code. Atherton discovered the absence of the necessary ground, among other deficiencies, and notified the Navy that these circumstances constituted a changed condition.

78. The Navy, which had known of this problem for several months prior to the default termination of Landmark's contract, initially denied the problem's existence. During this period, Atherton was unable to proceed with scheduled work on its critical path.

79. Finally, on or about March 15, 2002, the Navy acknowledged the existence of the changed condition and provided Atherton with a request for proposal to obtain Atherton's price for the added scope of work necessary to correct the deficient wiring.

80. Atherton was then able to re-start work, implementing the changes directed by the Navy.

81. As a result of this changed work, Atherton incurred a delay to its critical path. Atherton requested that the Navy provide a schedule extension to accommodate this delay. The Navy refused.

82. The Navy assessed liquidated damages against Lumbermens for the period of time encompassed by the 46-day schedule extension requested by Atherton.

83. The Navy also assessed liquidated damages against Lumbermens during the period in which Atherton was completing the additional 21 MFH units placed on the Contract by Modification A00010, which MFH units were not within the scope of work bonded by Lumbermens.

84. The 21 MFH units added by Modification Number A00010 would have reasonably required at least 74 days to complete, absent any differing site conditions encountered by Atherton. However, Atherton did encounter additional differing site conditions in performance of the additional 21 FAF units, including delays for transite pipe and asbestos in the wallboard.

85. Pursuant to the Completion Contract, Atherton completed work on the Project on June 6, 2003.

86. The Navy withheld liquidated damages against Lumbermens in the amount of $1,015,125. Of that amount, $304,800 is attributable directly to completing the 21 FAF units after the original contract completion date. Pl. Ex. 333B.

87. Lumbermens paid $4,160,034.76 under its performance bond to complete the project. In addition, Lumbermens paid $556,509.91 under its payment bond to compensate suppliers and subcontractors that had not been paid by Landmark.

88. The value of work performed and materials provided by Landmark as of its contract termination was $2,025,009.03. Pl. Ex. 333A. The Navy had paid Landmark $4,793,633.76.

## III. LAW AND ARGUMENT

### A. <u>This Court Has Jurisdiction Over Lumbermen's Claims.</u>

As an initial matter, the government continues to argue that this Court lacks jurisdiction over Lumbermen's claims. The government is incorrect. This Court has jurisdiction over both Lumbermens's discharge claims and its claims based on breach of the Takeover Agreement.

**1. <u>This Court Has Jurisdiction Over Lumbermens' Discharge/Impairment of Suretyship Claims.</u>**

The facts relevant to whether this Court has jurisdiction over Lumbermens' suretyship claims are uncontested:

- Lumbermens issued the payment and performance bonds for Landmark and those bonds were accepted and approved the government;
- After the government terminated Landmark's contract for default, Lumbermens and the government entered into a Takeover Agreement pursuant to which Lumbermens arranged for a contractor to complete the project;
- Under its performance bond, Lumbermens paid the completing contractor more than $4.1 million (above the amount of contract funds held by the government at termination) to complete the project;
- Under its payment bond, Lumbermens paid more than $550,0000 to satisfy the claims of subcontractors and suppliers that Landmark had not paid; and
- Lumbermens seeks to recover from the government funds paid by the Navy prior to the Takeover Agreement in violation of the Landmark contract.

Given these facts, there is no credible argument that this Court lacks jurisdiction over Lumbermens's suretyship claims. Indeed, the Federal Circuit in <u>National Surety Corp. v. United States</u>, 118 F.3d. 1542 (Fed. Cir. 1997) already resolved this issue. The jurisdictional basis for Lumbermens's claims is the same jurisdictional basis that exists for equitable subrogation claims, except that for suretyship claims, Lumbermens is not required to provide notice to the government.

In <u>National Surety</u>, the surety furnished performance and payment bonds in connection with a contract for construction of a water distribution system. The contract required the government to retain ten percent of all progress payments until the contractor submitted, and the contracting officer approved, a "complete project arrow diagram." The contractor did not provide the project arrow diagram. Nevertheless, the government paid the retainage. The

contractor abandoned the project and the surety completed. The surety then filed a claim for funds that were required to have been retained by the government.

Generally, jurisdiction over claims of improper payment by the government is contingent upon notice being provided to the government. Fireman's Fund Ins. Co. v. United States, 909 F.2d 495, 498 (Fed. Cir. 1990) ("[T]he government as obligee owes no equitable duty to a surety…unless the surety notifies the government that the principal has defaulted under the bond."). However, when the government makes payment to a defaulted contractor in violation of the terms of the contract, no notice is required:

> When the contractor abandoned performance before completion, as did Dugdale, and the government had knowledge of the default, as here, and so informed the surety, as here, *Fireman's Fund* does not impose a further requirement that the surety notify the government "that the principal has defaulted."

National Surety, 118 F.3d at 1547. Although National Surety had based its claim based on its purported status as a third-party beneficiary to the contract, (id. at 1544), the Federal Circuit evaluated it claim under the principles of suretyship, particularly the doctrine of discharge *pro tanto* (id. at 1545-47), and relied on the doctrine of equitable subrogation for jurisdiction, finding an exception to the notice requirement in cases in which the government materially departs from the terms of the contract to the detriment of the surety. Id. at 1547. That is the same jurisdictional basis applicable here.

This Court in Nova Casualty Co. v. United States, 72 Fed. Cl. 755 (2006), came to the same conclusion, relying upon National Surety. As stated by the court in Nova:

> In [National Surety], however, the Federal Circuit recognized and applied an exception to the notice requirement—under the exception, a surety may advance a claim against the government if it can demonstrate that the government violated the terms of a bonded contract to the detriment of the surety. The exception is based on the principle that the government owes the surety a duty "to administer the contract…in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded."

Nova, 72 Fed. Cl. at 760, quoting National Surety, 118 F.3d at 1546. The basis for the Court's jurisdiction over Lumbermens's claim is the same as any claim for equitable subrogation, except that no notice is required. Given the uncontested facts, this Court has jurisdiction over Lumbermens's claims based on discharge/impairment of suretyship.

### 2. Lumbermens's Claims Based on Breach of the Takeover Agreement are not Subject to the Contract Disputes Act.

The government also argues that Lumbermens's claims based upon beach of the Takeover Agreement are subject to the Contract Disputes Act, 41 U.S.C. §§ 601-14 ("CDA") and that Lumbermens failure to submit its claims to the contracting officer for a final decision deprives this Court of jurisdiction. However, the CDA does not apply to the Takeover Agreement. Moreover, even if the CDA applied to the Takeover Agreement, Lumbermens is not a "contractor" for the purposes of the CDA.

#### *1. The CDA does not apply to the Takeover Agreement.*

Contrary to the government's assumption, "[n]ot all government contracts … fall within the Contract Disputes Act." G.E. Boggs & Assocs., Inc. v. Roskens, 969 F.2d 1023, 1026 (Fed. Cir. 1992). Instead, the CDA applies only to contracts entered into by an executive agency for the "procurement" of property, services or construction and the "disposal" of personal property. 41 U.S.C § 602(a) (1978). The Takeover Agreement is not a "procurement" contract.

First, it is clear that the Takeover Agreement does not alter the services or obligations required of Lumbermens, nor its status as a surety:

> It is understood and agreed that the Surety, by entering into this Agreement, *is not acting as a contractor, but is instead acting in its capacity as a performance bond surety*. The Surety, who will have no employees on the project site, shall have no obligation to furnish any insurance under the contract, and any insurance required under the contract shall be provided by the Completing Contractor.

Pl. Ex. 142, ¶ 9 (emphasis added). Lumbermens remained a surety and its services as a surety did not change. The "services contracted for and/or performed by … [a surety] do not fit within those agreements deemed 'contracts' with the government." Westech Corp. v. United States, 20 Cl. Ct. 745, 749 (1990) (rejecting application of the CDA to an implied contract with a surety). Here, because (1) the services provided by Lumbermens under the Takeover Agreement were those normally provided by a surety and (2) surety services are not subject to the CDA, the CDA does not apply to the Takeover Agreement.

Unlike the Contract, the Takeover Agreement is not a construction contract; it does not itself procure construction services. Instead, the Takeover Agreement arranges for and leads to a contract for the procurement of construction. Accordingly, at best, the Takeover Agreement is ancillary to a contract for the procurement of construction and is not within the coverage of the CDA. See, e.g., Coastal Corp. v. United States, 713 F.2d 728, 730 (Fed. Cir. 1983) (holding that an implied contract to consider bids fairly was merely ancillary to a contract for goods and services, not itself a contract for goods or services, and, as a result, not within the CDA).

Indeed, as between the government and Lumbermens, the Takeover Agreement is nothing more than a settlement agreement. The "whereas" clauses describe the situation in which the parties found themselves – the existence of the Contract guarantee by Lumbermens of the principal, default by the principal, the government's demand and Lumbermens agreement to perform its duties under the performance bond. Paragraphs 1-11 of the Takeover Agreement describe the terms of that settlement agreement. Pursuant to these terms, the Parties agreed to resolve how Lumbermens would perform its duties under the performance bond. Lumbermens is merely asserting that the government breached that settlement agreement. A claim alleging a breach by the government of a settlement agreement is not covered by the CDA. Gutz v. United

States, 45 Fed. Cl. 291, 298-99 (1999) (suit for breach of a settlement agreement arising from a farm deficiency payment dispute is not covered by the CDA). For these reasons, the Takeover Agreement is not a procurement contact covered by the CDA.

### *2. Lumbermens Is Not a "Contractor" Under the CDA.*

Indeed, even if the CDA applied to the Takeover Agreement, Lumbermens would nonetheless not qualify as a "contractor" under the CDA for two reasons. First, Lumbermens remained a "surety" under the Takeover Agreement. Second, designation of Lumbermens as a CDA "contractor" in this context would violate the "single point of contact" rule in government contracts.

A takeover agreement – under certain circumstances – may turn the surety into a "contractor" under the CDA. See Fireman's Fund Ins. Co. v. England, 313 F.3d 1344 (Fed. Cir. 2002) (indicating that the CDA might be applicable to surety's post-takeover claims).[23] In many takeover agreements, for example, the agreement is solely between the surety and the government, and the surety agrees to complete the work remaining under the contract, stepping into the shoes of the defaulting prime contractor. See Fireman's Fund Ins. Co., 313 F.3d at 1346 (involving takeover agreement in which surety "agreed to complete the contract"); United Pac. Ins. Co. v. Roche, 401 F.3d 1362, 1364 (Fed. Cir. 2005) (following termination for default, surety entered into takeover agreement and was substituted as the contractor); St. Paul Fire and Marine Ins. Co. v. United States, 1994 U.S. Claims LEXIS 189, 39 Cont. Cas. Fed. (CCH) ¶ 76,706 (1994) (noting that "the takeover agreement *explicitly recognize[d]* the government's substitution of the original contractor, USR, with St. Paul [the surety] under the prime

[23] Under such circumstances, Courts hold that it would be "extremely harsh and inconsistent" to bar a surety from suing under the CDA. Travelers Indemnity Co. v. United States, 16 Cl. Ct. 142, 153 (1988).

construction") (emphasis added). The government asks this Court to find that the Takeover Agreement transformed Lumbermens into a contractor. The Takeover Agreement did no such thing. Instead, the Takeover Agreement expressly states that Lumbermens is *not* a contractor:

> It is understood and agreed that the Surety, by entering into this Agreement, *is not acting as a contractor* but is instead acting in its capacity as a performance bond surety. The Surety, who will have no employees on the project site, shall have no obligation to furnish any insurance under the contract, and any insurance required under the contract *shall be provided by the Completing Contractor*.

Pl. Ex. 142, ¶ 9 (emphasis added). Thus, unlike some takeover agreements, this Takeover Agreement merely memorialized and reaffirmed Lumbermens' pre-existing obligations as performance bond surety under the original Contract and the original tri-partite relationship remained unchanged. Lumbermens' role remained that of surety; it did not become a contractor.

This point is further reinforced by the designation of Atherton as the "contractor" under the Modification No. A00013, which states that "[t]he contractor organization performing the contract work has changed from Landmark Construction Corporation … to Atherton Construction, Inc." Pl. Ex. 22. The Takeover Agreement in question thus never altered the tri-partite relationship of contractor (Landmark/Atherton), surety (Lumbermens), and the government.

Moreover, the CDA is limited to "claims by a <u>contractor</u> against the government relating to a contract." 41 U.S.C. § 605(a) (emphasis added). Since Atherton – and not Lumbermens – is clearly and expressly considered the "contractor" under the Takeover Agreement, the CDA is not applicable to Lumbermens or its claims. Where such a relationship exists, courts have uniformly held that a surety is not considered a "contractor" under the CDA. As stated by the Second Circuit – and echoed by the Federal Circuit – a surety simply lies outside of the intended scope of the CDA.

> Nowhere are sureties or the Miller Act mentioned [within the CDA], and the goals of encouraging bids on contracts and lowering the cost of resolving disputes surrounding government contracts bear little relation to the type of performance bonds that are issued for all large scale government construction projects. Congress simply had an entirely different set of problems in mind when it passed the CDA, and *we see no reason to judicially transform sureties into 'contractors' where Congress has not done so*.

United States v. Seaboard Surety Co., 817 F.2d 956, 961-62 (2nd Cir. 1987) (emphasis added). See also Admiralty Construction, Inc. v. Dalton, 156 F.3d 1217, 1221 (Fed. Cir. 1998) (quoting Seaboard).

Finally, designation of Lumbermens as a contractor in these circumstances is inconsistent with the "single point of contact" required by the CDA. Congress passed the CDA in 1978 to provide a comprehensive, uniform system for adjudicating contract claims against the government. See Seaboard Surety, 817 F.2d at 961 (citing S. Rep. No. 95-1118, 95th Cong., 2d Sess. 16, reprinted in 1978 U.S.C.C.A.N. 5235, 5235-36 (hereinafter Legislative history)). In order to streamline the adjudicative resolution of contract claims, the CDA placed strict and specific parameters limits on the process. See id.; Sharman Co., Inc. v. United States, 2 F.3d 1564, 1568-69 n.6 (Fed. Cir. 1993) overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995). Jurisdiction under the CDA is limited to claims of a "contractor," which is defined as "a party to a Government contract other than the Government." 41 U.S.C. § 609(a)(1); 41 U.S.C. § 601(4). According to the legislative history of the CDA, the requirement that one must be a contractor was to achieve a "single point of contact" between the contractor and the government so that the government would not be faced with multiple, duplicative claims by numerous parties involved with the same project. See Admiralty Construction, 156 F.3d at 1220 (citing Legislative History at 5250). A "contractor" for jurisdictional purposes is thereby limited to the prime contractor. Westech Corp., 20 Cl. Ct. at

749 (1990). See also Admiralty Construction, 156 F3d at 1220. ("Thus, the CDA makes only a single 'contractor' eligible to appeal a contracting officer's final decision."); Travelers Indemnity Co. v. United States, 16 Cl. Ct. at 153 ("Therefore, the right to sue the government over the construction contract was … limited to the contractor."). Here, the government's attempt to designate Lumbermens as a CDA contractor for claims arising under the Takeover Agreement violates that rule.

The Takeover Agreement is not subject to the CDA because it is not a procurement contract. Further, because Atherton, not Lumbermens, replaced Landmark as the contractor under the original Contract, Lumbermens is not a "contractor" for purposes of the CDA. Lumbermens is therefore not subject to the jurisdictional requirements of the CDA and may pursue its Takeover Agreement-related claims without first submitting them to the contracting officer for a final decision. This Court has jurisdiction over those claims.

**B. Lumbermens Proved Its Claims for Discharge/Impairment of Suretyship.**

Courts have generally stated the doctrine of impairment of suretyship as follows:

> Where there has been a material departure from *contractual provisions relating to payments* and the security of retained funds, a compensated surety is discharged from its obligations on the performance bond to the extent that such unauthorized payments result in prejudice or injury.

National Union Indem. Co. v. G. E. Bass & Co., 369 F.2d 75, 77 (5th Cir. 1966) (emphasis added); United States v. Reliance Ins. Co., 799 F.2d 1382, 1385 (9th Cir. 1986). The courts have identified two theories supporting impairment of surety claims on government contracts: 1) the Government's failure to comply with mandatory payment terms, and 2) the Government's abuse of discretion in making progress payments. Both theories are applicable in this case.

Government trial counsel repeatedly argued during trial that the Court must apply what is essentially a third-party beneficiary test, asserting that the particular provision violated by the

government must be included in the contract for the benefit of the surety.[24] However, the court in National Surety expressly rejected that approach:

> Suretyship law derives from a different legal premise than whether the bonded contract, or any provision thereof, was made for the surety's benefit. The surety bond embodies the principal that any material change in the bonded contract, that increases the surety's risk or obligation without the surety's consent, affects the surety relationship.

National Surety, 118 F.3d at 1544. Accordingly, the legal test is not whether the provision violated by the government was included in the contract for the benefit of the surety, but whether the government breached its duty "to administer the contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded." Id. at 1546. Thus, "a surety will be discharged where the bonded contract is materially altered or changed without the surety's knowledge or consent," as long as such an "alteration caused prejudice or damage." Id. Here, the government materially altered the terms of the contract in ways that damaged Lumbermens. In particular, the government simply failed to enforce any of the mandatory payment provisions Landmark with which Landmark was to comply before it was entitled to be paid.

Pursuant to the Payments Clause, Landmark was entitled to invoice, and the government was permitted to pay, based on Landmark's progress. Of course, because payments were based on Landmark's progress, the FAR required the government to ensure that payments were commensurate with the work performed. The contract contained a variety of mandatory terms that—if followed—would have permitted the government to fulfill that duty. However, the government simply ignored or violated those provisions and, as a result, the payments to

---

[24] See, e.g., Tr. 102/4-9 ("In resolving the second issue, the first thing that the court must decide is whether the contractual provisions pertaining to the schedule of prices, the NAS and the payment of invoices were included in the contract for the benefit of the surety.").

Landmark far exceeded the value of work performed by Landmark at termination. The direct result of those overpayments was damage to Lumbermens because there were insufficient funds remaining to complete the work and Lumbermens incurred damages in excess of $4.1 million under its performance bond to complete the project.

### 1. The Navy Paid Landmark Invoices Notwithstanding the Absence of the Mandatory Progress Payment Certification.

The facts clearly establish that the government materially departed from mandatory contractual provisions related to payment and the security of retained funds. FAR 52.232-5(c) provides that "with each request for progress payments, the Contractor shall furnish the following certification, or **payment shall not be** made . . . :

> I hereby certify, to the best of my knowledge and belief, that –
>
> (1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;
>
> (2) Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and requirements of chapter 39 of Title 31, United States Code;
>
> (3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract; and
>
> (4) This certification is not to be construed as final acceptance of a subcontractor's performance."

FAR 52.232-5(c) (emphasis added). This certification is mandatory. See, e.g., Thomas & Sons Building Contractors, Inc., ASBCA No. 53395, 05-2 B.C.A. ¶ 33,083 ("correctly certified invoices must be provided 'or payment shall not be made'") (quoting FAR 52.232-5). Accordingly, in the absence of the acquired certification, payment is prohibited. Here, Landmark failed to submit a single invoice that contained the required certification.

Nevertheless, the government paid Landmark's invoices. These payments in violation of the mandatory payment provisions reduced the funds available to remedy the contractor's default, and accordingly increased Lumbermens suretyship obligation. These payments make the government liable to Lumbermens for the losses it sustained. See Nova Casualty, 72 Fed. Cl. at 763.

**2. The Navy Violated the Terms of the Contract When it Paid Landmark for Construction Work Without the Schedule of Prices Required by § 01200, ¶ 1.2.**

In addition to its failure to require Landmark to submit the mandatory progress payment certification, the Navy also failed to require Landmark to submit a schedule of prices before it paid Landmark for any construction work. The contract clearly states that "payments for construction work will not be made until the Schedule of Prices has been approved by the Contracting Officer." The contracting officer informally waived this requirement, and the Navy paid Landmark $4,560,377.76 for construction services. [25]

The government argued at trial that the schedule of prices component of the NAS satisfied the requirements of § 01200, ¶ 1.2. However, the schedule of prices component of the NAS used by the Navy here in lieu of that required by § 01200, ¶ 1.2 failed to provide either "quantities for each of the various kinds of work" or "unit prices," both of which are expressly required by § 01200, ¶ 1.2. The contracting officer conceded that the NAS did not contain either of those pieces of information. Tr. 232/19-24. Thus, the schedule of prices component of the NAS on which the government relies for this argument was less stringent that that required by § 01200, ¶ 1.2 The government's argument on this point is identical to the argument raised in the dissent, but rejected by the majority opinion, in National Surety:

[25] Because Landmark was permitted to invoice for its bond and design costs in invoice number 1 without the construction schedule of prices, the amount of invoice 1 is excluded from this total.

> The dissent argues that it was not necessary for the government to require the submission of the "complete project arrow diagram" . . . because the contractor submitted and the government accepted a "progress curve" (independently required by [the contract]). We are not told how meeting this lesser performance condition relieved the contractor of its obligation concerning the greater one, compliance with which was a condition to release of the retainage requirement.

National Surety, 118 F.3d at 1547 n.2.

Of course, there are *additional* problems here for the government not present in National Surety. Here, the purported substitute performance (the NAS) was neither contract compliant nor approved by the contracting officer, both of which were conditions on its use even as the NAS, much less the schedule of prices required by § 01200. See, infra, § III, B.3. As a result, the government's argument that the NAS satisfied the requirements of § 01200, ¶ 1.2 must fail. The Navy violated the terms of the contract when it paid Landmark for construction services without obtaining and approving the schedule of prices required by § 01200, ¶ 1.2.

**3. The Navy Violated the Terms of the Contract When it Paid Landmark's Invoices Based on an Un-approved and Noncompliant NAS.**

Perhaps the most significant failure by the government was the contracting officer's failure to review and approve a NAS that complied with the requirements of § 01321, because this violation rendered the concept of "progress payments" meaningless. The contract required Landmark to submit a NAS that complied with the requirements of § 01321. The contract required the contracting officer to review the NAS to ensure it complied with the requirements of § 01321 and approve it only if it did. The contract also required that an approved NAS be updated and submitted with each invoice. All of these requirements were vital, because the NAS was expressly intended to provide "the basis for requesting progress payments" and was the one document upon which the government could rely to ensure that progress payments were commensurate with work performed. However, all of these requirements were ignored or

violated. As a result, the Navy used a NAS from which it could not determine whether the progress payments it approved were commensurate with the work performed by Landmark. Thus, by the Navy's own reckoning, it had paid 39% of the contract funds to Landmark while Landmark had performed only 15% of the work. Had the Navy complied with the payment provisions of the contract—in particular those pertaining to the content and approval of the NAS—it could have ensured that the payments were commensurate with the work performed, there would have been no overpayment and Lumbermens would not have been damaged.

There are a great many problems with the NAS and the manner in which the Navy used—or failed to use—it:

- It did not contain the required number of activities.
- Not all the activities were priced.
- When an activity was priced, the activity was so poorly defined that the Navy could not tell what the price was for.[26]
- Not all the activities had responsibility codes.
- There was no critical path in the schedule in which these activities resided.

The magnitude of these problems is significant because the NAS was the foundation for progress payments. Because there were an insufficient number of activities, because the activities weren't defined, because the activities weren't priced and because they weren't properly scheduled, the NAS could not be used for the very purpose it was intended. That is exactly what happened here. As the contracting officer testified, he "didn't use the NAS." Tr. 389/11. Indeed,

---

[26] For example, the activity for "doors and windows" was priced at $500,000. However, neither Mr. McAteer nor Mr. Santiago had any idea how that price was split between doors and windows. The activities for both "electrical supplies" and "mechanical supplies" suffered from the same infirmity, as did "siding" and "paint".

Mr. Santiago didn't "have any idea" whether the NAS used by the Navy complied with the contract requirements. Tr. 239/25. Yet an approved and compliant NAS was a mandatory component of a proper invoice, a point with which the contracting officer agreed. Tr. 239/11-14.

In this case, the NAS used by the Navy did not show the percentage of work performed by Landmark. Instead, what it measured, according to the contracting officer, was the percentage of contract price paid.[27] Tr. 360/7-12. In fact, many of the activities that actually were priced in the NAS were paid by the Navy simply as a *function of time*, without any regard to whether work was actually accomplished.[28]

The Navy's use of a NAS that did not comply with the requirements of § 01321 and was not approved by the contracting officer violated the terms of the contract. It resulted in improper payments to Landmark. Indeed, because a compliant and approved NAS was required for every invoice, *the Navy should not have paid a single one of Landmark's invoices.* These improper payments reduced Lumbermens' security and materially increased its risks and, to the extent these improper payments were not used to perform work on the project, Lumbermens is discharged from its obligations under the performance bond.

**4. The Navy Violated the Terms of the Contract When it Paid for Materials Without Obtaining Any Evidence Either that Landmark Had Title to the Materials or that the Materials Were Onsite.**

The contract permitted the Navy to pay Landmark for materials prior to their incorporation into the project, but only if (a) the materials were onsite or (b) Landmark provided evidence that it had acquired title to the materials. However, the Navy made no effort to determine if either of these conditions was satisfied. Accordingly, the Navy's payment to

[27] Mr. Paullin, the government's scheduling expert, testified that "actually, the percent complete on the NAS on a particular date is the percent billed." Tr. 1484/9-10.
[28] See Tr. 1487/15-18.

Landmark for the material violated the terms of the contract. As a direct result of these improper payments by the Navy, Lumbermens was damaged, because those improper payments reduced the funds available to Lumbermens to complete the project upon Landmark's default.

Of course, this particular count of the complaint assumes, as it must, that Landmark actually purchased the material for which it was paid by the Navy. As the evidence established, Landmark did not purchase the material for which it was paid. This dilemma is the result of–and further demonstrates–the Navy's failure to comply with the payment terms of the contract. Had the Navy complied with the payment provisions of the contract, either (1) it would not have paid for the material or (2) it would actually have material to provide to Lumbermens after Landmark's termination. As it turned out, because the Navy violated the contract's payment provisions, it paid Landmark for material that was never even ordered by Landmark, much less delivered to the project site. As a result, after Landmark's termination, not only was the surety deprived of contract funds that should have been available, it was forced to essentially "repurchase" material (and services) for which the Navy had already paid.

**5. The Contracting Officer Abused Any Discretion He May Have Had in Approving Landmark's Invoices Because He Completely Abdicated His Responsibility in the Payment Process.**

The facts also establish that the contracting officer abused any discretion he may have had in making progress payments. As this Court has recognized:

> various cases suggest that if the Air Force abused its discretion in making progress payments that ... could be viewed as an impairment of plaintiff's suretyship and give rise to damages. "During the performance of the contract," the Court of Claims once stated, "the Government has a duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract." *Argonaut Ins. Co. v. United States*, 193 Ct. Cl. 483, 434 F.2d 1362, 1368 (1970); *see also Nat'l Surety*, 118 F.3d at 1546; *U.S. Fidelity & Guaranty Co.*, 475 F.2d at 1384. …

U.S. Fire Ins. Co. v. United States, 78 Fed. Cl. 308, 330 (2007) (quoting from American Ins. Co. v. U.S., 62 Fed. Cl. 151, 157-58 (2004)). However, "where a contracting officer fail[s] to exercise his own independent judgment . . . 'it would represent an abdication rather than an exercise of his discretion'". SIPCO Servs. & Marine Inc. v. United States, 41 Fed. Cl. 196, 220-21 (1998) (internal quotations omitted).

This Court's decision in CEMS, Inc. v. United States, 65 Fed. Cl. 473 (2005), illustrates this doctrine. There, the court found that the contracting officer's testimony at trial reflected a pattern of releasing authority to subordinates and revealed significant detachment from the decision-making process. Specifically, in that case, the court found that the contracting officer relied almost exclusively on determinations by the contracting officer's technical representative ("COTR").

The contracting officer testified that he did not know whether the COTR had conducted a critical path analysis, or had interviewed pertinent witnesses in the course of preparing the contracting officer's final decision ("COFD"). In addition, the contracting officer did not know that the contractor had submitted substantial, notarized bid information, which discredited the COTR's rejection of a claim on the ground that CEMS had not provided its bid information.

Upon reviewing the contracting officer's testimony, the CEMS court found that "even accounting for the passage of time from adjudication to the trial, the contracting officer seemed remarkably unfamiliar with the relevant back up documents." 65 Fed. Cl. at 480; citing Marshall Associated Contractors, Inc. & Columbia Excavating, Inc., 2001-1 B.C.A. (CCH) ¶ 31,248, at 154,259, 2001 WL 59573 (I.B.C.A.2001) (finding that the contracting officer abused his discretion by relying entirely upon the advice of his technical personnel). On these facts, the CEMS court found that the contracting officer's pattern of detachment from the claim

adjudication decision making process demonstrated that "the contracting officer released his responsibility to such a degree that his actions, or inactions, were unreasonable." 65 Fed. Cl. at 480 citing Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 421, 427 (2002).

Here, the contracting officer faced no pressure, he simply didn't do his job. He waived the requirement for the schedule of prices required by § 01200, ¶ 1.2. He did not even review, much less approve the NAS (including the schedule of prices component of the NAS). He did not analyze a single invoice; he simply ensured the math was correct. He never asked to see a single bill of lading, invoice or other document establishing Landmark had obtained title to the material for which it was invoicing. He had no idea what he was what he was paying for when he approved an invoice. Instead, he simply looked for the signatures of Mr. McAteer and Mr. Martin. As long as their signatures were present, he simply approved the invoices.

Moreover, because neither Mr. McAteer nor Mr. Martin actually did anything to ensure the accuracy of the amounts billed by Landmark, *the contracting officer in effect ceded his responsibility to approve both the NAS and invoices to Landmark*. As a result, whatever Landmark asked for, the contracting officer approved it. There can be no greater abdication of the contracting officer's role or responsibility than to give to the contractor the responsibility of approving invoices.

**C. Lumbermens Proved its Claims Under the Takeover Agreement.**

Finally, Lumbermens proved at trial its claims under the Takeover Agreement. First, the facts prove Lumbermens' claim in Count 14 that, in violation of paragraph 10 of the Takeover Agreement, the government failed to provide to Lumbermens all of the materials two which the government had obtained title by virtue of its payment of Landmark's invoices. Second,

Lumbermens proved that the government improperly withheld liquidated damages from the contract balance otherwise due Lumbermens.

1. **The Navy Breached the Takeover Agreement by Failing to Provide the Materials to Which it had Title.**

In the Takeover Agreement, it promised to provide to the completing contractor all of the materials to which it had title. The Navy had title to all of the material for which it paid Landmark. However, the Navy failed to provide to Lumbermens the material to which it had obtained title. As a result, the Navy breached the Takeover Agreement.

Table 3, *infra*, lists the material the Navy paid for, the amount it paid, and the value of material made available to Lumbermens to complete the project. This data is taken directly from the final invoice approved for payment by the Navy (Def. Ex. 3-12) and the analysis of Mr. Smith, who quantified the value of material made available by the Navy (including both material incorporated into the project and that not incorporated into the project). The difference between these two amounts represents the damages suffered by Lumbermens as a direct result of the government's breach of that promise.

Of course, this particular count of the complaint assumes, as it must, that Landmark actually purchased the material for which the Navy paid. However, as the evidence established, Landmark did not purchase the material for which it was paid. This dilemma is the result of–and further demonstrates–the Navy's failure to comply with the payment terms of the contract. Had the Navy complied with the payment terms of the contract, it would have either (1) not paid for the material or (2) provided the material to Lumbermens after Landmark's termination.

**2. The Navy Improperly Withheld Liquidated Damages for Delays Attributable to Work on the FAF Units that Was Outside the Scope of Lumbermens Performance Bond.**

Pursuant to the Takeover Agreement, the parties agreed that there existed $7,392,381.24 in unpaid contract balance available to complete the project and would be paid by the government for that work. The FAF units were outside the scope of work bonded by Lumbermens. However, the government withheld $304,800 from the unpaid contract balance as liquidated damages for the "delay" associated with completing the FAF units. The Navy's withholding of liquidated damages for the completion of work that was outside the scope of the bonded performance violated the terms of the Takeover Agreement.

**3. The Navy Improperly Withheld Liquidated Damages from the Unpaid Contract Balance Because it Failed to (a) Account for the Impact of the FAF Units on the Bonded Work and (b) the Electrical Delay.**

Not only did the government withhold liquidated damages for the FAF units directly, it also failed to recognize (a) the diversion of resources to complete the FAF units resulted in a delay to the original scope of work and a differing site condition related to electrical work. As a result, the government withheld from the contract balance additional liquidated damages and (b) Atherton was delayed by a differing site condition affecting the electrical work. Simply stated, this additional, unbonded scope of work delayed Atherton's performance, as did the differing site condition. The government's failure to recognize and take into account both of these issues and extend the contract completion date was a breach of the Takeover Agreement.

Mr. Smith's report establishes that the impact on the base work was 74 calendar days. Pl. Ex. 333, pp. 53-54. Mr. Smith relied on the earned value method of establishing the impact of the FAF units on the base contract units. Tr. 1004/4. As Mr. Smith testified that the earned value method was the appropriate method to quantify that impact because

> A schedule approach doesn't account for the diverted resources that we saw during the project where Atherton's work forces and their subcontractors divested from the FAF units and because of that that eliminated the schedule analysis as a viable means to make that analysis.

Tr. 1008/25-1009/5. Of course, Mr. Smith's analysis makes perfect sense, because Atherton worked on the FAF units over a 14-month period, according to the as-built schedule. Tr. 1010/1-4. As a result, the completion date should have been extended by 74 days.

In addition, Mr. Smith's analysis proved that Atherton was delayed because of a differing site condition resulting from faulty electrical wiring. His analysis demonstrated that Atherton suffered a 46-day delay in this critical path, between January 31, 2002 and March 18, 2002, which extended the project completion date from April 23, 2002 to June 6, 2003. Pl. Ex. 333, pp. 55-56.

**D. <u>Lumbermens Proved its Damages.</u>**

Lumbermens pleaded several alternative counts in its First Amended Complaint. While the court may find in favor of Lumbermens on each of Counts 1-13, if the court finds in favor of Lumbermens on any of Counts 1-3, Counts 4-14 become irrelevant. However, Count 15 is independent of Counts 1-14. Thus, any damages to which the court finds Lumbermens entitled in Count 15 is in addition to any other damages.

The evidence establishes that Lumbermens is entitled to judgment in each of its discharge/impairment of suretyship causes of action. However, because Counts 1 and 3 encompass the damages suffered by Lumbermens on the other discharge counts, Lumbermens damages for discharge should be measured by either of those counts. As discussed below, Lumbermens is entitled to $2,768,624.73 under either Count 1 or Count 3.

In addition, Lumbermens is entitled to judgment on Count 15. The parties do not contest that the government withheld liquidated damages in the amount of $304,800.00 tied directly to

the completion of the FAF units. As a result, the uncontradicted testimony of Mr. Smith establishes that Lumbermens is entitled to <u>at least</u> $3,073,824.73.

Table 1 is a summary of damages pertaining to Lumbermens discharge/impairment of suretyship claims. In each row, Lumbermens identifies the particular count of the complaint, the amount of improper payment, the extent to which the improper payment was mitigated and the resulting damages.

**Table 1: Summary of Damages**
**(Discharge/Impairment of Suretyship Causes of Action)**

| Count | Amount of Improper Payment | Mitigation (Value of Work Performed by Landmark)[29] | Lumbermens's Damages |
|---|---|---|---|
| 1: Progress Payment Certifications | $4,793,633.76 | $2,025,009.03 | $2,768,624.73 |
| 2: Schedule of Prices | $4,560,377.76[30] | $2,025,009.03 | $2,535,368.73 |
| 3: NAS | $4,793,633.76 | $2,025,009.03 | $2,768,624.73 |
| 4: Doors and Windows | $375,000 | $87,500.00 | $287,500 |
| 5: Cabinets | $260,000 | $65,223.00 | $194,777 |
| 6: Paint | $156,000 | $18,827 | $137,173 |
| 7: Flooring | $485,940 | $99,658 | $386,282 |
| 8: Siding | $287,040 | $54,000 | $233,040 |
| 9: Abatement | $458,640 | $252,957 | $205,682 |
| 10: Personnel | $378,936 | $87,460[31] | $291,476 |

| | | | |
|---|---|---|---|
| 11: Sitework | $590,000 | $187,000 | $403,000 |

Table 2 provides a summary of damages for Count 14, breach of the agreement to provide Lumbermens the material to which the Navy had obtained title pursuant to its payment of Landmark for these materials. Each row of Table 2 lists the material at issue, the amount paid by the Navy, and the value of material provided to Lumbermens after termination (whether incorporated into a housing unit or not) and the resulting damages.

[29] With the exception of the value for "personnel," the numbers in this column are taken directly from Pl. Ex. 333, pp. 46-52.

[30] This amount is derived from subtracting the amount of invoice number 1 ($233,256.00) from the total amount paid to Landmark from the Navy.

[31] This amount is 12% of the personnel activity value of $728,934 as stated in Landmark's NAS. Def. Ex. 3-2, Activity 136.

**Table 2: Summary of Damages—Count 14**
**(Failure to Provide Government Property)**

| Materials Paid For | Amount Paid[32] | Value of Material Provided to Lumbermens[33] | Lumbermens Damages[34] |
|---|---|---|---|
| Doors and Windows | $375,000 | $87,500.00 | $287,500.00 |
| Cabinets | $280,000 | $65,233.00 | $194,776 |
| Toilets and Accessories | $100,000 | $15,620.00 | $84,380.00 |
| Paint | $156,000 | $18,827.00 | $127,173.00 |
| Mechanical Supplies | $220,000 | $101,029.50 | $118,970.00 |
| Electrical Supplies | $209,155 | $$173,766 | $35,389 |
| Flooring | $485,940 | $98,658.00 | $386,282 |
| Siding | $287,040 | $54,000 | $233,040 |
| Fireplace Mantels | $32,000 | $12,400 | $19,600 |
| | | **Total** | **$1,487,110** |

Table 3 provides a summary of damages for Count 15, the improper withholding of liquidated damages by the Navy. For ease of reference, Lumbermens segregated the liquidated damages assessed the FAF units themselves from the liquidated damages to be remitted after recognition of the additional time Lumbermens is entitled to as the result of (a) the electrical delay and (b) the impact of the FAF units on the original 160 base contract units.

[32] Amounts paid for material are taken from Def. Ex. 3-12, the last Landmark invoice paid by the Navy.

[33] These amounts are taken directly from Pl. Ex. 333, pp. 46-52.

[34] These amounts are taken directly from Pl. Ex. 333, pp. 46-52.

**Table 3: Summary of Damages—Count 15**
**(Improper Assessment of Liquidated Damages)**

| Basis for Remission of Liquidated Damages | Amount of Remission |
|---|---|
| Liquidated damages assessed solely against the completion of the FAF units | $304,800 |
| Liquidated damages assessed during periods of delay resulting from electrical issues and the FAF impact on base units | $548,425 |

As discussed in greater detail below, Lumbermens is entitled to at least $304,800 as a result of the Navy's withholding of liquidated damages to complete the FAF units, which were outside the bonded scope of work and, as a result, could not be used as the basis for withholding liquidated damages from the contract balance available at termination of Landmark's contract.

1. **Lumbermens is Entitled to Damages in the Amount of $2,768,624.73 as the Result of the Navy's Failure to Require Progress Payment Certifications or to Obtain and Approve a NAS that Complied with the Requirements of the Contract.**

In the face of the facts establishing impairment of suretyship, the government must establish that Lumbermens did not suffer any prejudice from the improper payments or that the Lumbermens' prejudice was mitigated. National Surety, 118 F.3d at 1548; Reliance Ins. Co. v. Colbert, 124 U.S. App. D.C. 339, 365 F.2d 530, 535 (D.C. Cir. 1966); see also Mergentime Corp. v. Washington Metro. Area Transit Auth., 775 F. Supp. 14, 21 (D.D.C. 1991) (stating that the "obligee bears the burden of persuasion on the issue of prejudice"). To carry its burden, the government must produce specific evidence showing that Landmark used the government's improper payments to reduce Lumbermens' subsequent performance. See, e.g., Ramada Development Co. v. U.S. Fidelity & Guar. Co., 626 F.2d 517, 521-22 (6th Cir. 1980).

As set forth by the Federal Circuit in National Surety:

> [The surety's] recovery should not exceed any losses that ensued, directly or indirectly, from the impairment of the security. Thus it is relevant to consider what the contractor did with the released funds. If the unauthorized payments were expended for the purposes of the contract so that the extent of the surety's subsequent performance was reduced thereby, any injury to the surety would to that extent be mitigated.

118 F.3d at 1548. Notably, the government must produce specific, calculable evidence of mitigation in order to reduce the extent of Lumbermens' presumed prejudice. "If that prejudice proves impossible of rational measurement, the surety must receive a total discharge" of the improper payment. Reliance Ins. Co. v. Colbert, 365 F.2d 530, 535 (D.C. Cir. 1966); see also RESTATEMENT OF SECURITY § 128, cmt f (1941) ("If the change imposes a danger of loss upon the surety which cannot fairly be measured, the surety is discharged entirely.") If, on the other hand, the prejudice is subject to measurement, "the surety must receive only a partial discharge, measured by the extent of that prejudice." Reliance, 365 F.2d at 535.

Here, the government simply failed to offer *any* evidence of mitigation on the discharge claims advanced by Lumbermens. That is, the government provided no evidence whatsoever of mitigation with respect to Counts 1-13 of the Amended Complaint. Mr. Paullin stated so in his testimony.[35] Mr. Wright, the government's expert regarding damages, did evaluate eight individual line items:

> Q: So let's go back to my question then. My question was did you take the $4.7 million in total paid by the Navy to Landmark and determine how much of that $4.7 million was actually used by Landmark to perform work on the project?
>
> A: Components for the $4.7 million are broken down by the schedule of prices, so those payments that relate to the eight items that we've addressed, then yes we have because we've calculated the percentage of completion of those eight items. So I haven't done it in total for the $4.7 million, but I've done it for the eight specific line items in the complaint.

[35] Tr. 1472/3-9 (did not offer in his report any opinion or draw any conclusions regarding the damages claimed by Lumbermens).

Tr. 1858/7-19. However, Mr. Wright also testified that the analysis he performed and on which he testified was not based on how much the government paid Landmark, but the relative costs incurred by Landmark and Atherton. See Tr. 1858/20-1860/7. As a result, his analysis is not even relevant on this issue because Mr. Wright offered no opinion at all on the key issue of mitigation—whether "the unauthorized payments were expended for the purposes of the contract so that the extent of the surety's subsequent performance was reduced thereby." National Surety, 118 F.3d at 1548. *Mr. Wright simply did not answer the question of how much of what the government paid Landmark for the eight items he evaluated was actually used by Landmark to reduce the surety's liability.* As a result, the *only* evidence before the Court on mitigation is that offered by Lumbermens through the testimony of Mr. Smith.

Moreover, to the extent the court finds that Mr. Wright actually testified on the issue of mitigation–at least with respect to the eight individual line items he does address–his expert testimony should be ignored. The admissibility of expert testimony is governed by the standards articulated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and Federal Rule of Evidence 702. Under Daubert and Kumho, courts must only admit expert opinions that are related to the issues in dispute and are reliable and non-speculative. Daubert, 509 U.S. at 589 ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); Kumho Tire, 526 U.S. at 152 (extending Daubert to non-scientific, technical or specialized expert evidence); Microstrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1355 (Fed. Cir. 2005). To establish reliability, Defendant must show that the proffered expert correctly employed methods that are well founded in the knowledge and practice of his discipline to an appropriate and adequate set of facts and data. Daubert, 509 U.S. at 589; Kumho Tire, 526 U.S. at 152

(noting that Daubert's relevancy and reliability requirements are intended "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."); see also Fed. R. Evid. 702 (providing that an expert witness may testify in the form of an opinion if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.").

Daubert identified a non-exclusive list of factors that a court may consider in deciding whether an expert's methodology and, ultimately, opinion is reliable. Where appropriate, the court should consider whether a proffered expert's methodology (1) can be, or has been tested; (2) whether the methodology has been subjected to peer review and/or publication; (3) whether the methodology has a known rate of error; (4) whether there are standards governing the use of the methodology, and whether those standards were followed by the expert; and (5) whether the methodology has gained general acceptance within the expert's field for the purposes for which it has been employed. See Daubert, 509 U.S. at 593-94. Mr. Wright's modified cost-to-cost methodology as applied by him here fails to satisfy any of these considerations.

As Mr. Wright acknowledged, the cost-to-cost methodology is intended to be used in the context of a single contractor on a single contract as an alternative method of determining that contractor's percent complete; there is nothing in Statement of Position 81-1[36] that discusses the application of the cost-to-cost methodology relied upon by Mr. Wright on the facts presented in this case– two different contractors working consecutively on the same project. Tr. 1764/24-

[36] SOP 81-1 represents generally accepted accounting principles for revenue recognition for long-term construction contracts. Tr. 1762/24-1763/1. Mr. Wright relied on SOP 81-1 throughout his testimony and in his report.

1765/4. Mr. Wright in his report attempts to extend that generally accepted method of determining percent complete to an entirely different situation presented by these facts. As Mr. Wright further acknowledged:

- There is nothing in the literature that describes how to apply the cost-to-cost methodology in this context; Tr. 1765/5-16.
- He's never seen anybody else apply the cost-to-cost methodology as he did in this case; Tr. 1765/19-1786/15.
- He's not aware of any article or peer reviewed paper in which the cost-to-cost methodology has been applied as he did; Tr. 1766/16-1767/4.

Not only has the cost-to-cost method not been used (except by Mr. Wright) in this context, the manner in which he used it is contrary to the very GAAP (SOP 81-1) on which he relied for authority. For example, SOP 81-1 is used to determine *contract* completion. Mr. Wright used it on individual line items within the Schedule of Prices component of the NAS, including *material* line items.[37] However, SOP 81-1 specifically states that uninstalled materials not specifically produced or fabricated for the project should be disregarded because they do not relate to contract performance.[38] Of course, none of the material actually purchased by Landmark for this project was specifically produced for this project and, as a result, consistent with GAAP, it may not be considered in determining Landmark's percentage of completion unless it is actually installed in the project. However, Mr. Wright tried to argue that consideration of uninstalled material was proper in this case *because of the geographic location of the project*, as if Whidbey Island Naval Air Station was somehow inaccessible and in the middle of the Pacific Ocean. Tr. 177/3-10. That simply is not a credible reason to violate GAAP.

---

[37] See Tr. 1767/5-21.

[38] Tr. 1769/20-1770/21.

In the end, this Court is left with nothing but this—the assertion that Mr. Wright's application of the cost-to-cost method in these unique circumstances is appropriate only because Mr. Wright says so. Ultimately, a court may not simply rely on an expert's assurances that his methods and opinions are reliable; rather, a court must exercise its independent gatekeeping authority to admit only reliable expert testimony. General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."). Because the methodology underlying Mr. Wright's opinion is untested, unguided, and not generally employed when applied in the manner he described, his testimony based on this methodology should be excluded as unreliable. See LifeWise Master Funding v. Telebank, 374 F.3d 917, 929 (10th Cir. 2004) (finding a damages model unreliable where it was "unique to this case and not based on any recognized standard," "not in regular usage," "not peer reviewed," and "has no uniform usage in any known industry.").

Even if the cost-to-cost methodology could be applied as modified by Mr. Wright to these facts, he injected even further unreliability into his conclusions. First, Mr. Wright makes no distinction between materials costs that Landmark *actually* incurred, i.e., paid to its suppliers and subcontractors, and its *obligations* to pay for materials that were never satisfied. That is, whether or not Landmark actually paid for the materials it ordered or services rendered, it incurred a "cost" for the purposes of Mr. Wright's cost-to-cost method and was credited for performance. Tr. 1800/25-1801/3. By affording identical treatment to accounts paid and unsatisfied accounts payable, the cost-to-cost method as applied by Mr. Wright routinely overestimates actual costs where a terminated contractor does not pay its bills which, as the

government stipulated, happened here. As a result, Mr. Wright credited Landmark with far greater work than it actually performed.

Second, Mr. Wright ignores primary sources of data regarding Landmark's actual expenditures for project materials and instead relies solely upon Landmark's self-reporting of its job-to-date costs, the accuracy of which is assumed under Wright's methodology. For example, he testified that Landmark incurred costs of $162,000 for cabinets. Tr. 1777/4-8. However, the evidence he reviewed and considered in forming his opinion establishes that Landmark had purchased only $84,560.98 worth of cabinets and had actually only paid $38,213.56 of that amount. Tr. 1778/2-10; Pl. Ex. 307. The balance was actually paid by Lumbermens under its payment bond. He considered, but discounted, the supplier invoices and accounting documents, the sworn deposition testimony of the supplier, the government's own inventory of materials and the inventory prepared by Atherton and, instead, relied blindly upon Landmark's job cost report, the accuracy of which he assumed. Tr. 1781/15-1782/21.

Of course, he didn't always assume the accuracy of Landmark's job cost records. Indeed, he ignored those records and the cost-to-cost method if it didn't produce the "right" result. For example, he ignored the job cost records for siding because he didn't believe the job cost record was accurate. Tr. 1788/1-25. Relying on Landmark's job cost records would have resulted in a much smaller percentage of percent complete for Landmark than the "unit price" methodology he ultimately applied for this line item. Thus, Mr. Wright employed whatever methodology suited him. Neither Mr. Wright's methodology, nor his application of that methodology by Mr. Wright, is a reliable basis for his testimony. Mr. Wright's testimony should simply be ignored.

On the other hand, Mr. Smith's approach is reliable. He considered all available data to determine how much of the $4.8 million paid by the Navy to Landmark was actually used by Landmark to perform work and thereby decrease the surety's obligation. In Pl. Ex. 333A, Mr. Smith summarized the damage to which Lumbermens is entitled as a result of the government's failure to comply with the payment provisions of the contract. His report established that the government overpaid Landmark by $2,768,624.73, the difference between the amount paid by the Navy and the value of work actually performed by Landmark. Mr. Smith's testimony on this issue is not only reliable and reasonable, it is uncontradicted.

2. **Lumbermens is Entitled to $1,487,110 Under Count 14, Because the Navy Failed to Provide Lumbermens the Material to Which the Navy Had Obtained Title.**

As Table 2 demonstrates, the Navy paid Landmark $1,487,110 for certain material. By virtue of that payment, the Navy had title to that material. As a result, material valued in that amount should have been provided to Lumbermens; that is, the material should have been in storage or incorporated into the MFH units. However, Mr. Smith's analysis proved that the Navy failed to provide material of that value to Lumbermens. As a result, Lumbermens was damaged in the amount of $1,487,110.

3. **Lumbermens is Entitled to $853,225 As Damages for Breach of the Takeover Agreement as the Result of Improper Deductions for Liquidated Damages.**

In addition, Mr. Smith quantified the effect of the government's decision to assess liquidated damages for completing the FAF units. As Pl. Ex. 333B shows, the Navy withheld $304,800.00 in liquidated damages–tied directly to the FAF units themselves; that is, the $304,800.00 does not include any amount for overall project delay. On that point, there is no testimony from either Mr. Paullin or Mr. Wright that contradicts Mr. Smith's conclusion. As a

result, the uncontradicted testimony of Mr. Smith establishes that Lumbermens is entitled to *at least* $304,800 on Count 15.

In addition, however, Mr. Smith's report and testimony established that the Navy should have extended the contract completion date even further, as a result of both the electrical delay and the effect that working on the FAF units had on the bonded contract performance. As Mr. Smith demonstrated, the additional liquidated damages withheld by the Navy for those two delays total $548,425. As a result, Lumbermens is entitled to $853,225 under this count.

Of course, Mr. Paullin and Mr. Smith disagreed as to both whether the completion of the FAF units resulted in an overall delay to the project and to whether there was a delay to the critical path as a result of the differing site condition regarding the electrical issue. However, even if the court were to accept Mr. Paullin's opinions on those issues, left unresolved would be the question of the liquidated damages assessed by the Navy for the completion of the FAF units themselves. Even Mr. Paullin agreed that, should the court find that the Navy improperly assessed liquidated damages for the completion of the FAF units, Lumbermens would be entitled to the remission of those liquidated damages. Def. Ex. 20, p. 9.

## IV. CONCLUSION

The Navy breached its duty to administer the Landmark contract so as not to materially increase Lumbermens's risk under that contract. The Navy failed miserably in the performance of that duty because it failed to enforce the mandatory payment provisions in the contract and, as a result, paid Landmark millions it should not have. When the Navy terminated Landmark's contract for default, the contract balance available to Lumbermens to complete performance contained $2,768,624.73 million less than it should have. When the Navy promised to make the

remaining contract balance available to Lumbermens to complete the project with a new contractor, the Navy breached that promise by improperly withholding liquidated damages and refusing to pay out the remaining contract balance. As a result, Lumbermens was damaged in the amount of $853,225. Accordingly, as the direct result of (1) the Navy's failure to administer the Landmark contract according to its terms and (2) its breach of the Takeover Agreement, Lumbermens is entitled to judgment in the amount of $3,621,849.73. Lumbermens respectfully requests that the Court enter judgment in favor of Lumbermens in that amount.

Respectfully submitted,

By:_________/s/________________
Mark G. Jackson

GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for
Lumbermens Mutual Casualty Company

August 8, 2008

SEA_DOCS:898318.1 [13281-00100]